EXHIBIT 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF MISSISSIPPI

3    Will McRaney,                    )
                                      )
4         Plaintiff,                  )
                                      )CASE NO.
5    vs.                              )1:17-cv-00080-GHD-DAS
                                      )
6    The North American Mission       )
     Board of the Southern Baptist    )
7    Convention, Inc.,                )
                                      )
8         Defendant.                  )

9

10

11                 DEPOSITION OF

12                  KEVIN EZELL

13               March 2, 2023

14                  8:58 a.m.

15

16              Butler Snow, LLP

17          1170 Peachtree Street NE

18               Suite 1900

19             Atlanta, Georgia

20

21      Robin K. Ferrill, CCR-B-1936, RPR

22

23

24

25

```
                                          Page 2
 1                    APPEARANCES OF COUNSEL
 2    On behalf of the Plaintiff
      SCOTT E. GANT, Esquire
 3    VICTORIA SCORDATO, Esquire
           Boies Schiller Flexner LLP
 4         1401 New York Avenue, NW
           Washington, DC   20005
 5         202.237.2727
           sgant@bsfllp.com
 6         vscordato@bsfllp.com
 7
 8    On behalf of the Defendant
      TIMOTHY J. PERLA, Esquire
 9         WilmerHale LLP
           60 State Street
10         Boston, Massachusetts 02109
           617.526.6000
11         timothy.perla@wilmerhale.com
12
13
14    On behalf of the Defendant
      KATHLEEN CARRINGTON, Esquire
15         Butler Snow LLP
           1170 Peachtree Street NE
16         Suite 1900
           Atlanta, Georgia 30309
17         678.515.5000
           kat.carrington@butlersnow.com
18
19
20
21    ALSO PRESENT:
22         Mike Brown, Videographer
23         Will McRaney
24         George McCallum, NAMB In-house Counsel
25
```

```
                                              Page 12

 1                      DEPOSITION OF
 2                       KEVIN EZELL
 3                      March 2, 2023
 4           THE VIDEOGRAPHER:  We are on the record.
 5      Today's date is March the 2nd, 2023.  The time
 6      on the video monitor is 8:58 a.m.  This marks
 7      the beginning of video Number 1, deposition of
 8      Kevin Ezell, in the matter of Will McRaney
 9      versus the North American Mission Board of
10      Southern Baptist Convention, Incorporated.
11      Location of the deposition is 1170 Peachtree
12      Street, Atlanta, Georgia.
13           MR. GANT:  I'm sorry.  If you're not asking
14      the question.  The typing is really loud so --
15           MS. CARRINGTON:  Oh, okay.
16           MR. GANT:  -- if you could not ...
17           THE VIDEOGRAPHER:  My name is Mike Brown,
18      representing Veritext Legal Solutions.  I'm the
19      videographer.  The court reporter is Robin
20      Ferrill.
21           Counsel, please state your name for the
22      record and who you represent.
23           MR. GANT:  Scott Gant from Boies Schiller
24      Flexner, for the plaintiff, Dr. Will McRaney.
25      With me is my colleague from my law firm,
```

Page 13

1      Victoria Scordato, and Dr. McRaney is also

2      present.

3              MR. PERLA:  Timothy Perla, WilmerHale, for

4      the defendant and the witness.

5              MS. CARRINGTON:  Kat Carrington, Butler

6      Snow, LLP, for the defendant and the witness.

7              MR. McCALLUM:  George McCallum with the

8      North American Mission Board, serving as

9      in-house counsel.  I'm here for the North

10      American Mission Board and the witness.

11              THE VIDEOGRAPHER:  Will the court reporter

12      please swear in the witness.

13  DR. KEVIN EZELL,

14          called as a witness, having been duly sworn

15  by a Notary Public, was examined and testified as

16  follows:

17  EXAMINATION

18  BY MR. GANT:

19      Q.  Good morning, Dr. Ezell.

20      A.  Good morning.

21      Q.  I introduced myself a few minutes ago, but

22  just to repeat, my name is Scott Gant.  I represent

23  Dr. McRaney, the plaintiff in this case, against the

24  North American Mission Board.

25              I would ask Robin to hand you what I have

Page 26

1      Q.   All right.  If you use that term, I'll
2  understand what that means.  If I use BCMD, you will
3  understand what I'm referring to.
4      A.   All right.
5      Q.   Same thing.
6           Prior to the time that Dr. McRaney became
7  the executive director of the BCMD, you never met him
8  in person, correct?
9      A.   No.
10     Q.   Sorry.  Had you ever met him in person
11  before he became executive director of BCMD?
12     A.   No.
13     Q.   Had you ever communicated in any way with
14  Dr. McRaney before he became executive director of
15  BCMD?
16     A.   Not to my knowledge.
17     Q.   Were you aware of who he was before he
18  became the executive director of the BCMD?
19     A.   No.
20     Q.   And if I understand your testimony, you
21  have only met with Dr. McRaney in person twice, is
22  that correct?
23     A.   To my knowledge.
24     Q.   Now, the first meeting in person with
25  Dr. McRaney that you had you indicated was shortly

Page 27

1    after he became the executive director, is that

2    correct?

3        A.   Yes.

4        Q.   Do you remember the month and year of that

5    meeting?

6        A.   I do not.

7        Q.   Do you remember what year Dr. McRaney

8    became the executive director of BCMD?

9        A.   I think it was '13.

10       Q.   2013?

11       A.   2013.

12       Q.   Do you remember what month and year

13   Dr. McRaney was terminated by BCMD?

14       A.   I think it was 2015, but I don't know the

15   dates.

16       Q.   What was the purpose of meeting with

17   Dr. McRaney in person that first time?

18       A.   There are 42 state conventions.  Fifteen of

19   those state conventions give us 90 percent of our

20   revenue.  The other 27 are much smaller and I

21   delegate those to regional guys.

22            And so when a new state comes on, I connect

23   so that we are -- got my cell phone.  I'll see if

24   there's any specific needs they might have; in his

25   case, communicated the challenge of having an

Page 28

1   apartment and a home in Florida, an apartment in

2   Maryland/Delaware, and that's when we initiated the

3   $30,000 gift to pay for his first year's rent.

4   So ...

5         Q.   Was that the purpose of the meeting?

6         A.   The purpose of the meeting is get to know

7   him.  And then a part of that, anytime there's a new

8   state exec, you know, I ask if there are other --

9   what's your biggest need and how can we be the

10  best -- I mean, were there -- in their case they are

11  our biggest partner, so how can we help?  And in that

12  case it was rent.

13        Q.   Do you remember where that first meeting

14  occurred?

15        A.   Yeah.  I don't remember the hotel, but we

16  were -- I remember the meeting; but said, hey, if you

17  got some time, come up to the room and I would just

18  love to get to know you better.  It was a -- it was a

19  crowded lobby and everybody kept stopping in so it

20  was one of those -- just like get to know his

21  background, that type of thing.

22        Q.   So the meeting wasn't planned in advance?

23        A.   Oh, no, no.

24        Q.   It was impromptu?

25        A.   Impromptu.

1      Q.   And where -- what city was this in?

2      A.   I don't remember.

3      Q.   Do you remember what event this was in

4   connection with?

5      A.   I don't.

6      Q.   How long was this meeting?

7      A.   I don't remember.

8      Q.   Was it in your hotel room?

9      A.   My hotel room, yeah.  It was brief, less

10  than an hour.

11     Q.   You don't know how much less?

12     A.   I have no idea.

13     Q.   Did you take any notes from that meeting?

14     A.   No.

15     Q.   Was anyone else present?

16     A.   No.

17     Q.   Just the two of you?

18     A.   Yes.

19     Q.   And then the second and only other meeting

20  you ever had with Dr. McRaney in person occurred

21  when?

22     A.   That I recall, was the one in Baltimore

23  with his leadership.

24     Q.   Do you remember what year?

25     A.   It was -- I believe it was in spring --

Page 33

1          MR. PERLA:  Objection.  Misstates the

2     testimony.  Go ahead.

3     A.    Mr. Christopherson was the representative

4 for Maryland/Delaware.  At some point we transitioned

5 to Steve Davis, but they continued to work together

6 to my knowledge.

7     Q.    (By Mr. Gant) Notwithstanding whether and

8 how they worked together after the transition, do you

9 recall when the transition occurred?

10     A.    I do not.

11     Q.    So you don't know on what date or month

12 Steve Davis became the vice president for the

13 Northeast Region at NAMB?

14     A.    No.

15     Q.    So we discussed your in-person meetings

16 with Dr. McRaney and we'll come back to the second

17 one later.

18          Have you ever spoken on the phone with

19 Dr. McRaney one-on-one?

20     A.    I don't recall.

21     Q.    Have you ever spoken on the phone with

22 Dr. McRaney with others participating?

23     A.    I don't recall.

24     Q.    Have you ever texted with Dr. McRaney?

25     A.    I don't recall.

Page 34

1      Q.   Have you ever -- strike that.

2           I know you have responded to a few e-mails

3      from Dr. McRaney at various points and we'll look at

4      those, some of them.  Have you ever, to your

5      recollection, initiated an e-mail to Dr. McRaney?

6      A.   I don't recall.

7      Q.   During your first meeting with Dr. McRaney

8      in person, did he make any threats to you?

9      A.   Not that I recall.

10     Q.   During your second in-person meeting with

11     Dr. McRaney, did he make any threats to you?

12     A.   Not that I recall.

13     Q.   Has Dr. McRaney ever sent you anything in

14     writing that threatened you?

15     A.   When he sent us -- sent us and the SBC

16     leaders and our trustees a note, I think it was -- I

17     can't remember the date when he sent kind of this

18     very long statement.  I remember at that point we did

19     feel threatened.

20     Q.   In what sense?

21     A.   My relationship -- I guess our relationship

22     with Mr. McRaney evolved.  Started very well I

23     thought.  We provided one year rent for him.  And we

24     were told he was intelligent, liked to talk about

25     himself, but other than that, it was very workable.

1          And over a period of time things began to

2     deteriorate or have challenges, Mr. Christopherson

3     and then Mr. Davis, and it evolved to the point --

4     when you see that note -- that he had characteristics

5     of being a bit unhinged and not -- very

6     unpredictable, hard to follow.  His version of facts

7     would not represent what my representatives would

8     say, and the inconsistencies.  So it was a build-up.

9     And so, yes, when he sent that, we did have a sense

10    of concern.

11         Q.   You just used the phrase "sense of concern"

12    earlier.  You said we did feel threatened.

13         A.   Yeah.

14         Q.   What kind of threat was it that you felt?

15    First, let's back up.

16         A.   Okay.

17         Q.   What do you remember about this

18    communication you just referred to as a note a few

19    minutes ago?  What was this note or communication?

20         A.    It was a long letter to my trustees and to

21    our SBC.  What I do remember about it is it was

22    written in such a way in which setting a narrative.

23    It was obvious it was trying to set a basis for some

24    type of lawsuit, and his narrative did not match the

25    facts of the interaction that we'd had.  And it was a

1    growing -- you know, when I said threat, it was a

2    growing concern that he's very unpredictable.

3         Q.   Unpredictable in what sense?

4         A.   I mean unpredictable.

5         Q.   Lots of things could be unpredictable.  A

6    baseball pitcher could be unpredictable in pitches he

7    throws.  There are all kinds of unpredictability, so

8    what kind of unpredictability?

9         A.   He's unpredictable in the fact you can't

10   predict.  Who knows?  And so ...

11        Q.   The note that you're referring to?

12        A.   Uh-huh.  Not his note.  It was a very long

13   e-mail.

14        Q.   I was using your word.  Okay.  So how

15   should we refer to it?

16        A.   Very long e-mail.

17        Q.   Okay.  This very long e-mail that

18   Dr. McRaney sent, that you said made you or NAMB feel

19   threatened and gave you a sense of concern, what

20   specific language in it gave you concern or made you

21   feel threatened?

22        A.   It was obviously a complete temperature

23   turn, going back and stating things that were not the

24   case, and that was the consistent problem, the

25   inaccuracy of statements, saying one thing and doing

Page 37

1   another, and the whole narrative listed in that long
2   e-mail was the same.
3           Q.   When you said that we did feel threatened,
4   what kind of threat?  Are you talking about physical
5   threat or something else?
6           A.   Unpredictable.  It just -- all I know is my
7   guys, they told me, look, he's -- he's very
8   unpredictable.  You don't know where he's going to
9   come from.
10          Q.   I'm asking you -- you used the word
11  "threat."
12          A.   Uh-huh.
13          Q.   Are you talking about a physical threat
14  or --
15          A.   He's unpredictable.  You don't know.  You
16  just didn't know.
17          Q.   So physical threat plus other threats?
18          A.   I don't know.  He's unpredictable.
19          Q.   Did anyone at any point ever tell you that
20  Dr. McRaney posed a physical threat to you or others
21  at NAMB?
22          A.   Are you referring to who?
23               MR. GANT:  Robin, can you read it back,
24          please?
25               (WHEREUPON, the record was read back by the

1    reporter as follows:

2         Question:  Did anyone at any point ever

3    tell you that Dr. McRaney posed a physical

4    threat to you or otherwise [sic] at NAMB?)

5         MR. GANT:  Anyone else.

6         THE REPORTER:  Anyone else.  Sorry.

7    A.    Anyone else at NAMB?

8    Q.    (By Mr. Gant) Let me try it again.

9    A.    Okay.

10   Q.    Did anyone at any point in time tell you,

11   Kevin Ezell, that Dr. McRaney posed a threat to you

12   or anyone else at NAMB?

13   A.    No one ever told me that he would cause a

14   threat.

15   Q.    Sitting here -- strike that.

16        What you call this very long e-mail that

17   you say did make you feel threatened and gave a sense

18   of concern, when is the last time you reviewed that

19   e-mail?

20   A.    I glanced at that with my attorneys.

21   Q.    When you say you glanced at it, does that

22   mean you didn't read it through?

23   A.    Parts of it.

24   Q.    Why did you only read parts?

25   A.    It's all I ever -- I just -- I didn't read

Page 85

1          A.    I just don't know who participated.    You
2     asked me who I knew participated.    Those two guys
3     did.
4          Q.    And one of them was not a board member,
5     right?
6          A.    Right.
7          Q.    Was Mark Dyer on the board at that time?
8          A.    Yes.
9          Q.    Do you know for a fact whether or not any
10    other nonboard members participated in the
11    examination?
12         A.    I have no knowledge.
13         Q.    I take it, based on your prior answers, you
14    don't know how the examination and review was
15    conducted, is that right?
16              MR. PERLA:  You can answer yes or no.
17         A.    No.
18         Q.    (By Mr. Gant) You don't know?
19         A.    No.
20         Q.    Did you ever see any written description of
21    the outcome of that review and examination?
22              MR. PERLA:  You can say whether you saw
23              something.  Don't say what it said if you saw
24              something.
25         A.    No.

Page 86

1    Q.   (By Mr. Gant) Did you ever discuss with
2    anyone the process for the examination and review
3    referred to in Exhibit 5?
4         MR. PERLA:  You can say yes or no whether
5         you discussed something.
6    A.   No.
7    Q.   (By Mr. Gant) Did you ever discuss with
8    anyone the outcome of the examination and review
9    described in Exhibit 5?
10        MR. PERLA:  Same idea.
11   A.   No.
12   Q.   (By Mr. Gant) Put that aside for the
13   moment.
14        Have you ever heard of a Timothy Reece?
15   A.   Yes.
16   Q.   Who is that?
17   A.   He's a former FBI agent, Tennessee.
18   Q.   How do you know him?
19   A.   I was interim pastor at Long Hollow Church
20   after a friend of mine died who was a pastor there,
21   for 10 months, and Tim was on my security detail.
22   Q.   Where is Long Hollow?
23   A.   It's in Hendersonville, Tennessee.
24   Q.   I'm sorry.  It's in what?
25   A.   Hendersonville, Tennessee.

Page 87

1      Q.   You said you had a security detail while
2   you were at Long Hollow?
3      A.   Yes.
4      Q.   Why?
5      A.   They run about seven -- I don't know.  I
6   don't know how many.  Six, 7,000 and that's standard.
7      Q.   To have security at a large church?
8      A.   Yes.
9      Q.   And when you say your detail, what do you
10  mean?  Did he -- was he only present at the church or
11  did he follow you around at home?
12     A.   No.  He followed me to the car to where I
13  lived.
14     Q.   Did he sometimes come to your home?
15     A.   I didn't live there.
16     Q.   Where were you living?
17     A.   In Alpharetta, Georgia.
18     Q.   You were commuting?
19     A.   Yes, sir.
20     Q.   Did you know Timothy Reece before he was on
21  your security detail at Long Hollow?
22     A.   No.
23     Q.   When were you interim there?
24     A.   I just don't remember the years.
25     Q.   What's your best estimate?  What decade?

Page 88

1      A.   Decade?  It was -- it's when David -- oh, I

2  don't remember.  It's in the 2012-ish decade.  But

3  when David Landrith passed away, it would be right

4  after that.

5      Q.   Okay.  Thank you.

6           And did you go there once a week?

7      A.   Yes.

8      Q.   Sundays?

9      A.   Saturday and come back Sunday.  It was four

10 services.

11     Q.   Did you stay at a hotel or somewhere else?

12     A.   Hotel.

13     Q.   Did you have security at the hotel as well?

14     A.   No.

15     Q.   So your security was just at the church?

16     A.   Yes.

17     Q.   What was the size of the security detail at

18 Long Hollow?

19     A.   I don't know.  They -- they had regulars,

20 and he was personally assigned to me, but there were

21 several.

22     Q.   I'm sorry if I asked this already.  Did you

23 know Timothy Reece prior to that?

24     A.   No.

25     Q.   And have you ever discussed Dr. McRaney

Page 89

1    orally or in writing with Timothy Reece?

2         A.   I don't -- I mean, we used him for one of

3    the SBC meetings in Nashville and he obviously, I'm

4    sure -- I don't remember ever talking to Tim about

5    Mr. McRaney.

6         Q.   You say you used him for one of the SBC

7    meetings in Nashville.  What do you recall about

8    that?

9         A.   Yeah, the SBC executive committee meetings.

10        Q.   Were there other SBC meetings where you had

11   security?

12        A.   Yes.

13        Q.   Every one or just sometimes?  Did you have

14   it at every meeting?

15        A.   Every SBC convention.

16        Q.   Yes.

17        A.   I can't remember if it's every -- I don't

18   remember when, but SBC executive committees, the

19   larger meetings.

20        Q.   So since you became president of NAMB, you

21   have had security at every SBC convention meeting?

22        A.   No.

23        Q.   How many of them?

24        A.   I don't remember how many, but ...

25        Q.   What determines whether you have security

Page 90

1    at a particular meeting?

2         A.   My trustees, due to the unpredictability in

3    this, had asked that we have security.

4         Q.   Your testimony is the trustees of NAMB

5    asked that you have security?

6         A.   Yes.  They asked that we be cautious and to

7    have security.  I know we had them in our trustee

8    meetings and at the SBC convention.

9         Q.   You had security at trustee meetings?

10        A.   Well, some of the -- again, I don't know

11   which ones, but some of the trustee meetings were at

12   the convention.

13        Q.   Okay.

14        A.   It's the same time, so ...

15        Q.   Okay.  Do you remember having security at

16   any trustee meetings other than those conducted in

17   connection with the SBC meeting in Nashville,

18   Tennessee?

19        A.   No.

20        Q.   No, you don't?

21        A.   I don't recall.  I just don't know.  We

22   could have.

23        Q.   When I asked you about security a moment

24   ago, you referred to the unpredictability of, I think

25   you said, this situation.

Page 91

1    A.    Uh-huh.

2          MR. PERLA:  Just make -- don't say uh-huh.

3    Was it yes?

4    A.    Yes.

5          MR. PERLA:  Okay.

6    A.    Sorry.

7          MR. PERLA:  That's okay.

8    Q.    (By Mr. Gant) Is it your testimony that one

9    or more trustees asked you to or instructed you to

10   hire security?

11   A.    No.  They instructed our staff to do that.

12   I never -- they never told me.

13   Q.    Okay.  What knowledge do you have of one or

14   more trustees instructing NAMB staff to hire security

15   in connection with Dr. McRaney?

16   A.    What personal knowledge?  It was discussed

17   as is that something that we should do just to be

18   safe.  I don't remember which trustees said it, I

19   don't remember what year, but I remember the

20   discussion of -- because I was against it, I ...

21   Q.    You were against having security?

22   A.    I didn't want -- I don't want to walk

23   around with an entourage and -- and -- but the

24   unpredictability, trying to be on the safe side,

25   which I appreciated.

Page 92

1      Q.   So you appreciated, but you were against
2   it?
3      A.   No.  I appreciated it.  I just didn't want
4   to -- you know, I just didn't want to be seen as
5   somebody -- I wanted to be discreet and so we
6   compromised on being more discreet.
7      Q.   Did you ever tell NAMB staff that you
8   wanted security hired to protect you?
9      A.   I told our trustees that I had a degree of
10  fear.
11     Q.   Fear of Dr. McRaney?
12     A.   Yes.
13     Q.   So who did you tell that to?
14     A.   I know Carlos Ferrer was in the room and
15  been -- at that point, yeah, it was a chairman and
16  officers, but I don't remember what year and which
17  ones.  Because I'm trying to -- I just don't remember
18  the exact ones.
19     Q.   You don't remember what trustees were --
20     A.   I don't.
21     Q.   Do you remember what year this was?
22     A.   No, I don't.
23     Q.   Do you remember whether there was something
24  specific that happened that led you to have fear of
25  Dr. McRaney?

Page 93

1      A.   Yes, the very long e-mail we referred to.

2   The tone and the tenor of that and the temperature of

3   it escalated everyone's concern to just be on the

4   safe side.

5      Q.   So you're still referring to that one very

6   long e-mail?

7      A.   Very long e-mail.  Well, there are several,

8   but the one he sent.

9      Q.   So it's your testimony that very long

10  e-mail instilled fear in you for your physical

11  safety?

12     A.   Yes.

13     Q.   And you told other people that?

14     A.   I told Carlos Ferrer and I'm sure there was

15  others perhaps as we discussed what to do, what not

16  to do.  I'm sure there were others, but Carlos was

17  always there.

18     Q.   Uh-huh.  Sitting here today, can you tell

19  me with certainty whether or not you ever told anyone

20  outside of NAMB that you feared for your physical

21  safety from Dr. McRaney?

22     A.   Anyone outside of NAMB?

23     Q.   Yes.  Are you able to tell me?

24     A.   Does that include the trustees?

25     Q.   Well, I consider the trustees part of NAMB.

Page 94

1      A.   Part of NAMB.

2      Q.   Don't you consider the trustees part of

3  NAMB?

4      A.   Sure, but -- no, I do not recall anyone

5  outside.

6      Q.   Are you 100 percent certain you never said

7  that to anyone outside of NAMB or you just don't

8  remember?

9      A.   I just don't remember.

10          (Plaintiff's Exhibit 6, E-mail string to

11       Smith from Ferrer, 9/18/18, Bates stamped NAMB

12       8237 - 38, marked for identification.)

13      Q.   (By Mr. Gant) Robin has handed you what's

14  been Bates labeled -- excuse me -- what's been marked

15  as Exhibit 6, which is Bates labeled NAMB 8237

16  through 38.  Please let me know when you've reviewed

17  it and are ready for a question.

18      A.   Okay.

19      Q.   Have you reviewed both pages?

20      A.   Oh, is it both?  Oh, I'm sorry.

21       Okay.

22      Q.   Have you reviewed both pages now?

23      A.   Yes, sir.

24      Q.   Do you recognize them?

25      A.   No.

Page 321

1      A.   Looks like -- I think it was a place in

2   South -- Travelers Rest or something like that maybe.

3      Q.   So Dr. McRaney wrote, Sandy and I will be

4   in T.R. the next several days.  Our youngest daughter

5   and her husband just built a home there they have

6   moved into the last couple of weeks.  They are also

7   expecting their first child.  So we will be traveling

8   tomorrow to T.R. to visit with them for several days.

9   If you would like to connect, let me know.

10          Do you see that?

11      A.   Yes, sir.

12      Q.   So Dr. McRaney was reporting he was taking

13   a trip with his wife to visit his daughter and

14   expected grandchild, correct?

15      A.   Looks that way.

16      Q.   Do you see anything threatening or

17   worrisome in there?

18      A.   In that note?

19      Q.   Yes.

20      A.   Not in that note.

21      Q.   Randy Bradley forwarded that e-mail to

22   Danny Wood, correct?

23      A.   Yes, looks that way.

24      Q.   And then you responded.  Danny Wood then

25   looped you in and you wrote in the middle of the

Page 322

1    first page, yikes.

2            Do you see that?

3        A.    Yes.

4        Q.    Why did you write "yikes" about

5    Dr. McRaney's e-mail about visiting his daughter and

6    grandchild?

7        A.    As I said several times, we started with a

8    good relationship over the period of time.  And all

9    these public displays of whatever you want to call

10   it -- you can tell my trustees had a sense of, I

11   would say, fear for my own safety and concern.  They

12   purchased a home security for me.

13       Q.    Because of Dr. McRaney?

14       A.    Yes, and because it's unpredictability.

15   And so all of them, they typically -- I want to say

16   they would forward things to the chairman.  The

17   chairman would let us know a cause of concern.  And

18   they instructed me to -- when I post things on social

19   media, to do it a day or two after I do it so he

20   would not know where I would be.

21           And so, yes, I mean, there was a level of

22   feeling threatened and it -- and our trustees have

23   seen this.  I mean, trustees serve for eight years,

24   and people rotated on and now rotated off and this is

25   still going on.  You don't see this type of obsession

Page 323

1    every day.
2         Q.   Well, I have taken the deposition of a
3    couple of them and none of them were able to identify
4    anything that suggested that Dr. McRaney posed a
5    physical threat to you or anyone else at NAMB.
6         A.   Yes.
7         Q.   So this sounds like it's an imagination
8    rather than in fact.  What were the facts that --
9              MR. GANT:  By the way, let me note for the
10             record to your attorneys, Dr. Ezell just
11             testified that home security was purchased for
12             him by NAMB as a result of Dr. McRaney.  We have
13             received zero documents about that.  So that's
14             another document deficiency that we expect to be
15             promptly addressed.
16        A.   It's a Ring.
17             MR. PERLA:  Is there a question pending?
18             MR. GANT:  I'm going to ask one.
19             MR. PERLA:  Nothing said until there's a
20             question.  And objection to the speech.
21             MR. GANT:  Has it been produced?  Did I
22             miss it?
23             MR. PERLA:  If you would like to talk about
24             documents, you've got 10 minutes left.  Do you
25             want to use it talking about this or do you want

Page 324

1    to ask a question?

2         MR. GANT:  We expect it to be produced

3    promptly.

4    Q.   (By Mr. Gant) You declined security at the

5    top of this e-mail, correct?

6    A.   For that -- I'm good but thanks.  I'm good

7    but thanks.  Yeah.

8    Q.   So you were -- you didn't feel like you

9    needed security?

10   A.   As an association event, with a lot of

11   people there, so in that particular case I didn't.

12   Q.   Dr. McRaney has been present for the entire

13   deposition today, correct?

14   A.   Uh-huh, yes.

15   Q.   Are you fearful of him today?

16   A.   Today?

17   Q.   Yes.  I mean, you've been in the same room.

18   You've been standing close to him.  Were you afraid

19   for your physical safety at any point in time?

20        MR. PERLA:  Objection.  Argumentative.  Go

21   ahead.

22   A.   There's a -- there's still a sense of he's

23   unpredictable.  So in these settings I was confident

24   that everything would be fine.  But would you say

25   it's a -- do I have complete peace that it would be?

Page 333

C E R T I F I C A T E

STATE OF GEORGIA    )

                    ) ss.:

FULTON COUNTY       )


    I,  Robin Ferrill, Certified Court Reporter

within the State of Georgia, do hereby certify:

        That KEVIN EZELL, the witness whose

deposition is hereinbefore set forth, was duly sworn

by me and that such deposition is a true record of

the testimony given by such witness.

        I further certify that I am not related to

any of the parties to this action by blood or

marriage; and that I am in no way interested in the

outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set

my hand this 20th day of March, 2023.

                _____

                _____

                ROBIN K. FERRILL, RPR