# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF MISSISSIPPI

 3                       ABERDEEN DIVISION

 4    WILL MCRANEY                    )

 5         Plaintiff                  )

 6              Vs.                   )

 7    THE NORTH AMERICAN              ) Civil Action No.:

 8    MISSION BOARD OF THE            ) 1:17-cv-80GHD-DAS

 9    SOUTHERN BAPTIST                )

10    CONVENTION, INC.               )

11         Defendant                 )

12                    --------------------

13

14            Deposition of WILLIAM WARREN, Ph.D., was

15    taken via videotape on Thursday, May 4, 2023,

16    commencing at 10:39 a.m., at Regus - Annapolis 2,

17    1910 Town Centre Boulevard, Suite 250, Annapolis,

18    Maryland, before MICHELE D. LAMBIE, Notary Public.

19                    --------------------

20    Reported By:  Michele D. Lambie, CSR-RPR

21
```

Page 1

```
 1   APPEARANCES:

 2            ON BEHALF OF THE PLAINTIFF:

 3        Boies Schiller Flexner LLP.

 4            SCOTT GANT, ESQUIRE.

 5            sgant@bsfllp.com.

 6            1401 New York Avenue, N.W.

 7            Washington, D.C.  20005.

 8            (202) 237-2727

 9

10            ON BEHALF OF THE DEFENDANT:

11        WilmerHale.

12            MATTHEW MARTENS, ESQUIRE.

13            matthew.martens@wilmerhale.com.

14            1875 Pennsylvania Avenue, N.W.

15            Washington, D.C.  20006.

16            (202) 663-6493

17

18

19

20

21        APPEARANCES CONTINUED:
```

Page 2

```
 1          ON BEHALF OF THE DEFENDANT: (Cont.)
 2      WilmerHale.
 3          JOSHUA VITTOR, ESQUIRE.
 4          joshua.vittor@wilmerhale.com.
 5          350 South Grand Avenue.
 6          Suite 2100.
 7          Los Angeles, California  90071.
 8          (213) 443-5300
 9
10      Butler Snow LLP. (via Zoom)
11          KATHLEEN INGRAM CARRINGTON, ESQUIRE.
12          kat.carrington@butlersnow.com.
13          150 3rd South.
14          Suite 1600.
15          Nashville, Tennessee  37201.
16          (615) 651-6700
17
18
19
20
21
```

Page 3

```
 1        APPEARANCES CONTINUED:
 2            ON BEHALF OF THE WITNESS:
 3        Davis Agnor Rapaport Skalny, LLC.
 4            ERIC W. GUNDERSON, ESQUIRE.
 5            egunderson@darslaw.com.
 6            10211 Wincopin Circle.
 7            Suite 600.
 8            Columbia, Maryland  21044.
 9            (410) 995-5800
10
11        Jones Walker LLP. (via Zoom)
12            CLARENCE WEBSTER, ESQUIRE.
13            c.webster@joneswalker.com.
14            201 South Biscyane Boulevard.
15            Suite 3000.
16            Miami, Florida  33131.
17            (305) 679-5700
18
19        ALSO PRESENT:  Brian Mackey - Videographer
20                       Dr. Will McRaney
21
```

Page  4

```
1                    EXAMINATION INDEX
2
3    WILLIAM WARREN, Ph.D.
          BY MR. MARTENS                     11
4         BY MR. GANT                        222
          R BY MR. MARTENS                   377
5         R BY MR. GANT                      385
6
7                     EXHIBIT INDEX
8             (Attached to Transcript.)
9                                            MAR
     Exhibit 1   Baptist Faith & Message 2000    27
10
     Exhibit 2   Copy of BCMD Website            37
11
     Exhibit 3   Documents Bates Numbered NAMB-0002  42
12               through 0005
13   Exhibit 4   Documents Bates Numbered WARR 041   72
                 through 042
14
     Exhibit 5   Documents Bates Numbered NAMB 7667  77
15               through 7668
16   Exhibit 6   Portion of Philippians in New       80
                 Testament
17
     Exhibit 7   Affidavit of Mark Dooley In         87
18               Support of the Baptist Convention
                 of Maryland/Delaware's Motion to
19               Quash
20   Exhibit 8   Document Bates Numbered NAMB-0001   89
21
```

Page 5

```
 1   WARREN EXHIBITS CONTINUED:
 2    Exhibit 9  Documents Bates Numbered NAMB 6645 103
                 through NAMB 6648
 3
      125 10     Documents Bates Numbered WM00895   125
 4               through WM00897
 5    Exhibit 11 Documents Bates number WM06171 to   131
                 WM06172
 6
      Exhibit 12 Documents Bates Numbered BCMD_0152 140
 7               to BCMD_0153
 8    Exhibit 13 Documents Bates Numbered WM00837    144
                 through WM00840
 9
      Exhibit 14 Documents Bates Numbered Bates      150
10               number BCMD_0395 through BCMD_0396
11
      Exhibit 15 Document Bates Numbered WM00846     154
12
      Exhibit 16 Documents Bates Numbered NAMB 6981 157
13               to NAMB 6982
14    Exhibit 17 Documents Bates Numbered WM00103    165
                 to WM00104
15
      Exhibit 18 Documents Bates Numbered BCMD_0682 175
16               through BCMD_0692
17    Exhibit 19 Document Bates Numbered WARR 002    192
18    Exhibit 20 Documents Bates Numbered WARR 012   195
                 through WARR 013
19
      Exhibit 21 Documents Bates BCMD_0029 to        203
20               BCMD_0030
21
```

Page 6

```
 1    WARREN EXHIBITS CONTINUED:
 2     Exhibit 22 Documents Bates Numbered NAMB 5379 212
                  through 5382
 3
       Exhibit 23 Documents Bates Numbered NAMB 6695 225
 4                through NAMB 6704
 5     Exhibit 24 Documents Bates Numbered WARR 001  238
                  through WARR 054
 6
       Exhibit 25 Subpoena to Produce Documents,     241
 7                Information, or Objects or to
                  Permit Inspection of Premises in a
 8                Civil Action
 9     Exhibit 26 Separation Agreement and Release   260
10     Exhibit 27 Documents Bates Numbered WM00048   266
                  through WM00049
11
       Exhibit 28 Documents Bates Numbered BCMD_1838 273
12                through BCMD_1839
13     Exhibit 29 Documents Bates Numbered BCMD_1806 279
                  through BCMD_1807
14
       Exhibit 30 Documents Bates Numbered NAMB      282
15                010664 through NAMB 665
16     Exhibit 31 Document Bates Numbered BCMD_0085  331
17     Exhibit 32 Documents Bates Numbered NAMB 7160 333
                  through NAMB  7162
18
       Exhibit 33 Document Bates Numbered BCMD_0664  337
19                through BCMD_0667
20     Exhibit 34 Document Bates Numbered NAMB 7667  346
21
```

Page 7

1  WARREN EXHIBITS CONTINUED:

2  Exhibit 35 Documents Bates Numbered NAMB 6756 362
              through NAMB 6758

3

   Exhibit 36 Documents Bates Numbered NAMB 9061 365
4              through NAMB 9062

5  Exhibit 37 Documents Bates Numbered WM831      370
              through WM832

6

   Exhibit 38 Document Bates Numbered NAMB 7638  372

7

   Exhibit 39 Documents Bates Numbered BCMD_0095 373
8              through BCMD_0096

9

10

11

12

13

14

15

16

17

18

19

20

21

                                            Page 8

```
 1                     P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  We are going on the

 3     record at 10:39 a.m. on May 4th, 2023.

 4              This is media unit number one in the

 5     deposition of Bill Warren, Ph.D., in the matter of

 6     Will McRaney versus the North American Mission

 7     Board of the Southern Baptist Convention,

 8     Incorporated, in the United States District Court

 9     for the Northern District of Mississippi, Case

10     Number 1:17-cv-80GHD-DAS.

11              This deposition is taking place at Regus,

12     1910 Town Centre Boulevard, Annapolis, Maryland.

13              My name is Brian Mackey from Veritext,

14     and I'm the videographer.  The court reporter today

15     is Michele Lambie from Veritext.

16              Will Counsel please state their

17     appearances and affiliations for the record?

18              MR. GANT:  Scott Gant from Boise Schiller

19     Flexner for Plaintiff.

20              MR. MARTENS:  Matthew Martens and Joshua

21     Vittor for the Defendant.
```

Veritext Legal Solutions
866 299-5127

1          MR. GUNDERSON:  Eric Gunderson

2   representing Dr. William Warren.

3          THE WITNESS:  William Warren, testifying.

4          MR. WEBSTER:  Clarence Webster also from

5   Jones Walker also representing Dr. Warren.

6          MS. CARRINGTON:  And Kat Carrington with

7   Butler Snow, LLP for NAMB.

8          MR. MARTENS:  And then also for the

9   record, Plaintiff Dr. McRaney is present.

10          MR. GANT:  Yes.  Just is the laptop

11   Veritext?  Is it the Zoom or is that Dr. Warren's

12   laptop?

13          THE VIDEOGRAPHER:  It's just the Zoom.

14          MR. GANT:  It's the Zoom, okay.

15          THE VIDEOGRAPHER:  Um-hmm.

16          Will the reporter please swear in the

17   witness?

18          WILLIAM WARREN, Ph.D.,

19   the Deponent, called for examination by the

20   Defendant, being first duly sworn to tell the

21   truth, the whole truth, and nothing but the truth,

Veritext Legal Solutions
866 299-5127

1    testified as follows:

2                        EXAMINATION

3            BY MR. MARTENS:

4        Q.    Good morning, --

5        A.    Good morning.

6        Q.    -- Dr. Warren.

7        A.    Good morning.

8        Q.    Thank you for coming in today.

9        A.    Certainly.

10       Q.    You and I have never spoken before; is

11   that right?

12       A.    No.

13       Q.    So, as you heard, I represent the North

14   American Mission Board of the Southern Baptist

15   Convention.  We're going to be using that a lot

16   today.  It's a long phrase, so I'm just probably

17   going to say NAMB, N-A-M-B, and you'll know what I

18   mean when I do that?

19       A.    Yes.

20       Q.    All right.  Thank you.  You're appearing

21   here today pursuant to a Subpoena; is that right?

Page 11

```
 1          A.    Yes.

 2          Q.    Have you ever had your deposition taken

 3   before?

 4          A.    No.

 5          Q.    Have you ever given testimony under oath

 6   before?

 7          A.    Yes.

 8          Q.    And so you understand you're under oath

 9   today which requires you to give truthful answers

10   to my questions just as if you're in court?

11          A.    Yes.

12          Q.    And you have Counsel representing you

13   here today, correct?

14          A.    Yes.   Um-hum.

15                MR. GANT:   Just didn't have any

16   objections, but you are not giving me a chance.

17   So, just a reminder to pause.

18                THE WITNESS:   Oh, pause, okay.

19                MR. GANT:   Yes, thank you.

20                THE WITNESS:   Sure.

21   BY MR. MARTENS:
```

Veritext Legal Solutions
866 299-5127

1      Q.    Also, just because everything you say is

2  being taken down today, you have to give audible

3  answers rather than head nods or head shakes so

4  that the court reporter can record it, okay?

5      A.    Yes.

6      Q.    Can you state your full name for the

7  record?

8      A.    William Leon Warren, Jr.

9      Q.    What's your date of birth?

10     A.    Jr.  May 16th, 1953.

11     Q.    Are you married?

12     A.    Yes.

13     Q.    How long have you been married?

14     A.    1979, so 40 plus years.

15     Q.    And where are you currently employed?

16     A.    Allen Memorial Baptist Church, Salisbury,

17  Maryland.

18     Q.    How long have you been there?

19     A.    Thirty-nine years.

20     Q.    So, since 1984?

21     A.    Correct.

Veritext Legal Solutions
866 299-5127

1          Q.    Have you been the senior pastor the

2     entire time?

3          A.    Yes.

4          Q.    What type of church is Allen Memorial

5     Baptist Church?

6          A.    It is -- it is a Southern Baptist Church.

7          Q.    What do you mean when you say it's a

8     Southern Baptist Church?

9          A.    We are affiliated with the Southern

10    Baptist Convention.

11         Q.    And what does it mean to be affiliated

12    with the Southern Baptist Convention?

13              MR. GANT:  Objection.  Vague, compound.

14              THE WITNESS:  Well, for one thing, it

15    means we send them money.  It also means that we

16    support their mission endeavors, and we are in line

17    with their beliefs.

18    BY MR. MARTENS:

19         Q.    Their doctrinal beliefs?

20         A.    Yes.

21         Q.    And when you say in line with their

1  doctrinal beliefs, what in particular are you

2  referring to when you refer to the Southern Baptist

3  Convention's doctrinal beliefs?

4      A.   The Baptist Faith and Message.

5      Q.   Which version?

6      A.   The most recent one.

7      Q.   2000?

8      A.   Yes.

9      Q.   Can you just briefly sketch your

10  educational background?

11      A.   I graduated with a Bachelor of Arts from

12  Washington and Lee University in Lexington,

13  Virginia; master of divinity from the Southern

14  Baptist Theological Seminary in Louisville,

15  Kentucky; and a Ph.D. in New Testament from the

16  Southern Baptist Theological Seminary.

17      Q.   During your tenure as senior pastor of

18  Allen Memorial Baptist Church in Maryland, did you

19  become familiar with the Baptist Convention of

20  Maryland and Delaware?

21      A.   Yes.

Veritext Legal Solutions
866 299-5127

```
1        Q.    Again, for ease today, I'll just refer to
2   that as BCMD; is that okay?
3        A.    That's okay.
4        Q.    What, if any, involvement do you
5   have -- strike that.
6              What, if any, involvement did you have
7   with BCMD during your tenure as senior pastor of
8   Allen Memorial Baptist Church?
9        A.    I served on the General Mission Board.
10       Q.    What is the General Mission Board?
11       A.    In layman's terms, it's the ruling body.
12  It's -- it's the convention.  When the convention
13  is not in session, representatives of the various
14  churches, associations are elected to serve, so
15  it's a ruling body.
16       Q.    The General Mission Board, which I'll
17  sometimes refer to the GMB, is the ruling body of
18  the BCMD?
19       A.    Yes, when they're not in -- in convention
20  meetings.
21       Q.    Directing your attention to the 2014/2015
```

Page 16

```
 1    time period, what, if any, position did you hold
 2    with the BCMD?
 3         A.    I was the president.
 4         Q.    How did you become president?
 5         A.    I was elected by --
 6         Q.    Who elected you?
 7         A.    -- messengers to the annual meeting of
 8    the Baptist Convention of Maryland/Delaware.
 9         Q.    And what are messengers?
10         A.    Members of cooperating churches who are
11    elected to represent them at the annual meeting.
12         Q.    And when you refer to the annual meeting,
13    you're referring to the annual meeting of the BCMD
14    as opposed to the annual meeting of the Southern
15    Baptist Convention; is that correct?
16         A.    Yes.
17         Q.    Can you just briefly describe your role
18    as president of the BCMD?
19         A.    To provide leadership along with the
20    president of the General Mission Board and the
21    chairman of the adminis- -- Administrative
```

Page 17

1    Committee in conjunction with the executive

2    director.

3         Q.   And when you refer -- refer to the

4    executive director, are you referring to the

5    executive director of BCMD?

6         A.   Yes.

7         Q.   And when you refer to the Administrative

8    Committee, what is that?

9         A.   That is a committee drawn from the

10   General Mission Board that deals with matters such

11   as personnel.

12        Q.   Are there spiritual, religious, or

13   doctrinal criteria to be the president of the BCMD?

14             MR. GANT:  Objection.  Vague, compound.

15             THE WITNESS:  Would you repeat the

16   question, please?

17   BY MR. MARTENS:

18        Q.   Sure.  Are there any type of doctrinal

19   criteria in order to qualify to be the president of

20   the BCMD?

21             MR. GANT:  Same objections.

Page 18

```
 1              THE WITNESS:  No more than there would be
 2     for a messenger to the convention.
 3     BY MR. GANT:
 4         Q.   And what would the criteria be for a
 5     messenger to the convention?
 6              MR. GANT:  Same objection.
 7              THE WITNESS:  That you come from a
 8     cooperating Southern Baptist Church in
 9     Maryland/Delaware.
10     BY MR. MARTENS:
11         Q.   Did you as the president of the BCMD have
12     to be in agreement with the Baptist Faith and
13     Message 2000?
14         A.   I was not asked.
15         Q.   Are you in agreement with the Baptist
16     Faith and Message 2000 or 1963?
17              MR. GANT:  Objection.  Vague, compound,
18     foundation.
19              THE WITNESS:  I'm in agreement in general
20     with both of those, not everything in both of
21     those.
```

Page 19

1    BY MR. MARTENS:

2        Q.    Were you compensated for your work as

3    president of BCMD?

4        A.    If you're meaning were I -- was I paid,

5    no.

6        Q.    While you were serving as the president

7    of the BCMD, were you also contemporaneously a

8    pastor of Allen Memorial Baptist Church?

9        A.    Yes.

10       Q.    Can you just briefly describe

11   what -- what is BCMD?

12           MR. GANT:  Objection.  Vague.

13           THE WITNESS:  It's a cooperative body of,

14   I think we're close to 500 churches now, that come

15   together to advance the gospel.

16   BY MR. MARTENS:

17       Q.    Are those 500 churches geographically

18   located in certain places?

19       A.    For the most part, they're in Maryland

20   and Delaware.

21       Q.    When you say advance the gospel, what do

Page 20

1    you mean by that?

2        A.    Pursue the great -- excuse me.

3            (Brief pause for cell phone

4    interruption.)

5            THE WITNESS:  Pursue -- pursue the --

6    BY MR. MARTENS:

7        Q.    Let me restate the question again so we

8    can have a clean record there.

9            You used the phrase advanced the gospel.

10   What did you mean by that?

11       A.    Pursue the Great Commission of Jesus

12   Christ as given in Matthew 28:18-20.

13       Q.    How is the BCMD organized?

14       A.    We have an executive director.  We have a

15   staff who work with him, and then we have the

16   General Mission Board, Administrative Committee and

17   the president.

18       Q.    How does a church become affiliated with

19   the BCMD?

20       A.    We've been a member for so long I'm not

21   exactly sure, but I think it is that we have to be

Page 21

1   in line -- in general, we have to be in line with

2   the Baptist Faith and Message and also agree to

3   contribute financially.

4       Q.   Is it fair to say that the BCMD is a

5   cooperative missions and ministry organization?

6       A.   Yes.

7       Q.   What does that mean?

8       A.   That means we work together to pursue the

9   Great Commission of Jesus Christ, which includes

10   planting churches.

11       Q.   And what does it mean to say that the

12   BCMD is cooperative?

13          MR. GANT:  Objection.  Vague.

14          THE WITNESS:  No church in

15   Maryland/Delaware -- no -- no Southern Baptist

16   Church in Maryland and Delaware has to participate.

17   Some don't, so there's no forced participation.

18   BY MR. MARTENS:

19       Q.   And is that a Baptist distinctive, that

20   cooperation?

21       A.   Oh, yes.

Veritext Legal Solutions
866 299-5127

1          MR. GANT:  Objection.  Sorry.

2          THE WITNESS:  I'm sorry.

3          MR. GANT:  You need to give me a chance

4   to object here.

5          THE WITNESS:  I'm going to look at you

6   before I answer.  That will help.

7          MR. GANT:  If that helps --

8          THE WITNESS:  That will help me help you.

9          MR. GANT:  -- that's fine, that's fine by

10  me.

11          THE WITNESS:  Okay.

12          MR. GANT:  Can I hear the question back

13  so I can articulate my -- sorry, I lost it.

14          MR. MARTENS:  Yeah.

15  BY MR. MARTENS:

16      Q.   Is cooperation a Baptist distinctive?

17          MR. GANT:  Objection.  Vague, foundation.

18          THE WITNESS:  Yes, it is.

19  BY MR. MARTENS:

20      Q.   What do you mean by that?  Why do

21  you say it's -- strike that.

Veritext Legal Solutions
866 299-5127

```
 1              Why do you say it's a Baptist
 2    distinctive?
 3         A.   According to my understanding of Baptist
 4    his- -- Southern Baptist history, it's always been
 5    a distinctive.
 6         Q.   Are you familiar with the principle
 7    autonomy?
 8              MR. GANT:  Objection.  Vague.
 9              THE WITNESS:  Yes.
10    BY MR. MARTENS:
11         Q.   What do you understand to be the
12    principle of autonomy?
13         A.   Every Southern Baptist Church governs
14    itself.  We don't have a Bishop.  We don't have a
15    Pope.
16         Q.   Is the principle of autonomy relevant to
17    the fact that Baptists organize themselves in a
18    cooperative way?
19              MR. GANT:  Objection.  Vague, foundation.
20              THE WITNESS:  I would say yes.
21    BY MR. MARTENS:
```

Page 24

1      Q.   In what way?

2           MR. GANT:  Same objections.

3           THE WITNESS:  Would you repeat the

4    question, please?

5    BY MR. MARTENS:

6      Q.   In what way does the principle autonomy

7    relate to the fact that Baptists organize

8    themselves in a cooperative way?

9           MR. GANT:  Same objections.

10          THE WITNESS:  As autonomous

11   inst- -- institutions, we are free to cooperate

12   together.  In other words, we are not required to

13   be a part of the state convention.  So, if we were

14   not autonomous, we could, perhaps, be forced to

15   participate.

16   BY MR. MARTENS:

17     Q.   Does the principle of autonomy apply to

18   the relationship between BCMD and NAMB?

19          MR. GANT:  Objection.  Vague, compound,

20   foundation.

21               THE WITNESS:  Yes.

Veritext Legal Solutions
866 299-5127

1   BY MR. MARTENS:

2       Q.   Why do you say that?

3       A.   My understanding is that if a state

4   convention does not wish to cooperate with NAMB,

5   they don't have to.

6       Q.   And what about in reverse with regard to

7   NAMB and its cooperation with the state convention?

8           MR. GANT:  Same objections.

9           THE WITNESS:  I think they have the same

10  autonomy.

11  BY MR. MARTENS:

12      Q.   Are there spiritual -- strike that.

13           Are there doctrinal criteria for a church

14  to be affiliated with the BCMD?

15           MR. GANT:  Objection.  Vague, compound,

16  foundation.

17           THE WITNESS:  I would say yes.

18  BY MR. MARTENS:

19      Q.   Why would you say yes?

20           MR. GANT:  Same objections.

21           THE WITNESS:  Because if a Southern

Veritext Legal Solutions
866 299-5127

1 Baptist Church in Maryland/Delaware steps outside

2 of the Baptist Faith and Message in a radical way,

3 they might well be booted out of the convention.

4 BY MR. MARTENS:

5     Q.   I'd like to show you a copy of the

6 Baptist Faith and Message 2000.

7     A.   Okay.

8       MR. MARTENS:  Which I'm going to mark as

9 Warren Exhibit 1.

10       MR. GUNDERSON:  Mr. Warren, since you're

11 going to be handling exhibits, why don't you put

12 these papers aside so you don't confuse them with

13 what's being handed to you.

14       THE WITNESS:  Sounds good.

15       (Whereupon, Warren Deposition Exhibit No.

16 1, Baptist Faith and Message 2000, marked for

17 identification.)

18 BY MR. WARRENS:

19     Q.   Are you familiar with the Baptist Faith

20 and Message 2000?

21       MR. GANT:  Objection.  Vague, compound.

Veritext Legal Solutions
866 299-5127

1              THE WITNESS:  Overall, yes.

2      BY MR. MARTENS:

3          Q.   I'd like you to turn to page 7, the

4      Section 6 entitled, The Church.  And do you see the

5      first sentence reads, A New Testament Church of the

6      Lord Jesus Christ is an autonomous local

7      congregation of baptized believers associated by

8      covenant in the faith and fellowship of the gospel

9      observing the two ordinances of Christ governed by

10     His laws, exercising the gifts, rights, and

11     privileges invested in -- in them by His word and

12     seeking to extend the gospel to the ends of the

13     earth?  Did I read that correctly?

14         A.   Yes.

15         Q.   Do you agree with that?

16             MR. GANT:  Objection.  Compound.

17             THE WITNESS:  Yes.

18     BY MR. MARTENS:

19         Q.   Did you agree with that during your

20     tenure as president of BCMD?

21             MR. GANT:  Same objection.

Page 28

1              THE WITNESS:  Yes.

2     BY MR. MARTENS:

3         Q.   If you go to the next page, page 8, the

4     last paragraph reads, "The New Testament speaks

5     also of the church as the Body of Christ which

6     includes all of the redeemed of all of the ages,

7     believers from every tribe, and tongue, and people,

8     and nation."  Did I read that correctly?

9         A.   Yes.

10        Q.   Do you agree with that?

11        A.   Yes.

12        Q.   Mr. Warren, just so you know, you don't

13    need permission to answer any question.  You

14    can -- you're here to ans- -- you'll answer every

15    question regardless of objections, so I just don't

16    want to slow us down.  You don't have to --

17        A.   I'm just trying to give him time to

18    object.

19        Q.   Yeah, you can give him time, but you

20    don't have to get his permission to answer, okay?

21        A.   Oh, I understand.

Veritext Legal Solutions
866 299-5127

1     Q.    Okay.  Do you agree with that statement?

2     A.    Yes.

3     Q.    Did you agree with that statement at the

4  time you were serving as BCMD president?

5     A.    Yes.

6     Q.    Let's turn to Section 14 on page 12 of

7  Exhibit 1 entitled, Cooperation, and the -- it

8  reads at the beginning, Christ people should, as

9  occasion requires, --

10     A.    I'm sorry, you're on page 14.

11     Q.    I'm sorry, page 12, section 14, entitled,

12  Cooperation.  The first paragraph reads "Christ

13  people should, as occasion requires, organize such

14  associations and conventions as may best secure

15  cooperation for the great objects of the Kingdom of

16  God.  Such organizations have no authority over one

17  another or over the churches.  They are voluntary

18  and advisory bodies designed to elicit, combine,

19  and direct the energies of our people in the most

20  effective manner."  Did I read that correctly?

21     A.    Yes.

Page 30

```
 1          Q.   Do you agree with that?

 2               MR. GANT:  Objection.  Compound.

 3               THE WITNESS:  I do.

 4    BY MR. MARTENS:

 5          Q.   Did you believe that when you were

 6    president of BCMD?

 7               MR. GANT:  Same objection.

 8               THE WITNESS:  Yes.

 9    BY MR. MARTENS:

10          Q.   Is the BCMD an association or convention

11    as that phrase is used in the pass- -- passage I

12    just read?

13               MR. GANT:  Objection.  Vague, foundation,

14    calls for a legal speculation.

15               THE WITNESS:  It is convention.

16    BY MR. MARTENS:

17          Q.   Is the SBC, including its agencies, a

18    convention as that phrase is used in the passage I

19    just read?

20               MR. GANT:  Objection.  Vague, compound,

21    foundation, calls for a legal conclusion.
```

Page 31

1          THE WITNESS:  It is.

2    BY MR. WARRENS:

3          Q.   Do you agree that under the Baptist

4    principle of autonomy any cooperation between a

5    state convention like BCMD and the SBC, including

6    its agencies, must be voluntary on the part of both

7    parties?

8          MR. GANT:  Objection.  Compound, vague,

9    foundation.

10          THE WITNESS:  Yes.

11    BY MR. MARTENS:

12          Q.   Let's turn to section 17 on page 14

13    entitled, Religious Liberty, and do you see in the

14    third sentence it reads, "The state owes to every

15    church protection and full freedom in a pursuit of

16    its spiritual ends?"

17          A.   Yes.

18          Q.   Do you agree with that?

19          A.   Yes.

20          Q.   Did you believe that when you were

21    president of BCMD?

Veritext Legal Solutions
866 299-5127

1          A.   Yes.

2          Q.   Do you believe that this full freedom

3    applied not only to churches, but also to an

4    association of churches like BCMD?

5               MR. GANT:  Objection.  Vague, compound,

6    foundation.

7               THE WITNESS:  Yes.

8    BY MR. MARTENS:

9          Q.   Do you believe that the full freedom

10   applied -- applies not only to a state convention

11   like BCMD, but also to the SBC?

12              MR. GANT:  Same objection.

13              THE WITNESS:  Yes.

14   BY MR. MARTENS:

15         Q.   And by SBC, I'm referring to the Southern

16   Baptist Convention.  You understand that?

17         A.   I understand.

18         Q.   Do you see that in the next sentence it

19   reads, "In providing for such freedom, no

20   ecclesiastical group or denomination should be

21   favored by the state more than others?"  Did I read

                                              Page 33

1  that correctly?

2       A.   Yes, you did.

3       Q.   Do you agree with that?

4       A.   Yes.

5       Q.   Did you believe that when you were

6  president of BCMD?

7       A.   I will say I think the wording is a bit

8  vague, but since no one is here to clarify, I

9  will -- I will say yes.

10      Q.   Is there something in there that you

11  think is vague?

12      A.   Ecclesiastical group.

13      Q.   Okay.

14      A.   Are they referring to churches?  Are they

15  referring to -- what are they referring to?

16  But --

17      Q.   Okay.  Well, any -- any ecclesiastical

18  group in any form do you believe should be favored

19  by the state more than another ecclesiastical

20  group?

21      A.   No.

Veritext Legal Solutions
866 299-5127

1          MR. GANT:  Objection.  I'm sorry.

2          THE WITNESS:  I'm sorry.

3          MR. GANT:  Objection.  Vague, foundation.

4          THE WITNESS:  No.  No.

5    BY MR. MARTENS:

6        Q.   Did you believe that when you were

7    president of BCMD?

8          MR. GANT:  Same objections.

9          THE WITNESS:  I did.

10   BY MR. MARTENS:

11       Q.   Do you believe that Roman Catholic

12   Churches should have more freedom from government

13   interference when it comes to disputes between a

14   church and a diocese than Baptist Churches should

15   have when it comes to disputes between a church and

16   a state convention?

17         MR. GANT:  Objection.  Vague, compound,

18   foundation, calls for speculation, and to the

19   extent it calls for a legal conclusion.

20         THE WITNESS:  Please ask that question

21   again.

```
 1   BY MR. MARTENS:
 2       Q.   Do you believe that Roman Catholic
 3   Churches should have more freedom from government
 4   interference when it comes to disputes between a
 5   Roman Catholic Church and a Roman Catholic Diocese
 6   than a Baptist Church should have when it comes to
 7   a dispute between a church and a state convention?
 8            MR. GANT:  Same objections, and if I
 9   didn't include calls for speculation as an
10   incomplete hypothetical, I'll add that.
11            THE WITNESS:  No.
12   BY MR. MARTENS:
13       Q.   Do you believe that Roman Catholic
14   Churches should have more freedom from government
15   interference when it comes to disputes between a
16   diocese and the Vatican than a Baptist association
17   should have when it comes to disputes between a
18   state convention and the SBC?
19            MR. GANT:  Same objections.
20            THE WITNESS:  No.
21   BY MR. MARTENS:
```

Page 36

1       Q.   I'm going to show you what I'm going to

2   mark as Exhibit 2.  And while we're doing that, can

3   I just ask you, do you recognize this Exhibit 1 as

4   a copy of the Baptist Faith and Message 2000?

5       A.   Yes.

6       Q.   Okay.  I'll show you what we're going to

7   mark as Warren Exhibit 2.

8          (Whereupon, Warren Deposition Exhibit No.

9   2, Copy of BCMD Website, marked for

10  identification.)

11  BY MR. MARTENS:

12      Q.   Do you recognize Exhibit 2 as a copy of

13  the BCMD website?

14        MR. GANT:  A copy of the whole website,

15  is that what you're asking?  Objection.  Vague,

16  foundation, calls for speculation.

17        THE WITNESS:  Yes, it appears to be drawn

18  from -- yes, it does -- it is drawn from the

19  website.  Whether it's the entire website or not, I

20  don't know.

21  BY MR. MARTENS:

Veritext Legal Solutions
866 299-5127

1      Q.    I'll ask you to turn to page 4, the

2   section entitled, Our Mission, and it states that

3   the Baptist Convention of Maryland/Delaware will

4   intention- -- intentionally assist in starting and

5   strengthening congregations so that together we can

6   fulfill Jesus' command in Matthew 28:19-20 and Acts

7   1:8.  Did I read that correctly?

8      A.    Yes.

9      Q.    What is a congregation?

10         MR. GANT:  Objection.  Vague, foundation.

11         THE WITNESS:  A church.

12  BY MR. MARTENS:

13     Q.    What was Jesus' commands in those

14  passages referenced, in the passage I just read?

15     A.    Make disciples of all nations.

16     Q.    Is that a religious endeavor?

17         MR. GANT:  Objection.  Vague.

18         THE WITNESS:  It's a spiritual endeavor.

19  BY MR. MARTENS:

20     Q.    Is strengthening congregations in

21  fulfillment of Jesus' command a spiritual endeavor?

Veritext Legal Solutions
866 299-5127

```
 1              MR. GANT:  Objection.  Vague.

 2              THE WITNESS:  Yes, it certainly is.

 3    BY MR. MARTENS:

 4         Q.   Are you familiar with NAMB?

 5              MR. GANT:  Objection.  Vague.

 6              THE WITNESS:  Yes.

 7    BY MR. MARTENS:

 8         Q.   What is NAMB?

 9              MR. GANT:  Same objection.

10              THE WITNESS:  The initials stand for

11    North American Mission Board, and it is an -- an

12    entity of the Southern Baptist Convention charged

13    basically with planting churches in North America.

14    BY MR. MARTENS:

15         Q.   Is planting churches a spiritual

16    endeavor?

17              MR. GANT:  Objection.  Vague.

18              THE WITNESS:  Yes.

19    BY MR. MARTENS:

20         Q.   Why do you say that?

21         A.   Because it's in line with the Great
```

Page 39

1    Commission of Jesus Christ.

2         Q.    During your tenure as president of

3    BCMD -- strike that.

4              I'm not sure if I asked you this.  When

5    were you president of BCMD?

6         A.    From November of 2014 through October of

7    2016 is my recollection.

8         Q.    During your tenure as president of BCMD,

9    were you involved in working together with NAMB?

10        A.    Yes.

11        Q.    Do you know Kevin Ezell?

12        A.    Yes.

13        Q.    Who is Kevin Ezell?

14        A.    He is executive director of NAMB.

15        Q.    Have you ever met Kevin Ezell?

16        A.    Yes.

17        Q.    Do you consider him to be a friend?

18        A.    Yes.

19        Q.    Do you consider --

20        A.    But I would clarify, he's more of what I

21    would call a phone friend.

Page 40

1       Q.   Have you ever met him in person?

2       A.   Yes.

3       Q.   How many times?

4       A.   Once.

5       Q.   Do you consider him to be a good person?

6          MR. GANT:  Objection.  Vague.

7          THE WITNESS:  Yes.

8 BY MR. MARTENS:

9       Q.   Do you have --

10      A.   Yes.

11      Q.   Do you have any doubt that he's a man of

12 God?

13          MR. GANT:  Objection.  Vague.

14         THE WITNESS:  None whatsoever.

15 BY MR. MARTENS:

16      Q.   If we go back to Exhibit 2, page 2, Who

17 We Are -- strike that.  We'll move on beyond that.

18 I think we've already covered it.

19      A.   Okay.

20      Q.   I'd like to show you what I'm now going

21 to mark as Exhibit 3.

1          (Whereupon, Warren Deposition Exhibit No.

2    3, Documents Bates Numbered NAMB-0002 through 0005,

3    marked for identification.)

4    BY MR. MARTENS:

5          Q.   And ask you if you recognize Exhibit 3?

6               MR. GANT:  You may be getting to this,

7    but if you can read in the Bates number for the

8    record.

9               MR. MARTENS:  Sure.

10              THE WITNESS:  Yes, I do.

11              MR. MARTENS:  For the record, Exhibit 3

12   is Bates numbered NAMB-0002 through 0005.

13   BY MR. MARTENS:

14         Q.   What is Exhibit 3?

15         A.   It is a Strategic Partnership Agreement

16   between the North American Mission Board and the

17   Baptist Convention of Maryland/Delaware.

18         Q.   I'm going to for short sometimes refer to

19   that as the SPA, okay?

20         A.   Okay.

21         Q.   If you go to the last page of Exhibit 3,

Page 42

1    do you know whose signature is on the left?

2         A.   I would assume it's the executive

3    director's, but I don't know which one.

4         Q.   You don't remember who the executive

5    director was in 2012?

6         A.   David Lee.

7         Q.   Okay.  Was this SPA in place during your

8    tenure as president of BCMD?

9         A.   We had one.  I am assuming it was this

10   one.

11        Q.   Okay.  You're not aware of any other SPA

12   signed after 2012, are you?

13        A.   No.

14        Q.   Okay.  Let's go to the second page of

15   Exhibit 3 under General Principles.  In paragraph

16   2, it states that the Strategic Partnership

17   Agreement shall be driven by shared values that

18   reflect mutual respect and peer-to-peer

19   relationships.  Did I read that correctly?

20        A.   Yes, you did.

21        Q.   What does that mean?

Page 43

```
 1              MR. GANT:  Objection.  Vague, foundation.
 2              THE WITNESS:  Shared Biblical values.
 3    BY MR. MARTENS:
 4         Q.   And what does peer-to-peer relationship
 5    mean?
 6              MR. GANT:  Same objections.
 7              THE WITNESS:  There's an equality in the
 8    relationship.
 9    BY MR. MARTENS:
10         Q.   An equality between whom?
11              MR. GANT:  Same objections.
12              THE WITNESS:  The members of the Baptist
13    Convention of Maryland/Delaware and the North
14    American Mission Board.
15    BY MR. MARTENS:
16         Q.   Do you see in paragraph 2 it refers to a
17    list of values?
18         A.   Yes.
19         Q.   And letter F is autonomy of individual
20    Baptist entities?
21         A.   Yes.
```

Page 44

1      Q.   What does that mean?

2         MR. GANT:  Same objections.

3         THE WITNESS:  What we said earlier, that

4  each entity governs itself and is not dictated to

5  by any other entity.

6  BY MR. MARTENS:

7      Q.   And in this instance, which entities are

8  you referring to in particular?

9      A.   Baptist Convention of Maryland/Delaware

10  and North American Mission Board.

11      Q.   During your tenure as president of BCMD,

12  did the autonomy of individual Baptist entities

13  apply to the peer-to-peer relationship between NAMB

14  and BCMD?

15         MR. GANT:  Objection.  Vague, compound,

16  foundation, calls for speculation.

17         THE WITNESS:  Yes.

18  BY MR. MARTENS:

19      Q.   Are you familiar with an individual named

20  Will McRaney?

21      A.   Yes.

Veritext Legal Solutions
866 299-5127

1    Q.   And you're aware that he's the Plaintiff

2  in this lawsuit?

3    A.   Yes.

4    Q.   Directing your attention to September of

5  2013, was Dr. McRaney selected to be the executive

6  director at BCMD?

7    A.   I don't remember the date, but I would

8  assume that was the date.

9    Q.   Okay.  And do you remember how he was

10  selected?

11            MR. GANT:  Objection.  Vague.

12            THE WITNESS:  I would assume he was

13  elected by the messengers to the convention --

14  BY MR. MARTENS:

15    Q.   Why do you say you would assume that?

16            MR. GANT:  Were you finished?

17            THE WITNESS:  I'm sorry?

18            MR. GANT:  Were you finished?  I thought

19  you were still talking and the next question came.

20            THE WITNESS:  No, I was finished.

21  BY MR. MARTENS:

Page 46

1      Q.   Why -- why did you assume -- why do you

2   assume that?

3      A.   Because I don't recall exactly how -- I

4   would -- I would assume that it has to be approved

5   by the messengers, something that major.  Perhaps,

6   it was approved by the General Mission Board

7   because the convention wasn't in session.  That's

8   probably more likely since it's -- the September

9   convention usually meets in November, so probably

10  the General Mission Board.

11     Q.   Were you involved in the selection of

12  Will McRaney as the executive director of BCMD?

13     A.   No, I don't believe I was on the GMB

14  then.

15     Q.   Was Dr. McRaney an ordained minister

16  while he served as executive director of BCMD?

17     A.   I -- yes, I assume so.

18     Q.   Are there doctrinal criteria to be the

19  executive director of BCMD?

20          MR. GANT:  Objection.  Vague, foundation,

21  calls for speculation.

Page 47

1                  THE WITNESS:  Yes.

2      BY MR. MARTENS:

3           Q.    What are those?

4                  MR. GANT:  Same objections.

5                  THE WITNESS:  Again, I would think

6      adherence with the Baptist Faith and Message.

7      BY MR. MARTENS:

8           Q.    Directing your attention to the 2014 to

9      2015 time period, --

10          A.    Okay.

11          Q.    -- was the BCMD executive director

12     required to believe a particular version of the

13     Baptist Faith and Message?

14                 MR. GANT:  Objection.  Vague, foundation,

15     compound, calls for speculation.

16                 THE WITNESS:  I don't know.

17     BY MR. MARTENS:

18          Q.    Earlier today we looked at the Baptist

19     Faith and Message provision on religious liberty,

20     do you recall that?

21          A.    Yes.

Veritext Legal Solutions
866 299-5127

1      Q.   Did Dr. McRaney ever express to you a

2  belief that Roman Catholic Churches should have

3  more freedom from government interference when it

4  comes to disputes between a diocese and the Vatican

5  than a Baptist association should have when it

6  comes to disputes between the state convention and

7  the SBC?

8      A.   I don't recall.

9      Q.   Would you have remembered that if he had

10  expressed that?

11         MR. GANT:  Objection.  Calls for

12  speculation.

13         THE WITNESS:  Maybe.

14  BY MR. MARTENS:

15      Q.   What would your reaction have been if you

16  had heard the executive director of the BCMD

17  expressed the view that a Baptist religious entity

18  should have less religious freedom than a Roman

19  Catholic entity?

20         MR. GANT:  Objection.  Vague, foundation,

21  calls for speculation.

1          THE WITNESS:  I would be stunned.

2     BY MR. MARTENS:

3          Q.   Why?

4          MR. GANT:  Same objections.

5          THE WITNESS:  It's just not the Will

6     McRaney I know, and it's not in keeping with

7     Baptist beliefs.

8     BY MR. MARTENS:

9          Q.   During Dr. McRaney's tenure as executive

10    director of BCMD, what did his position entail in

11    terms of duties?

12         MR. GANT:  Objection.  Vague, foundation,

13    calls for speculation, and compound.

14         THE WITNESS:  Setting and implementing a

15    vision for our state convention and providing

16    leadership.

17    BY MR. MARTENS:

18         Q.   When you say vision, what do you mean by

19    that?

20         A.   Where he wanted to see the convention go

21    in terms of how we spend our dollars and pursue our

Veritext Legal Solutions
866 299-5127

```
 1   ministry.
 2        Q.    Is setting vision a spiritual activity?
 3             MR. GANT:  Objection.  Vague.
 4             THE WITNESS:  In this context, yes.
 5   BY MR. MARTENS:
 6        Q.    Why do you say that?
 7        A.    If you're the executive director of a
 8   state convention and you're not seeking the will of
 9   God, you're not doing your job.
10        Q.    Does the executive director's -- strike
11   that.
12             During your tenure as BCMD president, did
13   the executive director's job responsibilities
14   include conveying the Baptist message?
15             MR. GANT:  Objection.  Vague, compound.
16             THE WITNESS:  I suppose.  It's not a
17   major task.
18   BY MR. MARTENS:
19        Q.    Does -- during your tenure as the
20   president of the BCMD, did the executive director's
21   job responsibilities include evangelism?
```

1    MR. GANT:  Objection.  Vague.

2    THE WITNESS:  It might not have been in

3 the job description, but it's certainly an

4 expectation of every Christian, particularly every

5 Christian minister.

6 BY MR. MARTENS:

7   Q.   During your tenure as the president of

8 BCMD, did the executive director's job

9 responsibilities including church -- include church

10 planting?

11    MR. GANT:  Objection.  Vague, foundation.

12    THE WITNESS:  He oversaw church planting,

13 but that wasn't specifically his task.

14 BY MR. MARTENS:

15   Q.   During your tenure as president of BCMD,

16 did the executive director's job responsibilities

17 include oversight and direction of church planting?

18    MR. GANT:  Same objections, and compound.

19    THE WITNESS:  Yes.

20 BY MR. MARTENS:

21   Q.   During your tenure as president of BCMD,

Page 52

1  did the executive director's job responsibilities

2  include support of evangelism?

3          MR. GANT:  Objection.  Vague.

4          THE WITNESS:  Absolutely.

5  BY MR. MARTENS:

6      Q.   During your tenure as president of the

7  BCMD, did the executive director's job

8  responsibilities include oversight of strengthening

9  congregations to fulfill Jesus' command in

10  scripture?

11          MR. GANT:  Objection.  Vague, compound.

12          THE WITNESS:  Yes.

13  BY MR. MARTENS:

14      Q.   During your tenure as president of BCMD,

15  did the executive director's job responsibilities

16  including -- include oversight of church planting

17  strategy?

18      A.   Yes.

19      Q.   If you could take a look at Exhibit 3,

20  this is the Strategic Partnership Agreement?

21      A.   Okay.  Um-hum.

Veritext Legal Solutions
866 299-5127

1      Q.   During your tenure as president of BCMD,

2  did the executive director's job responsibilities

3  include oversight effort -- oversight of efforts to

4  seek conversions?

5           MR. GANT:  Objection.  Vague, compound.

6           THE WITNESS:  Yes.

7  BY MR. MARTENS:

8      Q.   And what are conversions?

9      A.   Where people surrender their life to

10  Jesus Christ as their Lord and Savior.

11     Q.   Take a look at the Strategic Partnership

12  Agreement, Exhibit 3, the second page under General

13  Principles, paragraph 1, there's a reference at the

14  end of that paragraph to penetrating lostness

15  through church planting and evangelism, do you see

16  that?

17     A.   Where is it?

18     Q.   The last -- the last line of paragraph 1

19  under General Provisions.

20     A.   Yes, I see it.

21     Q.   Do you know what penetrating lostness

Veritext Legal Solutions
866 299-5127

1  means?

2      MR. GANT:  Objection.

3      THE WITNESS:  Yes, I do.

4  BY MR. MARTENS:

5      Q.  What is it?

6      A.  Yes, I do.

7      MR. GANT:  Objection.  Vague, foundation.

8  Go ahead.

9      THE WITNESS:  Seeking to lead people from

10  no relationship to God to a relationship to God

11  through Jesus Christ.

12  BY MR. MARTENS:

13      Q.  During your tenure as president of BCMD,

14  was the executive director's job responsibilities

15  such that they included developing a Strategic plan

16  for penetrating lostness through church planting

17  and evangelism?

18      A.  Would you repeat the question please?

19      Q.  During your tenure as president of BCMD,

20  did the executive director's job responsibilities

21  include development of a strategic plan for

Page 55

1   penetrating lostness through church planting and

2   evangelism?

3            MR. GANT:  Same objections.

4            THE WITNESS:  Absolutely.

5   BY MR. MARTENS:

6       Q.   During Dr. McRaney's tenure as executive

7   director, did he hold himself out as a minister?

8            MR. GANT:  Objection.  Vague, foundation,

9   calls for speculation.

10           THE WITNESS:  I would say yes.

11  BY MR. MARTENS:

12      Q.   Why would you say yes?

13           MR. GANT:  Same objections.

14           THE WITNESS:  Because he came to us as

15  a -- as a -- as a minister of the gospel.

16  BY MR. MARTENS:

17      Q.   During Dr. McRaney's tenure as executive

18  director of BCMD, was he provided a parsonage

19  allowance by BCMD?

20           MR. GANT:  Objection.  Foundation, calls

21  for speculation, and for a legal conclusion.

Veritext Legal Solutions
866 299-5127

1          THE WITNESS:  I think so, but I'm not

2    sure.

3    BY MR. MARTENS:

4      Q.   And can you just tell us briefly what a

5    parsonage allowance is?

6          MR. GANT:  Objection to the extent it

7    calls for a legal conclusion and foundation.

8          THE WITNESS:  For pastors, the church

9    helps or entirely -- helps to fund or entirely

10   funds a pastor's residence.

11   BY MR. MARTENS:

12     Q.   Is there a tax advantage to doing so?

13     A.   Yes.

14         MR. GANT:  Same objection.

15         THE WITNESS:  Yes.

16   BY MR. MARTENS:

17     Q.   What is that?

18         MR. GANT:  Same objections.

19         THE WITNESS:  I don't think it's taxable

20   income if I'm recall -- recalling correctly.

21   BY MR. MARTENS:

Page 57

1      Q.   And are you familiar that -- familiar

2  with that idea of a parsonage allowance as a result

3  of your service as a minister?

4      A.   I would quibble with the -- the word

5  parsonage allowance.

6      Q.   What would you call it?

7      A.   Housing allowance.

8      Q.   Are you familiar with the idea of a

9  nontaxable housing allowance as a result of your

10 service as a minister?

11     A.   Yes.

12     Q.   Let's go back to Exhibit 3, the Strategic

13 Partnership Agreement, --

14     A.   Um-hum.

15     Q.   -- and look at the top of the last page

16 entitled, Cooperation, do you see that?

17     A.   Yes, I do.

18     Q.   And reading from paragraph 1, it says, It

19 is the continuing goal of the two partners to

20 improve cooperation and communication in the

21 planning, administration, promotion, and

1    implementation of the details of the Strategic

2    Partnership Agreement.  Did I read that correctly?

3         A.   Yes, you did.

4         Q.   Do you agree that that was the goal of

5    the Strategic Partnership Agreement during your

6    tenure as president of BCMD?

7              MR. GANT:  Objection.  Vague, compound,

8    foundation, calls for speculation.

9              THE WITNESS:  Please repeat the question.

10   BY MR. MARTENS:

11        Q.   Do you agree that improving cooperation

12   and communication between NAMB and BCMD was the

13   goal of the SPA during your tenure as BCMD

14   president?

15             MR. GANT:  Same objections.

16             THE WITNESS:  Yes.

17   BY MR. MARTENS:

18        Q.   Is the relationship between BCMD as

19   cooperative rather than hierarchical a doctrinal

20   commitment?

21             MR. GANT:  I'm sorry, can I hear that

Page 59

1    back, please?

2            (Whereupon, the record was read as

3    requested.)

4            MR. GANT:  Objection.  Vague.

5            THE WITNESS:  I don't know if it's

6    referred to in the Baptist Faith and Message or

7    not, but it is -- it is in keeping with Baptist

8    principles.

9    BY MR. MARTENS:

10       Q.    Okay.

11       A.    The principle of autonomy.

12       Q.    Okay.  Let's turn to the second page of

13   the document which has a section we looked at

14   before entitled, General Principles.

15       A.    Um-hum.

16       Q.    And it reads in the second sentence of

17   paragraph 1, The purpose of this Agreement is to

18   define the relationships and responsibilities of

19   the Convention and the North American Mission Board

20   in areas where the two partners jointly develop,

21   administer, and evaluate a strategic plan for

Page 60

1    penetrating lostness through church planting and

2    evangelism, did I read that correctly?

3         A.   Yes, you did.

4         Q.   And in that sentence, the convention

5    refers to whom?

6         A.   Baptist Convention of Maryland/Delaware

7    in this instance, in this particular agreement.

8         Q.   If we look at item 5, it reads that,

9    Financial support for the strategic plan shall be

10   provided by the two entities on a negotiated ratio

11   basis and reviewed annually, did I read that

12   correctly?

13        A.   Yes, you did.

14        Q.   What is financial support?

15             MR. GANT:  Objection.  Vague, foundation.

16             THE WITNESS:  Funds that the North

17   American Mission Board would provide to the Baptist

18   Convention of Maryland/Delaware to pursue our

19   mission.  In particular, church planting is my

20   understanding.

21   BY MR. MARTENS:

Page 61

1      Q.   Let's turn to the next page under the

2  section entitled, Personnel.  Paragraph No. 1 says,

3  Jointly Funded Missionary Personnel.  I'd like to

4  go to item D that reads, All missionaries will

5  participate in at least semiannual review --

6  reviews with input from all financially supporting

7  partners coordinated through the convention's

8  executive director or his designee, did I read that

9  correctly?

10     A.   Yes, you did.

11     Q.   And NAMB was a financially supporting

12  partner --

13     A.   Yes.

14     Q.   -- of BCMD during your tenure as

15  president of BCMD, correct?

16     A.   Yes.

17          THE WITNESS:  Did you have an objection?

18          MR. GANT:  I did.

19          THE WITNESS:  Go ahead.

20          MR. GANT:  Can I hear it back?

21          (Whereupon, the record was read as

1    requested.)

2         MR. MARTENS:  Let me do the question over

3    to save time here.

4    BY MR. MARTENS:

5         Q.   During your tenure as president of BCMD,

6    was NAMB a financially supporting partner as that

7    term is used in paragraph D that we just read?

8         MR. GANT:  Objection.  Vague, compound,

9    foundation.

10        THE WITNESS:  Yes.

11   BY MR. MARTENS:

12        Q.   What does it mean to be a financial

13   support -- a financially supporting partner under

14   the SPA?

15        MR. GANT:  Same objections.

16        THE WITNESS:  As I said earlier, they

17   provide funds for the pursuit of the convention's

18   mission, particularly church planting, but I don't

19   think it was exclusively that.

20   BY MR. MARTENS:

21        Q.   Let's turn to the last page.  The V is

1 entitled, Funding. Look at paragraph 2. It reads,

2 The convention will be accountable to the North

3 America Mission Board for the expenditure of NAMB

4 resources according to the specifics of the

5 strategic plan. Did I read that correctly?

6      A. I'm sorry, which one?

7      Q. Paragraph 2.

8      A. Please read it again.

9      Q. The convention will be accountable to the

10 North American Mission Board for the expenditure of

11 NAMB resources according to the specifics of the

12 strategic plan did I read that correctly?

13      A. Yes.

14      Q. In your understanding, is that consistent

15 with the principle of autonomy?

16        MR. GANT: Objection. Vague, foundation.

17        THE WITNESS: Certainly.

18 BY MR. MARTENS:

19      Q. If we go back to page 3 of the SPA, this

20 section entitled on page 2, General Principles, the

21 last general principle No. 14 on page 3 reads, "All

1   elements of this document shall be consistent with

2   the most recently adopted version of the Southern

3   Baptist Convention Baptist Faith and Message, did I

4   read that correctly?

5       A.   Yes, you did.

6       Q.   What does that mean?

7            MR. GANT:  Objection.  Vague, foundation,

8   calls for speculation.

9            THE WITNESS:  It means that nothing in

10  this agreement can violate the most recent adopted

11  version of the Baptist Faith and Message.

12  BY MR. MARTENS:

13      Q.   Does that mean that interpreting this

14  agreement requires an understanding of the Baptist

15  Faith and Message?

16           MR. GANT:  Objection.  Foundation, calls

17  for speculation, vague, compound.

18           THE WITNESS:  Please repeat the question.

19  BY MR. MARTENS:

20      Q.   Does interpreting this agreement require

21  an understanding of the Baptist Faith and Message?

Veritext Legal Solutions
866 299-5127

1      A.    It wouldn't hurt.  I don't know that it's

2  necessary.

3      Q.    How would one -- strike that.

4            If paragraph 14 requires that the

5  agreement be consistent with the Baptist Faith and

6  Message, how would one interpret the agreement

7  without knowing the Baptist Faith and Message?

8            MR. GANT:  Objection.  Vague, foundation,

9  calls for speculation, and mischaracterizes the

10  document.

11           THE WITNESS:  I think I may correct my

12  answer.  I would say that you could understand it.

13  You could understand the document, but interpreting

14  would require a knowledge of the Baptist Faith and

15  Message.  You could understand it without that, but

16  interpreting it would require that, yes, in my

17  view.

18  BY MR. MARTENS:

19      Q.    When did Dr. McRaney's tenure as

20  executive director of BCMD end?

21      A.    The vote was on June the 8th, 2015.

Page 66

1      Q.   Why did his time in that role end?

2           MR. GANT:  Objection.  Vague.

3   BY MR. MARTENS:

4      Q.   Let me rephrase because you may -- I may

5   be unclear.

6           Was Mr. B -- was Mr. -- strike that.

7           Was Dr. McRaney's tenure as executive

8   director of BCMD terminated?

9           MR. GANT:  Was his tenure terminated?

10  Objection, vague.

11  BY MR. MARTENS:

12     Q.   Let me rephrase.

13          Was Dr. McRaney terminated as executive

14  director of BCMD in June of 2018?

15     A.   He was given an opportunity to resign.

16     Q.   Did he resign?

17     A.   He did the next day as I recall.

18     Q.   Were you involved in the decision to give

19  him an opportunity to resign?

20     A.   Yes.

21     Q.   Did you pray over that decision?

Veritext Legal Solutions
866 299-5127

1        A.    Abundantly.

2        Q.    Why do you say that?  Why did you -- why

3   did you laugh when I asked that?

4        A.    It was probably the most painful,

5   difficult decision of my life.

6        Q.    Did you consider it a spiritual decision?

7              MR. GANT:  Objection.  Vague.

8              THE WITNESS:  Absolutely.

9   BY MR. MARTENS:

10       Q.    Did you consider it a decision for which

11  you sought God's guidance?

12       A.    Absolutely.

13       Q.    I'm going to show you what appears to be

14  an email from John -- from June of 2016 between you

15  and Michael Trammell and ask you if you recognize

16  it, and --

17       A.    Can --

18       Q.    -- I'm going to mark it.

19       A.    Can I ask you a question?

20       Q.    Well --

21       A.    No, I guess not.  Okay.  You said

Veritext Legal Solutions
866 299-5127

1   something earlier.  I'm not sure I answered it, but

2   that's --

3       Q.  Okay.  Well, what was that?  We can

4   certainly clear it up.

5       A.  There was -- there was a why question in

6   there somewhere.  Maybe I answered it.  I don't

7   recall.

8       Q.  Yeah.  Why -- why -- I think what I asked

9   you was why was Dr. McRaney given the opportunity

10   to resign?

11       MR. GANT:  Are you asking a new question?

12   BY MR. MARTENS:

13       Q.  If you --

14       MR. MARTENS:  Yes, I am.

15       MR. GANT:  Okay.  Objection.  Vague,

16   foundation.  Go ahead.

17       THE WITNESS:  To adequately answer that

18   question, you would have to interview every one of

19   the 37 people who voted in favor of asking him for

20   his resignation.

21   BY MR. MARTENS:

Veritext Legal Solutions
866 299-5127

1     Q.   Okay.  Let me show you -- strike that.

2     Were you involved in discussions with

3 those 37 people who were members of the General

4 Mission Board in the decision to ask Dr. McRaney to

5 resign as executive director?

6     A.   Yes, I was.

7     MR. GANT:  You've got to give me a

8 chance.

9     THE WITNESS:  I'm sorry.  I keep

10 forgetting.  I'll just pause all the time.

11     MR. GUNDERSON:  You're doing fine.

12     MR. GANT:  I know you're trying.  I'm not

13 criticizing you.  I'm just --

14     THE WITNESS:  I'm trying.  I'm not used

15 to the setup.

16     MR. GANT:  We need a clear record.  It's

17 an unusual way of communicating.

18     May I have the question back and then

19 I'll lodge my objection?  And just I think you

20 misstated something, but you can -- I'll make my

21 objection and you can decide whether you want to

Veritext Legal Solutions
866 299-5127

1    fix your question.  Go ahead.

2            (Whereupon, the record was read as

3    requested.)

4            MR. GANT:  Objection.  Foundation, vague,

5    assumes facts not in evidence, calls for

6    speculation.

7            THE WITNESS:  I want to add to that

8    response.

9    BY MR. MARTENS:

10       Q.   Sure.

11       A.   There were 38 people present.  To my

12   knowledge, one did not vote, so that's why I said

13   you would have to ask 37.

14       Q.   Were you involved in discussions with all

15   38 of those people?

16       A.   Yes.

17           MR. GANT:  Wait.  You need --

18           MR. MARTENS:  Scott, it's a frivolous

19   objection.  There's nothing to object to in that

20   question.

21           MR. GANT:  It's not frivolous.

Veritext Legal Solutions
866 299-5127

```
 1              (Whereupon, Warren Deposition Exhibit No.
 2    4, Documents Bates Numbered WARR 041 through 042,
 3    marked for identification.)
 4    BY MR. MARTENS:
 5        Q.    I'm going to show you Exhibit 4.
 6              MR. GANT:  It's not frivolous.  First of
 7    all, I didn't make an objection, Scott.
 8              MR. MARTENS:  Scott, if you keep it up,
 9    we're going to go to the Judge on this.
10              MR. GANT:  You're --
11              MR. MARTENS:  You're objecting to
12    compound and vague to questions that are not
13    remotely compound or vague, and I've asked you
14    not -- before not to do this, and if you're going
15    to keep it up, we're going to go to the Judge.
16              MR. GANT:  You're -- you're welcome to
17    call.  I didn't make an objection to that last
18    question, but what I would have done --
19              MR. MARTENS:  Just state what you need to
20    state.  Let's go.
21              MR. GANT:  No, I just -- please give me a
```

Veritext Legal Solutions
866 299-5127

1    chance and pause.  I know you're trying your best.

2    Thank you.

3                THE WITNESS:  Okay.

4    BY MR. MARTENS:

5        Q.   I'll show you Exhibit 4.

6                MR. GANT:  You're welcome to apologize at

7    any time.

8    BY MR. MARTENS:

9        Q.   Do you recognize Exhibit 4?

10       A.   Yes.

11       Q.   And is it an email exchange between you

12   and Michael Trammell on or about June 3rd and June

13   4th of 2016?

14       A.   Yes.

15       Q.   As of June 2016, who was Michael

16   Trammell?

17       A.   He was a member -- I believe he was a

18   member of the Administrative Committee, certainly a

19   member of the General Mission Board.

20       Q.   And was he another pastor in the BCMD

21   jurisdiction?

Page 73

1        A.    Yes.

2        Q.    I want to direct your attention to the

3     middle of the first page --

4        A.    Um-hmm.

5        Q.    -- in an email that you wrote on June

6     4th, 2016 at 12:08 p.m.; do you see that?

7        A.    Um-hum.  Yes.  Um-hum.

8        Q.    And you wrote, "I really do not recall at

9     all what I said to Wolverton.  He may well be

10    right.  I would tell him and anyone else, though,

11    that this is the bottom line:  We fired Will

12    because of his retched leadership, not because of a

13    possible loss of NAMB funds."  Did I read that

14    correctly?

15       A.    No.  You said --

16       Q.    I -- I misread the first sentence?

17       A.    The all, yeah.

18       Q.    Let me read that again.  On June 4th,

19    2016 at 12:08 p.m. you wrote, "I really do not

20    recall all that I said to Wolverton.  He may well

21    be right.  I would tell him and anyone else,

Page 74

1    though, that this is the bottom line:  We fired

2    Will because of his retched leadership, not because

3    of a possible loss of NAMB funds."  Did I read that

4    correctly?

5        A.   Yes, you did.

6        Q.   Was that a true statement when you made

7    it to Mike Trammell in June of 2016?

8            MR. GANT:  Objection.  Vague, compound.

9            THE WITNESS:  It was my view, which I

10   considered it to be the truth.

11   BY MR. MARTENS:

12       Q.   Do you still consider it to be the truth

13   today?

14       A.   Absolutely.

15       Q.   What was your basis for making that

16   statement?

17           MR. GANT:  Objection.  Compound.

18           THE WITNESS:  Numerous conversations with

19   leadership, conversations with pastors,

20   conversations with senior staff, observations.

21   BY MR. MARTENS:

Veritext Legal Solutions
866 299-5127

1      Q.   Are you done with your answer?

2      A.   Yes.

3      Q.   When you say conversations with

4  leadership, what do you mean by leadership?

5      A.   The president of the General Mission

6  Board, Mike Dooley, and the chairman of the

7  Administrative Committee, Harold Phillips, as well

8  as others on the Administrative Committee.  In

9  fact, all of the others on the Administrative

10  Committee.

11     Q.   When you refer to Will McRaney -- strike

12  that.

13        When you refer to Will in this passage

14  that I read from your email, is Will, Will McRaney?

15     A.   Yes.

16     Q.   And when you refer to Will McRaney's

17  retched leadership, what did you mean by that?

18     A.   There were six areas of concern that we

19  had with Will, which you all have the documentation

20  for.

21        Five of those -- actually, all six were

Veritext Legal Solutions
866 299-5127

1    concerns that we had.  He failed -- we thought that

2    he had failed to serve us well as our leader.

3         Q.    I'm going to show you what I'm going to

4    mark as Exhibit 5.

5              (Whereupon, Warren Deposition Exhibit No.

6    5, Documents Bates Numbered NAMB 7667 through 7668,

7    marked for identification.)

8    BY MR. MARTENS:

9         Q.    Do you recognize Exhibit 5?

10        A.    I certainly do.

11        Q.    What is it?

12             MR. GANT:  Just, Matt, just a standing

13   request if it has a Bates number, if you can put it

14   in the record.

15             MR. MARTENS:  Exhibit 5 bears the Bates

16   number NAMB 7667 through 7668.

17             MR. GANT:  Thank you.

18   BY MR. MARTENS:

19        Q.    Do you recognize Exhibit 5 as an email

20   exchange between you and Kevin Ezell on June 14th

21   of 2016?

Veritext Legal Solutions
866 299-5127

1            MR. GANT:  Objection.  Mischaracterizes

2    the document.

3            THE WITNESS:  Yes, it is an email from me

4    to Kevin.

5    BY MR. MARTENS:

6        Q.   And just for clarification, and also

7    involves an email with a steve@cantonbaptist, do

8    you see that at the bottom?

9            MR. GANT:  Thank you.  That was the

10   objection.

11           THE WITNESS:  Yes, it does.

12   BY MR. MARTENS:

13       Q.   Who is steve@cantonbaptist?

14       A.   Pastor Steve Wolverton.

15       Q.   I want to direct your attention to the

16   second paragraph of the email and I'm going to ask

17   you to read it to yourself.

18           MR. GANT:  Sorry, which?

19           MR. MARTENS:  Paragraph two of the first

20   email on -- at the top of the page at 9:12 p.m.

21           THE WITNESS:  Do you want me to read it?

Veritext Legal Solutions
866 299-5127

1    BY MR. MARTENS:

2        Q.    Just to yourself.

3              (Whereupon, there was a pause for

4    document examination.)

5              THE WITNESS:  Yes.  Okay.

6    BY MR. MARTENS:

7        Q.    What role, if any, did Will McRaney's

8    lack of a humble spirit play in BCMD's decision to

9    terminate his employment?

10             MR. GANT:  Objection.  Vague and

11   foundation.

12             THE WITNESS:  He betrayed a spirit of

13   unwillingness to make the changes from his heart

14   that needed to be made in his leadership.

15   BY MR. MARTENS:

16       Q.    Was it -- in your estimation, did Will

17   McRaney lack the humble spirit necessary for the

18   role as executive director of BCMD?

19             MR. GANT:  Objection.  Foundation.

20             THE WITNESS:  Yes.

21   BY MR. MARTENS:

Page 79

1       Q.   Are you familiar with Philippians 2:5-8?

2       A.   Yes.

3       Q.   I'm going to show what you what we're

4  going to mark as Exhibit 6.

5       (Whereupon, Warren Deposition Exhibit No.

6  6, Portion of Philippians in New Testament, marked

7  for identification.)

8  BY MR. MARTENS:

9       Q.   Do you recognize Exhibit 6 as a portion

10  of Philippians 2 in the New Testament of the King

11  James version of the Bible?

12      A.   Yes, I do.

13      Q.   And are you familiar with verses 5

14  through 8 of Philippians 2?

15      A.   I'm very familiar.

16      Q.   You probably could recite it from memory,

17  right?

18      A.   Not in King James, but maybe.

19      Q.   Verse 5 reads, Let this mind be in you,

20  which was also in Christ Jesus.  Do you have an

21  understanding of that passage, of that verse?

Page 80

1        A.   Yes.

2        Q.   What is your understanding of it?

3        A.   That we should emulate the mind of

4  Christ.

5        Q.   And verse 8 reads, And being found in

6  fashion as a man, He humbled himself and became

7  obedient unto death, even the death of the cross.

8  Did I read that correctly?

9        A.   Yes.

10       Q.   Who is the He in that verse?

11       A.   Jesus.

12       Q.   And what does that passage tell you what

13  the mind of Christ was?

14       A.   He flew low.

15       Q.   What do you mean by that?

16       A.   Which is what the Greek word for humble

17  means.  It means that you -- you don't puff

18  yourself up, you know, consider yourself above

19  others.  You serve -- you're not proud.  Beyond

20  that, he was totally obedient to the Father, to

21  Father of God, even though it involved crucifixion.

Veritext Legal Solutions
866 299-5127

1    Q.    Do you consider a humble spirit to be an

2   element of a Christ-like character?

3    A.    Absolutely.

4    Q.    Based on your involvement -- strike that.

5          Based on your discussion with other

6   members of the General Mission Board during your

7   tenure as president of BCMD, was Dr. McRaney

8   terminated as executive director of BCMD because

9   someone in NAMB stated that he had breached the

10  SPA?

11          MR. GANT:  Objection.  Vague, compound,

12  foundation.

13          THE WITNESS:  No, he was not terminated

14  because of the funding issue.

15  BY MR. MARTENS:

16    Q.    Based on your discussions with others on

17  the General Mission Board during your tenure as

18  president of BCMD, did NAMB or any NAMB personnel

19  say disparaging things about Dr. McRaney to BCMD

20  that caused BCMD to terminate Dr. McRaney?

21          MR. GANT:  Objection.  Vague, compound,

Page 82

 1   foundation, calls for speculation.

 2            THE WITNESS:  No, not to --

 3            MR. GANT:  Sorry, and to the extent it

 4   calls for a legal conclusion.

 5            THE WITNESS:  I can't speak for the

 6   entire BCMD, but not to my knowledge.

 7   BY MR. MARTENS:

 8       Q.   Did NAMB personnel tell BCMD that

 9   Dr. McRaney had lied?

10            MR. GANT:  Same objections.

11            THE WITNESS:  Please repeat the question.

12   BY MR. MARTENS:

13       Q.   Did any NAMB personnel tell BCMD that

14   Dr. McRaney had lied?

15            MR. GANT:  Objection.  Vague, compound,

16   foundation, calls for speculation.

17            THE WITNESS:  Not to my knowledge.

18   BY MR. MARTENS:

19       Q.   Did any allegation that Dr. McRaney had

20   lied have any bearing on BCMD's decision to

21   terminate him in June of 2015?

Veritext Legal Solutions
866 299-5127

1          MR. GANT:  Objection, vague, compound,

2     foundation, calls for speculation.

3          THE WITNESS:  Would you repeat it?

4     BY MR. MARTENS:

5          Q.   Based on your discussions with other

6     members of the General Mission Board, to your

7     knowledge did any allegation that Dr. McRaney had

8     lied have any bearing on the decision to terminate

9     him in June of 2015?

10          MR. GANT:  Same objections.

11          THE WITNESS:  No.

12     BY MR. MARTENS:

13          Q.   Did NAMB personnel tell BCMD that

14     Dr. McRaney had ruined BCMD?

15          MR. GANT:  Same objections.

16          THE WITNESS:  Not to my knowledge.

17     Again, I have to answer in terms of what I was

18     said -- what was said to me.  That was never said

19     to me.

20     BY MR. MARTENS:

21          Q.   Based on your interactions with other

Veritext Legal Solutions
866 299-5127

1   members of the GMB, did any allegation that

2   Dr. McRaney had ruined BCMD play any role in the

3   decision to terminate him in June of 2015?

4          MR. GANT:  Same objections.

5          THE WITNESS:  No.

6   BY MR. MARTENS:

7     Q.   From your perspective, did NAMB appear to

8   be attacking Dr. McRaney?

9          MR. GANT:  Objection.  Vague.

10         THE WITNESS:  No, not as I understand the

11   word attack.

12   BY MR. MARTENS:

13     Q.   Based on your discussions with other

14   members of the GMB, did any attack on Dr. McRaney

15   by NAMB play any role in the decision to terminate

16   Dr. McRaney in June of 2015?

17         MR. GANT:  Objection.  Vague, foundation.

18         THE WITNESS:  Not at all.

19   BY MR. MARTENS:

20     Q.   Based on your discussions with other

21   members of the GMB, was Dr. McRaney terminated as

Veritext Legal Solutions
866 299-5127

1    executive director of the BCMD because NAMB asked

2    BCMD to fire him?

3         A.    Not at all.

4         Q.    Based on your discussions with other

5    members of the GMB, was Dr. McRaney terminated as

6    executive director of the BCMD in June of 2015

7    because NAMB pressured BCMD to fire him?

8              MR. GANT:  Objection.  Vague, foundation,

9    compound, calls for speculation.

10             THE WITNESS:  Not at all.

11   BY MR. MARTENS:

12        Q.    Based on your discussions with other

13   members of the GMB, was Dr. McRaney terminated as

14   executive director of the BCMD because NAMB

15   threatened to withhold funds if Dr. McRaney was not

16   terminated?

17             MR. GANT:  Objection.  Vague, foundation,

18   calls for speculation, compound.

19             THE WITNESS:  No.

20   BY MR. MARTENS:

21        Q.    I want to show you what we're going to

Page 86

1   mark as Exhibit 7.

2           (Whereupon, Warren Deposition Exhibit No.

3   7, Affidavit of Mark Dooley In Support of the

4   Baptist Convention of Maryland/Delaware's Motion to

5   Quash, marked for identification.)

6   BY MR. MARTENS:

7       Q.   Have you seen 7, Exhibit 7 previously?

8       A.   I have seen it, but I have not read it.

9       Q.   Okay.  I'd like you to take a minute to

10  read whatever you want, but in particular, I'm

11  going to ask you about paragraph 4 of Exhibit 7.

12          (Whereupon, there was a pause for

13  document examination.)

14          THE WITNESS:  Okay.  I've read section 4.

15  BY MR. MARTENS:

16      Q.   Were all personnel decisions considered

17  and recommended by the Administrative Committee and

18  voted on by the General Mission Board during your

19  tenure as president of the BCMD guided by religious

20  tenants of BCMD and its associated churches and

21  made only after meaningful prayer and

Page 87

1    consideration?

2            MR. GANT:  Objection.  Vague, compound,

3    foundation, calls for speculation.

4            THE WITNESS:  Yes.

5    BY MR. MARTENS:

6        Q.   Was that true of BCMD's decision to

7    terminate Dr. McRaney in June of 2015?

8            MR. GANT:  Same objections.

9            THE WITNESS:  Please repeat the question.

10   BY MR. MARTENS:

11       Q.   Was that true of BCMD's decision to

12   terminate Dr. McRaney in June of 2015?

13       A.   Was what true?

14           MR. GANT:  Same objections.

15   BY MR. MARTENS:

16       Q.   The statement that we just -- that I just

17   asked you about concerning how decisions were made

18   with regard to personnel?

19           MR. GANT:  Same objections.  Vague if it

20   wasn't included.

21           THE WITNESS:  Yes, we did.  We were

Page 88

1    guided by religious tenets of BCMD and associated

2    churches, and we made that decision only after

3    meaningful prayer and consideration.

4           MR. MARTENS:  Let's take a break.

5           THE WITNESS:  Okay.

6           THE VIDEOGRAPHER:  We are going off the

7    record.  The time is 11:55 a.m.

8           (Recess taken -- 11:55 a.m.)

9           (After recess -- 12:07 p.m.)

10          THE VIDEOGRAPHER:  We are back on the

11    record.  The time is 12:07 p.m.  This is media

12    number two.

13    BY MR. MARTENS:

14      Q.   Dr. Warren, I would like to show you what

15    I'm going to mark as Exhibit 8.

16          (Whereupon, Warren Deposition Exhibit No.

17    8, Document Bates Numbered NAMB-0001, marked for

18    identification.)

19    BY MR. MARTENS:

20      Q.   I want to back up and talk about the

21    events that led to Dr. McRaney's termination.

Veritext Legal Solutions
866 299-5127

1          Do you recognize Exhibit 8?

2     A.   Yes, I do.

3     Q.   What is it?

4     A.   It is a letter from Kevin Ezell and Jeff

5   Christensen -- Christopherson, I'm sorry, to Will

6   McRaney.

7     Q.   Were you copied on that letter?

8     A.   Yes.

9     Q.   Did you receive a copy of it on or about

10  December 2nd, 2014?

11    A.   Yes.

12    Q.   When did you first learn that NAMB had

13  concerns -- strike that.

14          At some point, did you learn that NAMB

15  had concerns about Dr. McRaney's work as executive

16  director of BCMD?

17          MR. GUNDERSON:  Objection.  Vague.

18          THE WITNESS:  It was at this point that I

19  learned that NAMB had concerns not about Will's

20  ministry in general, but about his handling of the

21  agreement.

Veritext Legal Solutions
866 299-5127

1    BY MR. MARTENS:

2        Q.    And when you say at this point, to what

3    are you referring?

4        A.    December 2nd, 2014, whenever we received

5    the letter.

6        Q.    What did you do when you got the letter?

7        A.    I got angry.

8        Q.    Angry at whom?

9        A.    Kevin Ezell and NAMB.

10       Q.    Why?

11       A.    I thought very highly of Will.  I was on

12   board with him.  I once told a group -- this is a

13   bit of a longer answer.

14       Q.    That's fine.

15       A.    I once told a group of -- on the General

16   Mission Board that I would follow him anywhere.  I

17   was a fan, and I was very impressed with him.  So,

18   I took this personally because they were slamming

19   my leader and my friend and someone that I

20   respected.

21       Q.    So, what did you do about that?

Veritext Legal Solutions
866 299-5127

1     A.   Well, we got together and talked about

2  it.

3     Q.   When you say we, who is we?

4     A.   My recollection is Will and Harold

5  Phillips and Mark Dooley and me; the leadership

6  team.

7     Q.   At the time, who was Harold Phillips?

8     A.   The -- he -- he was the chairman of the

9  Administrative Committee.

10     Q.   Of the BCMD?

11     A.   Yes.

12     Q.   And at the time, who was Mark Dooley?

13     A.   He was the president of the General

14  Mission Board of the BCMD.

15     Q.   Did the four of you get together in

16  person?

17     A.   I don't recall if it was in person or it

18  was a conference call.

19     Q.   Did you speak with anybody at NAMB about

20  the letter?

21     A.   No.

Veritext Legal Solutions
866 299-5127

```
 1            MR. GANT:  Objection.  Objection.  Vague.
 2            THE WITNESS:  No.
 3   BY MR. MARTENS:
 4       Q.   Did you speak with Kevin Ezell about the
 5   letter?
 6            MR. GANT:  Same objection.
 7            THE WITNESS:  He called -- he called me.
 8   BY MR. MARTENS:
 9       Q.   When was that approximately?
10       A.   It's in the documentation somewhere.  I
11   think it was still in Novem- -- in December.
12       Q.   And what do you recall about that
13   conversation?
14       A.   I wondered how he got my number.  I was
15   surprised to hear from him.  I was blunt.  I said,
16   You're wrong about Will.  You don't know him the
17   way I know him, and I'm not happy about your
18   letter, and I don't think you're being fair to him
19   or to us.
20       Q.   And what was Dr. Ezell's response?
21       A.   I don't recall.
```

Veritext Legal Solutions
866 299-5127

1    Q. Do you see that the letter, Exhibit 8,

2 refers to Dr. McRaney's serious and persistent

3 disregard of the Strategic Partner Agreement in the

4 first paragraph?

5    A. Yes.

6    Q. Do you see the first paragraph refers to

7 a breach of the agreement in the third line?

8    A. I was looking for the word breach.

9    Q. In the third line of the first paragraph.

10    A. Oh, yes.

11    Q. Do you see that the last paragraph refers

12 to willfully and repeatedly ignoring the Strategic

13 Partner Agreement?

14    A. I see that.

15    MR. GANT: I'm sorry, Matt. You keep

16 saying partner. It's partnership.

17 BY MR. MARTENS:

18    Q. Partnership Agreement.

19    Did any of those statements -- strike

20 that.

21    Based on your discussions with other

1    members of the GMB or anyone else at BCMD, did any

2    of those statements in the letter from Dr. Ezell

3    that is Exhibit 8 have any bearing on the decision

4    of BCMD to terminate Dr. McRaney's employment in

5    June of 2015?

6            MR. GANT:  Objection.  Vague, compound,

7    foundation, calls for speculation.

8            THE WITNESS:  One element of concern that

9    we had with Will was his relationship to NAMB.

10   BY MR. MARTENS:

11       Q.   What do you mean by that?

12       A.   As time went on, it seemed to be

13   adversarial.

14       Q.   And what do you mean as time went on?

15       A.    In the next six months, it seemed

16   adversarial to us, to me.

17       Q.   What does adversarial mean?

18       A.   Quite frankly, I think both men were

19   adversarial.

20       Q.   Both men meaning?

21       A.   Kevin Ezell and Will.  I think there was

Veritext Legal Solutions
866 299-5127

1    poor communication between the two of them.

2         Q.    Adversarial in a nonChrist-like way?

3              MR. GANT:  Objection.  Vague, foundation.

4              THE WITNESS:  No, not as enemies.  They

5    just -- just didn't agree, and I think it

6    became -- well, they just didn't agree.

7    BY MR. MARTENS:

8         Q.    You referenced earlier a -- a meeting you

9    had after receiving this letter with -- with four

10   people, three other people besides yourself.

11             Did Dr. McRaney during that meeting, or

12   otherwise, express to you a response to Exhibit 8,

13   the letter from Dr. Ezell in December of 2014?

14             MR. GANT:  Objection.  Vague, compound.

15             THE WITNESS:  If you mean did we discuss

16   it, yes.

17   BY MR. MARTENS:

18        Q.    And did Dr. McRaney express a view about

19   the letter?

20        A.    I'm sure he did.

21        Q.    Do you recall what that was?

Veritext Legal Solutions
866 299-5127

```
 1        A.   Like the rest of us, he wasn't happy
 2   about it.
 3        Q.   Okay.
 4        A.   More specific I can't get.
 5        Q.   Okay.  Did Dr. McRaney and Dr. Ezell in
 6   your -- based on your discussions with them appear
 7   to be in disagreement over whether or not
 8   Dr. McRaney had complied with the SPA?
 9        A.   Absolutely.
10        Q.   Let me show you what I'm going to mark as
11   Exhibit 9.
12             Strike that.  We already marked as
13   Exhibit I believe 1 the Baptist Faith and Message.
14   I'll just direct you back to page 7 where we
15   earlier looked at Section VI of the Baptist Faith
16   and Message concerning the church.  Do you remember
17   that?
18        A.   Yes.
19        Q.   And on page 8, we looked at the paragraph
20   that states that the New Testament speaks also of
21   the church as the Body of Christ, which includes
```

Page 97

1    all of the redeemed of all of the ages, believers

2    from every tribe, and tongue, and people, and

3    nation.  Do you remember discussing that?

4         A.   Yes.  Um-hum.

5         Q.   Do you consider Dr. McRaney to be part of

6    the Body of Christ, meaning a member of the

7    redeemed of all ages?

8         A.   Absolutely.

9         Q.   Did you believe that to be the case in

10   2015?

11        A.   Absolutely.

12        Q.   Do you believe it to be the case today?

13        A.   Absolutely.

14        Q.   Did you consider Dr. Ezell to be part of

15   the Body of Christ?  Meaning a member of the

16   redeemed of all ages?

17        A.   Absolutely.

18        Q.   Did you believe that to be the case in

19   2015?

20        A.   Absolutely.

21        Q.   Do you believe it to be the case today?

Veritext Legal Solutions
866 299-5127

1        A.    Absolutely.

2        Q.    Regardless of what local congregations

3   Drs. McRaney and Ezell are members of, do you

4   consider them to be both members of the church,

5   meaning the Body of Christ?

6        A.    Absolutely.

7        Q.    Did you believe that to be the case in

8   2015?

9        A.    Absolutely.

10       Q.    The disagreement you just described that

11  you observed between Drs. McRaney and Ezell over

12  Dr. McRaney's compliance with the SPA, do you view

13  that as a dispute between two people within the

14  Body of Christ?

15            MR. GANT:   Objection.   Vague.

16            THE WITNESS:   Yes, it was a dispute.

17  BY MR. MARTENS:

18       Q.    Did you consider that to be a dispute

19  between two members within the Body of Christ over

20  BCMD's cooperation with NAMB in their performance

21  of their cooperative evangelistic mission?

Page 99

```
 1              MR. GANT:  Objection.  Vague, foundation,
 2    compound.
 3              THE WITNESS:  It wasn't BCMD's
 4    cooperation.  It was Will's cooperation.
 5    BY MR. MARTENS:
 6        Q.   Okay.  Did you consider the dispute that
 7    you observed between Dr. Ezell and Dr. McRaney to
 8    be a dispute between two members within the Body of
 9    Christ concerning Dr. McRaney's cooperation with
10    NAMB in the performance of the cooperative
11    evangelistic mission?
12              MR. GANT:  Objection.  Vague, compound,
13    foundation.
14              THE WITNESS:  Yes.
15    BY MR. MARTENS:
16        Q.   When you received the termination --
17    strike that.
18              When you received the letter that's
19    Exhibit 8 from Dr. Ezell in December of 2014, did
20    you interpret it as an ultimatum from NAMB to fire
21    Dr. McRaney?
```

Veritext Legal Solutions
866 299-5127

1          MR. GANT:  Objection.  Vague.

2          THE WITNESS:  Absolutely not.

3  BY MR. MARTENS:

4     Q.  Did anyone from NAMB tell you that the

5  December 2nd, 2014 letter from Dr. Ezell and Jeff

6  Christer- -- Christopherson was an ultimatum to

7  fire Dr. McRaney?

8     A.  No.

9     Q.  Did BCMD terminate Dr. McRaney's

10  employment as executive director of BCMD because of

11  the December 2nd, 2014 letter?

12          MR. GANT:  Objection.  Vague, foundation,

13  calls for speculation.

14          THE WITNESS:  Again, you would need to

15  ask all 37 members why they voted yes.  That is not

16  why I voted yes --

17  BY MR. MARTENS:

18     Q.  Did any --

19     A.  But it wasn't this letter.

20     Q.  Did anyone in your presence express the

21  view that they voted to terminate Dr. McRaney's

Veritext Legal Solutions
866 299-5127

1    termination as executive director of BCMD because

2    of the December 2nd, 2014 letter from Dr. Ezell?

3        A.    No.

4        Q.    Who is David Jackson?

5        A.    At the time, he was the -- I don't recall

6    the technical term, but he was in charge of church

7    planting for the State Convention of

8    Maryland/Delaware.

9        Q.    At the time, meaning in 2014 and 2015?

10       A.    Yes.

11            MR. GANT:  Objection.  Sorry, objection.

12   Compound.

13   BY MR. MARTENS:

14       Q.    Did you speak to David Jackson about the

15   December 2nd, 2014 letter from NAMB that is Exhibit

16   8?

17       A.    No, not that I recall.

18       Q.    I'm going to show you what I'm going to

19   mark as Exhibit 9.

20            (Whereupon, Warren Deposition Exhibit No.

21   9, Documents Bates Numbered NAMB 6645 through NAMB

Page 102

1   6648, marked for identification.)

2           THE WITNESS:  So, is the correct answer

3   there I don't recall or, no, not that I recall?

4   Does it matter?

5   BY MR. MARTENS:

6      Q.   Whichever is --

7      A.   It doesn't matter?

8      Q.   Whichever is your best recollection.

9           MR. GANT:  I think you're looking in the

10   wrong direction.  I think you should look to your

11   left.

12   BY MR. MARTENS:

13      Q.   Whichever is your best memory.

14           MR. GUNDERSON:  You're saying because you

15   answered, no, I don't recall, or, yes, I don't

16   recall?  Is that your --

17   BY MR. MARTENS:

18      Q.   Let me ask you it this way:  I'll try to

19   clarify it.

20           MR. GUNDERSON:  Yeah.

21   BY MR. MARTENS:

Veritext Legal Solutions
866 299-5127

1    Q.   Do you recall any conversation with David

2  Jackson about the December 2nd, 2014 letter that is

3  Exhibit 8?

4    A.   I do not recall a conversation.

5    Q.   Let me show you what is Exhibit 9.

6        MR. GANT:  Matt, just a reminder, please,

7  about the Bates numbers.

8        MR. MARTENS:  Exhibit 9 is a document

9  bearing Bates numbers NAMB 6645 through 6648.

10  BY MR. MARTENS:

11    Q.   Do you recognize Exhibit 9?

12    A.   Yes, I do.

13    Q.   Do you recognize it as an email exchange

14  between Will McRaney, Kevin Ezell and ultimately

15  you beginning in November 20th, 2014 and continuing

16  through December 5th, 2014?

17        MR. GANT:  Objection.  Mischaracterizes

18  the document.

19        THE WITNESS:  Yes.

20  BY MR. MARTENS:

21    Q.   Do you remember receiving this email on

Page 104

1    or about December 5th, 2014?

2        A.   I remember it because I pulled it out of

3    my computer last week.

4        Q.   Okay.  Do you remember receiving

5    at -- remember receiving it at the time?

6        A.   I have no distinct recollection that

7    I -- when I received it.

8        Q.   Do you know why -- strike that.

9            Do you know what prompted Kevin Ezell to

10   send this to you on December 5th, 2014?

11       A.   I can't speak for Kevin, but I would

12   assume that he wanted to keep me in the loop of

13   conversations -- of communications since I was the

14   president.

15       Q.   Had you spoken with Kevin Ezell by

16   telephone as of December 5th, 2014?

17       A.   There is documentation in here somewhere

18   of my conversation with him, so I do not believe

19   that we had spoken at that point.  I would -- I do

20   not believe we did.

21       Q.   Okay.  Let's focus on Dr. Ezell's email

Page 105

1    to Will McRaney on the first page of Exhibit 9, the

2    email dated November 20th, 2014 at 10:06 p.m.  Do

3    you see that?

4        A.   November 20th?

5        Q.   Yes.

6        A.   At 5:25?

7        Q.   At 10:06 on the first page.

8        A.   On the first page.

9            MR. GUNDERSON:  The first page.

10           THE WITNESS:  Okay.  Yes.

11   BY MR. MARTENS:

12       Q.   And I think I said -- I should have said

13   from Kevin Ezell to Will McRaney on November 20th,

14   2014 at 10:06 p.m., are you with me there?

15       A.   Yes.

16       Q.   Okay.  Do you see there's some numbered

17   paragraphs there?

18       A.   Yes.

19       Q.   Numbered paragraph No. 1 reads, "Local

20   disregard for NAMB staff.  You have not yet

21   returned a phone call from Kevin Marsico.  Kevin

Page 106

1    and Ron Larson are very careful of their speech,

2    but our understanding is that you openly speak

3    against both leaders.  Jeff has confronted you on

4    this on two separate occasions.  Did I read that

5    correctly?

6         A.   Yes, you did.

7         Q.   Who is Kevin Marsico?

8         A.   He was employed by the North American

9    Mission Board.  I think he functioned as like a

10   regional director for church planting.

11        Q.   Back in 2014/2015?

12        A.   Yes.

13        Q.   Who was Ron Larson?

14        A.   Ron, as I recall, was the Send, S-E-N-D,

15   Send City representative for the North American

16   Mission Board dealing primarily I think with

17   Baltimore.

18        Q.   And that was true back in 2014/2015?

19        A.   Yes.

20        Q.   What is the Send organization?

21             MR. GANT:  Objection.  Foundation.

Page 107

1          THE WITNESS:  My recollection is it was

2     an effort to plant churches in major metropolitan

3     areas of the United States.

4     BY MR. MARTENS:

5          Q.   Prior to receiving this email from Kevin

6     Ezell on December 5th, 2014, were you aware of

7     issues between Dr. McRaney, Kevin Marsico, and Ron

8     Larson?

9          MR. GANT:  Objection.  Foundation,

10    compound.

11         THE WITNESS:  No.

12    BY MR. MARTENS:

13         Q.   Do you believe Kevin Marsico to be a

14    member of the Body of Christ?

15         MR. GANT:  Objection.  Foundation.

16         THE WITNESS:  Yes.

17    BY MR. MARTENS:

18         Q.   Do you -- did you believe that to be the

19    case in 2015?

20         A.   Yes.

21         Q.   Do you believe Ron Larson to be a member

1    of the Body of Christ?

2          A.    Yes.

3          Q.    Did you believe that to be the case in

4    2015?

5          A.    Yes.

6          Q.    Do you believe that openly speaking

7    against other members of the Body of Christ is an

8    example of a humble spirit?

9               MR. GANT:   Objection.   Vague, foundation,

10   incomplete hypothetical.

11              THE WITNESS:   Repeat the question,

12   please.

13   BY MR. MARTENS:

14         Q.    Do you believe that openly speaking

15   against other members of the Body of Christ is an

16   example of a humble spirit?

17              MR. GANT:   Same objections.

18              THE WITNESS:   If by openly speaking

19   against them one is referring to negative comments

20   about their character, my answer is yes.

21   BY MR. MARTENS:

                                          Page 109

1      Q.   You think it is an example of a humble

2  spirit?

3      A.   Oh, I'm sorry.  My answer is no, it's

4  not.

5      Q.   Do you believe that openly speaking

6  against other members of the Body of Christ is an

7  example of Christ-like character?

8         MR. GANT:  Objection.  Vague, compound,

9  foundation, incomplete hypothetical, calls for

10  speculation.

11         THE WITNESS:  Again --

12         MR. GANT:  Go ahead.

13         THE WITNESS:  -- with my understanding of

14  what speak against, openly against is, it is

15  not -- it's not in the spirit of Christ and it's

16  not humble.

17  BY MR. MARTENS:

18      Q.   Are you familiar with Christ's teaching

19  in Matthew 18 about how to resolve disputes among

20  members of the Body of Christ?

21      A.   Yes, I am.

Veritext Legal Solutions
866 299-5127

1    Q.   At a high level, what does Christ say are

2    the steps for dealing with disputes among members

3    of the Body of Christ?

4    A.   Matthew 18 states that if your brother

5    sins against you, you go to him, and I'll

6    paraphrase, try to work it out.

7    Q.   And when you --

8    A.   That's the beginning.

9    Q.   Okay.  And when does the term

10   brother -- what does the term brother mean in your

11   answer?

12   A.   Fellow Christian.

13   Q.   Is that another member of the Body of

14   Christ?

15   A.   Yes.

16   Q.   Where does openly speaking against

17   another member of the Body of Christ fit into

18   Christ's teaching in Matthew 18?

19   A.   It's a violation of Matthew 18.

20   Q.   Let's look at item 2 in Kevin Ezell's

21   email to Will McRaney titled, Disregarding NAMB's

Veritext Legal Solutions
866 299-5127

1　Processes.  Did you understand the part of the

2　dispute between NAMB and BCMD was the hiring of

3　BCM -- strike that.

4　　　　　Did you understand in the 2014/2015 time

5　period that part of the dispute between NAMB and

6　BCMD was the hiring by BCMD of certain personnel?

7　　　　　MR. GANT:  Objection.  Vague, compound,

8　foundation.

9　　　　　THE WITNESS:  Yes.

10　BY MR. MARTENS:

11　　　Q.　Who were the personnel?

12　　　A.　Joel Rainey and later Michael Crawford.

13　　　Q.　What position was Joel Rainey hired to

14　fill?

15　　　A.　I don't recall the exact title, but it

16　had to do with directing evangelism.

17　　　Q.　As directing evangelism, are you

18　referring to the BCMD?

19　　　A.　Yes.

20　　　Q.　Is directing evangelism for BCMD a

21　spiritual activity?

Page 112

1          MR. GANT:  Objection.  Vague.

2          THE WITNESS:  Absolutely.

3     BY MR. MARTENS:

4          Q.   What position was Michael Crawford hired

5     for?

6          A.   Again, in layman's terms, church

7     planting.

8          Q.   Is church planting a spiritual activity?

9          MR. GANT:  Same objection.

10         THE WITNESS:  Certainly.

11    BY MR. MARTENS:

12         Q.   And when you say hired for church

13    planting, are you referring to Michael Crawford

14    being hired for church planting for BCMD?

15         A.   Yes.

16         Q.   Let's look at item 3.  It refers to

17    adding percentages fees to -- to planters.

18              Prior to receiving this email from Kevin

19    Ezell on December 5th, 2014, were you aware of a

20    dispute between Drs. Ezell and McRaney about adding

21    percentages fees to planters?

                                      Page 113

```
 1              MR. GANT:  Objection.  Mischaracterizes
 2      the document, foundation, vague.
 3              THE WITNESS:  No, I was not aware.
 4      BY MR. MARTENS:
 5         Q.   Were you aware of -- strike that.
 6              Prior to receiving the email on December
 7      5th, 2014, were you aware of a dispute between
 8      anyone at NAMB and Dr. McRaney about adding
 9      percentages fees to planters?
10              MR. GANT:  Objection.  Vague.
11              THE WITNESS:  No, I was not.
12      BY MR. MARTENS:
13         Q.   Do you see in that document in paragraph
14      numbered 3, that document meaning Exhibit 9, the
15      email at 10:06 p.m. on November 20th from Kevin
16      Ezell to Will McRaney, on the second line of
17      paragraph numbered 3, there's a reference to church
18      planter's covenant, do you see that?
19         A.   Yes.
20         Q.   What is the church planter's covenant?
21         A.   My recollection is it's a covenant
```

Page 114

```
 1    between the church planter and the -- probably the

 2    Baptist Convention of Maryland/Delaware.

 3         Q.    And what is it -- what does the word

 4    covenant mean?

 5              MR. GANT:  Objection.  Vague, foundation.

 6    BY MR. MARTENS:

 7         Q.    Strike that.

 8              What does the word covenant mean as used

 9    in this email as you understand it meaning?

10         A.    An operating agreement.

11         Q.    Is there a reason it's referred to as a

12    covenant and not just an agreement?

13              MR. GANT:  Objection.  Foundation, calls

14    for speculation.

15              THE WITNESS:  Probably.

16    BY MR. MARTENS:

17         Q.    What would that be?

18              MR. GANT:  Same objections.

19              THE WITNESS:  A covenant is a more

20    Biblical word than agreement.  If someone violates

21    the covenant, we're not going to court.
```

Page 115

1    BY MR. MARTENS:

2         Q.   Where do you go if someone violates a

3    covenant if you don't go to court?

4              MR. GANT:  Objection.  Vague, foundation.

5         A.   Matthew 8 --

6              MR. GANT:  Compound, calls for

7    speculation.

8              THE WITNESS:  Matthew 18.  You go to your

9    brother and talk -- and discuss it and try to work

10   it out.

11   BY MR. MARTENS:

12        Q.   After receiving this email on December

13   5th, 2014, did you speak with Dr. McRaney about it?

14        A.   I don't recall.

15        Q.   The email in Exhibit 9 from Kevin Ezell

16   on November 20th, 2014 is in response to an email

17   from Will McRaney to Kevin Ezell earlier that day,

18   correct?

19        A.   Will's email is the day before.

20        Q.   Aren't they both on November 20th?

21        A.   Well, one says September -- Thursday,

Page 116

1    November 20th.  The other one says -- oh, I'm

2    sorry.  Yes, they are.

3            I was looking at the wrong -- I was

4    looking at Kevin's email to me.  Yes, they are both

5    November 20th.  Yes.

6        Q.   Do you remember when you received this

7    email from Kevin Ezell on December 5th, 2014

8    reading Will McRaney's email of November 20th, 2014

9    to Kevin Ezell?

10       A.   I'm certain that I did.

11       Q.   Do you remember what your reaction was?

12       A.   No.

13       Q.   If you look at the second full paragraph

14   of Will McRaney's email of December -- excuse me,

15   of November 20th, 2014, so page 2 of Exhibit

16   9, --

17       A.   Um-hmm.

18       Q.   -- on the fourth line, Will McRaney

19   refers to our collective work to reduce the

20   spiritual and personal darkness in this region, do

21   you see that?

Page 117

1          A.    Yes.   Um-hum.

2          Q.    What is your understanding of whose

3     collective work was to reduce spiritual and

4     personal darkness in the region?

5               MR. GANT:  Objection.   Foundation.

6               THE WITNESS:   The collective work of the

7     BCMD and NAMB.

8     BY MR. MARTENS:

9          Q.    And what is spiritual and personal

10    darkness?

11              MR. GANT:  Objection.   Vague, foundation,

12    calls for speculation.

13              THE WITNESS:   Lack of a personal

14    relationship with Jesus Christ --

15    BY MR. MARTENS:

16         Q.    And --

17         A.    -- which has -- which has negative

18    effects on the individual.

19         Q.    And how did NAMB and BCMD collectively

20    work to reduce spiritual and personal darkness in

21    the -- in the Delaware/Maryland region?

Veritext Legal Solutions
866 299-5127

1          MR. GANT:  Objection.  Vague, compound.

2          THE WITNESS:  NAMB provided funds for us

3    to hire Michael Crawford, and they provided funds

4    for us to do other parts of the ministry.  I don't

5    recall the details.

6    BY MR. MARTENS:

7          Q.   If you look at the first paragraph of

8    that same email about midway through, Will writes

9    that, I'm extending the offer again to do the

10   Biblical thing and talk together first and deal

11   with the facts and realities, do you see that?

12         A.   Yes, I do.

13         Q.   What do you understand the Biblical thing

14   to be a reference to?

15         A.   He's referring to Matthew 18 or, perhaps,

16   Matthew 5.

17         Q.   And what does Matthew 5 provide?

18         A.   Matthew 5 says if your brother has

19   something against you, go to him.

20         Q.   And in your view, does scripture provide

21   guidance as to how cooperating organizations like

Page 119

1    BCMD and NAMB should resolve disputes over church

2    planting and evangelization issues?

3              MR. GANT:  Objection.  Vague, compound,

4    foundation.

5              THE WITNESS:  Yes.

6    BY MR. MARTENS:

7         Q.   And what is that guidance?

8              MR. GANT:  Same objection.

9              THE WITNESS:  Matthew 5; Matthew 18.

10   BY MR. MARTENS:

11        Q.   If you go to the fourth paragraph of that

12   email --

13              (Whereupon, there was a pause for

14   document examination.)

15   BY MR. MARTENS:

16        Q.   Sorry, the third paragraph, still on the

17   second page of Exhibit 9, the next to the last line

18   on the page Will writes, I'm seeking to do this not

19   without assistance from you and NAMB, but seeking

20   to reduce the dependency on others as we seek to

21   carry our own load for this region and beyond, do

Page 120

1    you see that?

2          A.    Yes, I do.

3          Q.    What do you -- what did you understand

4    assistance from you and NAMB to be referring to?

5                MR. GANT:  Objection.  Foundation.

6                THE WITNESS:  Financial assistance and

7    other types of assistance.

8    BY MR. MARTENS:

9          Q.    From whom to whom?

10         A.    From NAMB to BCMD.

11         Q.    Dr. McRaney also refers to reducing

12   the -- the dependency on others.  What did you

13   understand that to refer to?

14               MR. GANT:  Objection.  Foundation.

15               THE WITNESS:  My recollection is that

16   Will wanted us to be in a financial position where

17   we didn't have to depend upon NAMB dollars to do

18   our mission.  We did not want to be dictated to by

19   NAMB in terms of how we did our mission, but he

20   wasn't opposed to working together.

21   BY MR. MARTENS:

                                        Page 121

1      Q.   Did NAMB's relationship with BCMD include

2    NAMB supporting BCMD's work?

3           MR. GANT:  Objection.  Vague, compound,

4    foundation.

5           THE WITNESS:  Yes.

6    BY MR. MARTENS:

7      Q.   At the bottom of page 3 of Exhibit 9, the

8    next to the last paragraph begins, Romans 12:8

9    instructs us to, "if it is possible, as far as it

10   depends on you, live at peace with everyone."  I am

11   totally committed to this.  I hate interpersonal

12   conflict, but we are in a spiritual war with the

13   real enemy.  It is for the Kingdom good that you

14   and I try to quickly identify the many points of

15   major agreement, clear up any false perceptions,

16   and then work together in our lanes with deep

17   respect on the matters which we disagree

18   strategically and do so based on our call to carry

19   out the mission given and entrusted to you.  Did I

20   read that correctly?

21     A.   Yes.  Um-hmm.

                                        Page 122

1     Q.    Did you have an understanding based on

2   reading this email exchange as to whether

3   Dr. McRaney and NAMB or Dr. Ezell had a

4   disagreement about how to carry out the mission?

5           MR. GANT:   Objection.  Vague, compound,

6   foundation.

7           THE WITNESS:  They had a disagreement as

8   to how to carry out the agreement.

9   BY MR. MARTENS:

10    Q.    And the agreement being --

11          MR. GANT:   Same objections.

12  BY MR. MARTENS:

13    Q.    -- the SPA?

14    A.    The SPA.

15    Q.    And the purpose of the SPA was to do

16  what?

17    A.    To lay out the -- to create an

18  understanding of how we would cooperate together,

19  to lay out the ground rules and expectations.

20    Q.    Cooperate together to what end?

21    A.    Fulfilling the Great Commission.

Page 123

1      Q.   Do you see a reference in that paragraph

2  I just read to being in a spiritual war with the

3  real enemy?

4      A.   Yes.

5      Q.   Who is the real enemy?

6      A.   Satan.

7      MR. GANT:  Objection.  Sorry.

8      THE WITNESS:  Well, okay.  I didn't think

9  there would be -- I'm sorry.

10      MR. MARTENS:  Hard to imagine why there

11  would be an objection, but understood.

12      MR. GANT:  I'll explain it, if you'd

13  like, Matt.

14      THE WITNESS:  Yeah, I would.  Oh, him,

15  okay.

16      MR. MARTENS:  I don't want to take Matt's

17  time, but he's asking you about something someone

18  else wrote, so ...

19      THE WITNESS:  I see.  Okay.  Yes, that's

20  Satan.

21  BY MR. MARTENS:

Page 124

1        Q.   Let's take a look at --

2        A.   That is standard Biblical language.

3        Q.   What is standard Biblical language?

4        A.   The enemy refers to Satan.

5        Q.   Let's take a look at what I'm going to

6  mark as Exhibit 10.

7        (Whereupon, Warren Deposition Exhibit No.

8  10, Documents Bates Numbered WM00895 through

9  WM00897, marked for identification.)

10  BY MR. MARTENS:

11        Q.   I am handing you what's marked as Exhibit

12  10, which is document bearing Bates number WM00895

13  through 00897, and ask you if you recognize it?

14        A.   Yes.

15        Q.   Do you recognize it as an email exchange

16  between you and Will McRaney between December 4th,

17  2014 and December 5th, 2014?

18        A.   Yes.

19        Q.   And let's start with the email at the

20  end, so the first email in the string

21  chronologically, which is at the -- on the last

Veritext Legal Solutions
866 299-5127

1    page, the page marked 897.

2            This is the end of an email from Will

3    McRaney on December 4th, 2014, correct?

4        A.   Yes.

5        Q.   And the last paragraph reads, I don't

6    believe much will change.  There -- they are on a

7    course, and even with a good meeting (whatever that

8    would look like) the end result is the same.  They

9    want to get to planting and pay us to be nice and

10   not cause them trouble or tell our people the

11   facts.  We do not have to demean them, but it is

12   energizing for pastors to know what we are facing

13   in the region and mission field.  Did I read that

14   correctly?

15       A.   No.

16            MR. GANT:  You missed one word.

17            MR. MARTENS:  What word did I miss?

18            MR. GANT:  You said the instead of their

19   before region.

20   BY MR. MARTENS:

21       Q.   Okay.  Other than that, did I read it

Page 126

1   correctly?

2       A.   There was another one.  I don't --

3       Q.   All right.  Let me do it again.

4       A.   Sorry.

5       Q.   Let's just say do you see the last

6   paragraph?

7            MR. GANT:  I'll make a suggestion.  You

8   can just say, Do you see that paragraph?

9   BY MR. MARTENS:

10      Q.   Do you see that last paragraph?

11      A.   I do.

12      Q.   Did you understand what Dr. McRaney was

13  referring to when he said, they want to get

14  planting?

15           MR. GANT:  Objection.  Foundation, calls

16  for speculation.

17           THE WITNESS:  Yes.

18  BY MR. MARTENS:

19      Q.   Who was the they?

20      A.   North American Mission Board.

21      Q.   And getting planting refers to what?

Page 127

1          MR. GANT:  Same objections.

2          THE WITNESS:  My recollection was that

3   that meant they would fund our church planting

4   ministry fully.

5   BY MR. MARTENS:

6      Q.   They being NAMB would fund it?

7      A.   (Nodding head yes.)

8          MR. GANT:  Same objections.

9          THE WITNESS:  Yes.

10  BY MR. MARTENS:

11     Q.   And when you say our church planting, who

12  is the our?

13          MR. GANT:  Same objections.

14          THE WITNESS:  BCMD.  There might have

15  been more to it than that, but that's what I

16  recall.

17  BY MR. MARTENS:

18     Q.   When Dr. McRaney referred to paying us to

19  be nice and not cause them trouble or tell our

20  people the facts, did you have an understanding as

21  to what he was referring to there when you received

1   this email?

2        A.   I think so, yes.

3        Q.   What did you understand Dr. McRaney to be

4   referring to?

5        A.   To take the money, total funding without

6   objection and without expressing concerns to our

7   people, the constituents of the Baptist Convention

8   of Maryland/Delaware.

9        Q.   Did you agree with Dr. McRaney's

10  assessment of what NAMB wanted BCMD to do?

11            MR. GANT:  Objection.  Vague.

12            THE WITNESS:  At that point, I didn't

13  know whether he was correct or not.

14  BY MR. MARTENS:

15       Q.   What did you do in response to that

16  email?

17       A.   Well, my response here is that I say, I

18  agree.  I'm not sure what I was agreeing with.

19  Perhaps, other -- just the meeting and that I would

20  wish Kevin to meet in January.

21       Q.   Did you talk to Will McRaney about this

Page 129

1  email, particularly the allegation that NAMB wants

2  to get to planting and pay the BCMD to be nice and

3  not cause them trouble?

4      A.   I don't recall.  We had lots of

5  conversations.

6      Q.   Understood.  I'm going to show you what

7  I'm going to mark as Exhibit 11.

8          MR. MARTENS:  Do you want to take a

9  break?

10          THE WITNESS:  No, just stretching.  Just

11  stretching.

12  BY MR. MARTENS:

13      Q.   Let me ask you this:  Did BCMD ever send

14  NAMB a formal response to that termination -- to

15  the -- strike that.

16          Did BCMD ever send NAMB a formal written

17  response to the December 2nd, 2014 letter from

18  Kevin Ezell?

19      A.   Oh, yes.  It's in the documentation.

20          MR. GANT:  I think we're going to see it.

21          THE WITNESS:  I think you're right.

Veritext Legal Solutions
866 299-5127

1  BY MR. MARTENS:

2       Q.    I'm going to show what you we're going to

3  mark as Exhibit 11.

4             (Whereupon, Warren Deposition Exhibit No.

5  11, Documents Bates number WM06171 to WM06172,

6  marked for identification.)

7  BY MR. MARTENS:

8       Q.    Do you recognize Exhibit 11?

9             MR. GANT:  I don't have it yet.  I don't

10 think Eric does either.  I know Eric doesn't, since

11 I give them to him.

12            MR. GUNDERSON:  Thank you.

13            THE WITNESS:  Yes, I do recognize it.

14 BY MR. MARTENS:

15      Q.    What is Exhibit 11?

16      A.    It is a letter from the top leadership of

17 the Convention, Baptist Convention of

18 Maryland/Delaware, Will McRaney, Mark Dooley,

19 Harold Phillips and yours truly.

20            MR. GANT:  I'm sorry, Matt, just a

21 reminder about the Bates numbers, please,

                                    Page 131

1   especially since there's different versions of this

2   in the production of documents.

3           MR. MARTENS:  Exhibit 11 is Bates

4   numbered WM06171 to 06172.

5           MR. GANT:  Thank you.

6   BY MR. MARTENS:

7       Q.   What was the gist of your response to

8   Kevin Ezell in your letter of January -- January

9   14th, 2015?

10      A.   We did not agree that Dr. McRaney had

11  violated the agreement, the Cooperative Agreement.

12  We found the notice of pending termination to be

13  unfortunate.  We also did not agree with the

14  personal claims and accusations against Will, but

15  we were willing to work together to resolve the

16  issues.

17      Q.   And when you say we didn't agree, who

18  didn't agree?

19      A.   The signatories on the letter.

20      Q.   And did you take steps to reach the

21  conclusion that you did not agree with the concerns

Page 132

1    raised by NAMB?

2         A.    We discussed them.

3         Q.    Discussed.  Who is the we that discussed?

4         A.    The four of us discussed it.

5         Q.    Did you take any other steps other than

6    discussing it?

7         A.    In the previous -- one of the previous

8    emails, I did note to Will that I would press Kevin

9    Ezell to have a meeting in January, so, yes, we --

10   we sought to have a meeting.

11        Q.    Let's look at the second page of Exhibit

12   11.  There's a signature there by you on the lower

13   left-hand side, correct?

14        A.    Um-hum.

15        Q.    Is that a yes?

16        A.    I'm sorry, yes.

17        Q.    And above that, there's a signature by

18   Will McRaney; is that right?

19        A.    Yes.

20        Q.    And it refers to him as the Exec

21   Missional Strategist, do you see that?

Veritext Legal Solutions
866 299-5127

1        A.   Yes.

2        Q.   What does that mean?

3        A.   That was Will's terminology for executive

4   director.

5        Q.   What do you understand missional to mean?

6             MR. GANT:  Objection.  Vague.

7             THE WITNESS:  The pursuit of the Great

8   Commission.

9   BY MR. MARTENS:

10       Q.   Did you agree that Dr. McRaney's role

11  as -- at BCMD during the 2014/2015 time period was

12  to be an executive strategist for pursuing the

13  Great Commission on behalf of BCMD?

14            MR. GANT:  Objection.  Vague, foundation.

15            THE WITNESS:  Yes.

16  BY MR. MARTENS:

17       Q.   On page 1 of Exhibit 11, the second

18  paragraph refers to a careful and thorough

19  exploration of the claims against our executive

20  director, do you see that?

21       A.   Yes.

Veritext Legal Solutions
866 299-5127

1      Q.   And had there, in fact, been a careful

2  and thorough ex- -- exploration of NAMB's concerns

3  with regard to Will McRaney?

4      A.   Absolutely.

5      Q.   And based on that, were you confident

6  that our executive director and BCMD had not

7  breached the SPA?

8      A.   Yes.

9      Q.   That was your view as of January 14th,

10 2015; is that right?

11     A.   Yes.

12     Q.   And you held that view notwithstanding

13 NAMB's allegation in December of 2014 that

14 Dr. McRaney had disregarded the SPA, correct?

15     A.   Yes.

16     Q.   In other words, you had a difference of

17 opinion with NAMB over that issue; is that right?

18     A.   At that time, yes.

19     Q.   At some point, did you come to agree with

20 NAMB on that point?

21          MR. GANT:  Objection.  Vague.

Page 135

1          THE WITNESS:   I came to agree that there

2    was some merit to his -- his concerns.

3    BY MR. MARTENS:

4        Q.   His concerns meaning?

5        A.   Dr. Ezell's concerns.

6        Q.   There was some merit to Dr. Ezell's

7    concerns about what?

8        A.   How Will -- whether Will did or did not

9    follow the agreement.

10        Q.   And what led you to come to the

11    conclusion that there was some merit to Dr. Ezell's

12    concerns?

13        A.   I don't recall.  I'm sure just further

14    discussion, further thought.

15        Q.   Further factual investigation?

16        A.   Probably just further discussion.

17        Q.   Discussion with whom?

18        A.   That I don't recall.

19        Q.   Is it fair to say that as of January

20    14th, 2015, notwithstanding the December 2014

21    letter from Dr. Ezell, BCMD was not planning on

Page 136

1    terminating Will McRaney; is that correct?

2         A.    Absolutely not.

3         Q.    It's not correct or it is correct?

4         A.    Oh, I'm sorry.  Restate the question,

5    please.

6         Q.    As of December -- strike that.

7               As of January 14th, 2015, notwithstanding

8    the December 2nd, 2014 letter from Dr. Ezell, was

9    BCMD considering terminating Dr. McRaney?

10              MR. GANT:  Objection.  Compound.

11              THE WITNESS:  We were not considering

12   terminating Dr. McRaney at that time.  That's

13   just -- okay.

14   BY MR. MARTENS:

15        Q.    On the next page, the last page of

16   Exhibit 11, the paragraph -- there's a paragraph

17   that begins, The Mid-Atlantic Baptist Network, do

18   you see that?

19        A.    Yes.

20        Q.    Is that another name for the BCMD?

21        A.    Yes.

Veritext Legal Solutions
866 299-5127

1      Q.   That sentence ends by -- excuse me.  That

2 paragraph begins, "The Mid-Atlantic Baptist Network

3 remains open to a continuing future partnership

4 with the North American Mission Board provided that

5 it honors and protects the historic Baptist notions

6 of autonomy and mutual respect."  Did I read that

7 correctly?

8      A.   Yes.

9      Q.   What did the historic Baptist notions of

10 autonomy and mutual respect have to do with the

11 relationship between NAMB and BCMD?

12           MR. GANT:  Objection.  Vague, compound.

13           THE WITNESS:  Well, I think the mutual

14 respect is obvious.  That's how we treat one

15 another, with respect, the two entities, the

16 leaders.

17           Autonomy means that NAMB can't tell us

18 what to do, and we can't tell NAMB what to do in

19 layman terms.

20 BY MR. MARTENS:

21      Q.   Turning back to the prior page, the first

                                             Page 138

1    page of Exhibit 11, there's a header that says

2    FORWARD, do you see that?

3         A.   Yes.

4         Q.   And under that it reads, We know the

5    Baptist way has always required a mutual

6    interdependence grounded in mutual respect spurring

7    one another on toward love and good works.  Losing

8    this long-standing Baptist-way partnership as

9    assigned and entrusted to us by Southern Baptist

10   Worldwide, would be most unfortunate.  Did I read

11   that correctly?

12             MR. GANT:  No.

13             THE WITNESS:  You said works instead of

14   deeds, but I get it.

15   BY MR. MARTENS:

16        Q.   What is the Baptist way?

17             MR. GANT:  Objection.  Vague, compound.

18             THE WITNESS:  Our way of pursuing the

19   Great Commission as Baptists.

20   BY MR. MARTENS:

21        Q.   And what is the Baptist way of pursuing

1   the Great Commission?

2          MR. GANT:  Same objections.

3          THE WITNESS:  Mutual interdependence,

4   grounded in mutual respect, and also I would add

5   respect for the autonomy of the various parties,

6   and spurring one another on toward love and good

7   deeds is a Biblical reference that we are to do

8   with all Christians from Hebrews.

9          MR. MARTENS:  All right.  Let's take a

10  break.

11         THE WITNESS:  Yes.

12         THE VIDEOGRAPHER:  We're going off the

13  record.  The time is 1:01 p.m.

14         (Recess taken -- 1:01 p.m.)

15         (Whereupon, Warren Deposition Exhibit No.

16  12, Documents Bates Numbered BCMD_0152 to

17  BCMD_0153, marked for identification.)

18         (After recess -- 1:57 p.m.)

19         THE VIDEOGRAPHER:  We are back on the

20  record.  The time is 1:57 p.m.  This is media unit

21  number three.

Veritext Legal Solutions
866 299-5127

```
1    BY MR. MARTENS:
2        Q.   Dr. Warren, I'd like to show you what I
3    have marked as Exhibit 12, a document bearing the
4    Bates number BCMD_0152 to 0153.
5             Do you recognize this as an email you and
6    others received from Will McRaney on January 9th,
7    2015?
8        A.   Yes.
9        Q.   I would like to direct your attention to
10   the fourth paragraph that begins with the word,
11   Michael.
12       A.   Um-hum.
13       Q.   And if you go down about two-thirds of
14   the way, there's a line that begins with the word,
15   Occurred, and there's a sentence that reads, "We
16   believe their strategic approaches and tactics are
17   short-sighted, missionally unsound for our region,
18   outside of the spirit of cooperation and good
19   partnership, and in the end undercuts the fabric of
20   our historic SBC values and damages the future of
21   the SBC.  Did I read that correctly?
```

Veritext Legal Solutions
866 299-5127

1       A.   Yes.

2       Q.   Do you agree with that assessment by

3  Dr. McRaney in January of 2015 with regard to NAMB?

4            MR. GANT:  Objection.  Compound and

5  vague.

6            THE WITNESS:  I don't recall.

7  BY MR. MARTENS:

8       Q.   Did you have an understanding as

9  to -- strike that.

10          In -- in that sentence, it refers to

11  their strategic approaches, do you see that?

12       A.   Yes.

13       Q.   Who is the their?

14       A.   NAMB.

15       Q.   Do you have an understanding as to what

16  NAMB's strategic approaches and tactics Dr. McRaney

17  was referring to?

18            MR. GANT:  Objection.  Foundation, calls

19  for speculation.

20            THE WITNESS:  No.

21  BY MR. MARTENS:

Page 142

1      Q.   Was it a reference to strategic

2   approaches to -- strike that.

3           Did you understand it to be a reference

4   to strategic approaches to church planting?

5           MR. GANT:  Objection.  Foundation, calls

6   for speculation, asked and answered, and leading.

7           THE WITNESS:  I don't know what I thought

8   at the time.

9   BY MR. MARTENS:

10     Q.   Do you see the reference in that sentence

11  to NAMB being missionally unsound for our region?

12     A.   Yes.

13     Q.   What does missionally unsound mean as you

14  understand it?

15          MR. GANT:  Objection.  Foundation.

16          THE WITNESS:  Not effective in pursuing

17  the mission.

18  BY MR. MARTENS:

19     Q.   The mission being what?

20     A.   The Great Commission.

21     Q.   Let's look at what I'm going to mark as

Page 143

1    Exhibit 13.

2              (Whereupon, Warren Deposition Exhibit No.

3    13, Documents Bates Numbered WM00837 through

4    WM00840, marked for identification.)

5              MR. MARTENS:  For the record, Exhibit 13

6    is a document bearing Bates number NAMB 6777

7    through 6782.

8              THE WITNESS:  Mine says WM.

9              MR. GANT:  You gave us a different

10   document.

11             MR. MARTENS:  I may have.  Exhibit 12.

12   I'm looking at the wrong one.  Sorry.

13   BY MR. MARTENS:

14        Q.   Exhibit 13 --

15        A.   Yes.

16             MR. GANT:  Do you want these back?  BY

17   MR. MARTENS:

18        Q.   -- is a document --

19             MR. GANT:  Hold on.  Are you --

20             MR. VITTOR:  No.  He was looking at the

21   wrong document.

Page 144

1          MR. GANT:  Okay.  He switched.

2   BY MR. MARTENS:

3      Q.   Exhibit 13 a document bearing Bates

4   number WM00837 through 840.  Do you recognize

5   Exhibit 13?

6      A.   Yes.

7      Q.   Was the regular -- strike that.

8          What is Exhibit 13?

9      A.   Minutes from the Administrative Committee

10  meeting February 5th to 6th, 2015.

11     Q.   And is that the Administrative Committee

12  of the BCMD?

13     A.   Yes.

14     Q.   Was it the regular practice of the

15  Administrative Committee to have minutes taken of

16  its meetings?

17         MR. GANT:  Objection.  Foundation,

18  compound.

19         THE WITNESS:  I don't recall.

20  BY MR. MARTENS:

21     Q.   Were minutes of the Administrative

Page 145

1    Committee meetings typically taken by someone in

2    attendance?

3              MR. GANT:  Same objections, and calls for

4    speculation.

5              THE WITNESS:  I'm going to change my

6    answer and say I'm confident that minutes were

7    taken in every meeting.  I would be stunned if they

8    were not, and they were undoubtedly taken by Donna

9    Jefferys.

10   BY MR. MARTENS:

11        Q.   Who is Donna Jefferys?

12        A.   Administerial assistant to Dr. McRaney.

13        Q.   Exhibit 13, the Administrative Committee

14   Minutes of a meeting on February 5th and 6th, 2015,

15   has a number of numbered paragraphs starting on

16   page 1, do you see that?

17        A.   Yes.

18        Q.   And it says as item No. 1 that after the

19   meeting was called to order, Bill Warren shared a

20   devotional thought and prayer, do you see that?

21        A.   Yes.

Page 146

1      Q.   Is that true?

2      A.   I assume so.

3      Q.   Why -- why did you begin the

4  Administrative meeting -- committee meeting with a

5  devotional thought and prayer?

6      A.   We always did.

7      Q.   Why is that?

8      A.   Because we are people of the Word of God,

9  and we are people of prayer.  We need God's help in

10  our proceeding.

11      Q.   You need God's help in your -- in which

12  proceeding?

13      A.   The meeting.

14      Q.   Did you view the meeting as a spiritual

15  activity?

16          MR. GANT:  Objection.  Vague, foundation.

17          THE WITNESS:  Certainly.

18  BY MR. MARTENS:

19      Q.   Why do you say that?

20      A.   Because it had to do with the pursuit of

21  the Great Commission, and we were asking God to

Page 147

1   assist us.

2       Q.   Let's just look at the second page, item

3   5.  The heading is, Update on Current Cooperative

4   Funding Agreement with NAMB, do you see that?

5              THE WITNESS:  Just a moment.  I need a

6   paper towel, if we have one.

7              MR. GUNDERSON:  Oh, you spilled.

8              MR. MARTENS:  Do you need to take a

9   break?

10             THE WITNESS:  No.

11             MR. GANT:  I was about to warn you, it's

12  loose, which has caused the spill.

13             MR. GUNDERSON:  You need to push down the

14  edge.  It gives a little character to the

15  deposition exhibits.

16  BY MR. MARTENS:

17      Q.   Do you want me to repeat the question?

18      A.   Please.

19      Q.   On page 2 of Exhibit 13, item 5 states,

20  Update on Current Cooperative Funding Agreement

21  with NAMB, do you see that?

Veritext Legal Solutions
866 299-5127

1      A.    Yes.

2      Q.    Do you remember that discussion?

3      A.    Yes.

4      Q.    What do you remember about it?

5      A.    That we were not in favor of NAMB having

6  one hundred -- one hundred percent control of

7  church planting.

8      Q.    And when you say we weren't in agreement,

9  who's the we?

10      A.    I'm confident it was all of the committee

11  at that point, all of the Administrative Committee.

12      Q.    On the next page at the very top, we're

13  still under item 5, it says, McRaney addressed the

14  accusations referenced in the NAMB termination

15  letter and supplied the committee with his written

16  response, do you see that?

17      A.    Yes.  Um-hum.

18      Q.    What is the NAMB termination letter?

19      A.    The letter from December the 4th, 2014.

20      Q.    December 2nd, 2014?

21      A.    December 2nd, 2014.

Page 149

1          Q.    The letter from Kevin Ezell --

2          A.    Yes.

3          Q.    -- on that date?

4                Why was Dr. McRaney given an opportunity

5     to address the accusations in the letter?

6          A.    Well, they involve him, and he was our

7     leader.

8          Q.    What do you remember about his

9     presentation?

10         A.    Nothing.

11         Q.    After this meeting on February 5th and

12    6th of 2015, were -- was the BCMD planning on

13    terminating Dr. McRaney as executive director?

14         A.    No.

15         Q.    Why not?

16         A.    At that point, we saw no need.

17         Q.    Let's look at what I'm going to mark as

18    Exhibit 14.

19                (Whereupon, Warren Deposition Exhibit No.

20    14, Documents Bates Numbered Bates number BCMD_0395

21    through BCMD_0396, marked for identification.)

1    BY MR. MARTENS:

2         Q.   I'll hand you what I have marked as

3    Exhibit 14, a document bearing the Bates number

4    BCMD_0395 through 0396.  I'll ask you if you

5    recognize it?

6         A.   Yes.  Yes.

7         Q.   What is it?

8         A.   It's an email from Will McRaney to Mark

9    Dooley, Harold Phillips, Tom Stolle, Michael

10   Crawford, Reid Sterrett and me.

11        Q.   On or about -- excuse me.  On February

12   4th, 2015?

13        A.   February 4th, 2015.

14        Q.   On the third paragraph of that document,

15   that email from Dr. McRaney, he refers to -- he

16   states, "Just two quick verses I shared among

17   others and a longer devotional time with staff this

18   morning."

19             Is it -- what is the purpose of, as you

20   understand it, having a devotional with the NAMB

21   staff?

1         MR. GANT:  Objection.  Foundation.

2         THE WITNESS:  Again, our ministry is

3    based upon the Word of God, so it's appropriate for

4    us to learn more from the Word of God and to give

5    reverence and respect to the Word of God at our

6    meetings.

7    BY MR. MARTENS:

8         Q.   Did you believe it was within the duties

9    of the executive director of BCMD in February of

10   2015 to lead the staff of BCMD in devotionals?

11        A.   Absolutely.

12        MR. GANT:  Objection.  Vague.

13        THE WITNESS:  Absolutely.

14   BY MR. MARTENS:

15        Q.   Why do you say that?

16        MR. GANT:  Same objection.

17        THE WITNESS:  He's the leader of the

18   State Convention, and he's wedded to the scriptures

19   as much as any of the rest of us.  Anything we can

20   learn, and I'm sure he -- he had a point to make by

21   referencing scripture.

Veritext Legal Solutions
866 299-5127

1    BY MR. MARTENS:

2        Q.    There's a document attached to the email.

3    Do you recognize that as the second page of this

4    exhibit?

5            MR. GANT:  Objection.  Vague.

6            THE WITNESS:  Yes, it is the second page.

7    BY MR. MARTENS:

8        Q.    The document -- the attachment is

9    entitled, Selected Avenues to Address NAMB's

10   Withdrawal of the Financial Support, do you see

11   that?

12       A.    Yes.

13       Q.    Did NAMB provide financial support to

14   BCMD during your tenure as BCMD president?

15           MR. GANT:  Objection.  Vague.

16           THE WITNESS:  Yes.

17   BY MR. MARTENS:

18       Q.    Was NAMB a supporting organization of

19   BCMD during your tenure as president of BCMD?

20           MR. GANT:  Objection.  Vague, foundation,

21   calls for speculation, and to the extent it calls

Page 153

1    for a legal conclusion and -- yes, that's it.

2              THE WITNESS:  Yes.

3    BY MR. MARTENS:

4         Q.   Let's look at what I'm going to mark as

5    Exhibit 15.

6              (Whereupon, Warren Deposition Exhibit No.

7    15, Document Bates Numbered WM00846, marked for

8    identification.)

9    BY MR. MARTENS:

10        Q.   A document bearing the Bates number

11   WM00846.  Do you recognize that document?

12        A.   Yes.

13        Q.   What is it?

14        A.   It's a resolution of support from Mark

15   Dooley on behalf of the General Mission Board and

16   resolution of support for Will McRaney and the

17   elected leadership of our board and convention.

18        Q.   And when was that resolution of support

19   issued?

20        A.   February the 6th, 2015.

21        Q.   What, if anything, is the relationship

Veritext Legal Solutions
866 299-5127

1    between this resolution of support and the

2    meet -- minutes of the Administrative Committee

3    meeting that we just looked at?

4              (Whereupon, there was a pause for

5    document examination.)

6              THE WITNESS:  They both deal with persons

7    present at the meeting of the Administrative

8    Committee.

9    BY MR. MARTENS:

10        Q.   And what do you mean deal with persons

11   present?

12        A.   Well, they both speak to -- reference

13   Will McRaney and the elected leadership of our

14   board and convention, and we were present at the

15   Administrative Committee meeting.

16        Q.   Exhibit 15 has as the heading

17   Mid-Atlantic Baptist Network.  Is that the BCMD?

18        A.   Yes.

19        Q.   And the Exhibit 15 says, On this 6th day

20   of February 2015, the General Mission Board of the

21   Mid-Atlantic Baptist Network/BM -- BCMD meeting in

Page 155

```
 1    executive session unanimously voted a resolution of

 2    support for Dr. Will McRaney and the elected

 3    leadership of our board and convention.  Do you see

 4    that?

 5         A.   Yes.

 6         Q.   Is that true?  Did that happen?

 7         A.   Yes, I'm sure it did.

 8         Q.   Did you vote in support of Dr. McRaney as

 9    of February 6th, 2015?

10         A.   I'm sure I did.

11         Q.   Why do you say that?

12         A.   Because Mark Dooley is a man of

13    integrity, and he would not have written

14    that, I'm certain of that, because I do not recall

15    any discussion with Mark Dooley that I was in

16    opposition.

17         Q.   Did you --

18         A.   And at that point, I'm sure I was not in

19    opposition to this show of support.

20         Q.   As of February 6th, 2015, did Dr. McRaney

21    have your support?
```

Page 156

1      A.   That is my recollection.  Also, Mark

2   would not have put unanimously if I had not voted

3   in favor.

4      Q.   I'm going to show you what I'm going to

5   mark as Exhibit 16.

6           (Whereupon, Warren Deposition Exhibit No.

7   16, Documents Bates Numbered NAMB 6981 to NAMB

8   6982, marked for identification.)

9   BY MR. MARTENS:

10     Q.   A document bearing the Bates number NAMB

11  6981 to 6982.  Do you recognize this document?

12          (Whereupon, there was a pause for

13  document examination.)

14          THE WITNESS:  Yes.

15  BY MR. MARTENS:

16     Q.   What is it?

17     A.   It is an email from Steve Davis of the

18  North American Mission Board to Dr. McRaney

19  concerning a recap of, I'm assuming, the meeting

20  that we had at the convention headquarters, Baptist

21  Convention of Maryland/Delaware headquarters with

Page 157

1    Kevin Ezell, and I believe Steve Davis was there.

2    And I was there and I'm sure that everyone listed

3    here.  My recollection is Mark Dooley was there,

4    and Harold Phillips was there.

5         Q.   And were you a recipient of this email on

6    March 18th, 2015?

7         A.   I don't think so.

8         Q.   Do you see the cc: line?

9         A.   Okay.  Then I must have been.

10        Q.   Do you have any doubt that you were a

11   recipient of this email --

12        A.   No.

13        Q.   -- on March 18th, 2015?

14        A.   No.  I don't remember in particular, but

15   yes.  I don't have any doubt, no.

16        Q.   Let's look at item 10 of the recap of

17   your meeting last week.  Item 10 reads, Commit all

18   this to prayer for the Holy Spirit's guidance

19   toward positive resolutions for a more healthy

20   relationship and partnership to reach the lost and

21   plant churches in Maryland/Delaware, do you see

Veritext Legal Solutions
866 299-5127

1    that?

2        A.   Yes.

3        Q.   Why -- strike that.

4             Did you agree that the meeting the prior

5    week between NAMB and BCMD should be committed to

6    prayer?

7             MR. GANT:  Hold just a moment, please.

8    Mischaracterizes the document, vague.

9    BY MR. MARTENS:

10       Q.   Let me rephrase.  What did you -- what

11   did you understand this to be stating, should be

12   committed to prayer?

13            MR. GANT:  Objection.  Foundation.

14            THE WITNESS:  The Holy Spirit's guidance

15   toward a resolution of the difficulties between us

16   so that we could do a better job of pursuing the

17   Great Commission.

18   BY MR. MARTENS:

19       Q.   The difficulties between whom?

20       A.   NAMB and BCMD.

21       Q.   Did you agree that this should be

Page 159

1    committed to prayer for the Holy Spirit's guidance?

2        A.   Yes.  At -- may I comment?

3        Q.   Sure.

4        A.   I remember that meeting well, and at that

5    point, all of us, including me, were firmly in

6    Will's corner.

7        Q.   And when you say you meet -- you remember

8    the meeting well, which meeting is that?

9        A.   When Kevin Ezell came in wearing his

10   white sweater.

11       Q.   That's why you remember it in part?

12       A.   That's one of the things.  I was told

13   before he came he was going to wear a sweater, and

14   he did.

15       Q.   Where was the meeting at?

16       A.   BCMD headquarters.

17       Q.   And where is that?

18       A.   In Columbia.

19       Q.   Columbia, Maryland?

20       A.   Um-hum.  (Nodding head yes.)

21       Q.   Is that a yes?

Page 160

1          A.    Oh, I'm sorry.  That's a yes.  Yes.

2          Q.    What do you remember about the meeting?

3          A.    It was frank.  It was clear that Kevin

4    wanted to run the meeting, and it was also clear

5    that he wanted to get a resolution, if at all

6    possible, it seemed to me that day.

7                Will, to his credit, did not attack.  He

8    was calm and patient, and we -- we complimented him

9    on that after the meeting.  Kevin wasn't ugly.  He

10   was just kind of, like, large and in charge.

11         Q.    Does this document, Exhibit 16, fairly

12   recap the meeting?

13               MR. GANT:  Objection.  Vague, foundation,

14   calls for speculation.

15               (Whereupon, there was a pause for

16   document examination.)

17               THE WITNESS:  To the best of my

18   recollection.

19   BY MR. MARTENS:

20         Q.    You said after that meeting you were

21   still, I think your words were, in Will's camp.

Veritext Legal Solutions
866 299-5127

1    What does that mean?

2            MR. GANT:  Objection.  Mischaracterizes

3    his testimony.

4            THE WITNESS:  We were supportive of him

5    as our executive director.

6    BY MR. MARTENS:

7        Q.   And when you say we, who is the we?

8        A.   My sense is the entire Administrative

9    Committee.  Certainly, the people at the meeting.

10       Q.   So, at that point in March of 2015, you

11   had received the December 2nd, 2014 letter from

12   Kevin Ezell contending that Dr. McRaney had

13   breached the SPA, correct?

14       A.   Yes.

15       Q.   And you had had discussions

16   about -- strike that.

17           You had had a telephone conversation with

18   Kevin Ezell by that point, correct?

19       A.   Yes.

20       Q.   You had had email exchanges with Kevin

21   Ezell regarding the situation, correct?

Page 162

```
 1           MR. GANT:  Objection.  Vague,
 2    mischaracterizes testimony, foundation.
 3           THE WITNESS:  I'm not sure if there was a
 4    conversation, it was email or telephone.
 5    BY MR. MARTENS:
 6       Q.   Had you received emails at that point
 7    regarding the issue from Kevin Ezell?
 8           MR. GANT:  Objection.  Vague.
 9           THE WITNESS:  I'd have to look in my
10    file, but you all should have it if I did.
11    BY MR. MARTENS:
12       Q.   Do you remember looking at some emails
13    today with regard to that email?
14           MR. GANT:  Objection.  Vague.
15           THE WITNESS:  No.  No, I didn't have time
16    to go over everything again.
17    BY MR. MARTENS:
18       Q.   Okay.  Had you had conversations as of
19    March 2015 with Will McRaney concerning the
20    disagreement between NAMB and BCMD?
21           MR. GANT:  Objection.  Vague.
```

Page 163

1     THE WITNESS: Oh, sure.

2 BY MR. MARTENS:

3   Q. As of March 2015, had you had discussions

4 with other members of the Administrative Committee

5 regarding the disagreement between NAMB and BCMD?

6     MR. GANT: Same objection, foundation.

7     THE WITNESS: Certainly we did.

8 BY MR. MARTENS:

9   Q. As of March 2015, had you had discussions

10 with other members of the GMB regarding the

11 disagreement between NAMB and BCMD?

12     MR. GANT: Objection. Vague, foundation,

13 compound.

14     THE WITNESS: I don't recall, because I

15 don't know when the GMB met.

16 BY MR. MARTENS:

17   Q. And after all of that as of March 2015,

18 having heard Kevin's concerns, you were in

19 agreement with Dr. McRaney; is that fair?

20     MR. GANT: Objection. Foundation, vague,

21 compound, mischaracterizes testimony.

Page 164

 1              THE WITNESS:  I think the date would be
 2    about -- well, to be precise, March the 18th, yes.
 3    Not the 25th.
 4    BY MR. MARTENS:
 5        Q.   I'm going to show you what I'm going to
 6    mark as Exhibit 17.
 7              (Whereupon, Warren Deposition Exhibit No.
 8    17, Documents Bates Numbered WM00103 to WM00104,
 9    marked for identification.)
10              THE WITNESS:  Is it the coffee or did
11    they turn the air down?
12              MR. GUNDERSON:  You're chilly?
13              THE WITNESS:  Huh?
14              MR. GUNDERSON:  You're chilly?
15              THE WITNESS:  I'm warm I think.
16              MR. GUNDERSON:  Oh, warm.
17              MR. GANT:  I think what's tricky is, is
18    the air going down and making it hotter or cooler.
19              THE WITNESS:  I'm okay.  I'm just
20    wondering if anybody else noticed.  It's probably
21    the coffee, I'm sorry.

                                          Page 165

1    BY MR. MARTENS:

2        Q.   I'm going to show you what I have marked

3    as Exhibit 17.

4        A.   Okay.

5        Q.   A document bearing the Bates number

6    WM00103 to 104.  Do you recognize this document?

7             (Whereupon, there was a pause for

8    document examination.)

9             THE WITNESS:  Yes.

10   BY MR. MARTENS:

11       Q.   What is it?

12       A.   It's an expression from the

13   Administrative Committee of our disappointment with

14   Dr. McRaney's performance, especially relative to

15   the relationship with NAMB, members -- member

16   churches, director of admissions and the senior

17   leadership team network and it states what those

18   concerns are.

19       Q.   And this document is dated June 2nd,

20   2015?

21       A.   Yes, it is.

                                    Page 166

1     Q.   And do you recognize Will McRaney's

2  signature on the second page?

3     A.   Yes, I do.

4     Q.   The first line of the document refers to

5  of a meeting on Tuesday, June 2nd, 2015, do you see

6  that?

7     A.   Yes.

8     Q.   Do you -- were you present at that

9  meeting?

10     A.   Yes, I was.

11     Q.   What do you remember about that meeting?

12     A.   It was in, I believe, a conference room

13  off of Will's office.  Harold Phillips, Mark Dooley

14  and I were there with Will, and I believe Sandy was

15  in the office that day as well.

16     Q.   Who is Sandy?

17     A.   His wife.

18     Q.   Okay.  She was in the meeting?

19     A.   No, no.

20     Q.   Okay.

21     A.   I think she was in the office complex.

Page 167

```
 1        Q.    Who called the meeting?

 2        A.    The three of us did.  I don't remember if

 3   it was one of us or all three of us together.

 4        Q.    Had you told Dr. McRaney in advance what

 5   the meeting was going to be about?

 6        A.    No, not to my recollection.

 7        Q.    So, what was the meeting about?

 8        A.    What's on the paper here.

 9        Q.    Who was speaking on behalf of -- you

10   mentioned that there were four people present.  Who

11   was presenting to Dr. McRaney?

12             MR. GANT:  Objection.  Vague, foundation.

13             THE WITNESS:  Harold Phillips, Mark

14   Dooley and I.

15   BY MR. MARTENS:

16        Q.    Was any one of you taking the lead?

17        A.    I don't recall.

18        Q.    And this document says in the second

19   paragraph, Will, you need to improve and perform

20   the following actions within the next two weeks, do

21   you see that?
```

Page 168

1      A.   Yes.

2      Q.   As of June 2nd, 2015, were you still in

3    Will McRaney's camp?

4           MR. GANT:  Objection.  Vague.

5           THE WITNESS:  Not as I was in March.

6    BY MR. MARTENS:

7      Q.   Why not?

8      A.   Because of the six concerns.

9      Q.   You referenced six concerns, meaning the

10   handwritten numbers along the left-hand side of

11   Exhibit 17?

12     A.   Yes.

13     Q.   What caused you to form -- strike that.

14          As of June 2nd, 2015, did you have each

15   of those six concerns personally about

16   Dr. McRaney's performance as executive director of

17   BCMD?

18          MR. GANT:  Objection.  Vague.

19          THE WITNESS:  Yes, I did.

20   BY MR. MARTENS:

21     Q.   What led you to have those concerns?

Page 169

1      A.   Observations, conversations with the

2   Administrative Committee, conversations with

3   pastors, conversations with staff.

4      Q.   When you say observations, what do you

5   mean by that?

6      A.   I'll strike that.  Conversations.

7      Q.   What were your observations?

8      A.   I cannot recall specific observations, so

9   I'll just go with conversations.

10     Q.   When you say conversations with the

11  staff, what do you mean by that?

12     A.   Hearing the concerns of some of the staff

13  about Dr. McRaney.

14     Q.   What types of concerns?

15     A.   The style of his leadership, the

16  direction he was taking the convention, his

17  treatment of them.

18     Q.   What do you mean by -- what do you mean

19  by the direction he was taking the convention?

20     A.   At least some of the staff were concerned

21  about the seeming inability to get this thing

Page 170

1   with -- this controversy with NAMB fixed.  There

2   may have been other concerns, but that's what I

3   remember.

4        Q.   You mentioned treatment of staff.  What

5   do you mean by that?

6        A.   From their viewpoint, heavy-handed,

7   middle-of-the-night emails that were censorious in

8   nature.

9        Q.   What does censorious mean?

10       A.   Highly critical, kind of the tone of sort

11  of at times putting them in their place.  It -- it

12  became fairly common for them to refer to them as

13  midnight emails.

14       Q.   What do you mean by that?

15       A.   A lot of them would get emails in the

16  middle of the night that were difficult to read in

17  the sense of -- in the sense of they weren't

18  pleasant.

19       Q.   They were what?

20       A.   They were not pleasant.  I'm not saying

21  that all of them were that way, but some were

                                        Page 171

1   categorized that way by the members of the team.

2        Q.    During the meeting with Dr. McRaney on

3   June 2nd, 2015, did you or other members of BCMD

4   talk through each of the six items with Will?

5        A.    Absolutely.

6        Q.    What was his response?

7             MR. GANT:  Objection.  Compound,

8   foundation, calls for speculation.

9             THE WITNESS:  He was quiet, pretty quiet.

10  I think he was surprised, but he was willing

11  to -- well, he was pretty quiet.  I don't remember

12  much of any reaction really.  I think he was

13  surprised.

14  BY MR. MARTENS:

15       Q.    Did you bring this document, Exhibit 17,

16  with you to the meeting?

17       A.    Yes.

18       Q.    Was it given to Will at the meeting?

19       A.    Yes.

20       Q.    Did he sign the document there at the

21  meeting?

Page 172

1      A.    That's my recollection.

2      Q.    So, how were things left at the end of

3  the meeting?

4      A.    I went out and told I think it was Sandy

5  or somebody, Will -- Will needs you right now.

6  It's been a tough meeting.

7            After that, I think Will proceeded to try

8  to do what we asked of him to do.

9      Q.    I want to show you, just have you take a

10  look again at Exhibit 5, which we looked at earlier

11  today.

12     A.    Okay.

13     Q.    Do you have that in front of you?

14     A.    Yes.

15     Q.    There's a reference in that second

16  paragraph, which we looked at earlier, that said,

17  Had Will exhibited a humble spirit after we

18  confronted him and had he not dismissed the six

19  charges against him as baseless, we would have

20  given him time to work out the mess and just lived

21  with the reduction in NAMB funding that was coming

Page 173

1    down the pike, do you see that?

2        A.    Yes, I do.

3        Q.    That reference there to confronting Will,

4    what is that a reference to?

5        A.    This meeting.

6        Q.    The June 2nd, 2015 meeting?

7        A.    Yes, which I would not characterize as

8    confrontational, but confront in the more milder

9    sense of the term.

10       Q.    And in this Exhibit 5, you refer to Will

11   as dismissing the charges against him as baseless,

12   do you see that?

13       A.    Yes.

14       Q.    In fact, dismissing the six charges

15   against him as baseless, do you see that?

16       A.    Yes.

17       Q.    What are the six charges you're

18   referencing in Exhibit 5?

19       A.    What's on Exhibit 17.

20       Q.    The six numbered items in Exhibit 17?

21       A.    Yes.

Page 174

1    Q.   When did Will dismiss the six charges

2  against him as baseless?

3    A.   According to a member of the -- I believe

4  Victor Kirk was on the Administrative Committee.

5  He was certainly on the General Mission Board.  He

6  referenced a phone call to Will in which basically

7  Will said, I'm not guilty of any of these.

8         And then in the meeting on June the 8th,

9  I recall Victor point blank asking Will if there

10 was any merit to these concerns, and his answer

11 was, No.  Something to that effect.

12   Q.   And you observed that personally?

13   A.   Yes, I did.  It should be in the minutes.

14   Q.   Well, let's look at that.  I'll show you

15 what I'm going to mark as Exhibit 18.

16         (Whereupon, Warren Deposition Exhibit No.

17 18, Documents Bates Numbered BCMD_0682 through

18 BCMD_0692, marked for identification.)

19 BY MR. MARTENS:

20   Q.   And ask you if you recognize this?

21   A.   Yes.

Page 175

1              MR. MARTENS:   For the record, Exhibit 18

2    is a document bearing Bates number BCMD_0682

3    through 0692.

4    BY MR. MARTENS:

5         Q.   What is Exhibit 18?

6         A.   It is the confidential minutes of the

7    meeting on June 8th with the General Mission Board

8    concerning the termination of Dr. McRaney.

9         Q.   And is that the June 8th meeting you

10   referenced just a minute ago?

11        A.   Yes.

12        Q.   Is this the June 8th meeting where you

13   observed Will McRaney dismiss as baseless the six

14   concerns raised with him on June 2nd?

15        A.   Yes.

16        Q.   Tell me what you remember about the June

17   8th meeting.

18        A.   It was at the church Tim Simpson used to

19   pastor.  I can't remember the name, and it was well

20   attended.

21              Will had an opportunity to speak on his

Page 176

1    behalf, which he did.  Then we had lunch, and then

2    Will left I'm sure per our request, and then we had

3    a long meeting that afternoon.  And what I remember

4    most vividly, and it's reflected in the minutes, is

5    the overwhelming negative view expressed that day

6    by five of his top six staff, as well as a director

7    of missions who in -- in -- in -- was representing

8    the other, maybe not all of them, but a significant

9    por- -- portion of the other directors of missions.

10              I also recall the vote was by ballot, and

11   according to what I've read since then, 37 voted

12   yes.  I think one vote -- did not vote.

13       Q.   So, let me break this down a bit.

14   Anything more?

15       A.   Mike Trammell was given the task of going

16   to tell Will about our decision.

17       Q.   Let me go back and break that down a bit

18   and ask a few follow-up questions.

19       A.   Okay.

20       Q.   The Exhibit 18, is this the minutes of

21   that meeting?

Page 177

1        A.    Yes.

2        Q.    Was it, again, the regular practice to

3    take minutes of the meetings of the GMB during your

4    tenure as president of BCMD?

5              MR. GANT:  Objection.  Vague.

6              THE WITNESS:  I would assume it was.

7    BY MR. MARTENS:

8        Q.    Do you have any -- I'm sorry.

9        A.    I'm going to say yes.

10       Q.    Do you remember who it was who would

11   typically take minutes?  Was it someone present?

12             MR. GANT:  Objection.  Vague, compound,

13   foundation.

14             THE WITNESS:  Yes.  The one who took

15   these minutes was Thomas Winborn, a member of the

16   Administrative Committee.

17   BY MR. MARTENS:

18       Q.    The agenda for the meeting, page 1 of

19   Exhibit 18, references a devotion by Mark.  Who is

20   Mark?

21       A.    Mark Dooley.

Page 178

```
1          Q.    Why did a meeting open with a devotion?

2          A.    Again, we're people of the Word, and we

3    like to start with the Word of God.

4          Q.    And then after the devotion, there was a

5    prayer by Harold.  Who is that?

6          A.    Harold Phillips.

7          Q.    Why did the meeting have a prayer after

8    the devotional?

9          A.    Well, if we ever needed prayer for a

10   meeting, it was this one.

11         Q.    Why is that?

12         A.    There was a very important decision

13   before us, and we needed to seek God's guidance.

14         Q.    Did you view it as a spiritual decision?

15               MR. GANT:  Objection.  Vague, foundation.

16               THE WITNESS:  Yes.

17   BY MR. MARTENS:

18         Q.    Why do you say that?

19               MR. GANT:  Same objections.

20               THE WITNESS:  Because it dealt with

21   the -- our pursuit of the Great Commission and who
```

Page 179

1    was going to lead us to do that.

2    BY MR. MARTENS:

3        Q.    Why was Dr. McRaney given an opportunity

4    to speak at the meeting?

5        A.    To be fair.

6        Q.    What do you mean by that?

7        A.    To give him an opportunity to share what

8    was on his heart, to give "his side of the story,"

9    because we were going to hear the other side later

10   in the day, to give him an opportunity to own some

11   of the six concerns.

12       Q.    How long did Dr. McRaney speak for?

13       A.    I don't recall.  He was scheduled for 30

14   minutes.  I don't recall how much of the time he

15   took.

16       Q.    Do you recall -- do you recall anyone

17   cutting him off from anything he wanted to say

18   during that meeting?

19       A.    No.  No.

20       Q.    You mentioned that after Dr. -- you

21   mentioned that there were other people who

Page 180

1   presented at the meeting, some staff members?

2        A.   Yes.

3        Q.   How many staff members presented?

4        A.   Five.

5        Q.   Do you remember who they were?

6        A.   Tom Stolle, Joel Rainey, Doug DuBois,

7   Michael Crawford, Randy Millwood.

8        Q.   And who are each of them?

9        A.   I don't remember the exact titles.  Randy

10  Millwood was -- he might have been in charge of

11  church services.  I recall Michael Crawford was

12  church planting.  Joel Rainey was evangelism.  Doug

13  DuBois and Scott Croft -- Tom Stolle was the CFO,

14  and he might have been at that time like an

15  assistant executive director, but I'm not sure.

16       Q.   I think you mentioned earlier that the

17  response from or the views of five of the six was

18  negative toward Dr. McRaney?

19       A.   Yes.

20       Q.   In what way?

21       A.   It's in the minutes.  Those were the

Page 181

1   concerns that I mentioned earlier; his treatment of

2   the staff, his direction for the -- for the future,

3   his skills as a leader.

4       Q.   When you came to the meeting on June 8th,

5   2015, were you in Will McRaney's camp or outside of

6   his camp by that point?

7           MR. GANT:  Objection.  Vague.

8           THE WITNESS:  I was out.

9  BY MR. MARTENS:

10      Q.   Why were you out?  What had happened

11  since June 2nd?

12      A.   I'm glad you asked me that question.

13  Again, this is one person's view of a meeting.

14         Will had a meeting with his senior staff

15  in between June 2nd and June the 8th.  One of the

16  members called me after the meeting was over and

17  basically said, Will is not owning any of this.  He

18  makes it seem like it's our fault because we didn't

19  come to him.  He has an open door.  We don't see

20  that anything has changed in his attitude.  We

21  don't see any humility.  We don't see any

Page 182

1    acceptance of -- real acceptance of fault.

2            At that point, because I had been

3    taking -- keeping up with these five and where they

4    were, I said, If he stays, are you going to leave?

5    He said, Yes.  I said, What about the other four

6    guys?  They were all still there.  So, they did a

7    quick vote, and all five said, If he stays, we're

8    gone.

9        Q.    And who was it who called you?

10       A.    Either he called me or I called him.  I

11   don't recall, but my initial conversation was with

12   Tom Stolle.

13       Q.    And Tom Stolle, I'm sorry, again is whom?

14       A.    CFO.

15       Q.    And who were the others that you

16   understood were expressing the view that they, too,

17   would leave if Will stayed?

18       A.    Joel McRaney, Randy Millwood, Doug

19   DuBois, Michael Crawford.  If you will note in the

20   minutes, Michael Crawford flat out says it.

21       Q.    Do you remember him saying that at the

Veritext Legal Solutions
866 299-5127

1    meeting on June 8th?

2         A.    Because I read some of the minutes this

3    morning on my way in.

4         Q.    That refreshed your memory?

5         A.    It did.  That was, for me, the tipping

6    point.

7         Q.    Why?

8         A.    I had concerns about Will's leadership,

9    and those five men, I had no concerns about their

10   leadership.  They were excellent employees,

11   excellent leaders, and I didn't want to lose those

12   five men.  I thought that would be very, very

13   detrimental to our convention.

14        Q.    Would losing them have been detrimental

15   to the spiritual mission of the BCMD?

16             MR. GANT:  Objection.  Vague --

17             THE WITNESS:  In --

18             MR. GANT:  -- and foundation.

19             THE WITNESS:  Go ahead.

20             MR. GANT:  No, I'm done.

21             THE WITNESS:  In my opinion, yes.

Page 184

```
 1   BY MR. MARTENS:

 2        Q.   Why?

 3        A.   Because they were very good at what they

 4   did.  They were very spiritual men, and they had

 5   proven over the years to be high quality.

 6        Q.   During the meeting on June 8th, 2015, did

 7   you form any opinions about Dr. McRaney?

 8             MR. GANT:  Sorry, can I hear that back?

 9             (Whereupon, the record was read as

10   requested.)

11             MR. GANT:  Objection.  Vague.

12             THE WITNESS:  I was disappointed that he

13   didn't take his time to say to us, Obviously,

14   I've -- I've screwed up.  Obviously, I'm doing

15   something wrong.  Let's work together, give me some

16   time to fix it.  Again, I was disappointed that

17   there wasn't ownership and humility, but -- yeah.

18   BY MR. MARTENS:

19        Q.   If there had been ownership and humility

20   by Dr. McRaney at the June 8th, 2015 meeting, what

21   would you have done?
```

Veritext Legal Solutions
866 299-5127

1          MR. GANT:  Objection.  Vague.

2          THE WITNESS:  I would have recommended

3    that the Administrative Committee have a meeting

4    with the five men and say, Okay, you heard him.  Do

5    you believe him?  What are your thoughts?  Are you

6    still going to leave?

7    BY MR. MARTENS:

8          Q.   Were those five men present when

9    Dr. McRaney presented during the meeting?

10         A.   As soon as I said that, I realized

11    they -- they probably were not, yeah.

12         Q.   So, you mentioned that after lunch I

13    think you said there was a long meeting that

14    occurred on June 8th, 2015?

15         A.   Yes.

16         Q.   How long did the meeting last?

17         A.   Well, if we stuck to the schedule, I'm

18    going to say it was probably four, four and a half

19    hours.  Now, after -- at some point during that

20    day, the Administrative Committee did meet, and I

21    think it was after lunch, to kind of get a head

Page 186

1  count of based upon what we've heard, what -- what

2  are you thinking.

3      Q.   Why did the meeting last -- why did the

4  discussion last so long?

5      A.   It took a long time to hear from the five

6  men, and it took a pretty good time, length of time

7  to do Q and A.

8      Q.   Was there then a discussion after hearing

9  from the five men?

10      A.   I'm assuming so since that's item 10.

11      Q.   Do you remember that?

12      A.   I'm sure there was.  Yes, I do.

13      Q.   How long did that last?

14      A.   I don't recall, but it was thorough.

15      Q.   What do you mean it was thorough?

16      A.   Everyone had an opportunity to ask any

17  question they wanted to ask, and I think they did.

18  We -- we did not say when -- we needed to be

19  finished by such and such a time.  We -- we were

20  going to stay as long as it was necessary to hear

21  from everybody.

Page 187

1     Q.    And by everybody, are you referring to

2     the --

3     A.    General Mission Board.

4     Q.    Was there -- did you stop at any point

5     during that discussion to pray further?

6     A.    I don't recall.

7     Q.    Was there a prayer before the vote?

8     A.    I don't recall.

9     Q.    You mentioned -- strike that.

10          At the -- there's a reference to item 8,

11    Corporate Prayer Time, do you see that?

12    A.    Yes.

13    Q.    What is corporate prayer?

14    A.    Very likely what we did there was we

15    opened it up so that anybody could pray who wanted

16    to among the GMB.

17    Q.    Was this before or after hearing from the

18    five men?

19    A.    Before.

20    Q.    You --

21    A.    Now I do recall we had prayer time.

                                              Page 188

1      Q.    That's okay.  That's why I show you the

2   documents to try to refresh your memory.

3      A.    Sure.

4      Q.    You -- you mentioned that the vote was by

5   ballot?

6      A.    Yes.

7      Q.    What did you mean by that?

8      A.    On a piece of paper, you write yes or no.

9      Q.    Was there some significance to the fact

10  that the vote was by ballot?

11     A.    Yes.

12     Q.    Why?

13     A.    We wanted everyone to feel free to vote

14  their conscience with no pressure from others in

15  terms of people standing or putting their hands up,

16  so ...

17     Q.    What was your vote?

18     A.    My vote was to terminate.

19     Q.    What was the overall vote?

20     A.    Thirty-seven in favor of termination, and

21  I'm assuming that one did not vote.

Page 189

1          Q.   When you say you assume one, because

2     there were 38 present?

3          A.   Yeah.

4          Q.   Was the vote counted immediately during

5     the meeting?

6          A.   Yes.  Well, I don't know about

7     immediately, but it was counted before everyone

8     left.

9          Q.   What happened after the vote came back?

10         A.   I don't recall if we had any discussions

11    or not, but then we adjourned.  And then -- I don't

12    know, it might have been Harold and Mike Trammell

13    who went to talk to Will.  I'm not sure, but we

14    agreed that -- that they should do that.

15         Q.   And what was Harold's position at the

16    time?

17         A.   The chairman of the executive -- of the

18    Administrative Committee.

19         Q.   And what was Mike Trammell's position at

20    the time?

21         A.   He was on the General Mission Board.  He

Page 190

1    might have been -- I think he was also on the

2    Administrative Committee.

3         Q.    And why were those two selected to go

4    talk to Will?

5         A.    Because Harold had a better relationship

6    with Will than I did and so did Mike, and quite

7    frankly I said, Gentlemen, he doesn't want to see

8    me, I'm sure.

9         Q.    Was Will still in the building at that

10   point?

11        A.    No.

12        Q.    Where did they go see him?

13        A.    I don't remember.  I -- I -- I don't

14   know.  I don't remember.  I'm assuming his home,

15   but I don't recall.

16        Q.    Did you hear from Will after that?

17        A.    Not directly, no.

18        Q.    Now, you had said earlier in the day that

19   he was given the opportunity to resign, which you

20   used here the word terminated.  Why the difference?

21             MR. GANT:  Objection.  Vague.

Page 191

1          THE WITNESS:  Well, we voted to allow him

2     to resign.  We all knew what was happening.

3     BY MR. MARTENS:

4          Q.   Meaning what?

5          A.   We were voting to terminate him as

6     director.  We wanted to give him the opportunity to

7     resign so that on his resume' it didn't say

8     terminated.

9          Q.   I'm going to show you what we're going to

10    mark as Exhibit 19.

11             (Whereupon, Warren Deposition Exhibit No.

12    19, Document Bates Numbered WARR 002, marked for

13    identification.)

14    BY MR. MARTENS:

15         Q.   Exhibit 19 is a document bearing the

16    Bates number WARR 002.

17         A.   Yes.

18         Q.   You chuckled at that document.

19         A.   Oh, I recognize it.  I've read it about,

20    I don't know, four -- three, four, five times.

21         Q.   Did you receive this email on or about

1  June 24th, 2015?

2      A.   I did.

3      Q.   Who did you receive it from?

4      A.   Clint Scott.

5      Q.   Who is Clint Scott?

6      A.   A pastor in Delaware, he was at the time.

7  He's no longer there.

8      Q.   And what made you chuckle when seeing

9  this today?

10     A.   Because Clint engaged in a fishing

11 expedition at my expense.

12     Q.   What do you mean by that?

13     A.   He contacted me the day before.  It was a

14 Tuesday.

15     Q.   The day before what?

16     A.   The day before this letter.  My

17 recollection, it was a Tuesday.  I think it was the

18 day before.

19          I was standing in my front yard.  I

20 remember distinctly where I was.  I just had gotten

21 home from work, and he called to ask a lot of

1  questions.

2      Q.   What questions did he call to ask?

3      A.   Questions about the -- Will's

4  termination.

5      Q.   Why did you describe that as a fishing

6  expedition?

7      A.   Because -- in part, because of this

8  email.  He states that sometimes I have a tendency

9  to hear something different than the way it was

10  stated, so respond to my questions, which I took to

11  mean I want to nail down your answers in writing so

12  I can go share them with Will.

13          In my opinion, he had no desire to really

14  want to know, to really communicate.  He wanted

15  information, and it has been since used in that

16  way.

17      Q.   Does this email, Exhibit 19, accurately

18  reflect what you said in your conversations with

19  Clint Scott?

20      A.   I would like see the -- to answer that, I

21  need to look at my response to him, which is a

1    document that you have.

2         Q.   Okay.  I'm going to show you what I'm

3    going to mark as Exhibit 20.

4              (Whereupon, Warren Deposition Exhibit No.

5    20, Documents Bates Numbered WARR 012 through WARR

6    013, marked for identification.)

7              THE WITNESS:  Can we break for a moment?

8              MR. MARTENS:  Certainly.

9              THE WITNESS:  This contact is about as

10   dry as it can get.

11             MR. MARTENS:  We'll go off the record.

12             THE VIDEOGRAPHER:  We're going off the

13   record.  The time is 2:56 p.m.

14             (Recess taken -- 2:56 p.m.)

15             (After recess -- 3:03 p.m.)

16             THE VIDEOGRAPHER:  We are back on the

17   record.  The time is 3:03 p.m.  This is media unit

18   number four.

19   BY MR. MARTENS:

20        Q.   I'd like to direct your attention to

21   Exhibit 19.

Page 195

1      A.    Um-hum.

2            MR. GANT:  Sorry, the new one?

3            MR. MARTENS:  I'm going back to 19 for a

4    second.

5            MR. GANT:  Okay.

6    BY MR. MARTENS:

7      Q.    Exhibit 19 is the email to you from Clint

8    Scott on June 24th, 2015, a Wednesday, correct?

9      A.    Yes.

10     Q.    And item No. 3 Clint Scott said you, Bill

11   Warren, said that, "Kevin Ezell said that as long

12   as Will McRaney was to stay the executive leader,

13   NAMB would not support the BD/DE -- the MD/DE

14   convention and that this was wrong for him to say."

15     A.    Um-hum.

16     Q.    Do you see that?

17     A.    Yes.

18     Q.    Did you say that during your telephone

19   call with Clint Scott?

20           MR. GANT:  Objection.  Foundation.

21           THE WITNESS:  No.

Page 196

1    BY MR. MARTENS:

2         Q.    Why do you say that?

3         A.    Because I answered no in my response to

4    him, so I'm trusting my memory from that time and

5    not eight years later.

6         Q.    So, let's look at Exhibit 20.  Do you

7    recognize Exhibit 20?

8         A.    Yes.

9         Q.    What is Exhibit 20?

10        A.    It's my response, my note -- my response

11   to his questions.

12        Q.    Is this an email from you to Clint Scott?

13        A.    Yes.

14        Q.    And this is a document bearing the Bates

15   number, if I haven't said it before, WARR 12

16   through WARR 13, correct?

17        A.    Can I get an Exhibit 20?

18             MR. GUNDERSON:  It's --

19             THE WITNESS:  Oh, it's on the back?

20             MR. GUNDERSON:  Yes.

21             THE WITNESS:  I got it.

Veritext Legal Solutions
866 299-5127

1  BY MR. MARTENS:

2     Q.   Let me just try that again.  Exhibit 20

3  is a document bearing Bates number WAR -- WARR 12

4  through 13, correct?

5     A.   Correct.

6     Q.   And do you recognize that as an email

7  from you to Clint Scott on August 25th, 2015?

8     A.   June.

9     Q.   It's dated August 25th, 2015, correct?

10    A.   Is it on the back?  Oh, okay.  Yes.

11    Q.   And it says, Notes from Wednesday,

12 6-24-15 Phone Conversation between Bill Warren and

13 Clint Scott, do you see that --

14    A.   Right.

15    Q.   -- in Exhibit 20?

16    A.   Right.  So, maybe I was wrong on the

17 date.  Maybe it was a Wednesday instead of a

18 Tuesday.  Okay.  Yes, I see that.

19    Q.   Who took those notes in Exhibit 20?

20    A.   Those were my written responses to the

21 questions that I chose to answer from Clint Scott.

Page 198

1      Q.    And why did you choose to answer certain

2    of his questions?

3      A.    I don't recall why.

4      Q.    In Exhibit 20 in the fourth bullet point

5    on the second page, it begins, Kevin Ezell said

6    that as long as Will McRaney was to stay executive

7    leader, NAMB would not support the MD/DE State

8    Convention and that this was wrong for him to say.

9    That's quoting from item No. 3 of Exhibit 19,

10   correct?

11     A.    Right.  Right.

12     Q.    And then after that, it says, No, in

13   caps, do you see that?

14     A.    Yes.

15     Q.    Who wrote no?

16     A.    I did.

17     Q.    And then it continues, "Implication from

18   March meeting that they would give less because

19   they were very dissatisfied with Will.  Never in

20   personal conversation with me did Kevin imply or

21   state a threat that we had to fire Will in order to

1  continue receiving funds at all or at an acceptable

2  level, do you see that?

3      A.   Yes.

4      Q.   Who wrote that?

5      A.   I did.

6      Q.   Were the words you wrote in bullet point

7  4 true?

8      A.   Yes, and when you finish, I want to speak

9  to them.

10      Q.   Please explain.

11      A.   I've been wanting to give this

12  explanation for eight years.

13          Here's what happened:  Clint is asking

14  his questions.  He said something to the effect,

15  Did Kevin Ezell ever say to you that you -- there

16  would be no NAMB funding if you didn't get rid of

17  Will.  I said, No, he never said that.  Did he

18  imply that?  I said, Yes.  And in that moment in

19  the pit of my stomach, there was a churning because

20  I realized I had not spoken what I intended to say.

21          Thinking back on it, what I should have

 1    said was, I inferred from Kevin Ezell's actions

 2    that that would be the case.

 3            Never in personal conversation or

 4    correspondence or any kind of meeting did Kevin

 5    imply that if you'll just get rid of him, we'll

 6    be -- we'll be whole.

 7            So, I said the wrong thing, and since

 8    then, I've been accused of lying and other things,

 9    but that's what I meant to say, that I inferred

10    from his actions, or less precisely, his actions

11    implied.

12            When you get a letter in December stating

13    that because of Will's actions, we're going to

14    terminate the agreement, okay, that's pretty clear.

15    When you have a meeting in March in which they say

16    they're going to reduce our funding because we

17    still have problems with Will's cooperation, that's

18    pretty clear, but, no, he never came to me and

19    said, Hey, Bill, just between you and me, get rid

20    of him and you got the money, nor would it have

21    mattered.

Page 201

1      Q.   Why not?

2      A.   As I stated in an email to Kevin Ezell,

3  we would have put up with it.  We would have put up

4  with the loss of funds trusting God for the

5  difference if we had seen from Will what we needed

6  to see in terms of humility and bearing his portion

7  of some portion of -- of the concerns that we

8  addressed to him.  I stated it in an email; I state

9  it today.

10      Q.   Did you vote to terminate Will McRaney as

11  executive director of BCMD in order to retain

12  funding from NAMB?

13           MR. GANT:  Objection.  Vague, compound,

14  foundation, calls for speculation.

15           THE WITNESS:  No.  We all knew -- well, I

16  can't say all.  I knew that that would very likely

17  mean a resumption of previous levels of giving, but

18  that's not why.

19           Despite what some people have said about

20  me, I am a man of integrity, and I can't be bought,

21  and I wasn't bought that day, and Kevin didn't try

                                        Page 202

1    to buy me.

2    BY MR. MARTENS:

3        Q.    So, why did you vote to terminate Will

4    McRaney?

5        A.    The tipping point of the five staff

6    members who said, We don't see any change.  We're

7    leaving.

8        Q.    In any of the meetings that you

9    participated in with regard to the termination of

10   Will McRaney as executive director of BCMD, did you

11   hear anyone express the view that Will was being

12   terminated in order to maintain NAMB's funding?

13       A.    No.  I can't say what was in the mind of

14   the other 36 people that day, but I didn't hear

15   anybody say that.

16       Q.    I'm going to show you -- I'm going to

17   show you what we're going to mark as Exhibit 21.

18           (Whereupon, Warren Deposition Exhibit No.

19   21, Documents Bates BCMD_0029 to BCMD_0030, marked

20   for identification.)

21   BY MR. MARTEN:

Page  203

1    Q.    Do you recognize this Exhibit 21?

2    A.    Yes.

3    Q.    What is it?

4    A.    It's an email from Mark Dooley to Mike

5    Trammell and Will, with a copy sent to me, Harold

6    Phillips, and Tom Stolle.

7    Q.    And did you receive this email exchange

8    on or about September 13th, 2015?

9    A.    Yes.

10    Q.    The first email -- strike that.

11    This is a document, Exhibit 21, bearing

12    the Bates BCMD_0029 to 0030.

13    Turn to the second page of that exhibit.

14    It begins with an email from Mike Trammell to Will

15    McRaney on September 13th, 2015, correct?

16    A.    Correct.

17    Q.    Who is Mike Trammell at this time?

18    A.    A member of the -- at least the General

19    Mission Board, but I'm -- I'm almost certain he was

20    also on the Administrative Committee.

21    Q.    Was he a member of the General Mission

Page 204

1    Board at the time of the vote to terminate --

2        A.    Yes.

3        Q.    -- Will McRaney as executive director of

4    BCMD?

5        A.    Right.

6        Q.    Was he present at the June 8th, 2015

7    meeting?

8        A.    Yes.

9        Q.    Do you see at the end that Mike says,

10   "Count me among those who will never vote for your

11   reinstatement"?

12       A.    Yes.

13       Q.    Do you know why Mike felt that way?

14       A.    He heard all -- well, I can't speak for

15   Mike.

16       Q.    Okay.  Do you see at the beginning of

17   that email by Mike he says, "I am writing to inform

18   you that I was offended that you came to my church

19   today for what appeared to be the purpose of

20   winning me over in your battle for reinstatement?"

21   Do you see that?

                                            Page 205

1        A.    I see that.  I see that.

2        Q.    Had you heard about Will appearing at

3   Mike Trammell's church to try to win him over for

4   reinstatement?

5              MR. GANT:  Objection.  Vague, foundation.

6              THE WITNESS:  I had heard that he

7   appeared at Mike's church and discussed the issue,

8   and Mike was not happy.

9   BY MR. MARTENS:

10       Q.    Who did you hear that from?

11       A.    Mike.

12       Q.    Do you think that was proper for Will to

13  do?

14             MR. GANT:  Objection.  Vague.

15             THE WITNESS:  No.

16  BY MR. MARTENS:

17       Q.    Do you see where Mike writes, Engaging me

18  in conversation in the foyer of my church within

19  earshot of my church members to discuss your recent

20  termination was highly improper?

21       A.    I see that.

Page 206

1      Q.   Do you agree with that?

2      A.   Yes.

3      Q.   Meaning do you --

4      MR. GANT:  Sorry.

5      THE WITNESS:  I'm sorry.

6      MR. GANT:  You just need to slow down a

7 little bit in case I have an objection.  Go ahead.

8 BY MR. MARTENS:

9      Q.   Do you agree with Mike Trammell's

10 assessment that that conduct by Will McRaney was

11 highly improper?

12      MR. GANT:  Objection.  Vague, foundation.

13      THE WITNESS:  Yes, I do.

14 BY MR. MARTENS:

15      Q.   Do you see where Mike wrote, I was

16 saddened to have to answer Sandy when she asked me

17 to explain to her I voted to fire her husband.

18 That is just plain wrong on a lot of levels.

19 Sunday is God's day, Will.  You should know that.

20 Do you see that?

21      A.   I see it.

Veritext Legal Solutions
866 299-5127

1      Q.   Do you agree with Mike Trammell's

2   assessment that Will McRaney's wife confronting

3   Mike Trammell was improper?

4            MR. GANT:  Objection.  Foundation,

5   mischaracterizes the document.

6            MR. MARTENS:  I'll restate.

7   BY MR. MARTENS:

8      Q.   Did you agree with Mike Trammell's

9   assessment that having to answer questions to Sandy

10  at church that Sunday was just plain wrong?

11     A.   Yes, but these are human beings who have

12  received terrible news and they're deeply hurt, so

13  nobody -- nobody defends us like our wives,

14  Gentlemen.  So, I understand.

15     Q.   Do you see Mike continues, Your ceaseless

16  verbal accusations against Bill Warren and others

17  is wearing thin?

18     A.   I see it.

19     Q.   Did you know what -- do you know what

20  Mike was referring to with regard to this reference

21  to ceaseless allegations against you and others?

```
 1              MR. GANT:  You said allegations.  That's

 2      not --

 3              THE WITNESS:  Accusations.

 4              MR. GANT:  It doesn't say that.

 5      BY MR. MARTENS:

 6         Q.   Do you -- strike that.

 7              Do you know what Mike was referring to

 8      when he referenced ceaseless verbal accusations

 9      against you and others?

10         A.   Yes.

11         Q.   What was he referring to?

12         A.   Emails.  I'm assuming he's referring to

13      emails and Facebook posts.

14         Q.   What emails and Facebook posts are you

15      referring to?

16         A.   My recollection is emails he sent to

17      other pastors or at least an email posted on

18      Facebook.

19              Over -- over the years, Will has sent me

20      emails.  I think the last one was in 2019, so I'm

21      familiar with -- with -- with that.
```

Page 209

1     Q.   When you say he was sending emails and

2   Facebook posts, he being Will McRaney?

3     A.   Yes.

4     Q.   Where does -- strike that.

5          Were these Facebook posts making

6   accusations against you?

7     A.   I tried --

8          MR. GANT:  Objection.  Vague, compound.

9          THE WITNESS:  I tried as best I could not

10   to read any of it.

11   BY MR. MARTENS:

12     Q.   Did you become aware that there were

13   Facebook posts making accusations against you?

14          MR. GANT:  Same objections.

15          THE WITNESS:  Yes.

16   BY MR. MARTENS:

17     Q.   Where does one member of the Body of

18   Christ making Facebook posts against another member

19   of the Body of Christ over a dispute concerning

20   employment at a state convention fit within Matthew

21   18?

Veritext Legal Solutions
866 299-5127

1    MR. GANT:  Objection.  Vague, foundation,

2    incomplete hypothetical, calls for speculation.

3    THE WITNESS:  It doesn't fit.

4    BY MR. MARTENS:

5    Q.    How does one member of the Body of Christ

6    making accusations on Facebook against another Body

7    of Christ -- another member of the Body of Christ

8    align with Christ-like character?

9    MR. GANT:  Same objections.

10    THE WITNESS:  Same -- same response.  It

11    doesn't fit Matthew 18, but nobody knows how deeply

12    Will was hurt but Will and Sandy.  And we are human

13    beings, so they were in a lot of pain.

14    BY MR. MARTENS:

15    Q.    And you understand that?

16    A.    As best I can.  I haven't been in his

17    shoes.

18    Q.    In other words, you're willing to show

19    grace in that situation even though it's not proper

20    conduct?

21    MR. GANT:  Objection.  Leading, Vague --

Page 211

1          THE WITNESS:  Yes.

2          MR. GANT:  -- foundation.

3          MR. MARTENS:  We can just take a break

4   and go off the record.

5          THE VIDEOGRAPHER:  We're going off the

6   record.  The time is 3:20 p.m.

7          (Recess taken -- 3:20 p.m.)

8          (After recess -- 3:28 p.m.)

9          THE VIDEOGRAPHER:  We are back on the

10  record.  The time is 3:28 p.m.

11         (Whereupon, Warren Deposition Exhibit No.

12  22, Documents Bates Numbered NAMB 5379 through

13  5382, marked for identification.)

14  BY MR. MARTENS:

15      Q.   I'm going to show you, sir, what I'm

16  going to mark as Exhibit 22.  It's a document

17  bearing the Bates number NAMB 5379 through 5382.

18         (Whereupon, there was a pause for

19  document examination.)

20  BY MR. MARTENS:

21      Q.   Take your time.

Page  212

```
 1              (Whereupon, there was a pause for
 2   document examination.)
 3              THE WITNESS:  Okay.
 4   BY MR. MARTENS:
 5       Q.    Have you ever seen Exhibit 22 before?
 6       A.    Yes, I have.  Yes.
 7       Q.    When did you see it?
 8       A.    A few days ago.
 9       Q.    Have you -- strike that.
10             Do you recall attending a meeting with
11   NAMB on May 19th, 2016?
12       A.    Yes, I do.  I was in the parking lot in
13   my car behind the University Library, Salisbury
14   University.  I know exactly where I was.
15       Q.    So, you participated in the meeting
16   remotely?
17       A.    Yes.
18       Q.    Why were you attending that meeting?
19       A.    Kevin requested that I talk to his
20   trustees and set the record straight.
21       Q.    And did you agree to do so?
```

Veritext Legal Solutions
866 299-5127

1          A.    Yes.

2          Q.    What do you mean by set the record

3     straight?

4          A.    Tell the truth.

5          Q.    The truth about what?

6          A.    About NAMB's -- about whether or not

7     Kevin badgered us or influenced us to fire Will.

8          Q.    Did you speak to the trustees of NAMB

9     about that issue?

10          A.    Yes.  I was on speaker phone.

11          Q.    What did you say?

12          A.    What's here in the -- in the letter, in

13     the -- in the minutes of the conference call.

14     That's exactly what I said per my recollection.

15          Q.    So, you're referring to on page 5380, the

16     second page of Exhibit 22, there's a paragraph that

17     begins, Bill Warren?

18          A.    Yes.

19          Q.    And is that an accurate recitation of

20     what you said in that meeting --

21          A.    Yes.

                                        Page  214

1      Q.  -- that you participated in by conference

2  call on May 16th, 2016?

3      A.  Yes, it is.

4      Q.  May 19th, 2016?

5      A.  Yes.

6          MR. GUNDERSON:  Hold on a second.

7          MR. GANT:  Objection.  Thank you, Eric.

8  Objection, compound, vague.

9          THE WITNESS:  Okay.  Yes, it is.

10  BY MR. MARTENS:

11      Q.  Is there anything in that paragraph that

12  is not an accurate recitation of what you recall

13  saying during that conference call?

14          MR. GANT:  Same objections.

15          THE WITNESS:  There's nothing inaccurate

16  here.

17  BY MR. MARTENS:

18      Q.  Did Kevin Ezell ever bully BCMD or badger

19  BCMD or ask BM -- BCMD to fire Will McRaney?

20          MR. GANT:  Objection.  Vague, compound.

21          THE WITNESS:  Not in my presence or in my

Veritext Legal Solutions
866 299-5127

```
1   knowledge from interactions with the GMB.
2   BY MR. MARTENS:
3        Q.   You state -- strike that.
4             It states in this document that you
5   stated during the call with the NAMB trustees that
6   over the months you started to realize that Kevin
7   was right and you came to see him as a friend, do
8   you see that?
9        A.   Not yet.  Where is it?
10       Q.   If you look in the paragraph that begins
11  Bill Warren?
12       A.   Yeah.
13       Q.   The sixth line down --
14       A.   Yes.
15       Q.   -- the sentence --
16       A.   I see it.
17       Q.   Did you state during that meeting that
18  over the months, you started to realize that Kevin
19  was right and you came to see him as a friend?
20       A.   Yes.
21       Q.   What did you come to realize Kevin was
```

Page  216

1  right about?

2      A.   That Will had not cooperated with NAMB

3  the way he should have and that despite our earlier

4  thoughts that he was not violating the agreement,

5  that actually he had.

6      Q.   You came to the conclusion that Will had

7  what?

8      A.   Violated the agreement between NAMB and

9  BCMD.

10     Q.   The SPA?

11     A.   Yes.

12     Q.   The document reads, Anyone who says we

13  wanted him (McRaney) to resign because we wanted

14  more money is out of their mind.  The loss of NAMB

15  funding was never a consideration.  We didn't act

16  out of a lust for money.  Do you see that?

17     A.   I see it.

18     Q.   Is that a fair and accurate

19  representation of what you said during that

20  conference call to the NAMB trustees?

21     A.   Yes, it is.

Page  217

1      Q.   Is it true?

2      A.   It is true.  Now, I'm not going to sit

3  here and say that we were happy at the prospect of

4  losing that money, that that didn't affect our

5  evaluation of Will.  I'm sure it did.  I tell the

6  truth, but it wasn't the reason.  It wasn't my

7  reason for voting yes.

8      Q.   Did you hear anyone else on the GMB

9  express that it was their reason?

10         MR. GANT:  Objection.  Vague.

11         THE WITNESS:  No.

12 BY MR. MARTENS:

13     Q.   The document states, I'm really ticked

14 off -- ticked off at the way he (Kevin) has been

15 treated by some of the players and the press.  Do

16 you see that?

17     A.   Yes.  Um-hum.

18     Q.   Is that a fair and accurate

19 representation of what you said at the meeting with

20 the NAMB trustees on May 19th, 2016?

21     A.   Yes.

                                        Page  218

1      Q.   What did you mean by that?

2      A.   I don't -- I don't precisely recall.

3      Q.   How was Kevin being treated by some of

4   the players?

5           MR. GANT:  Objection.  Vague, foundation,

6   compound, calls for speculation, asked and

7   answered.

8           THE WITNESS:  I'm sure it was negative,

9   but I don't recall specifics.

10  BY MR. MARTENS:

11     Q.   It ends -- that paragraph ends, I hope

12  you will continue to stand behind Kevin because he

13  is a great man of God.  Do you see that?

14     A.   Yes.

15     Q.   Is that a fair and accurate

16  representation of what you said to the NAMB

17  trustees on May 19th, 2016?

18     A.   Yes, it is.

19     Q.   Did you at that time sincerely believe

20  that Kevin was a great man of God?

21     A.   Yes, I did.

1      Q.   Do you still believe that?

2      A.   Yes, I do.

3      Q.   If you continue down the next paragraph

4   begins, Andy Childs, do you see that?

5      A.   Yes, I do.

6      Q.   And then two lines below it begins Bill

7   Warren again, correct?

8      A.   Yes.

9      Q.   And if you go four lines below that, it

10  reads, He is now aiming his bullets at Kevin.  He

11  wants Kevin's scalp.  He wants his job.  Do you see

12  that?

13     A.   Yes.

14     Q.   Is that a fair and accurate

15  representation of what you said to the NAMB

16  trustees during the meeting on May 19th, 2016?

17     A.   I'm sure it is.

18     Q.   And who is the he who is aiming his

19  bullets at Kevin?

20     A.   Will.

21     Q.   Who is the he who wanted Kevin scalped?

Page  220

1          A.    Will.

2          Q.    Who is the he who wanted Kevin's job?

3          A.    Will.

4          Q.    If you continue down a few more lines, it

5     recounts you speaking again as saying, He hasn't

6     been able to find a job, and he's trying to restore

7     his reputation and say, I'm not a bad guy.  "They

8     messed me over."  He's attempting to find a job.

9     Sadly, I think it's going to do just the opposite.

10    Do you see that?

11         A.    Yes, I do.

12         Q.    Is this a fair and accurate

13    representation of what you said to the NAMB

14    trustees during the meeting on May 19th, 2016?

15         A.    Yes, it is.

16         Q.    Was that your honest opinion at the time?

17         A.    Yes, it was.

18         Q.    Is it still your opinion?

19         A.    I don't know what he's doing now.  I

20    haven't kept up with Will's career.

21              MR. MARTENS:  I don't have any more

Page 221

1    questions at this time.  I reserve the time for

2    redirect.

3                MR. GANT:  What's our running time?

4                THE VIDEOGRAPHER:  Approximately 3.37.

5                MR. GANT:  Do you want five minutes or do

6    you just want to go?

7                THE WITNESS:  I'm good.

8                        EXAMINATION

9                BY MR. GANT:

10       Q.    Good afternoon, Dr. Warren.

11       A.    Good afternoon.

12       Q.    As you know from this morning, my name is

13    Scott Gant, and I represent Dr. McRaney in this

14    case.

15                You recall several hours ago you took an

16    oath?

17       A.    (Nodding head yes.)

18       Q.    You need to answer verbally, please.

19       A.    Oh, yes.

20       Q.    And --

21                MS. CARRINGTON:  You all, I'm sorry to

                                                Page 222

1    interrupt.  Scott, is there a like microphone that
2    you can put on or?
3                MR. GANT:  I have a microphone.
4                MS. CARRINGTON:  Okay.  It's just very
5    quiet.  Is there a way to turn up the volume up on
6    it?
7                THE WITNESS:  It may have to come up
8    higher on your shirt.
9                MR. GANT:  Kat, I'm just going to ask my
10   questions.  I have a cold.  So, if you can't hear
11   me, I'm sure Matt and Josh will fill you in.
12   BY MR. GANT:
13       Q.   Do you agree to give truthful and
14   complete answers to my questions?
15       A.   Yes.
16       Q.   Thank you.  Since you turned 18 years
17   old, have you ever told a lie?
18       A.   Yes.
19       Q.   What's your best guess about how many
20   times?
21       A.   That's a lot of years, Scott.

Veritext Legal Solutions
866 299-5127

1          Q.    I'm only asking for your best good-faith

2    estimate.

3          A.    Maybe five.

4          Q.    Thank you.

5          A.    Five to ten, I guess.

6          Q.    Thank you.   You have described

7    Dr. McRaney as a man of great vision and courage,

8    correct?

9          A.    Yes.

10          Q.    You have described Dr. McRaney as someone

11    who is not afraid to tackle hard issues, correct?

12          A.    I would -- I don't recall, but I -- that

13    would have been true at one point, yes.

14          Q.    You have also said that Dr. McRaney is a

15    man of truth who lives the Great Commission,

16    correct?

17          A.    I probably did.   Are you reading from

18    something?

19          Q.    I am.   Would you like to see it?

20          A.    Sure.

21          Q.    Okay.

                                              Page 224

1              (Whereupon, Warren Deposition Exhibit No.

2    23, Documents Bates Numbered NAMB 6695 through NAMB

3    6704, marked for identification.)

4    BY MR. GANT:

5         Q.    I've handed you what's been marked as

6    Exhibit 23, which is Bates labeled NAMB 6695

7    through 6704, and I was reading from page 6703, the

8    second to the last page.

9              When you get there, you will see there's

10   a section entitled, Presidents Remarks.  Is that a

11   picture of you?

12        A.    Yes, it is.

13        Q.    Okay.  A younger you?

14        A.    Yes.

15        Q.    We all -- we all look different.

16        A.    Yes.

17        Q.    And I was reading, in particular, from

18   under -- under the picture, the third paragraph --

19        A.    Yes.

20        Q.    -- beginning -- do you see that?

21        A.    Um-hum.  Um-hum.

Page 225

1      Q.   So -- so, does that refresh your

2  recollection of your making those statements about

3  Dr. McRaney?

4      A.   Yes, I see it and, yes, it does.

5      Q.   Okay.  And did you believe those to be

6  true when you made those statements?

7      A.   Absolutely.

8      Q.   Is it your practice when you put

9  something in writing or make a statement to be as

10  accurate and truthful as possible?

11      A.   Yes, it is.

12      Q.   Can you -- I just want to make sure I

13  understand a couple of things about the capacity in

14  which you're appearing today.

15          Mr. Martens has asked you if you were

16  appearing pursuant to a subpoena, do you recall

17  that?

18      A.   Yes.

19      Q.   Was it one subpoena or two?

20      A.   I think it was just one.

21          THE WITNESS:  Correct, one subpoena?

Page 226

```
 1              MR. GANT:  I don't mind if you answer,
 2    Eric.
 3              MR. GUNDERSON:  You can --
 4              MR. GANT:  If you don't want to, that's
 5    all right.  I'm happy to make a representation.
 6              MR. GUNDERSON:  We only received one
 7    subpoena from your office.
 8              MR. GANT:  Right, but there was a
 9    subpoena from NAMB.
10              MR. GUNDERSON:  Yes.  Yes.
11              THE WITNESS:  Well, there was a subpoena
12    from NAMB.  That's what --
13              MR. GUNDERSON:  Yes.
14              THE WITNESS:  -- he was referring to.
15    BY MR. GANT:
16         Q.   I'm not trying to hide the ball or make
17    this tricky.
18         A.   Okay.
19         Q.   I just -- my understanding is there was a
20    subpoena from NAMB for your testimony today, and
21    then I know that I sent a subpoena to your counsel
```

Page 227

1    for your testimony, which he accepted --

2         A.    Okay.

3         Q.    -- service of on your behalf, so those

4    are the two subpoenas I'm referring to.

5         A.    Okay.

6         Q.    Now, those -- you're appearing today and

7    giving testimony in your individual capacity,

8    correct?

9         A.    Yes.

10        Q.    You're not testifying on behalf of

11   anybody else?

12        A.    No.

13        Q.    Are you giving testimony for any of the

14   other members of the General Mission Board or the

15   BCMD, either now or at the time that you were

16   serving on the board?

17        A.    Clarify.

18        Q.    Well, are you test- -- giving sworn

19   testimony today for anyone other than yourself

20   individually?

21        A.    I'm giving sworn testimony of what I

1    recall.

2         Q.    And -- and --

3         A.    That may or may not involve other

4    peoples' opinions that were expressed to

5    me, --

6         Q.    Okay.

7         A.    -- but I'm not here to represent an

8    individual.

9         Q.    You're not here to represent, I'm sorry?

10        A.    I'm not here -- I'm not here to -- I'm

11   here to speak as an individual, a former president

12   of State Convention.

13        Q.    That's the capacity in which you're

14   appearing?

15        A.    Absolutely.

16        Q.    Okay.  You're not appearing as a -- as a

17   "legal representative" of the BCMD today, are you?

18             MR. GUNDERSON:  I'm not sure he

19   understands what that means.

20             MR. GANT:  Okay.

21             THE WITNESS:  I'm not sure either.

1    BY MR. GANT:

2         Q.    In lawyer speak, that means you're not

3    here as a 30(b)6 representative.

4              MR. GANT:  Eric will understand what that

5    means.  You're welcome to confirm that or I will

6    try and ask in terms he understands.

7              MR. GUNDERSON:  Yeah, he's not here on

8    that behalf.

9              MR. GANT:  He's not here on BCMD's

10   behalf?

11             MR. GUNDERSON:  No.  He's not been noted.

12   There's been no Notice of Deposition noted

13   for -- for BCMD to appear as a corporate designee,

14   and so there's been no process by which he's been

15   designated as a corporate resident -- corporate

16   resident for BCMD.

17             MR. GANT:  Okay.  Thank you.

18   BY MR. GANT:

19        Q.    I'll accept your lawyer's representations

20   if that's okay with you.

21        A.    That's fine, yes.

Veritext Legal Solutions
866 299-5127

1    Q.   Have you been designated or asked to
2    serve as an expert witness in this case?
3    A.   I don't know if anybody has designated me
4    as an expert witness or not.
5    Q.   Has anyone asked you to serve as an
6    expert in this case, to give testimony as an
7    expert?
8    A.   No.  I got a subpoena.  I showed up.
9    Q.   Are -- are you an expert on any aspect of
10   the First Amendment to the United States
11   Constitution?
12   A.   Refresh my memory, what's the First
13   Amendment?
14   Q.   I think that might answer the question
15   itself, but do you know what the -- what the First
16   Amendment to the United States Constitution is?
17   A.   I can't recall right now, but go ahead
18   and you tell me.
19   Q.   Okay.  well --
20   A.   If you're talking about separation of
21   church and state, yes, I am.

Page 231

1      Q.   You are an expert on separation of church

2  and state?

3      A.   Expert, no, I'm not an expert.

4      Q.   That was my question about expert.

5      A.   Okay.  Yeah.

6      Q.   So, let me ask it again.  Do you consider

7  yourself -- strike that.

8           Have you ever described yourself as an

9  expert on the First Amendment?

10     A.   No.

11     Q.   Are you offering testimony in this case

12 as an expert on the First Amendment?

13     A.   No.

14     Q.   You're not a lawyer, correct?

15     A.   No.

16     Q.   You're not offering any legal opinions in

17 this case; is that correct?

18     A.   No.

19     Q.   Well, I said is that correct?  So, is

20 that --

21     A.   Yes, that is correct.

Page 232

1      Q.   Thank you.  All right.  Thanks.  Okay.

2    Thank you for those clarifications.

3           Are you familiar with how the term

4    supporting organization is used in connection with

5    the Internal Revenue Code of the United States?

6      A.   No.

7      Q.   Do you know how the term supporting

8    organization is used in connection with accounting

9    for -- and taxes for nonprofits?

10     A.   No.  I don't know what a supporting

11   organization is --

12     Q.   Okay.  Do you know who Charles --

13     A.   -- in that context.

14     Q.   Do you know who Charles Lindsey is?  He

15   gave a declaration in this case.

16     A.   No, it doesn't ring a bell.

17     Q.   I take it you don't remember reading a

18   declaration by Charles Lindsey?

19     A.   Huh-uh. (Shaking head, no.)

20     Q.   She would like an audible answer.

21     A.   Oh, I'm sorry.  No.

Page  233

1      Q.   Thank you.  Are you aware that

2  Dr. McRaney has expert reports from some

3  individuals in this case?

4      A.   Expert reports?

5      Q.   Yes.

6      A.   No, I'm not aware of that.

7      Q.   You haven't read those?

8      A.   No.

9      Q.   Okay.  Have you read any of the

10  transcripts of any depositions in this case?

11      A.   No.  I read a couple of affidavits.

12      Q.   Okay.  But deposition transcripts, have

13  you read any?

14      A.   No.

15      Q.   What affidavits have you read?

16      A.   I read -- I scanned through quickly

17  from -- the one from Wolverton and Dooley.

18      Q.   The Dooley one that Mr. Martens showed

19  you?

20      A.   It was in the -- it was in the documents.

21      Q.   That Mr. Martens showed you today or some

Page 234

1    other documents?

2         A.   No, that one.  It was that one.

3         Q.   Okay.  So, Dooley, Wolverton.  Any others

4    you recall?

5         A.   Huh-uh.

6         Q.   Again, audible answers, please.

7         A.   No.

8         Q.   Thank you.

9         A.   No problem.  Sorry.

10        Q.   That was audible.  It just wasn't --

11        A.   I understand.  Yes or no, I'm sorry.  My

12   bad.

13        Q.   Thank you.  We're not trying to make this

14   difficult.

15        A.   No, I understand.  We -- we need to get

16   it right.

17        Q.   Did you starting at any point in time

18   specifically set out to preserve documents related

19   to this case?

20        A.   No.

21        Q.   Why not?

Page 235

1     A.   I never thought I would need them.

2     Q.   Do you remember being asked to preserve

3  documents related to this case?

4     A.   Yes.

5     Q.   By whom?

6     A.   Will.

7     Q.   And you did not heed that request or

8  abide by it?

9     A.   I did keep them all just in case.

10     Q.   Okay.  So, I thought you said -- I

11  thought you said that you didn't see a need, and I

12  got the impression that you didn't preserve.

13     A.   Well, I didn't see -- no, no.  That would

14  be a wrong impression.

15     Q.   Okay.

16     A.   I didn't see the need, but I'm very bad

17  at deleting emails.

18     Q.   Okay.

19     A.   So, that's why I have 18,000 emails on my

20  computer.  That's why I have emails dating back to

21  2015, so it was all preserved.

Page  236

1      Q.   Okay.  So, you kept them out of inertia

2  rather than --

3      A.   Inertia was -- right.  That's the right

4  term.

5      Q.   And do you remember Will sending you an

6  email in June 24th, 2017 requesting that you

7  preserve all documents related to -- to his work at

8  BCMD?

9      A.   Now that you mention it, yes.

10      Q.   I have that.  I'm not trying to hide it.

11           Would you like to see it or do you

12  remember it?

13      A.   No.  I remember it.

14      Q.   Okay.  Just for the record, I'm reading

15  from BCMD 0021.  So, it's your testimony that --

16      A.   So, before -- if I may?

17      Q.   Please.

18      A.   Before I received that email, I saw no

19  need to maintain the files, but I did anyway.

20      Q.   Okay.  Thank you.  So, to your knowledge,

21  you did not delete or dispose of any emails or

Page 237

1   other documents you had that might relate to

2   Dr. McRaney or this case?

3       A.   No.  I -- no.

4       Q.   And you did, in fact, make a production

5   of documents in this case --

6       A.   Yes.

7       Q.   -- recently, correct?

8       A.   Um-hum.  Yes.

9       Q.   Can you --

10          MR. GANT:  And we're going to mark those.

11          (Whereupon, Warren Deposition Exhibit No.

12   24, Documents Bates Numbered WARR 001 through WARR

13   054, marked for identification.)

14   BY MR. GANT:

15       Q.   I've handed you what's been marked WARR

16   001 through 054.  I will represent to you that

17   these are the documents that were produced by your

18   counsel to us and described as your document

19   production in response to Plaintiff's subpoena.

20       A.   Um-hum.

21       Q.   Were you involved in collecting those

Page 238

1    documents that you have in front of you marked as

2    Exhibit 24?

3         A.    Oh, yes.

4         Q.    What did you do to gather them?

5         A.    I looked through all of my emails on my

6    computer that had anything to do with McRaney.  I

7    also looked in my file to see if I had any

8    documents related to Will.

9              I also looked in an old computer that

10   was -- I don't know when it finally bit the dust,

11   but I can't access those emails.  It won't

12   get -- you can't get on the internet, so -- but I

13   had preserved a document from that old computer

14   that I put on my new computer.  That was the six

15   items.

16             I thought, well, I might need this one

17   day, and so I -- I did transfer that over.  But

18   there were no other documents on the computer that

19   were relevant.

20        Q.    When you say on the computer --

21        A.    On the old computer.

                                            Page 239

1      Q.    Okay.  And when you say you looked in

2  your emails, was there -- was there a particular

3  email address that you used?

4      A.    Both.  WWarren@allenmemorial.org and the

5  iCloud.

6      Q.    What's your iCloud email address?

7      A.    I think it's WWarren1953.  I never use

8  it.  I never pay much attention to it, but

9  it's -- they -- they're both on my Mac -- on my

10  Mac.

11      Q.    Do you have any other email addresses

12  other than those two?

13      A.    Not that I would have -- we have one at

14  home.  I don't even remember what it is, but I

15  don't get -- I've never gotten anything there.

16      Q.    And I thank you for conducting the search

17  for the documents and giving them to your counsel.

18      A.    You're welcome.

19              (Whereupon, Warren Deposition Exhibit No.

20  25, Subpoena to Produce Documents, Information, or

21  Objects or to Permit Inspection of Premises in a

Page 240

```
1    Civil Action, marked for identification.)

2    BY MR. GANT:

3         Q.   You have been handed Exhibit 25, which

4    will look like a little bit of legal mumbo-jumbo,

5    so I'll represent to you what it is.

6              It's a subpoena to you for

7    documents --

8         A.   Okay.

9         Q.   -- that your counsel accepted on your

10   behalf.

11        A.   Okay.

12        Q.   Have you ever seen it before?  You may

13   have seen the back pages which contain the actual

14   requests.  If you look at the very back page, that

15   has the actual requests.

16        A.   No, I don't think I have.

17        Q.   Can you turn to the back page?  I don't

18   think you looked at that yet.  Just flip it over.

19   There you go.

20        A.   Um-hmm.

21        Q.   Do you see two document requests there?
```

Page 241

1        A.    Yes, I do.

2        Q.    Have you ever seen these before?

3        A.    I have not seen this, no.

4        Q.    Okay.  When -- so, how did you know what

5    to look for?  What was your guiding principle when

6    you were searching for documents?

7        A.    Eric said, They want everything that even

8    tangentially relates to Will.  We're pushing back

9    and giving the documents that relate to the -- the

10   resignation.

11            So, I went through and found all of the

12   documents that dealt with the resignation.  Not

13   every single -- I did not present every single

14   document that says anything about Will McRaney, but

15   I did present every document that has anything to

16   do with the resignation.

17       Q.    What other kinds of documents related to

18   Will do you -- did you have in your computer that

19   you didn't provide?

20       A.    Nothing relevant to this case --

21       Q.    What --

Page 242

1          A.    -- as I recall.

2          Q.    What did they relate to if they were

3     about Dr. McRaney?

4          A.    If I get my bag, you won't hear me, but

5     I'll guess we'll just wait.

6          Q.    Well, you can get the bag.  I was going

7     to ask you some questions about the materials on

8     the floor in a second, so ...

9          A.    Let's see.  I think I have them with me.

10          MR. GUNDERSON:  What are you looking for?

11          THE WITNESS:  All of the documents that

12     had Will's name in them.

13          MR. GUNDERSON:  Okay.

14          THE WITNESS:  I'm not sure that I -- that

15     I brought them.  No, I don't have them with me.

16     BY MR. GANT:

17          Q.    Okay.  Do you have them at home

18     somewhere?

19          A.    Yes.

20          Q.    Where are they?

21          A.    They're in a file.  They're in a file

                                             Page 243

1    maybe in my car.  I might have brought them -- I

2    might have brought them with me.  I don't recall.

3        Q.    So you have them printed out in hard

4    copy.

5        A.    Um-hum.

6        Q.    Yes?

7        A.    I'm sorry.  Yes.

8        Q.    All right.

9             MR. GANT:  We request that Dr. Warren

10   through counsel provide them to us.  There's

11   obviously no burden objection.  They were already

12   collected.  He may even have them in his car as he

13   just said, so we'd like them produced to us as soon

14   as possible.

15   BY MR. GANT:

16       Q.    Do you have any objection to providing

17   them?

18       A.    No.  No.  No.  You can have whatever you

19   want.

20       Q.    Thank you.

21            MR. GUNDERSON:  I'll need to review them

Page 244

1   for attorney-client privilege.

2          MR. GANT:  That's fine.

3          MR. GUNDERSON:  But other than that --

4          MR. GANT:  Other than that, once that's

5   done, I would appreciate you sending them to us.

6   Thank you.

7   BY MR. GANT:

8      Q.   Now, you were just looking through a

9   stack of material to your left.  I also noticed

10  when you sat down this morning you have some kind

11  of tablet with you --

12     A.   Um-hum.

13     Q.   -- and then you had stuff on the floor

14  before.  I'm not sure if that's now on the table or

15  it's still on the floor and I would like to go

16  through what you have surrounding you.

17     A.   No.  I think it's all on the table.

18     Q.   Okay.  All right.  So, what do you have

19  to your left there?

20     A.   All the materials he gave me.

21     Q.   You mean the deposition exhibits?

Page 245

1        A.    Yes.

2        Q.    Okay.

3        A.    My iPad.

4        Q.    Your iPad was open for parts of the

5    deposition --

6        A.    Yes.

7        Q.    -- I believe when you started?

8        A.    Yes.

9        Q.    What's -- what's on the screen there?

10       A.    Okay.  All of the materials that I gave

11   to both of you is on --

12       Q.    You mean hard copies -- images of

13   materials?

14       A.    Yes.

15       Q.    Okay.  What did you give besides what was

16   marked as Exhibit 24?

17             MR. MARTENS:  I think that's -- are you

18   referring to --

19             THE WITNESS:  Yeah.

20             MR. MARTENS:  -- all of the Warren

21   documents?

```
 1              THE WITNESS:  All of the Warren stuff is
 2    what's on the iPad.
 3    BY MR. GANT:
 4         Q.   The 54 pages?
 5         A.   Yes.  You're welcome to take a look at it
 6    if you'd like.
 7         Q.   Well, at least for now, I'm fine taking
 8    your word for it.
 9              Is there anything on there other than the
10    54 pages that you produced?
11         A.   No.
12         Q.   Okay.
13         A.   Let's see what else is there.
14         Q.   What else is there?
15         A.   Notes from my attorney.  I think this
16    is -- see, what I wanted was the documents I sent
17    to Eric who sent to you with a correct pagination.
18         Q.   Okay.
19         A.   That's what I was looking for, and he
20    provided those with me, and that's what I put down
21    on the iPad so I would be -- literally be on the
```

Page 247

1    same page with all of you.  I'm pretty sure that

2    this is all of that just in a different order.

3         Q.   I see.  Okay.

4         A.   But you're welcome to look through it.

5         Q.   Well, if you don't mind at a break, can I

6    do that?

7         A.   Sure, you can.  Yeah, absolutely.

8         Q.   All right.

9         A.   I don't think you're going to find

10   anything different.

11        Q.   Okay.  Now, I also noticed that you took

12   a note at, at least one juncture during the

13   deposition on that yellow pad there?

14        A.   Yes.

15        Q.   What was that?

16        A.   You're going to laugh.

17        Q.   Is it about how good looking I am?

18        A.   No.

19        Q.   Okay.  What does it say?

20        A.   I said, No, I didn't say that.  I'm not

21   saying you're not, but, no, it wasn't that.  Yes,

Page 248

```
 1   no, don't recall to remind myself of how I should

 2   respond.

 3         Q.   Okay.

 4              MR. GANT:  I'm not getting into any

 5   privilege information, don't worry.

 6              THE WITNESS:  I took down -- I took

 7   down --

 8              MR. GANT:  Those were instructions from

 9   Eric.  I will not assert waiver, correct?

10              THE WITNESS:  Yeah, as well as two

11   friends of mine who have been through depositions.

12   BY MR. GANT:

13         Q.   Okay.

14         A.   Then I wrote down Scott, your name, and

15   Matt's name and Josh's name, and then I started

16   writing down answers to Matt's questions; no, no,

17   no, yes, and then I decided, no, I'm not going to

18   keep writing down the answers.

19         Q.   Is there anything else on there?

20         A.   No.

21         Q.   Can I just see it?
```

Page 249

```
 1        A.    Sure.

 2              (Document tendered.)

 3   BY MR. GANT:

 4        Q.    What's on -- I'm not going to turn in

 5   case it's privileged.

 6        A.    No, there's nothing.

 7        Q.    Well, there's something.  I don't want

 8   to --

 9        A.    Is there something?

10              MR. GUNDERSON:  There's something on the

11   second page.

12              THE WITNESS:  Oh, okay.

13              (Document tendered.)

14   BY MR. GANT:

15        Q.    What's there?

16        A.    Journal notes to myself, notes on

17   Ephesians Chapter 1.

18              THE COURT REPORTER:  Notes on?

19              THE WITNESS:  Notes to myself, like

20   journal --

21   BY MR. GANT:
```

Page 250

1      Q.   She wants to know exactly what you said.

2  Notes on?

3      A.   Like a journal.

4      Q.   No, you said -- I assume it's a Book of

5  the New Testament.

6      A.   Oh, -- Ephesians.

7         MR. GANT:  Is it Matthews?

8         MR. MARTENS:  It is.

9         THE WITNESS:  That's -- that's it.

10        MR. GANT:  I'm an Old Testament guy.

11  BY MR. GANT:

12      Q.   Okay.  So, do those -- those notes, do

13  they relate to your deposition?

14      A.   No.  I just grabbed what I thought was a

15  clean legal pad.  And guess what?  It wasn't.

16      Q.   Okay.

17      A.   But the front page was.

18      Q.   I'm glad I reminded you those were there.

19      A.   I'm glad you did.  I might need those.  I

20  have lots of legal pads sitting around.

21      Q.   Okay.  Good.  Can you describe for me

Veritext Legal Solutions
866 299-5127

1   what you did to prepare for today's deposition?

2       A.   I prayed --

3       Q.   Anything else?

4       A.   -- a great deal.  I collected the

5   materials as requested.

6       Q.   You're referring to Exhibit 24, the 54

7   pages?

8       A.   Right.

9       Q.   Okay.

10      A.   And I reviewed those pages at length to

11   refresh my memory.  It has been eight years.

12      Q.   Anything else?

13      A.   We -- we consulted.  I consulted with my

14   attorney about dos and don'ts for depositions --

15      Q.   Okay.

16      A.   -- and what to expect and how long is it

17   going to last.

18      Q.   How long did you meet with him?  Eric is

19   your counsel, correct?

20      A.   Yes.

21      Q.   Okay.  And --

Veritext Legal Solutions
866 299-5127

1       A.   We talked for an hour on Tuesday.

2       Q.   Okay.

3       A.   10:00 to 11:00.

4       Q.   You mentioned in response to a question

5  from Mr. Martens, I think it was about Exhibit 22,

6  yes, it was, that you reviewed it a few days ago.

7  Do you remember saying that in response to a

8  question from Mr. Martens?

9       A.   Let's see what it is.

10      Q.   Twenty-two.

11      A.   Yes.

12      Q.   How did you get that document?

13      A.   I received all of the documents that both

14  you and NAMB presented to one another.

15      Q.   How did you get those?

16      A.   I asked Eric.  Actually, what I asked

17  Eric for was a copy of the letter from Ezell in

18  December of 2014, because I couldn't find my copy,

19  and then he said, correct me if I'm wrong, that,

20  Well, we'll just get the materials from both sides

21  and you can look over them.

Page 253

1      Q.   Unless my memory is failing me, I don't

2    remember providing to your counsel any of the

3    documents that Dr. McRaney produced, so maybe

4    someone else gave them to him, and I wasn't aware

5    that you had received or your counsel had received

6    NAMB's document productions.  What do you know

7    about that?

8            MR. MARTENS:  Objection to the extent it

9    calls for anything that you learned from your

10    counsel.

11           THE WITNESS:  Yeah.

12           MR. GUNDERSON:  Can I --

13           MR. GANT:  Go ahead.

14           MR. GUNDERSON:  -- shortcut and clarify?

15           MR. GANT:  Go ahead.

16           MR. GUNDERSON:  So, NAMB provide --

17    NAMB's counsel provided me a copy of what the

18    anticipated might be some deposition exhibits to be

19    used today, and I forwarded those on to the -- the

20    witness.  It sounds like a couple of days ago he

21    reviewed them.

1             THE WITNESS:  Right.

2    BY MR. GANT:

3         Q.    Okay.

4             MR. GUNDERSON:  If you recall, I emailed

5    both counsel --

6             MR. GANT:  Yes.

7             MR. GUNDERSON:  -- and asked for that.

8             MR. GANT:  That's right.  Okay.  And I

9    don't think there could be any privilege over those

10   documents, so we will make a request, Eric, to you

11   and Dr. Warren that we be provided with copies of

12   what NAMB gave you in response to that, that you

13   just described?

14            MR. MARTENS:  Objection.  Work product.

15            MR. GANT:  You're saying that there's

16   documents that you selected and gave to

17   Dr. Warren's counsel are still shielded from work

18   product, as work product?

19            MR. MARTENS:  I'm not here to answer your

20   questions, just make my objections.

21            MR. GANT:  Okay.  We disagree with --

                                        Page 255

1    with that assertion.  I'll reiterate -- reiterate

2    the request for those documents.

3    BY MR. GANT:

4         Q.   Do you remember what other documents were

5    provided to you by counsel for NAMB in order to

6    prepare for today's deposition?

7         A.   No.  It's whatever I got from Eric.

8         Q.   What I was -- and I don't think we

9    finished, so I'm not criticizing you.  But --

10        A.   No, that's fine.

11        Q.   -- when I was asking you what you did to

12   prepare for today's deposition, I didn't understand

13   you.

14        A.   I read as much of the material, there's a

15   lot, as I could from both your side and NAMB and

16   then basically I reviewed my materials to make sure

17   that I remembered what was in them.

18        Q.   Did you receive from anyone other than

19   your counsel any mock questions and answers or

20   practice questions or lists of possible questions?

21        A.   No.

Page  256

1          Q.    Mr. Martens has asked you at the

2     beginning of the deposition -- strike that --

3     whether you had ever spoken with him before, do you

4     remember that?  He actually asked you to confirm

5     that you had never spoken, do you remember?

6          A.    I do remember.

7          Q.    Okay.  And you -- I think you said you

8     never have; is that right?

9          A.    No, never have.

10         Q.    Have you ever spoken with any lawyer

11    representing NAMB at any point in time?

12         A.    No.

13         Q.    I -- I take it then from your response

14    you had -- I said spoken.  Let me broaden that.

15              Have you ever communicated with any

16    counsel for NAMB?

17         A.    No.

18         Q.    Including in preparation for this

19    deposition?

20         A.    Including in preparation for this

21    deposition.

                                        Page  257

1      Q.   Other than reviewing the 54 pages of

2   documents you produced and the documents provided

3   to you by NAMB through your counsel, did you review

4   any other documents to prepare for today's

5   deposition or refresh your memory about the events

6   that you thought might come up today?

7      A.   I'm pretty sure I got some documents

8   from -- from -- that originated with you.

9      Q.   Well, we -- it may have had a WM on them,

10  which meant we produced them to NAMB in the case,

11  but we did not give any documents to your counsel.

12     A.   Okay.  Well, let's see.

13          (Whereupon, there was a pause for

14  document examination.)

15          THE WITNESS:  I'll see if there's any in

16  here, because --

17  BY MR. GANT:

18     Q.   Well, just to save us time, I'll look at

19  that at a break.

20     A.   Okay.

21     Q.   Unless you --

Page 258

1   A. No, no.

2   Q. -- you want to look at it now?

3   A. No.

4   Q. I don't want to interfere with your

5 answer.

6   A. No, I'm fine.

7   Q. Okay.  In order to prepare for today's

8 deposition, did you review a Separation Agreement

9 between Dr. McRaney and BCMD?

10   A. No.

11   Q. Are you aware that there was one?

12   A. Oh, yes, and it's in my file and I saw

13 it, but -- but I did not review it.

14   Q. So, that was one of the documents that

15 related to Dr. McRaney, but that you did not

16 provide for production; is that correct?

17   A. I don't recall whether I did or not.

18   Q. Well, it wasn't in --

19   A. It wasn't?

20   Q. It's not in Exhibit 24.

21   A. Okay.  Then I guess I didn't keep it.

Page 259

1      Q.   Were there any other documents related to

2  a draft or a potential separa- -- Separation

3  Agreement with Dr. McRaney that were in your files

4  that you didn't produce?

5      A.   No.

6          (Whereupon, Warren Deposition Exhibit No.

7  26, Separation Agreement and Release, marked for

8  identification.)

9  BY MR. GANT:

10     Q.   I'm handing you what's been marked as

11  Exhibit 26, which is a document from this

12  litigation number 37-1, which was filed with the

13  court on October 5th, 2018, a Separation Agreement

14  and Release.  Do you believe you have seen this

15  before?

16     A.   Yes.

17     Q.   What role, if any, did you have in

18  negotiating this agreement?

19     A.   I'm sure I consulted with our attorney as

20  well as Mark Dooley.

21     Q.   Are you making an assumption or do you

1    have an actual memory of having done so?

2        A.    I have an actual memory of doing so.

3        Q.    What do you remember?  Not the exhibit.

4    I asked -- asked specifically about your role, if

5    any, in negotiating.

6            Do you have a specific recollection of

7    playing any role in the negotiation of the

8    Separation Agreement?

9        A.    I'm sure I did.

10       Q.    Can you describe anything specific?

11       A.    No.  There -- I'm -- I'm sure there was

12   some back and forth, but I don't recall in

13   particular.

14       Q.    What role, if any, did you play in the

15   actual drafting of the Separation Agreement?

16       A.    Probably next to none.  It was just

17   probably Jeff Agnor, our attorney who did that.

18       Q.    Is he from the same firm as Eric who is

19   representing you in this case?

20       A.    Yes.

21       Q.    Okay.  By the way, who is paying for your

                                              Page 261

```
 1   attorney's time in connection with representing you

 2   in this deposition?

 3       A.   I'm assuming -- it's not me.  I'm

 4   assuming it's the BCMD.

 5       Q.   Have you discussed that with anyone at

 6   BCMD?

 7       A.   No.  They don't -- they don't talk to me

 8   about this.

 9       Q.   Why is that?

10       A.   It would be improper they say, so ...

11       Q.   So, not only are you not representing

12   BCMD today, but you have engaged in no

13   communications with BCMD about this -- this case

14   with Dr. McRaney for some period; is that right?

15       A.   Well, I had a conversation with Mark

16   Dooley before I realized I wasn't supposed to have

17   a conversation with Mark Dooley, and I said, Mark,

18   I'm going to be deposed.  And he said, Okay,

19   well ...

20       Q.   When was that?

21       A.   About two weeks ago I guess.
```

Page 262

1        Q.   What did you discuss with Mr. Dooley two

2    weeks ago?

3        A.   I just said, Believe it or not, I'm being

4    deposed.  Okay.  And --

5        Q.   Was it -- was it a surprise to you that

6    you were being deposed?

7        A.   No, because not after -- not after the

8    effort to quash NAMB's subpoena failed.  I knew

9    that after that I would be subpoenaed.

10       Q.   Were you surprised that the effort to

11   quash the Subpoena failed?

12       A.   I didn't have an opinion.  I will say

13   that I'm glad it did fail.

14       Q.   Okay.

15       A.   Because I wanted to tell the truth and

16   lay out my position.

17       Q.   Speaking of that, are you willing to come

18   to trial if asked by either NAMB or Dr. McRaney?

19       A.    I would prefer that we all meet here

20   again as opposed to going to Mississippi, but I am

21   prepared to do whatever needs to be done.

                                        Page  263

1   Q. Including attending a person -- a trial

2 in person?

3   A. Including attending in person.

4   Q. Okay. Thank you.

5   A. It would not be my preference, but ...

6   Q. If you could turn to page 7 of the

7 Separation Agreement, --

8   A. Um-hum.

9   Q. -- do you see there's a paragraph No. 15,

10 Governing Law and Jurisdiction? Do you see that?

11   A. Yes. Um-hum.

12   Q. Do you see the second sentence says, All

13 suits, proceedings, and other actions relating to

14 or rising out of or in connection with this

15 agreement shall be brought exclusively in the

16 Circuit Court for Howard County or, as applicable,

17 in the federal courts in the State of Maryland? Do

18 you see that?

19   A. I see that.

20   Q. So, even though you're not a lawyer, you

21 can read. Those words are pretty clear, would you

Page 264

1    agree with that?

2         A.   Yes.

3         Q.   And they provide that any suit,

4    proceeding, or other action relating to or arising

5    out of the Separation Agreement must be brought in

6    Maryland, correct?

7         A.   Correct.

8         Q.   You can put that aside for now.

9         A.   Okay.

10        Q.   Do you know who Danny de Armas is?

11        A.   Danny who?

12        Q.   De Armas.

13        A.   No, I don't think so.

14        Q.   Do you know who David de Armas is?

15        A.   I don't believe so.

16        Q.   Did you have any interaction with

17   Dr. McRaney's lawyer during the time when the

18   Separation Agreement was being drafted and

19   negotiated?

20        A.   No.  No, not that I recall.

21             (Whereupon, Warren Deposition Exhibit No.

Page 265

1    27, Documents Bates Numbered WM00048 through

2    WM00049, marked for identification.)

3    BY MR. GANT:

4        Q.   You've been handed Exhibit 27 which is

5    Bates labeled WM00048 through 49.  If you could

6    take a look at that and let me know when you're

7    ready for a question.  Thank you.

8             (Whereupon, there was a pause for

9    document examination.)

10            THE WITNESS:  Okay, I've read it.

11   BY MR. GANT:

12       Q.   Have you ever seen Exhibit 27 before?

13       A.   No.

14       Q.   Do you have any basis for disputing any

15   of the factual representations made in Exhibit 27

16   by Mr. De Armas?

17            MR. MARTENS:  Objection.  Compound.

18            MR. GUNDERSON:  Same objection.

19            MR. GANT:  Can I hear the question back?

20   I want to see how it's compound.  Can you read it,

21   please?

                                    Page 266

```
 1              (Whereupon, the record was read as
 2    requested.)
 3              MR. GANT:  Sorry, Matt, what's compound
 4    about it?
 5              MR. MARTENS:  Any of the.
 6              MR. GANT:  Okay.
 7    BY MR. GANT:
 8        Q.   To the extent you need to distinguish
 9    between or among any of the constituent parts of
10    the Exhibit 27, please let me know, but my question
11    is do you have any factual basis for disputing any
12    of the factual assertions set forth by David de
13    Armas in Exhibit 27?
14              MR. MARTENS:  Objection.  Compound.
15              MR. GUNDERSON:  Same objection.  If you
16    want to direct him to a specific factual statement
17    and ask him --
18              MR. GANT:  Well, he's read it so, I'm
19    asking --
20              MR. GUNDERSON:  Well --
21              MR. GANT:  Let me ask -- let me read it
```

Page 267

1    differently.

2    BY MR. GANT:

3         Q.    Having read the entirety of Exhibit 27,

4    do you see anything in there that you know to be

5    untrue based on your firsthand knowledge?

6              MR. MARTENS:  Objection.  Compound.

7              MR. GUNDERSON:  Same objection, and I

8    would ask or just before you answer make sure you

9    read the entire statement.

10             (Whereupon, there was a pause for

11   document examination.)

12             THE WITNESS:  What is the definition of a

13   supporting organization of the BCMD?

14   BY MR. GANT:

15        Q.    Okay.  You said -- I -- I don't want to

16   put words in your mouth, but --

17        A.    What is the definition of supporting?

18   That's obviously a legal term.

19        Q.    Well --

20        A.    Supporting organization, what is the

21   definition?

Page 268

1      Q.    I just don't think it's appropriate for

2   me to answer that.

3      A.    Okay.

4      Q.    But let me put it this way, because I

5   think -- I heard you testify a few minutes ago you

6   didn't know what a supporting organization is,

7   right?

8      A.    Yes.

9      Q.    That's what you said, correct?

10          MR. MARTENS:  Objection.  Misstates the

11   testimony.

12   BY MR. GANT:

13      Q.    Is that what you said?

14      A.    Yeah, I think so.

15          MR. GUNDERSON:  Do you recall the

16   question?

17          THE WITNESS:  I recall the question, and

18   I think that was my answer, yes.

19   BY MR. GANT:

20      Q.    And that's what I recall.

21      A.    Which is why I'm asking him what

Page 269

1    is --

2        Q.   So, which paragraph are you looking at?

3        A.   I'm looking at No. 5.

4        Q.   Okay.  All right.  Are you able to

5    understand paragraph 5 --

6        A.   Oh, yeah.

7        Q.   -- in light of your question?

8        A.   Yes.

9        Q.   Okay.

10       A.   But in order to agree or disagree, I need

11   to know what a supporting organization is.

12       Q.   Okay.  Well, without -- without knowing

13   what it is, are you able to agree or disagree with

14   paragraph 5?

15            MR. MARTENS:  Objection.

16            THE WITNESS:  Okay.  In my view --

17   because I don't know the legal definition of

18   supporting organization, in my view NAMB does

19   support the BCMD because they give us funds.

20   BY MR. GANT:

21       Q.   Does the BCMD support NAMB?

Page 270

1      A.   It goes both ways.

2      Q.   Okay.

3      A.   Now, if the definition of a supporting

4  organization means that they give us more money

5  than we give them, then -- then they're not a

6  supporting organization if that's what supporting

7  organization means.  But if it means do they

8  support us financially, yes, they do.

9           So, I would quibble with No. 5 if my

10 understanding of supporting organization, the

11 definition, is correct.

12     Q.   Okay.

13     A.   I don't quibble with No. 4.  That is

14 true.

15     Q.   Okay.  So, we've covered 4.  We've

16 covered 5.

17     A.   Um-hum.

18     Q.   With respect to do you have any basis for

19 disputing paragraph 3 of Exhibit 27?

20     A.   I have no knowledge of whether he did or

21 he didn't do it.

                                        Page  271

1      Q.   Do you have any basis for disputing

2   paragraph 6 of Exhibit 27?

3           MR. GUNDERSON:  I'll object to the extent

4   paragraph --

5           MR. GANT:  That's fine.  I'm going to

6   withdraw the question.

7           MR. GUNDERSON:  Okay.

8           MR. GANT:  So save -- save yourself.

9   Thank you.

10  BY MR. GANT:

11     Q.   Let's focus on paragraph 7.  Mr. De

12  Armas, Dr. McRaney's attorney, wrote there, At no

13  time did Dr. McRaney intend that his settlement

14  with BCMD would release the NAMB for the harm

15  caused by the NAMB nor did the release executed by

16  Dr. McRaney serve to release NAMB, do you see that?

17     A.   I see that.

18     Q.   Do you have any factual basis for

19  disputing that sentence?

20     A.   I was not privy to the conversation.

21     Q.   Do you -- are you aware of any factual

1    basis for questioning the accuracy of that

2    statement?

3         A.   No, I'm not aware of any factual basis to

4    question that.

5         Q.   You can put that aside for now.

6         A.   Okay.

7              (Whereupon, Warren Deposition Exhibit No.

8    28, Documents Bates Numbered BCMD_1838 through

9    BCMD_1839, marked for identification.)

10   BY MR. GANT:

11        Q.   I've handed you what's been marked as

12   Exhibit 28, which is Bates labeled BCMD_1838.

13             Just a housekeeping question before we

14   get on to the exhibit itself.

15             Were you provided with a copy of any

16   Protective Order in this case prior to reviewing

17   documents produced by BCMD?

18        A.   Define Protective Order.

19        Q.   A Protective Order generally is an Order

20   that governs how certain material may be used in a

21   case and who can see it.

Page 273

1          There's a specific Protective Order

2   related to BCMD documents that was entered by the

3   court in this case.  What I'm trying to find out is

4   whether anyone gave you a copy of that prior

5   to -- prior to or after your reviewing documents

6   produced by BCMD?

7          A.   I don't recall getting a Protective

8   Order.

9          Q.   Okay.

10          A.   But I didn't show them to anyone.

11          Q.   But you reviewed them?

12          A.   I reviewed them, yes.

13          Q.   All right.  Let's turn back to Exhibit

14   28.  I don't remember if I said the Bates numbers.

15   It's labeled BCMD_1838 through 39.

16          Please take a look at it and let me know

17   if you've seen this exhibit before.

18          (Whereupon, there was a pause for

19   document examination.)

20          THE WITNESS:  I don't recall receiving

21   the document, but obviously I did because I'm

Page  274

1    listed.

2    BY MR. GANT:

3        Q.    You don't have any reason to doubt that

4    you received this email --

5        A.    No.

6        Q.    -- on or around February 20, 2015?

7        A.    No.

8        Q.    Now, the -- the BCMD's legal counsel

9    there is identified as Jeff Agnor, correct?

10       A.    Yes.

11       Q.    And I may be mispronouncing the last

12   name.

13       A.    No, that's right.

14       Q.    His firm is the same firm that is

15   representing you in connection with this

16   deposition, correct?

17       A.    Yes.

18       Q.    And you were familiar with them from your

19   time as president of BCMD?

20       A.    Yes.

21       Q.    And do you consider them reliable

Page 275

1    counsel?

2         A.   Yes, I do.

3         Q.   Now, the first paragraph of this

4    email -- strike that.

5              This is an email from Dr. McRaney to

6    yourself and several other people, --

7         A.   Yes.

8         Q.   -- copying Jeff Agnor, BCMD's counsel,

9    correct?

10        A.   Yes.

11        Q.   And the first paragraph describes a

12   request that was made for an input from Jeff Agnor,

13   BCMD's counsel, correct?

14        A.   Correct.  Correct.

15        Q.   And then there's some bullet points where

16   Dr. McRaney has summarized statements from Jeff

17   that Jeff authorized to be communicated to you and

18   others, correct?

19        A.   Correct.

20        Q.   Okay.  And in the third bullet there,

21   Dr. McRaney transmitted from BCMD's counsel, Jeff

Page 276

1    Agnor, that neither Dr. McRaney nor the BCMD had

2    breached the Cooperative Agreement either

3    technically or the spirit of the agreement,

4    correct?

5            MR. MARTENS:  Objection.  Hearsay.

6            THE WITNESS:  That's what it says.

7    BY MR. GANT:

8        Q.   And there the reference to network you

9    understand to refer to BCMD?

10           MR. MARTENS:  Objection.  Hearsay.

11           THE WITNESS:  Yes.

12   BY MR. GANT:

13       Q.   And the reference to

14   Cooperative -- Cooperative Agreement you understand

15   to be to the Strategic Partnership Agreement that

16   you looked at earlier today?

17           MR. MARTENS:  Objection.  Hearsay.

18           THE WITNESS:  Yes.

19   BY MR. GANT:

20       Q.   Then after the bullets, it says, I

21   believe that I have accurately reflected my

Page  277

1    conversation with Jeff, but I am copying Jeff in

2    case he would like to correct or edit in some way.

3    Do you see that?

4              MR. MARTENS:  Objection.  Hearsay.

5              THE WITNESS:  Yes.

6    BY MR. GANT:

7        Q.   Are you aware of Jeff in any way

8    correcting or editing Dr. McRaney's representation

9    in the third bullet there?

10             MR. MARTENS:  Objection.  Hearsay.

11             THE WITNESS:  I'm not aware of any.

12   BY MR. GANT:

13       Q.   Okay.  And I'll represent to you I didn't

14   see in any of the documents --

15       A.   No.

16       Q.   -- produced anything indicating

17   that Mr. -- Mr. Agnor had, in fact, done so.

18             MR. MARTENS:  Objection.

19   BY MR. GANT:

20       Q.   So, you're -- you're not aware of that

21   happening, right?

Page 278

1          MR. MARTENS:  Objection to the speech.

2          THE WITNESS:  No, I'm not aware.

3   BY MR. GANT:

4      Q.   You can put that away for now.

5          Do you remember asking Mr. Agnor any

6   questions about this email or the third bullet in

7   particular?

8      A.   No.

9          MR. MARTENS:  Objection.  Privilege.

10          THE WITNESS:  I'm sorry.  No.

11          MR. GANT:  You can assert a privilege

12   objection for other parties?  On what basis?

13          MR. MARTENS:  I'm not here to answer

14   questions, Scott.

15          MR. GANT:  Okay.  Well, also don't make

16   inappropriate objections that you have no legal

17   basis to make.

18          (Whereupon, Warren Deposition Exhibit No.

19   29, Documents Bates Numbered BCMD_1806 through

20   BCMD_1807, marked for identification.)

21   BY MR. GANT:

                                          Page 279

1          Q.   I have handed you what's been marked as

2     Exhibit 29, which is Bates labeled BCMD_1806

3     through 1807.  Please let me know when you've

4     finished reviewing it.

5               (Whereupon, there was a pause for

6     document examination.)

7               THE WITNESS:  Okay.

8     BY MR. GANT:

9          Q.   You have reviewed the exhibit?

10         A.   I did.

11         Q.   Do you -- do you recognize this?

12         A.   Excuse me.  Yes, because it was in the

13    materials that I was given.

14         Q.   From NAMB?

15         A.   From Eric.

16         Q.   Transmitted by NAMB to Eric to give to

17    you?

18         A.   I'm -- yes, I'm assuming so.  I did not

19    have this in my file, this email.

20         Q.   Do you have any reason to doubt that you

21    received this email from Dr. McRaney on or around

                                          Page 280

1    February 17, 2015?

2         A.   No reason to doubt that.

3         Q.   Okay.  And do you have any reason to

4    doubt that you at the time you received this email

5    read the sixth bullet in which Dr. McRaney said, "I

6    am convinced that I -- we/I did not violate the

7    Cooperative Agreement with NAMB in our hiring

8    process of Michael Crawford?

9         A.   I'm confident that I read it.

10        Q.   Okay.  You can put that aside for now.

11   Thank you.

12             Now, you're welcome to pull it out, but

13   earlier we looked at Exhibit 11, which was a

14   response from BCMD to NAMB's December 2nd, 2014

15   termination letter.

16        A.   Yes.

17        Q.   I'm going to mark another version of it

18   that as far as I'm aware is substantively

19   identical, --

20        A.   Okay.

21        Q.   -- but it -- it's on BCMD letterhead

Page 281

1   unlike the other version.

2       A.   Okay.

3            (Whereupon, Warren Deposition Exhibit No.

4   30, Documents Bates Numbered NAMB 010664 through

5   NAMB 665, marked for identification.)

6   BY MR. GANT:

7       Q.   This is Exhibit 30.  It's Bates labeled

8   NAMB 010664 through 665.  I'm going to use Exhibit

9   30.

10      A.   Okay.

11      Q.   You can look at 11.  Again, as far as I'm

12  aware, they're the same with the exception of the

13  letterhead.  Speaking of which, is the top of

14  Exhibit 30 the BCMD letterhead and a reference to

15  Office of the Executive Director?

16      A.   Um-hum.  Yes, it is.

17      Q.   Okay.  So, you're welcome to look at

18  this, but I believe you looked at it earlier.  But

19  I -- if you feel like you want to review it again,

20  just let me know when you're ready for a question.

21      A.   I'm ready.

                                            Page 282

1          Q.   What steps, if any, did you take to

2     ensure the accuracy of this document prior to its

3     being sent by BCMD to NAMB?

4          A.   I don't recall, but I must have been in

5     agreement with it or I wouldn't have signed it.

6     But in terms of steps to assure the accuracy, I

7     don't recall.

8          Q.   Do you believe you would have relied on

9     others to ensure its accuracy or is that something

10    that you think you would have had a role in?

11         A.   I am sure that if I had a question about

12    anything on here, I would have communicated with

13    the other parties and discussed it with them.  I

14    don't just sign things because other people sign

15    it.

16         Q.   Is it fair to say that you would not have

17    signed this letter if you were not very confident

18    that the statements in it were accurate?

19         A.   That's fair to say.

20         Q.   So, when you signed this letter, you were

21    very confident that Dr. McRaney had not breached

Page 283

1    the Strategic Partnership Agreement, correct?

2        A.    Yes.

3        Q.    And you were very confident that there

4    had been a careful and thorough exploration of

5    NAMB's claims by BCMD, correct?  Let me restate

6    that.

7            You were very confident that BCMD had

8    conducted a careful and thorough exploration of

9    NAMB's claims against Dr. McRaney, correct?

10       A.    Yes.

11       Q.    What do you remember about the nature of

12   that careful and thorough exploration?

13       A.    Nothing.

14       Q.    You're confident that there was a

15   thorough and careful exploration, but you just

16   don't recall what the details were?

17       A.    Right.

18       Q.    Okay.  You were also confident when you

19   signed this letter that NAMB had made false

20   accusation against Dr. McRaney, correct?

21       A.    Yes.

Page  284

1       Q.   And you were very confident when you

2  signed this letter that BCMD and Dr. McRaney had

3  abided by both the letter and the spirit of the

4  Strategic Partnership Agreement, correct?

5       A.   At that time, that was my opinion.

6       Q.   Can -- can you identify for me as

7  precisely as you can the point in time when you

8  concluded that Dr. McRaney had violated the SPA,

9  which I understand to be your testimony today?

10      A.   I don't recall the point in time.  I

11  truly don't.  If I did, I'd tell you.

12      Q.   I believe you.  Will you agree with me

13  that the year that happened was 2015?

14      A.   Yes.

15      Q.   Okay.  But you can't tell me what month;

16  is that right?

17      A.   No.

18      Q.   And Mr. Martens was asking you --

19      A.   I might could piece it together if I

20  looked at the documents, --

21      Q.   Right.  Well --

Page 285

1      A.   -- so it was probably between this and

2  this time.

3      Q.   Mr. Martens was trying to narrow this

4  down, too, so he showed you a document from mid

5  March I believe, and at that point, you were -- his

6  word was you were still in Dr. McRaney's camp, do

7  you remember that?

8      A.   Yes.

9      Q.   I think you had said corner; he called it

10  a camp.   I'm not sure there's a difference.

11      A.   Right.

12      Q.   But so would you agree with me that at

13  some point between -- strike that.

14          At the time you voted to terminate

15  Dr. McRaney, you personally, was it your belief at

16  that point in time that Dr. McRaney had violated

17  the Strategic Partnership Agreement?

18      A.   Yes.

19      Q.   Okay.

20      A.   Based upon what I've read in my materials

21  to refresh my memory.

Page 286

1      Q.   Okay.  So, is it fair to say that it was

2  some point between mid March 2015 and June 8th,

3  2015 when you changed your mind about whether

4  Dr. McRaney had, in fact, violated the Strategic

5  Partnership Agreement?

6      A.   More than likely it was in that time

7  period, --

8      Q.   Okay.

9      A.   -- but since I don't recall when it was,

10  I'm not going to be categorical about it.

11      Q.   I understand.  I'm just trying to get

12  your best recollection.

13      A.   Sure.

14      Q.   Understanding you don't know exactly when

15  things happened in that time period, are you able

16  to tell me what it was specifically that led you to

17  change your mind about whether Dr. McRaney had

18  violated the Strategic Partnership Agreement?

19      A.   No.

20      Q.   When was the last time you -- other than

21  being shown the Strategic Partnership Agreement as

Page 287

1    an exhibit today, prior to starting the deposition

2    today, when was the last time you reviewed the

3    Strategic Partnership Agreement?

4         A.   Probably eight years ago.

5         Q.   You didn't review it in preparation for

6    your deposition?

7         A.   No.

8         Q.   Did anyone send it to you?

9         A.   I have a copy of it.  I think it was in

10   my materials.  I have a copy of it.

11        Q.   Why didn't you review the SPA in

12   preparation for today's deposition?

13        A.   I didn't think it was of critical

14   importance, and I only had just so much to time go

15   through all of these documents.  I'm still

16   pastoring a church.  So, I tried to stick to the

17   most important documents that are related to the

18   resignation.

19        Q.   Why did the SPA did not make cut in terms

20   of what you thought was important to review to

21   prepare for today's deposition?

Veritext Legal Solutions
866 299-5127

1      A.    Because whether Will violated the SPA or

2  not was not a significant factor in my decision to

3  vote for termination.

4      Q.    Is it fair to say it was a factor, but

5  not a significant factor?

6      A.    It was a factor that created a mosaic

7  concerning leadership.

8      Q.    Was there any one piece of information or

9  belief that you had about Dr. McRaney that led you

10 to vote to terminate him or were they all

11 interdependent?  You couldn't isolate?

12     A.    It was the five staff members who were

13 going to leave if he didn't.  As I said, that was a

14 tipping point.

15     Q.    Now, would that alone have been enough?

16     A.    Yes.

17     Q.    Okay.  Even if Dr. McRaney had not been

18 at fault?  Let's just say, for example --

19     A.    That's -- I'm not going to speculate.  I

20 don't think that's fair to ask me to speculate.

21     Q.    Well, I do get to ask you whether you

Page 289

1    think it's fair.

2        A.    Then I'll answer.  Go ahead.  Ask the

3    question.

4        Q.    Yeah.  I -- and when -- if I'm asking you

5    to speculate, you're entitled to be clear that you

6    are speculating.

7        A.    Okay.

8        Q.    Let's -- let's hypothesize that the five

9    people you're referring to as staff members made up

10   information about Dr. McRaney and they just wanted

11   someone different that they liked better, but there

12   was no meritorious criticism of his job

13   performance, but they still said they were going to

14   quit and you believed them, would you have

15   terminated Dr. McRaney under that circumstance?

16           MR. MARTENS:  Objection.  Calls for

17   speculation.

18           MR. GUNDERSON:  Same objection.

19   BY MR. GANT:

20       Q.    You said you would answer.

21       A.    Give me a minute.  It's a specious

Veritext Legal Solutions
866 299-5127

1    question because those five gentlemen would not

2    have made up stuff to get somebody new.  Their

3    integrity would not allow that, so it is an

4    out-of-the-realm-of-possibility scenario.

5         Q.   So, you can't answer for that reason, is

6    that your testimony?

7         A.   Yeah.

8         Q.   Do you consider Dr. McRaney a liar?

9         A.   No.

10        Q.   Do you believe that Dr. McRaney genuinely

11   believed in things he told you and others at BCMD

12   about NAMB and his job performance?

13        A.   Oh, yes.

14        Q.   Okay.  You just think he's wrong even

15   though his beliefs are held in good faith?

16        A.   Yes.

17        Q.   I want to go back to the SPA in a second,

18   but I realize I wanted to clear up a couple of

19   things.

20             You testified earlier that you were

21   president of BCMD for roughly two years; is that

Page 291

1    right?

2         A.   Yes, two years.  Yeah.

3         Q.   Is it a two-year term?

4         A.   Well, it's a one-year term, and then you

5    have to be reelected, which I was.

6         Q.   So -- okay.  And did you put yourself up

7    for re-election --

8         A.   Yes.

9         Q.   -- a third time?

10        A.   No.  You're -- you're only allowed to

11   serve two terms.

12        Q.   There's a term limit?

13        A.   Um-hum.

14        Q.   Before you were president of BCMD, did

15   you have any formal role at BCMD?

16        A.   As I stated earlier, I was on the General

17   Mission Board.

18        Q.   During what period of time?

19        A.   Oh, I don't remember.  I've been around a

20   long time, 39 years, so I go way back.

21   Probably -- probably in the 1980s I was on the

Page 292

1   General Mission Board, and I might have been again

2   after that. But Ken Lyle was the executive

3   director when I was on the General Mission Board

4   the first time.

5       Q. When -- prior to your being president of

6   BCMD, do you remember when you last served on the

7   General Mission Board?

8       A. No.

9       Q. Was it within a couple of years of the

10   service or --

11       A. Oh, I don't think it was within a couple

12   of years. I think it had been quite a while.

13       Q. After you served your two years as

14   president of the BCMD, did you have a formal role

15   at BCMD?

16       A. Repeat the question.

17       Q. After you completed your two years as

18   president of BCMD, did you subsequently have a

19   formal role at BCMD?

20       A. No. No. I can't recall -- you know,

21   perhaps Kevin Smith, Will's successor, might have

Page 293

```
 1    said, Can you sit in on some meetings?  But I don't
 2    think he did.  I think after that second term, that
 3    was it.
 4         Q.    So, the last time you had a position at
 5    BCMD was October 2016?
 6         A.    Right.  As soon as my successor was voted
 7    in, in the meeting in November, yeah.
 8         Q.    And I think if my math is right, and my
 9    calendaring is right, you're going to turn 70 this
10    month; is that right?
11         A.    Yes.
12         Q.    Happy birthday in advance.
13         A.    Thank you.
14         Q.    And you said you're -- you're -- are you
15    the lead pastor or head pastor at your church?
16         A.    Yes.
17         Q.    And you've been there for 39 years?
18         A.    Thirty-nine years.
19         Q.    And do you have any plans to retire?
20         A.    Eventually.
21         Q.    Do you -- do you have any active plans to
```

Page 294

1    retire or specific plans?

2         A.   I don't have any, no.  I'm still waiting

3    for God to tell me when.

4         Q.   So, your present intention is to keep

5    pastoring for as long as you can?

6         A.   Until he tells me to quit, --

7         Q.   And --

8         A.   -- and I really don't know when that is.

9    I honestly don't.

10        Q.   And he hasn't told me either, so --

11        A.   Right.

12        Q.   Okay.  It's not unusual for pastors to

13   keep pastoring into their mid/late 70s, correct?

14        A.   Correct.  Right.  Well, is it unusual?  I

15   would say it's unusual, yeah.

16        Q.   Well, are you aware of pastors who pastor

17   into their mid 70s?

18        A.   Oh, yes.

19        Q.   Many, right?

20        A.   I don't know.

21        Q.   Okay.

Page 295

1      A.   I'm sure there's some, but most guys hang

2  it up at 70 --

3      Q.   Seventy.

4      A.   -- based upon my experience.

5      Q.   But you're not planning to do that?

6      A.   Not at this time.  Well, no, certainly

7  not.  That's in a couple of weeks.

8      Q.   Right.

9      A.   I have to give more notice than that.

10      Q.   Would you be surprised if you're still

11  pastoring at 75?

12      A.   Yes.

13      Q.   Yes?

14      A.   Yes, I would be.

15      Q.   So, you -- you think it's likely God will

16  tell you it's your time to retire at some point

17  between today and 75?

18      A.   It is likely, but I don't want to speak

19  for God unless he tells me to.

20      Q.   Okay.

21      A.   But it's -- it's likely.  It's likely,

Page 296

1    you know.

2        Q.   Okay.  And as a man of faith, is it your

3    view that that's what a good pastor should do, is

4    wait for God to tell the person when it's time to

5    hang it up?

6        A.   Absolutely.  He's the one that called me

7    to go there.

8        Q.   And that could be someone who is 80,

9    right?

10       A.   Potentially.

11       Q.   Okay.  That's happened with God and other

12   pastors.  You know, I'm sure you are aware --

13       A.   I'm sure there is.

14       Q.   -- there are other pastors pastoring in

15   their 80s?

16       A.   I imagine there are.

17       Q.   We looked earlier at the Strategic

18   Partnership Agreement.

19       A.   Um-hum.

20       Q.   It's -- I think it's Exhibit 3 if you

21   care to pull it out.

Page  297

1       A.   Okay.

2       Q.   Do you know who drafted the Strategic

3  Partnership Agreement?

4       A.   No.

5       Q.   You didn't, did you?

6       A.   No.  No, no.

7       Q.   And it was executed prior to your

8  becoming president of BCMD, correct?

9       A.   I'm confident that it was.

10       Q.   And this -- as you can see, the back, it

11  was signed in July and August 2012, correct?

12       A.   Okay.  Then it was.  Yes, I see that.

13       Q.   So, in a sense, you inherited

14  this S- --

15       A.   Yes.

16       Q.   -- this SPA when you became president?

17       A.   Yes.

18       Q.   Now, earlier in the discussion between

19  you and Mr. Martens, you -- you talked about -- he

20  asked you about a covenant and I think he asked you

21  how it was different from an agreement, do you

Page 298

1    remember that?

2         A.   Um-hum.

3         Q.   Just a factual question.  This document

4    is called the -- a Strategic Partnership Agreement,

5    correct?

6         A.   Yes, it is.

7         Q.   It does not describe -- describe itself

8    as a covenant, does it?

9         A.   Not in that title.

10        Q.   Did you see it reference covenant

11   anywhere in the title?

12        A.   Not in the title.  I would have to look

13   through the whole thing to see if it's in there,

14   but it's not in the title.  And under General

15   Principles, it's called an agreement.

16        Q.   Okay.  Okay.  While you were president of

17   BCMD, did you ask anyone to change the title of the

18   Strategic Partnership Agreement to a covenant?

19        A.   No.

20             MR. GANT:  Let's take a short restroom

21   break.

Page 299

```
 1              THE WITNESS:  Sure.

 2              THE VIDEOGRAPHER:  We're going off the

 3      record.  The time is 4:49 p.m.

 4              (Recess taken -- 4:49 p.m.)

 5              (After recess -- 5:00 p.m.)

 6              THE VIDEOGRAPHER:  We are back on the

 7      record.  The time is 5:00.  This is media unit

 8      number five.

 9      BY MR. GANT:

10         Q.   So, we were looking at the SPA, which was

11      marked as Exhibit 3.  Sitting here today, are you

12      able to identify specifically for me what precise

13      provisions of the SPA you believe Dr. McRaney

14      violated?

15         A.   Let's see.

16              (Whereupon, there was a pause for

17      document examination.)

18              THE WITNESS:  My recollection is that my

19      concern was with Personnel -- Personnel Section 1A,

20      and I came to believe that the -- the hiring of

21      Joel Rainey and/or Michael Crawford wasn't handled
```

Page 300

1    properly.  I don't recall all of the details, but I

2    think there was some moving ahead there with both

3    gentlemen before there should have been a moving

4    ahead with both gentlemen, before NAMB really

5    signed on and approved.  That's my recollection.

6    BY MR. GANT:

7        Q.   Is there specific language in Section II

8    that you're referencing?

9        A.   1A.  You go through the approval process

10   of both the convention and NAMB.

11       Q.   And --

12       A.   Searches shall be an initiative by the

13   convention in consultation with NAMB.

14            As I understood at the time, what should

15   have happened, whether it's typical procedure or

16   not, I mean, it just would have been a cooperative

17   thing to do to say, Hey, we're looking at Joel

18   Rainey, but before we talk to him, we want to know

19   what you think, or we're looking at Michael

20   Crawford, and before we talk to him, would you

21   approve him?

Page 301

1        Again, I don't know whether Will talked

2   to the Administrative Committee about these two

3   gentlemen or not.  I don't know if it got that far,

4   but that would be -- that was the concerns I recall

5   now that, that I had, that it would have been

6   better to have gotten full approval before -- even

7   before discussing and getting somebody's hopes up.

8        Q.   Well, you say would have been better.

9   That strikes me as different than my question,

10  which was whether there was an actual violation of

11  a provision in the SPA.

12       So, are you contending that Dr. McRaney

13  violated any express provision of the SPA,

14  including anything concerning personnel in Section

15  II?

16       A.   The agreement doesn't get into those

17  weeds, but Kevin Ezell did.

18       Q.   Kevin Ezell did what?

19       A.   Got into the weeds.

20       Q.   Do you know whether Kevin Ezell had any

21  firsthand knowledge or involvement with any of the

Page 302

1  circumstances related to alleged violations of the

2  SPA by Dr. McRaney?

3      A.   Do I know if he what?

4      Q.   Had any firsthand knowledge or

5  involvement of the circumstances that were at issue

6  in the alleged violation of the SPA by Dr. McRaney?

7      A.   What do you mean by firsthand?

8      Q.   That he was a direct participant in

9  or -- or a direct party in the communications

10  whether written or oral.

11      A.   Well, he states in his communications is

12  that Christopherson communicated on his

13  behalf --

14      Q.   Okay.

15      A.   -- on behalf of NAMB and expressed their

16  concern with the procedure used with Joel Rainey,

17  but that didn't make a change.  The same procedure

18  was used with Michael Crawford, so ...

19      Q.   And were you personally involved in those

20  circumstances?

21      A.   No.

Page 303

1        Q.   Did you have any --

2        A.   I don't -- I don't -- I don't recall.

3    I'm -- I don't recall.  I believe I was on the

4    Administrative Committee when Michael Crawford was

5    hired.  I'm not sure that I was when Joel was.  I

6    don't know about the timing.

7        Q.   Were you familiar with the SPA when you

8    became president of BCMD?

9        A.   I became familiar after the letter of

10   December 2014.

11       Q.   Not beforehand?  You didn't try to make

12   yourself aware of the obligations that the BCMD had

13   undertaken?

14       A.   Okay.  I had been in office less than a

15   month.  I have a church to pastor.  It's

16   Christmastime.  No.

17       Q.   And you didn't read Kevin Ezell's

18   deposition in this case, correct?

19       A.   (Shaking head no.)

20       Q.   So, you don't know whether he

21   acknowledged that he did not have firsthand

                                            Page 304

1    knowledge or involvement with any of the --

2         A.   No.

3         Q.   -- alleged violations of the SPA by

4    Dr. McRaney?

5         A.   No, I don't have any idea what he said.

6         Q.   Did he ever tell you that he didn't have

7    firsthand knowledge or --

8         A.   No.

9         Q.   Would that have mattered to you?

10        A.   No.

11        Q.   Why?

12        A.   You have to trust your lieutenants, and I

13   have a lot of respect for Christopherson.

14        Q.   So, you trusted Kevin Ezell's word

15   because Kevin Ezell trusted Jeff Christopherson?

16        A.   I trusted Kevin Ezell's word, period.  I

17   didn't know whether he had firsthand knowledge or

18   secondhand knowledge or what kind of knowledge he

19   had.

20        Q.   Did you personally -- well, strike that.

21             Sorry, I started to ask this, but I don't

Veritext Legal Solutions
866 299-5127

1    think we got to finish it.  Did you -- while you

2    were president of BCMD, did you have any

3    responsibility for supervising Dr. McRaney?

4          A.    As a member of the Administrative

5    Committee, yes.

6          Q.    But not as president?

7          A.    I was on the Administrative Committee

8    because I was president.

9          Q.    Right.  But there are people who are on

10   the Administrative Committee who are not president,

11   right?

12         A.    Right.

13         Q.    So, did they have the same

14   responsibilities vis-a-vis Dr. McRaney as you?

15         A.    Yes.  That -- that is the personnel

16   committee at State Convention.

17         Q.    And in what manner does the

18   Administration Committee supervise the executive

19   director while you were president?

20         A.    He communicated with us at our meetings,

21   updated us on what was going on, and when these

Veritext Legal Solutions
866 299-5127

1    concerns began to be raised, we discussed it,

2    discussed it among ourselves and the Administrative

3    Committee.

4        Q.    You mentioned the vote on June 8th, 2015

5    to terminate Dr. McRaney was done by ballot.

6            Do you remember what -- was there writing

7    on the ballot or was it a blank piece of paper that

8    people filled in?

9        A.    I don't recall.

10       Q.    Do you remember if there was either a

11   preprinted section or people who were asked to

12   write in their reasons for voting one way or

13   another?

14       A.    No.  There was -- there were no reasons

15   asked for.

16       Q.    It was just up or down on termination?

17       A.    Yes.

18       Q.    You don't have any direct knowledge about

19   the reason why each of the other 36 people who

20   voted to terminate Dr. McRaney did so, correct?

21       A.    Not all of them.  I do know the -- the

Veritext Legal Solutions
866 299-5127

1    reasons for some of them.

2        Q.   You know what they told you?

3        A.   Right.

4        Q.   Those might or might not be their

5    reasons, correct?

6        A.   I know what they told me if they told me

7    their reason.

8        Q.   Assuming they gave you all of their

9    reasons?

10       A.   Right.

11       Q.   It's possible someone told you a reason,

12   but didn't list every reason?

13       A.   Right.  Sure.

14       Q.   So, is it fair that the other 36 people

15   who voted to terminate Dr. McRaney may have been

16   influenced by allegation or belief that he violated

17   the SPA, correct?

18           MR. MARTENS:  Objection.  Calls for

19   speculation, object to the form.

20           THE WITNESS:  It's possible, but

21   impossible to determine unless you're going to

Page 308

1    bring them all in and do a dep- -- I mean, you

2    know, I'm not being smart, but unless you're going

3    to bring them all in and ask them, there's no way

4    to know.  It's possible.

5    BY MR. GANT:

6         Q.   I don't think you're being smart.  I

7    agree with you.

8              Is there -- you've -- you've pointed me

9    to Section 1A under Personnel in the Separation

10   Agreement.  Is there any other specific provision

11   that you want to point me to that sitting here

12   today you contend that Dr. McRaney breached?

13        A.   Which exhibit is that?

14             MR. GUNDERSON:  You said Separation

15   Agreement.

16             MR. GANT:  I'm sorry.

17             MR. GUNDERSON:  I think you meant

18   Strategic Partnership Agreement.

19             MR. GANT:  I misspoke.

20             MR. GUNDERSON:  So, he started looking

21   for the Separation Agreement.

Page 309

1           MR. GANT:  You're absolutely right.

2    BY MR. GANT:

3        Q.    We're still on Exhibit 3.

4        A.    Okay.

5        Q.    I called it the wrong name.

6           MR. GANT:  So, thank you for pointing

7    that out.

8    BY MR. GANT:

9        Q.    The Strategic Partnership Agreement --

10       A.    Okay.

11       Q.    -- you are contending today that

12   Dr. McRaney did, in fact, violate it, correct?

13       A.    Section II, 1-A.

14       Q.    Any other specific provision you'd like

15   to direct me to, to support your contention today

16   that Dr. McRaney violated the SPA?

17           (Whereupon, there was a pause for

18   document examination.)

19           THE WITNESS:  Potentially Section I,

20   General Principles, 2, Mutual Respect.  I don't

21   recall specific examples.  I just know that there

                                        Page 310

1 seemed to be some friction between Ron Larson and

2 Will. Now, whether there was disrespect, that I

3 don't know.

4 BY MR. GANT:

5     Q. I was just going to ask that question.

6     A. I don't -- I don't know. I don't know

7 for sure.

8     Q. Right.

9     A. Kevin Ezell thought there was, but I

10 don't recall my conversation with Ron Larson,

11 whether he felt there was disrespect or not, or

12 Kevin Marsico, but that may be an area, but ...

13     Q. Maybe; maybe not?

14     A. Maybe not.

15     Q. Okay. Any others that you would like to

16 refer me to?

17         (Whereupon, there was a pause for

18 document examination.)

19         THE WITNESS: Possibly No. 6, policies

20 and procedures of each partner. It was at the very

21 least a difference of opinion between NAMB and Will

Page 311

1   with regard to tacking on a 2-percent contribution

2   to church planters' churches.  I was -- I was --

3   there's the potential there.

4          I was dismayed that -- that

5   Christopherson made it clear that was not to be

6   done, and it was done anyway.  And I understand why

7   they don't want even more tacked on to church

8   planters.

9   BY MR. GANT:

10      Q.   Just because NAMB complained about

11  something doesn't mean that there was a violation

12  of the SPA, does it?

13      A.   It would be a matter of opinion whether

14  it was or it wasn't.

15      Q.   And someone would have to interpret the

16  agreement and apply it to the facts --

17      A.   Right.

18      Q.   -- to decide whether there was a

19  violation, correct?

20      A.   Right.

21      Q.   Would you agree with me that allegations

Page 312

1    of violation of the SPA was a serious charge of

2    misconduct?

3         A.    Sure.

4         Q.    And the December 2, 2014 termination

5    letter contained very serious allegations against

6    Dr. McRaney, correct?

7         A.    Yes, it did, and they focused on the

8    respect issue.  They focused on the procedural

9    issue, and they focused on the policy issues,

10   because there were three.

11          He's not respecting our people.  He

12   didn't respect our process for hiring, for joint

13   hires, and he tacked on a percentage that has never

14   been -- he tacked on a percentage that we thought

15   was inappropriate, and we told him so.

16        Q.    And when you say we, you're -- you're

17   speaking for NAMB?

18        A.    To NAMB.  Yeah, NAMB.

19        Q.    You're saying what NAMB alleged?

20        A.    What NAMB alleged.

21        Q.    Okay.  And BCMD did an investigation and

Veritext Legal Solutions
866 299-5127

1    they received a termination letter December 2014

2    and after a careful and thorough exploration of the

3    facts determined that NAMB's allegations were

4    misguided, correct?

5         A.   Yes.

6         Q.   You acknowledged a moment ago that the

7    allegations against Dr. McRaney in the December

8    2nd, 2014 termination letter were serious charges

9    of misconduct.

10              If they were false, do you acknowledge

11   that that could injure Dr. McRaney's reputation?

12              MR. MARTENS:  Objection.  Calls for

13   speculation.

14              MR. GUNDERSON:  Same objection.

15              THE WITNESS:  State it again, please.

16   BY MR. GANT:

17        Q.   Sure.  Allegations were made against

18   Dr. McRaney in the December 2nd, 2014 termination

19   letter, correct?

20        A.   (Nodding head yes.)  Yes.

21        Q.   If it turned out that those allegations

Veritext Legal Solutions
866 299-5127

1   were false, like BCMD thought they were --

2       A.    Right.

3       Q.    -- in mid-January 2015, --

4       A.    Um-hum.

5       Q.    -- but the word spread in the Baptist

6   world that Dr. McRaney had engaged in serious

7   violations of the Strategic Partnership Agreement

8   with NAMB and that was false, do you agree that

9   that false allegation could injure Dr. McRaney's

10  reputation?

11          MR. MARTENS:   Objection.   Calls for

12  speculation, assumes facts not in evidence.

13          MR. GUNDERSON:   Same objection.

14          THE WITNESS:   I would say that the damage

15  would be minimal because also people hopefully

16  would know that legal counsel of BCMD and the

17  leadership didn't agree, so I would say the damage

18  would be minimal.

19  BY MR. GANT:

20      Q.    Because of the cover provided by BCMD?

21      A.    Yeah.

1    Q.   And if that cover was removed?

2    A.   Well, that's not what happened.

3    Q.   But --

4    A.   I mean --

5    Q.   Well, let's suppose it is what happened.

6  Let's say Dr. McRaney is correct, that he did not

7  violate the SPA and you have NAMB contending that

8  he did and you have BCMD doing a 180 and saying

9  that he did, do you agree that that allegation, if

10 false, would injure Dr. McRaney's reputation?

11         MR. MARTENS:  Objection.  Calls -- calls

12 for speculation, assumes facts not in evidence.

13         MR. GUNDERSON:  Same objections.

14         THE WITNESS:  If it were false -- if the

15 allegations were false and there was no cover from

16 the BCMD, I'm going to answer the question, but

17 we're -- this is speculation universe, but you

18 asked the question.  I would still say minimal if

19 he kept his job.

20 BY MR. GANT:

21    Q.   Sorry, if he kept his?

1    A.   If he kept his job.  You know, with time,

2  it floats away.  People forget it.

3    Q.   And if he didn't keep his job?

4         MR. MARTENS:  Objection.  Calls for

5  speculation.

6         MR. GUNDERSON:  Same objections.

7         THE WITNESS:  Again, I would say it was

8  minimal because it's not even on the horizon for

9  the reasons of termination.  I think the larger

10  issue would be the termination itself, so I don't

11  see that as a major -- major damage to his

12  reputation, no.

13  BY MR. GANT:

14    Q.   You think it was the termination by BCMD

15  rather than the constituent reported out violation

16  of the SPA that harmed Dr. McRaney?

17         MR. MARTENS:  Objection.  Calls for

18  speculation, assumes facts not in evidence.

19         MR. GUNDERSON:  Same objections.

20         THE WITNESS:  I think that common sense

21  would dictate that, yes.

Veritext Legal Solutions
866 299-5127

1    BY MR. GANT:

2         Q.   All right.  I need you to be as specific

3    as you can here.

4         A.   Okay.

5         Q.   Tell me the particular things that you

6    heard or learned or found out that led you to go

7    from believing that Dr. McRaney did not violate the

8    SPA to the conclusion that he did.

9              We discussed earlier when that happened.

10   It was sometime in 2015, probably between mid March

11   and the beginning of June, but now we're -- that

12   was the when.

13             Now I'm focusing on the why.  Tell me as

14   specifically as you can what you learned that made

15   you do what I referred to a moment ago as a 180.

16        A.    In my judgment, the procedures as I've

17   already stated with the hiring of those two men was

18   not in the spirit of cooperation.

19             Now, you can go to this document all you

20   want, but to me, it wasn't in the spirit.  This

21   document is all about cooperation.  It wasn't in

Veritext Legal Solutions
866 299-5127

1    the spirit of cooperation, particularly after

2    objections were raised, and yet, the second man was

3    hired.  So, that -- I came to believe that

4    was -- that was a wrong move.

5           Whether it's legally a violation or not,

6    I thought it was the wrong move.  It was bad

7    judgment.  It wasn't cooperative in spirit.

8           I also felt the same way about the 2

9    percent tacking on.  To me, there needed to have

10   been some negotiation about that between NAMB and

11   the BCMD and not just what appeared to be, We're

12   going to go ahead and do it anyway.  Again, it was

13   the lack of a spirit of cooperation that disturbed

14   me.

15       Q.   Anything else you want to add to your

16   answer?

17       A.   That's sufficient.

18           MR. GANT:  Let's go off the record.

19   Someone is knocking at the door.

20           THE VIDEOGRAPHER:  We're going off the

21   record.  The time is 5:25 p.m.

Page 319

1          (Recess taken -- 5:25 p.m.)

2          (After recess -- 5:28 p.m.)

3          THE VIDEOGRAPHER:  We are back on the

4    record.  The time is 5:28 p.m.

5    BY MR. GANT:

6          Q.   You just answered in two parts.  I want

7    to take them one at a time.

8               You talked about the hirings of Rainey

9    and/or Crawford as being the wrong move, do you

10   remember?

11         A.   The procedure used seemed to me to be

12   lacking in a cooperative spirit --

13         Q.   Okay.

14         A.   -- and communication.

15         Q.   Can you tell me what you personally did

16   to investigate the actual facts concerning those

17   hirings that led you to move from thinking there

18   was no violation of the SPA to thinking there was a

19   violation of the spirit of the SPA?

20         A.   The facts remain the same.

21         Q.   No different facts?

Page 320

1        A.    The facts were the same.  It was the way
2    I interpreted the facts.
3        Q.    That changed?
4        A.    Yes.
5        Q.    Why?
6        A.    It didn't seem to be -- betray a
7    cooperative spirit.
8             THE COURT REPORTER:  I'm sorry, I didn't
9    hear it.
10            THE WITNESS:  It didn't seem to betray a
11   cooperative spirit.
12   BY MR. GANT:
13       Q.    Betray or portray?  Just say what you
14   said.
15       A.    It didn't seem to betray --
16       Q.    Betray.
17       A.    -- any cooperative spirit.
18       Q.    So, you -- you did no new factual
19   investigation --
20       A.    No.
21       Q.    -- that led you to change your mind?

                                        Page 321

1   A. No.

2   Q. And what -- you referred to as the 2

3 percent tacking on?

4   A. Right.

5   Q. Can you explain what you're referring to?

6   A. It was a percentage as I recall.  I can

7 look in the documents, but it was a percentage from

8 the church planting, from the church plants of

9 their budget or receipts, I'm not sure which it

10 was, going to the State Convention.

11   Q. And what's your understanding of what

12 Dr. McRaney purportedly did wrong concerning that

13 issue?

14   A. NAMB rigorously objected to that, and I

15 think there should have been some communication and

16 some give and take on that.  And perhaps there was,

17 but I didn't -- I didn't hear of any.

18   Q. Okay.  But you don't have any firsthand

19 knowledge of what actually happened in connection

20 with that issue, do you?

21   A. No.

1      Q.   Okay.  So, you don't actually know one

2    way or another whether Dr. McRaney violated the

3    letter of the spirit of the SPA in connection with

4    the 2-percent issue?

5      A.   I have an opinion.

6      Q.   But do you have facts?

7      A.   Well, it dep- -- again, how do you have

8    facts relative to the spirit of a document?  You

9    don't.

10     Q.   And what specifically -- strike that.

11          Your opinion presumably is based on some

12   understanding of the facts.  What I want to

13   understand is what specifically did Dr. McRaney do

14   wrong on the 2-percent issue?  Not in general

15   platitudes about not cooperating, but specifically

16   what you believe --

17     A.   Okay.  Let's go back to the document

18   then.

19          MR. MARTENS:  Objection.

20          (Whereupon, there was a pause for

21   document examination.)

Page 323

1          THE WITNESS:  Whichever one it is where

2    NAMB objects.  Maybe it's in the 2014; maybe it's

3    in an email after that.  I think it might be in an

4    email after that where Kevin explains.

5    BY MR. GANT:

6          Q.   It's Exhibit 9 I think you're looking

7    for.

8          A.   Okay.  No.

9          Q.   It's not?

10         A.   There's another document where he talks

11   about the time that Christopherson talked to Will.

12         Q.   All right.  Well, to save time, let's do

13   this:  Was the information that formed the basis

14   for your opinion about the 2-percent issue, did

15   your information come from NAMB?

16         A.   Yes.

17         Q.   Okay.

18         A.   And Ezell's explanation to us about the

19   history of the controversy.

20         Q.   And was that information from NAMB that

21   led you to your opinion about the 2-percent issue

                                            Page 324

1    as it relates to the SPA?

2         A.   I don't recall.

3         Q.   Do you recall --

4         A.   It may just be -- it may just be what I

5    think right now.  I don't recall what I thought

6    eight years ago or not.

7         Q.   Okay.

8         A.   I know I felt that way about the -- the

9    hirings for sure.

10        Q.   And the SPA that we've been looking

11   at, --

12        A.   Okay.

13        Q.   -- which was Exhibit 3, is that the

14   entirety of it?

15        A.   I assume.

16        Q.   Do you have any reason to believe that

17   that is not a full and complete copy of the SPA?

18        A.   I have no reason to believe that.

19        Q.   Okay.  So, if we wanted to discern the

20   contents and provisions of the SPA, we need look no

21   further than Exhibit 3 itself, correct?

Veritext Legal Solutions
866 299-5127

1    A.   It would seem so to me.

2    Q.   Okay.  The -- the meeting on June 2nd

3  with Dr. McRaney when he was provided with a copy

4  of the six points, --

5    A.   Um-hum.

6    Q.   -- do you remember discussing that

7  earlier?

8    A.   I certainly do.  Which Exhibit No. is

9  that?

10    Q.   Well, the six points, let's see what that

11  is.

12    A.   Please.

13    Q.   That is Exhibit 17.

14    A.   Okay.

15    Q.   Do you acknowledge that Dr. McRaney was

16  not given a copy of the six points in any format

17  prior to the June 2nd meeting?

18    A.   Yes.

19    Q.   And -- and he was terminated six days

20  later, correct?

21    A.   Yes.

Page 326

1       Q.   He was not given any period -- strike

2    that.

3            He was not given two weeks to try and

4    implement the changes he was asked to make,

5    correct?

6       A.   Correct.

7       Q.   Do you think that was fair?

8       A.   Yes.

9       Q.   Who drafted the six-points document

10   marked as Exhibit 17?

11      A.   I don't recall.  It was run by the -- I'm

12   pretty sure it was run by the -- well, it says here

13   Administrative Committee.  My hunch is it was -- my

14   hunch, it's just a hunch, that was it Mark Dooley

15   and Harold and me --

16      Q.   And why do you think --

17      A.   -- with a consultation of the

18   Administrative Committee.

19      Q.   And why do you think it was fair to not

20   give Dr. McRaney the two weeks that he had been

21   promised when he signed Exhibit 17?

                                          Page 327

```
 1        A.   Because --

 2             MR. MARTENS:  Objection.  Misstates the

 3   evidence.

 4             MR. GUNDERSON:  Objection.  Same

 5   objection.

 6             THE WITNESS:  Okay.  Because it was clear

 7   to me that the concern No. 5 was not going to be

 8   met, and that was, in my opinion, a major concern.

 9   BY MR. GANT:

10        Q.   When you met with Dr. McRaney on June

11   2nd, 2015, was he told that he might have fewer

12   than two weeks to --

13        A.   No.

14        Q.   Why not?

15        A.   Because we didn't anticipate that he

16   would have fewer than two weeks.  We didn't -- we

17   didn't dissemble.

18        Q.   I'm sorry, I couldn't hear you.

19        A.   We didn't dissemble.

20        Q.   As soon as you had your mind made up, you

21   acted and terminated Dr. McRaney?
```

Page 328

1          MR. GUNDERSON:  Objection.

2          THE WITNESS:  As soon as Mark Dooley and

3   I communicated, we then decided to call together

4   the Administrative Committee to discuss.  I don't

5   recall the exact order of events.

6          We -- yeah, we didn't -- we didn't have

7   the power to terminate him by ourselves.  That's

8   why I keep talking about the 37 people.

9   BY MR. GANT:

10     Q.   Okay.  But the precip- -- what

11  precipitated the June 8, 2015 meeting was a

12  decision by you and Mark Dooley that you thought

13  termination was in order, right?

14     A.   Yes, approved by the Administrative

15  Committee.

16     Q.   When you say approved by the

17  Administrative Committee, what do you mean?

18     A.   They agreed with us.

19     Q.   Okay.  When was that?

20     A.   I don't recall.  It might have been

21  before the meeting.  I don't recall.  I -- I know

Page 329

1    we had a meeting in the middle of the meeting for

2    sure.  I think -- I think that -- that it was more

3    a matter of, Okay, let's present this to the

4    General Mission Board and see what they do with it,

5    but then we did meet during the -- probably right

6    after the lunch break as an Administrative

7    Committee, and everyone but Harold was on board

8    with proceeding with the rest of the meeting and

9    then letting the General Mission Board make up

10   their mind having heard from Will, having heard

11   from a representative from the direct -- the DOMs

12   and having heard from the senior staff and having

13   heard from leadership.

14        Q.   When did you personally first seriously

15   entertain voting to terminate Dr. McRaney?

16        A.   After my conversation with Mark Dooley.

17        Q.   Which was when?

18        A.   After I got the call from Tom Stolle

19   about their meeting.

20        Q.   Do you remember what date that was?

21        A.   No.  I'm sure there's a record of it at

Page 330

1    the convention.

2           (Whereupon, Warren Deposition Exhibit No.

3    31, Document Bates Numbered BCMD_0085, marked for

4    identification.)

5    BY MR. GANT:

6        Q.    You're being handed Exhibit 31.  You're

7    welcome to read as much of it as you'd like, but in

8    the interest of time, I'm going to direct you to

9    specific provisions that I'm interested in.

10       A.    Sure.  That's fine.  I have seen this

11   before.

12       Q.    Okay.  So, Exhibit 31 is Bates labeled

13   BCMD_0085, and you just said a moment ago you have

14   seen this before?

15       A.    Um-hum.

16       Q.    This is a letter dated June 8th, 2015

17   from Mark Dooley to the BCMD --

18       A.    Right.

19       Q.    -- Network -- Network Pastors; is that

20   right?

21       A.    Right.  Yes.

Veritext Legal Solutions
866 299-5127

1     Q.   Who does that comprise?  Is that all of

2  the churches that are part --

3     A.   Yes.

4     Q.   Okay.  And in the third paragraph

5  Mr. Dooley wrote -- do you see there's a sentence

6  that begins, However on the third line?

7     A.   Yes.

8     Q.   It says, However, the issue of Will

9  McRaney's reinstatement is over and done with, do

10  you see that?

11     A.   Yes.

12     Q.   That was prior to Dr. McRaney resigning,

13  correct?

14     A.   I think so, because I think June 9th is

15  when he actually signed the document.

16     Q.   That's my understanding as well.

17     So, based on that, you acknowledge that

18  Mr. -- Mr. Dooley was telling the BCMD churches

19  that the issue of Dr. McRaney's tenure at BCMD was

20  over, correct?

21     A.   That's what he states.

Veritext Legal Solutions
866 299-5127

1     Q.   Okay.  You can put that aside.  Thank

2  you.

3          (Whereupon, Warren Deposition Exhibit No.

4  32, Documents Bates Numbered NAMB 7160 through NAMB

5  7162, marked for identification.)

6  BY MR. GANT:

7     Q.   You have been handed what's been marked

8  as Exhibit 32, which is Bates labeled NAMB 7160

9  through 62.

10          Once again, it's your right to review as

11  much of this as you'd like, but I'm going to direct

12  you to the portion I'm interested in, in the

13  interest of time.

14     A.   Sure.  I have seen it.

15     Q.   Okay.  Thank you.  So, I'm focusing on

16  the top of the first page of the email from Steve

17  Davis to Kevin Ezell.  Was this one of the

18  documents that was given to you by your counsel

19  that was provided by NAMB?

20     A.   I'm sure it was.

21     Q.   Do you see it says on the first line,

Page 333

1    Mr. Davis wrote to Mr. Ezell, I'm trying to hold

2    off as asked by Bill Warren, but also not wanting

3    to tip off Will that something else is causing the

4    delay?  Do you see that?

5        A.   Yes, I do.

6        Q.   Okay.  And that's in an email from

7    Mr. Davis to Mr. Ezell -- Mr. Ezell dated June 1,

8    2015, correct?

9        A.   Right.

10            MR. MARTENS:  Objection.  Hearsay.

11   BY MR. GANT:

12       Q.   Do you have any basis for disputing the

13   accuracy of Mr. Davis' characterization to

14   Mr. Ezell in this email?

15            MR. MARTENS:  Objection.  Calls for

16   speculation, hearsay.

17            THE WITNESS:  No.  I think it's accurate.

18   BY MR. GANT:

19       Q.   Okay.  You can put that aside, please.

20       A.   Um-hum.

21       Q.   Was -- when Dr. McRaney was terminated on

Veritext Legal Solutions
866 299-5127

```
 1    June 8th, 2015, was he given a description of the
 2    reasons for the vote at the time?
 3         A.    I don't think so.
 4         Q.    Okay.  In fact, didn't you --
 5         A.    Express regret that he was not?
 6         Q.    Yes.
 7         A.    Yes, I did.
 8         Q.    Do you remember the circumstances of your
 9    expressing your regret about that?
10         A.    Yes.  Matthew 5 says if your brother has
11    something against you, go to him.  It doesn't
12    matter whether your brother is correct or not.  And
13    I heard that Will wanted to meet with somebody from
14    leadership, and I got the call from Harold Phillips
15    who said, Will would like to meet with somebody
16    from leadership.  And I prayed about it, and that's
17    the verse that came to me.  And I thought, Okay,
18    let's go talk to Will.  He has something against
19    me.  Let's go talk to Will.
20              It was at the -- it was at the end of
21    that meeting, which was three hours, Will had two
```

Veritext Legal Solutions
866 299-5127

1    pastors with him, I had one pastor with me.  Their

2    role was to be silent witnesses.  Mine --

3        Q.    That's a biblical admonition --

4        A.    Yes.

5        Q.    -- of having witnesses, right?

6        A.    Yes.  Mine was silent; his were not.  So,

7    it was basically three on one for three hours, but

8    at the end of that, Harold, who was also there,

9    said, Would you do anything differently?  And I

10   said, No.

11          And later as I thought about it, I

12   thought -- I felt the Holy Spirit saying, Yeah,

13   you -- you should have told Will.  There should

14   have been reasons given that night, and so I

15   emailed -- and you have that document -- and said,

16   Yes, we should have given you the reasons that

17   night.  That wasn't fair to you.

18       Q.    And just for the sake of the record, the

19   email that you're describing is at WAR -- WARR 031,

20   which is part of Exhibit 24.

21       A.    Okay.

Veritext Legal Solutions
866 299-5127

1              (Whereupon, Warren Deposition Exhibit No.

2    33, Document Bates Numbered BCMD_0664 through

3    BCMD_0667, marked for identification.)

4    BY MR. GANT:

5        Q.   You have been handed Exhibit 34, which is

6    Bates labeled BCMD_066 --

7              MR. MARTENS:  Thirty-three, right?

8              THE WITNESS:  Yeah, 33 is what I have

9    got.

10             MR. VITTOR:  Unless you want to

11   introduce that as a separate exhibit?

12             MR. GANT:  Did I miss a sticker?  Yes,

13   it's 33.  Sorry.  Thank you for the correction.

14             THE WITNESS:  No problem.

15   BY MR. GANT:

16       Q.   Exhibit 33 is labeled BCMD_0664 through

17   67.  It says at the top, General Mission Board

18   Minutes February 6th, 2015.

19       A.   Um-hum.

20       Q.   Do you have any reason to doubt this is a

21   true and accurate copy of the General Mission Board

Veritext Legal Solutions
866 299-5127

1  Minutes from February 6th, 2015?

2      A.   I have no reason to doubt that.

3      Q.   You can put that aside.

4      A.   Okay.

5      Q.   If you could turn to Exhibit 24, which is

6  your document production, and if you could look

7  at -- it's the big packet.

8      A.   Oh, the big packet.  Okay.

9      Q.   That looks like it.

10      A.   I got it.

11      Q.   If you could turn to page 21, WARR 21 and

12  through 23.  This was in the documents you

13  produced?

14      A.   Yes.

15      Q.   And my only question about this document

16  is what is it?  Or let -- let me ask it to save

17  time.  Is -- are these pages 21 through 23 a copy

18  of a letter from Mark Dooley to pastors and church

19  leaders in the BCMD dated September 3rd, 2015?

20      A.   Yes.

21      Q.   Do you have any reason to doubt this is a

Veritext Legal Solutions
866 299-5127

1  true and accurate copy of that letter?

2      A.   No.

3      Q.   You can put that aside for now.  Thank

4  you.  Can you keep out that exhibit?

5      A.   It's right on top.

6      Q.   I'm going to direct you to a different

7  page, page 5.

8      A.   I'm sorry, page 5?

9      Q.   Five through 6.

10     A.   Okay.

11     Q.   This -- pages 5 through 6 in your

12 document production are an email chain, correct?

13     A.   Yes.

14     Q.   Do you have any reason to doubt that

15 these are true and accurate copies of the emails

16 exchanged between yourself and Clint Scott on the

17 dates indicated here?

18     A.   No, because I found them in my -- in my

19 computer.

20     Q.   So, you believe these are genuine?

21     A.   Yes.

Page 339

1        Q.  And you believe that the statements here

2  that are attributed to you are statements that you

3  actually wrote?

4             MR. MARTENS:  Objection.

5             MR. GUNDERSON:  Are you referring to the

6  statements that Scott made that --

7             MR. GANT:  No, no.

8             MR. GUNDERSON:  Oh, what he said or his

9  writing?

10            MR. GANT:  His emails.

11            MR. GUNDERSON:  His emails.

12            MR. GANT:  The emails that are his, so

13  let me state it more clearly.

14  BY MR. GANT:

15        Q.  Dr. Warren, these two pages, 5 and 6, in

16  Exhibit 24 include emails from you, correct?

17          I see three.  I'm happy to help if you,

18  but if you -- I see three emails that you wrote

19  here.  One --

20        A.  Yes.  I think this is accurate, yeah.

21        Q.  So, you wrote those words?

Veritext Legal Solutions
866 299-5127

1   A. Um-hum.

2   Q. Please answer audibly.

3   A. Yes, I wrote the words that were --

4 I -- that are -- where I speak to Clint, where I

5 write to Clint.

6   Q. And those are --

7   A. And just to be clear, Clint, I would say

8 that the December -- that those are -- are my

9 words.

10   Q. And you believed them to be true when you

11 wrote them, correct?

12   A. Absolutely.

13   Q. Okay.  You can put that aside for now,

14 please.

15   A. And then I enjoyed our conversation.

16 Please find attached.  Yes, those are also my

17 words.

18   Q. You can put that aside.

19   A. I think there seems to be two, am I

20 correct?

21   Q. I see --

Page 341

```
1        A.   Two emails from me.  Is there a third?

2        Q.   I see three, but it's -- they're

3   not -- the first one -- here, if you look with

4   me, --

5        A.   Yeah.

6        Q.   -- it's just one, two, three

7   (indicating).

8        A.   The word, Agreed?

9        Q.   Well, I see three from you.

10            MR. GUNDERSON:  Yes, the word Agreed is

11  what his point is.

12            THE WITNESS:  The word Agreed --

13  BY MR. GANT:

14       Q.   I'm saying there are three of them, yes.

15  One of them just says Agreed, yes.

16       A.   Oh, okay.  Yes.

17       Q.   But I'm saying there were three emails

18  from you on these two pages?

19       A.   I'm assuming the Agreed is from me.

20       Q.   Well, it says from William Warren, --

21       A.   Okay.
```

Page 342

1      Q.   -- do you see that?

2      A.   Yeah.  Yeah.

3      Q.   So, these are your words?

4      A.   Yes.

5      Q.   True statements?

6      A.   Yes.

7      Q.   Okay.  You can put that aside.  Let's go

8  to page 41 in that same packet.

9      A.   Um-hum.

10     Q.   Forty-one and 42.

11     A.   Um-hum.

12     Q.   You reviewed these to prepare for today's

13  deposition?

14     A.   Yes.

15     Q.   So, do you remember the reference to an

16  article in SBC Today and then -- that was brought

17  to your attention and then you wrote an email on

18  June 4th, 2016 at 12:08 p.m. in the middle of page

19  41?  Do you see that?

20     A.   To Mike Trammell?

21     Q.   Yes.

Page 343

1          A.   Yes, I see that.

2          Q.   And this is a true and accurate copy of

3     an email exchange between yourself and Mike

4     Trammell?

5          A.   I'm sure it is.  It was in my computer,

6     yes.

7          Q.   Okay.  And the statements that you wrote

8     you believed to be true when you wrote them?

9          A.   Yes.

10         Q.   And the Wolverton referred to there, is

11    that Steve Wolverton?

12         A.   Yes, Pastor.

13         Q.   Have you read his declaration in this

14    case?

15         A.   I don't recall.

16         Q.   Okay.  You can put that aside for now.

17    Thank you.

18         A.   Um-hum.

19         Q.   Can you turn to page 43 in the same

20    Exhibit 24 --

21         A.   Okay.

                                        Page 344

1     Q.   -- which is your document production?

2     A.   Okay.

3          MR. GANT:  Was this marked separately as

4  an exhibit?

5          MR. VITTOR:  Page 41 and 42 are.

6          MR. GANT:  Maybe not.  It doesn't matter.

7  BY MR. GANT:

8     Q.   Okay.  All right.  Do you have page 43

9  from your production in front of you?

10     A.   Yes.

11     Q.   And this is an email exchange?

12     A.   Yes.

13     Q.   The top email is from you to Kevin Ezell,

14  correct?

15     A.   Right.

16     Q.   Is that a true and accurate copy of the

17  email that you sent to Kevin Ezell on June 14th,

18  2016?

19     A.   Yes.

20     Q.   Were the statements in the email true

21  when you wrote them?

Page 345

1      A.   Yes.

2      Q.   You can put that aside.  Thank you.

3           I'm just going to mark a version of this

4    email that NAMB produced.

5      A.   Okay.

6           (Whereupon, Warren Deposition Exhibit No.

7    34, Document Bates Numbered NAMB 7667, marked for

8    identification.)

9           MR. VITTOR:  Exhibit 34?

10          MR. GANT:  Yes, Exhibit 34, Bates labeled

11   NAMB 7667.

12   BY MR. GANT:

13     Q.   The email on the top two-thirds of this

14   exhibit are the same as the one we just looked at

15   on Warren 43, correct?

16     A.   Yes.  It's from me to Kevin Ezell.

17     Q.   Okay.  So, Exhibit 34 is a true and

18   accurate copy of your email to Kevin Ezell and the

19   statements in there were true, correct?

20     A.   Yes.

21     Q.   You can put that aside.  Thanks.

Page 346

1            At the June 8, 2015 meeting, --

2        A.    Yes.

3        Q.    -- why was Dr. McRaney not permitted to

4    stay during the presentations of the NAMB staff

5    members about their experiences?

6        A.    I don't recall.

7        Q.    You acknowledged that he was not

8    permitted to stay?

9        A.    I acknowledged that he wasn't there.

10       Q.    I don't know if scripture has anything to

11   say about this, but in -- in civil law, there's a

12   very important principle about being able to

13   confront your accusers.  Have you ever heard that?

14       A.    I've heard of that.  Um-hum.

15       Q.    The Sixth Amendment Confrontation Right,

16   for example?

17       A.    Um-hum.  Um-hum.

18       Q.    Is there something comparable in

19   scripture?

20       A.    Yes, Matthew 5 and Matthew 18.

21       Q.    What does it say?

1   A. Matthew 5 says if your brother has

2 something against you, go to him, point out his

3 fault, just between the two of you.  No.  If your

4 brother has something against you, go to him and

5 work it out.

6    Matthew 18 is if your brother has sinned

7 against you, go and restore the relationship.

8   Q. So, in -- in both provisions, one of the

9 operative principles is a face-to-face?

10   A. Right.

11   Q. Okay.  And Dr. McRaney in the June 8th,

12 2015 meeting was not afforded that right, was he?

13   A. He was not invited to be there.

14   Q. So, he wasn't able to hear what was being

15 said about him --

16   A. No.

17   Q. -- and respond?

18   A. No.

19   Q. And Dr. McRaney had no opportunity to

20 respond to what was said outside of his presence

21 about him at the June 8th, 2015 meeting prior to

Page 348

1    being terminated, correct?

2         A.    Correct.

3              MR. GANT:  Let's take a short break.  Let

4    me see how much I have left.

5              THE WITNESS:  Okay.

6              THE VIDEOGRAPHER:  We're going off the

7    record.  The time is 5:56 p.m.

8              (Recess taken -- 5:56 p.m.)

9              (After recess -- 6:06 p.m.)

10             THE VIDEOGRAPHER:  We are back on the

11   record.  The time is 6:06 p.m.  This is media unit

12   number six.

13   BY MR. GANT:

14        Q.    Earlier in connection with Exhibit 5, you

15   mentioned the name Victor Kirk --

16        A.    Yes.

17        Q.    -- and some communication you had with

18   him that influenced at least your decision to vote

19   to terminate Dr. McRaney, do you recall that?

20        A.    I remember what he said in the meeting.

21        Q.    What did he say?  Who is he, and what did

1    he say?

2         A.   He's a pastor.  I'm pretty sure he was on

3    the Administrative Committee, and somewhere in all

4    of this mound of material I read that he had called

5    Will privately and had gotten the same response

6    about the six concerns, but I very distinctly

7    remember his standing and saying -- asking about

8    it, and I was shocked by Will's response.

9         Q.   Is it a Biblical tenet to be truthful and

10   give honest responses when someone asks you a

11   question?

12        A.   Sure.

13        Q.   If Dr. McRaney believed that the

14   allegations leveled against him were misguided or

15   unfounded, isn't the appropriate response for

16   Dr. McRaney to say so?

17        A.   Sure.

18        Q.   So, I think you testified earlier that

19   you acknowledge that Dr. McRaney believes that the

20   allegations against him are unfounded, correct?

21        A.   Right.

Page 350

1      Q.    So, your complaint wasn't about

2  Dr. McRaney's response, which is what you'd expect

3  to hear from him, it was for -- it was a complaint

4  about his beliefs that he had done nothing wrong;

5  aren't I right?

6      A.    Which I found out through his response.

7      Q.    Right.

8      A.    So, his response troubled me.

9      Q.    Because you thought that he should have

10  contrition even though he didn't think he

11  should -- had done anything wrong?

12      A.    If he was that blind to the six concerns

13  and he really felt like he hadn't done anything

14  wrong, we were worse off than I thought.

15      Q.    So, that was your complaint, a

16  disagreement over what the facts were?

17      A.    Yes.

18      Q.    Do you consider Dr. McRaney intelligent?

19      A.    Very.

20      Q.    You still do?

21      A.    Absolutely.

Page 351

1      Q.   Do you consider Dr. McRaney hard working?

2      A.   Yes.  One of the things that impressed me

3 about him in the beginning was that I don't think

4 he had been on the job a week when he invited many

5 of us pastors to come to the building and talk with

6 him, and -- and I thought that was very, very

7 admirable, and I know he worked hard during his

8 tenure.  He went to a lot of churches.

9      Q.   Earlier you said that you were a fan and

10 very impressed by Dr. McRaney, correct?

11      A.   Absolutely.

12      Q.   What -- what else did you observe that

13 made you have that impression?

14      A.   Well, that was a first, a good -- a great

15 first impression.  He's articulate.  He's bright.

16 He has a heart for lost people, which is rare among

17 pastors believe it or not.  I liked him personally.

18 I enjoyed working with him.

19      Q.   You believe he's committed to the -- and

20 forgive me, I'm --

21      A.   That's okay.

Page 352

1      Q.    -- if I get the words wrong, but is he

2   committed to the gospel?

3      A.    Absolutely.

4      Q.    To spreading Christ's message?

5      A.    Yes, absolutely.

6      Q.    A genuine believer?

7      A.    Absolutely.

8      Q.    You used the phrase with Mr. Martens man

9   of God.  Maybe I missed it, but I didn't hear what

10   you meant by that.  What does that phrase mean to

11   you?

12      A.    A really committed follower of Christ.

13      Q.    Do you consider Dr. McRaney a man of God?

14      A.    Yes, I do.

15      Q.    Dr. McRaney was not terminated by BCMD

16   due to differences over theology or doctrinal

17   issues, was he?

18      A.    No.

19      Q.    I think you testified earlier that

20   you -- and, again, I'm not trying to put words in

21   your mouth, just make sure I understand what you

Page 353

1    said.  I thought you said that you never

2    communicated directly with Kevin Ezell before the

3    December 2nd, 2014 termination letter; is that

4    right?

5        A.   Right.  I don't recall any.  No, I don't

6    recall.  No, I didn't.  Not -- if -- if there's

7    something out there that I'm overlooking --

8        Q.   No, no.  I'm not trying to trick you.

9    I'm not aware of anything.

10        A.   No.  No.  In fact, that call was out of

11    the blue.  I was, like I said, shocked that he

12    called me.

13        Q.   Shocked that he had your phone number?

14        A.   Shocked that he had my number, number

15    one.  I was like, Who's this?

16        Q.   He's an influential person.  He can get a

17    number if he needs it.

18        A.   I guess so.

19        Q.   The -- now, you did have a number of

20    communications with Kevin Ezell between December

21    2nd, 2014 and June 8th, 2015 when BCMD terminated

Page 354

1    Dr. McRaney, correct?

2         A.    I had some.

3         Q.    Those included one or more in-person

4    meetings, correct?

5         A.    Only one in-person meeting, and that was

6    in March of 2015.

7         Q.    You exchanged some texts according to the

8    documents with Kevin Ezell, correct?

9         A.    I probably did.  I'm sure I did.

10        Q.    Did you -- did you preserve those?

11        A.    Not -- no, I don't have those texts.  I

12   don't think so.  We can look.

13        Q.    Did you look for them in response?

14        A.    No, I didn't.  No, I didn't.

15        Q.    Just so the record is clear, did you

16   look for texts with Kevin Ezell or anyone else

17   about --

18        A.    No.  I didn't think about --

19        Q.    -- Dr. McRaney?

20        A.    I didn't think about texts.

21        Q.    Okay.  So, you didn't -- you didn't look

Page 355

1  for them in order to respond to the subpoenas?

2      A.   No.  Huh-uh.  I just focused on the

3  emails and the documents.  I don't even know -- I

4  mean, I can look.  I don't have a problem looking.

5  They may not -- they're probably not still in my

6  phone.

7      Q.   Okay.  If you have the texts, you have no

8  objection to providing them --

9      A.   None whatsoever.

10      Q.   -- to Eric?

11      A.   They tell the truth.

12      Q.   I appreciate that.  You also communicated

13  with Kevin Ezell during that period by telephone,

14  correct?

15      A.   I'm sure I did.

16      Q.   And by email?

17      A.   Yes.  The -- there's some email.  Yes,

18  there's some email evidence of that.

19      Q.   Okay.  Sitting here today are you able to

20  estimate, regardless of the method of

21  communication, how many times you communicated with

Page 356

1    Kevin Ezell about Dr. McRaney between December 2nd,

2    2014 and June 8th, 2015?

3         A.   I'm not able to estimate, but there were

4    a few times I'm sure.  Some of that was

5    communication about, Hey, when can we get together

6    and have this meeting to fix this mess?

7         Q.   Okay.  You don't have records of all of

8    the communications between you and Dr. Ezell during

9    that period, correct?

10        A.   I have what you have, all of the emails

11   and all of the documents.  I'll check for texts,

12   but I'm not optimistic.

13        Q.   We don't have the texts and we don't

14   have -- we don't know the context of the phone

15   calls, correct?

16        A.   No.

17        Q.   No, I'm not correct, or, no, we don't

18   have them?

19        A.   We don't have the -- I'll look and see if

20   I have the texts, but after eight years, I

21   doubt -- I doubt they're still.

Page 357

1    Q.   And the phone calls, I assume there are

2    no written records or summaries of those?

3    A.   No.  No.  No.

4    Q.   In Exhibit 24, the page WARR 30, it

5    references your application --

6    A.   Oh, yes.

7    Q.   -- for the position of executive

8    director --

9    A.   Yes.

10   Q.   -- at BCMD.  I also noticed that you have

11   an original copy --

12   A.   Yes.

13   Q.   -- in your pile to your left, correct?

14   A.   Yes, I do.  Yes, I do.

15   Q.   So, you reviewed that to prepare for

16   today's deposition?

17   A.   I did review it, and I did include it

18   because I figured I would get this question.

19   Q.   Why?

20   A.   That's -- you -- one might think this was

21   my motive.  Oh, I state it in my letter, you know,

Page 358

```
 1    that -- that -- that that might have been my motive

 2    for --

 3         Q.    Well, right now I just want to establish

 4    facts.

 5         A.    Yes.

 6         Q.    After Dr. McRaney was terminated by BCMD

 7    as its executive director, you subsequently applied

 8    to assume his position, correct?

 9         A.    Yes.

10         Q.    When did you make that application?

11         A.    I don't recall.

12         Q.    Was it at some point in 2015, after June

13    8th?

14         A.    Oh, yes.

15         Q.    Okay.

16         A.    Yes.

17         Q.    What happened with your application to

18    succeed Dr. McRaney as executive director at BCMD?

19         A.    Well, it came after, as you can read in

20    the document, a lot of pray and even a fleece that

21    I didn't think -- by fleece, I meant, God, if this
```

Veritext Legal Solutions
866 299-5127

1   happens, I'll take that as a yes.

2       Q.   I'm sorry, I wasn't clear.  I don't want

3   to cut you off, but I don't -- we don't have a ton

4   time.

5       A.   Okay.  All right.

6       Q.   I just meant did you get the job after

7   you applied for it?

8       A.   Oh, no.  No, no.  I withdrew my

9   nomination in December after the Lord told me to

10  withdraw it.

11      Q.   What did the Lord tell you about the

12  reason to withdraw it, or did the Lord not give you

13  a reason?

14      A.   I asked, and what I got was, I told

15  Abraham to sacrifice Isaac, so I --

16          THE COURT REPORTER:  Sacrifice, I'm

17  sorry?

18          MR. GANT:  Sacrifice Isaac.

19          THE COURT REPORTER:  Okay.

20          THE WITNESS:  So, I took it as a

21  test --

Page 360

1    BY MR. GANT:

2        Q.    Meaning just do what I say?

3        A.    -- a test -- a test of faith.

4        Q.    To withdraw?

5        A.    A test of faith to even submit.  I really

6    didn't want to, and I really didn't want to go

7    through the process because I knew it would be a

8    lot of hours on the road.  And my wife and I were

9    not going to move.  It wasn't going to be good for

10   my marriage, blah, blah, blah.

11       Q.    Okay.  So, I want to make sure I

12   understand.  You did put your -- your name in

13   for --

14       A.    Yes.

15       Q.    -- the position?  Are you saying that you

16   withdrew from the candidacy prior to a decision

17   about whether to hire you?

18       A.    Yes.

19       Q.    So --

20       A.    In December.

21       Q.    Okay.  Who is Tom Winborn?

Page 361

1          A.   He was a member of the Executive

2     Committee.  He was a member of the Administrative

3     Committee.  He's a pastor.  He's now in Alabama.

4          Q.   Do you know whether Kevin Ezell

5     communicated with him about Dr. McRaney at any

6     point in time?

7          A.   I do not know.

8               (Whereupon, Warren Deposition Exhibit No.

9     35, Documents Bates Numbered NAMB 6756 through NAMB

10    6758, marked for identification.)

11    BY MR. GANT:

12         Q.   Exhibit 35 is Bates -- it's stamped NAMB

13    6756 through 58.  Again, in the interest of time,

14    I'm going to just ask you some discrete questions.

15         A.   Sure.

16         Q.   But it's your right to review what you

17    think you need to in order to respond.

18              Have you ever seen this before, either

19    the email or the attachment?

20         A.   Hmm, not that I recall.  It could be in a

21    stack, but I don't think I got through the entire

```
 1    stack.
 2         Q.    And do you see the cover page is an email
 3    from Kevin Ezell to thomas@welshbaptist.com --
 4         A.    Yes.
 5         Q.    -- dated February 24th, 2015?
 6         A.    Yes.
 7         Q.    Was that a place where Thomas Winborn
 8    worked?
 9         A.    Yes.
10         Q.    So, you don't have any reason to doubt
11    this is an email from Kevin Ezell to Thomas
12    Winborn?
13         A.    I have no reason to doubt that.
14         Q.    Do you know whether Kevin Ezell sent any
15    texts to Thomas Winborn about or related to
16    Dr. McRaney?
17         A.    I have no idea.
18         Q.    Do you know what Dr. Ezell told anyone
19    else in leadership at BCMD about Dr. Ezell other
20    than what was said in your presence?
21              MR. GUNDERSON:   I believe you meant
```

Page 363

```
 1    Dr. McRaney.

 2              MR. GANT:  Yeah, sorry.  Let me start

 3    over.

 4    BY MR. GANT:

 5        Q.    Do you know what Kevin Ezell said to

 6    others in BCMD leadership about Dr. McRaney outside

 7    of your presence?

 8        A.    No.

 9        Q.    So, if Dr. McRaney -- excuse me.  If

10    Dr. Ezell had calls or texts or in-person

11    discussions or emails with others in BCMD

12    leadership that you weren't included in, you don't

13    know what he said?

14        A.    Not unless they cc:d me on a -- on an

15    email.

16        Q.    You can put 35 aside.

17        A.    Not that I recall.

18        Q.    Do you remember emailing Kevin Ezell and

19    asking him if he thought you would be called to

20    testify in this case?

21        A.    I don't recall, but it wouldn't surprise
```

1    me.

2         Q.   Why wouldn't it surprise you?

3         A.   Why -- why would it not surprise me?

4         Q.   Yes.

5         A.   Curiosity.

6              (Whereupon, Warren Deposition Exhibit No.

7    36, Documents Bates Numbered NAMB 9061 through NAMB

8    9062, marked for identification.)

9    BY MR. GANT:

10        Q.   You have been handed what's marked

11   Exhibit 36, which is Bates labeled NAMB 9061

12   through 62.

13             I'm just going to direct your attention

14   to the top of the first page, which is an email

15   from you to Kevin Ezell dated October 28th, 2020 in

16   which you wrote, Do you think I will be called to

17   testify?  Do you see that?

18        A.   Yes.

19        Q.   Do you recall getting a response?

20        A.   No, I don't recall.  I don't know whether

21   I did or not.

Veritext Legal Solutions
866 299-5127

1    Q.   Why were you asking Kevin Ezell that

2    question?

3    A.   Because I think at that time, I knew that

4    they were being sued.

5    Q.   The lawsuit was filed in April of 2017,

6    so --

7    A.   Okay.

8    Q.   -- the lawsuit had been going on for

9    three and a half years at that point.

10   A.   Yeah.

11   Q.   Do you know why --

12   A.   Why that particular moment?

13   Q.   Yes.

14   A.   No.

15   Q.   Other than this email, have you had any

16   communication with Kevin Ezell about this case

17   since it was filed?  And I just told you it was

18   filed in April of 2017.

19   A.   I can't remember when it was.  He called

20   me to see if I was still alive, because he would

21   get -- he was one of my prayer partners praying for

Page 366

1    the poor and the persecuted we help in Pakistan and

2    he hadn't heard from me in a while.  I said, Yeah,

3    I'm -- I'm still here.  And I -- I -- in that

4    conversation, or maybe one subsequent, I said, You

5    know, I want to tell the truth, so I'm willing

6    to -- to tell the truth about what happened.

7              I did call him a couple of weeks ago,

8    left a voicemail to explain to him why originally I

9    went along with the BCMD's effort to quash the

10   subpoena to testify to -- to be deposed.  I

11   explained to him that it really wasn't my desire

12   that I wanted to be deposed, but I wanted to tell

13   the truth.  I wanted to set the record straight.

14       Q.    You left all of that in a voicemail?

15       A.    Yes, and I said, Call me or text me and

16   let me know you got the voicemail.  He never did.

17   Now I know why.  He wasn't supposed to.

18       Q.    Why did you feel like you should or

19   wanted to leave that message, convey that message?

20       A.    I didn't want him to get the impression

21   that I went along with BCMD's quashing because I

1    didn't want to be cooperative or tell the truth or

2    whatever after I had told him before, you know, I

3    will testify.

4         Q.   I understand you're not a lawyer, but

5    just so you --

6         A.   Right.

7         Q.   -- understand, you also filed a Motion to

8    Quash the subpoena.  You and BCMD are separate

9    entities.  Do you dispute that?

10        A.   They -- I did it through their office.  I

11   did it through Agnor's office.

12        Q.   Well, you have the same lawyer?

13        A.   Right, we have the same lawyer.  David,

14   right.

15        Q.   You voluntarily made the decision to have

16   the same lawyer as BCMD, correct?

17        A.   For sure.  I wasn't going to pay for

18   them, --

19        Q.   And --

20        A.   -- and they know the case.

21        Q.   So, BCMD wanted to move to quash and you

Veritext Legal Solutions
866 299-5127

1   agreed to join that motion?

2       A.   Reluctantly.  After consultation with an

3   attorney in our church, reluctantly.

4       Q.   Did you pray on it?

5       A.   Yeah.

6       Q.   Did God give you any guidance whether to

7   move to quash or not?

8       A.   He told me to cooperate with them.

9       Q.   With BCMD?

10      A.   Yeah.

11      Q.   Generally or just with respect to that?

12      A.   With respect to this particular

13  issue --

14      Q.   What about that --

15      A.   -- which I'm glad -- excuse me?

16      Q.   What -- I'm sorry, we're speaking over

17  each other.

18      A.   Which I'm glad that I did cooperate with

19  them, because my hunch is that since the subpoena

20  wasn't quashed, I would probably be sitting here on

21  my own without legal counsel.  I don't know.  They

Page 369

1  might have -- you know, I think there would have

2  been a conflict of interest there or something.  I

3  think that's what I heard.

4       Q.   I can't remember if I asked you this

5  earlier.  Do you have a written engagement letter

6  with your attorney's firm for representation in

7  this case?

8       A.   No.

9       Q.   All right.

10           (Whereupon, Warren Deposition Exhibit No.

11  37, Documents Bates Numbered WM831 through WM832,

12  marked for identification.)

13  BY MR. GANT:

14       Q.   I'm handing you what's been marked as

15  Exhibit 37, which is Bates labeled WM831 through

16  32.  Have you ever seen this before?

17           MR. GUNDERSON:  Thirty-seven?

18           MR. GANT:  I'm sorry?

19           MR. GUNDERSON:  Thirty-seven.

20           MR. GANT:  Yes.

21           (Whereupon, there was a pause for

Page 370

1    document examination.)

2            THE WITNESS:  Yes, I have seen it.

3    BY MR. GANT:

4        Q.   Do you have any reason to doubt this is a

5    true and accurate copy of an email from you to

6    Dr. McRaney dated December 5th, 2014?

7        A.   No, I have no reason to doubt it is

8    accurate.

9        Q.   And is the information that you -- you

10   included here accurate -- accurate as far

11   as -- strike that.

12           You pasted an email from -- at least part

13   of an email from Kevin Ezell into this email,

14   correct?

15       A.   Yes, it looks like it.

16       Q.   Okay.  And so, Kevin Ezell told you that

17   the -- NAMB's three primary concerns or issues with

18   Will are the three that are listed here, correct?

19       A.   Yes.

20       Q.   You can put that aside.

21           Do you consider Clint Scott to be a liar?

                                          Page 371

1  A. No.

2  Q. Do you consider Clint Scott to be a man

3 of God?

4  A. Yes.

5  Q. Do you consider Steve Wolverton to be a

6 liar?

7  A. No.

8  Q. Do you consider Steve Wolverton to be a

9 man of God?

10  A. Yes.

11  Q. Are you -- have you read Steve

12 Wolverton's declaration in this case?

13  A. Is that his affidavit?

14  Q. I think it's called his declaration.

15 They're similar, but not the same.

16  A. I think I did.

17    (Whereupon, Warren Deposition Exhibit No.

18 38, Document Bates Numbered NAMB 7638, marked for

19 identification.)

20 BY MR. GANT:

21  Q. I'm handing you what's been marked as

Page 372

1   Exhibit 38, which is Bates labeled NAMB 7638.  Have

2   you ever seen this before?

3          A.   No.  I don't -- no.

4          Q.   My last question about it is going to be

5   did you review it to prepare for today's

6   deposition?

7          A.   No.

8          Q.   Okay.  You can put that aside, please.

9               (Whereupon, Warren Deposition Exhibit No.

10  39, Documents Bates Numbered BCMD_0095 through

11  BCMD_0096, marked for identification.)

12  BY MR. GANT:

13         Q.   I'm handing you what's been marked as

14  Exhibit 39, which is Bates labeled BCMD_0095

15  through 96.  Have you ever seen this before?

16         A.   I don't know.  It's not ringing a bell,

17  but I don't recall.

18         Q.   Did you consider recommending that

19  severance payments being made to Dr. McRaney under

20  the Separation Agreement be terminated?

21         A.   I don't think I did, no.

Veritext Legal Solutions
866 299-5127

1       Q.   You don't remember -- do you remember

2  anyone suggesting that?

3       A.   Oh, I think some people wanted to because

4  they felt like he violated our agreement.

5       Q.   You didn't hold that view?

6       A.   It didn't matter to me.

7       Q.   Do you --

8       A.   I wanted to do the best we could for him

9  and his family, so it didn't matter to me if he

10  didn't -- if he violated the agreement by whatever.

11  It didn't -- it didn't matter to me.

12       Q.   Do you remember Mark Dooley sharing with

13  you an email from Harold Phillips imploring that

14  the severance payments not be terminated?

15       A.   From Mark to Harold urging that they not

16  be?  I don't recall that.

17       Q.   Okay.  That's at Warren 28 in Exhibit 24

18  just for the record.

19       A.   Okay.

20       MR. GANT:  All right.  Let's take a quick

21  break.  I probably have five minutes or less left,

1    and then I'll turn it back to Mr. Martens and see

2    if he has anything.

3              THE VIDEOGRAPHER:  We're going off the

4    record.  The time is 6:27 p.m.

5              (Recess taken -- 6:27 p.m.)

6              (After recess -- 6:30 p.m.)

7              THE VIDEOGRAPHER:  We are back on the

8    record.  The time is 6:30 p.m.

9    BY MR. GANT:

10       Q.   Mr. Martens has asked you some questions

11   about these minutes earlier.  Do you remember

12   observing based on reviewing the document that

13   Thomas Winborn acted as recording secretary?

14       A.   Yes.

15       Q.   And we looked at an exhibit a few minutes

16   ago where Kevin Ezell sent some -- an email, a

17   document to Thomas Winborn, do you remember that?

18       A.   Yes.

19       Q.   Were you aware that Kevin Ezell had been

20   communicating with Thomas Winborn before he served

21   as the minute-taker for this meeting?

Page 375

```
 1        A.    I don't think so.

 2        Q.    Was Dr. McRaney sent a draft of the

 3   minutes to review for accuracy before they became

 4   final?

 5        A.    I don't know.

 6        Q.    Earlier you agreed to give truthful and

 7   complete answers to my questions.  I think I know

 8   the answer, but --

 9        A.    Yes.

10        Q.    -- have you done so?

11        A.    Yes, I have.  I have -- I have a higher

12   power that I answer to, but yes.

13             MR. GANT:  All right.  I think

14   Mr. Martens will have a few follow-up questions. I

15   may have questions after he goes.  That's how this

16   works.

17             THE WITNESS:  That's fine.

18             MR. GANT:  But for the moment, I

19   appreciate your time.

20             THE WITNESS:  Thank you for your time.

21             MR. MARTENS:  Just a few things.
```

Page 376

1          THE WITNESS:  No problem.

2                    REEXAMINATION

3          BY MR. MARTENS:

4      Q.   Are you familiar with the term orthodoxy?

5      A.   Yes.

6      Q.   Are you familiar with the term

7  orthopraxy?

8      A.   Yes.

9      Q.   What is -- strike that.

10          Is orthodoxy fairly defined as right

11  belief?

12      A.   Yes.

13          MR. GANT:  Sorry.  You still have to give

14  me a chance --

15          THE WITNESS:  Oh, I'm sorry.  Okay.

16  We're back to that.

17          MR. GANT:  -- even though we're in a

18  different phase.

19          THE WITNESS:  I didn't mean it in a

20  negative -- a critical way.  I've just got to shift

21  gears here.  You have objections, so okay.  Go

                                        Page  377

1    ahead, object.

2            MR. GANT:  Objection.  Foundation.  Go

3    ahead.

4            THE WITNESS:  Okay.

5    BY MR. MARTENS:

6        Q.   Does orthopraxy mean right practice or

7    conduct?

8            MR. GANT:  Objection.  Vague, foundation.

9            THE WITNESS:  Yes.

10   BY MR. MARTENS:

11       Q.   Did you expect an executive director of

12   the BCMD to be both orthodox in belief and orthodox

13   in practice?

14           MR. GANT:  Objection.  Vague, foundation,

15   compound.

16           THE WITNESS:  Yes.

17   BY MR. MARTENS:

18       Q.   Does orthopraxy include a humble spirit?

19           MR. GANT:  Same objections.

20           THE WITNESS:  Absolutely.

21   BY MR. MARTENS:

                                            Page 378

1          Q.    Does orthopraxy include a Christ-like

2     Christ likeness?

3                MR. GANT:  Same objections.

4                THE WITNESS:  Absolutely.

5     BY MR. MARTENS:

6          Q.    I want to show you Exhibit 31.

7          A.    So, we're going back to something you've

8     already given me?

9          Q.    And while I'm going back, let me just ask

10    you one more question on that last line.

11               Which is more important, orthodoxy or

12    orthopraxy?

13               MR. GANT:  Objection.  Vague, foundation,

14    calls for speculation, incomplete hypothetical.

15               THE WITNESS:  I think it's orthopraxy.

16    BY MR. MARTENS:

17         Q.    Orthopraxy?

18         A.    Orthopraxy.

19         Q.    Why?

20               MR. GANT:  Same objections.

21               THE WITNESS:  In the end, obedience is

Veritext Legal Solutions
866 299-5127

1    how God defines love.  In the end, orthopraxy is

2    obedience.  That's what matters most to God in my

3    opinion rather than whether you believed everything

4    correctly.

5          Jesus said to love me and still obey me,

6    basically.  They're both important, but orthopraxy

7    if I had to choose one.

8    BY MR. MARTENS:

9        Q.   Let's go back to Exhibit 31.

10       A.   Okay.

11       Q.   We looked at the memo earlier.  Do you

12   see the date on it is June 8th, 2015?

13       A.   Yes.

14       Q.   Is that the right date?

15          MR. GANT:  Objection.  Vague, foundation,

16   leading, calls for speculation.

17          (Whereupon, there was a pause for

18   document examination.)

19          THE WITNESS:  It can't be.

20    BY MR. MARTENS:

21       Q.   Why not?

Page 380

1       A.   Because it references an email sent by

2   Steve Wolverton on September 8th in an effort to

3   reinstate Will McRaney.  It's dated June the 8th,

4   2015.  That means the email would have to have been

5   sent out before we even had our meeting to

6   terminate.  That cannot be a correct date in my

7   view.

8       Q.   Okay.

9       A.   I don't know what the right date is, but

10  it's sometime after September 8th.

11      Q.   Okay.  Let's look at Exhibit 24, which is

12  a stack of documents from your production.

13          MR. GUNDERSON:  I think you passed it.  I

14  think it's --

15          THE WITNESS:  Thank you.

16          MR. GUNDERSON:  Here it is.

17          THE WITNESS:  Okay.

18  BY MR. MARTENS:

19      Q.   If you can go to page 43 of Exhibit 24.

20  Do you see the first email at the top of the page

21  is from you dated June 14th, 2016 at 9:12 p.m.?

Veritext Legal Solutions
866 299-5127

1     A.   Yes.

2     Q.   And the first two sentences reads, Steve

3 is right that I was convinced that we would lose

4 staff and NAMB funds if Will stayed in his

5 position.  He is wrong to believe such -- that such

6 a concern was a major factor in the firing of Will.

7 Do you see that?

8     A.   Yes, I do.

9     Q.   In the second sentence when you referred

10 to such a concern, which concern were you referring

11 to?

12     A.   The concern that we would lose staff and

13 NAMB funds.

14     Q.   So, did you -- was the concern about

15 losing staff not part of the decision-making in

16 terminating Will?

17     A.   Two different -- they are two different

18 factors, two different agents in the losing.

19       This references losing staff because of

20 funds.  The other was losing staff because they

21 resigned.

Page 382

1      Q.   Was losing staff because they resigned a

2  major factor in the decision to terminate

3  Mr. McRaney -- Dr. McRaney?

4      A.   In my decision to vote, yes, absolutely.

5  It was, again, the tipping point.

6         It's one thing to lose one or two staff

7  because you don't have the money.  It's not a thing

8  to have five of the six top staff leave because

9  they can't stay.  They don't want to stay.

10     Q.   You were asked about Exhibit 23 and some

11  statements that you made to the effect that

12  Mr. -- Dr. McRaney was a man of great vision and

13  courage.  He was not afraid to tackle hard issues.

14  He's a man of truth and lives the Great Commission.

15  Do you remember being asked about that?

16     A.   Yes, I do.  Do you want me to find the

17  document or just --

18     Q.   Sure, if you want to.

19     A.   -- or just wing it?

20     Q.   Exhibit 23.

21     A.   Or just wing it?

Page 383

1     Q.   No, let's not wing it.

2     A.   Okay.

3     Q.   We have done a good job thus far.

4     A.   All right.  My next deposition I'll keep

5  these in order.  Okay.

6     Q.   Go to the last page of Exhibit 23, the

7  next to the last page bearing the Bates number

8  ending in 6703.

9     A.   Okay.  Okay.

10    Q.   Do you remember being asked about

11 statements you made to the effect that Dr. McRaney

12 was a man of great vision and courage, not afraid

13 to tackle hard issues, a man of truth and lives the

14 Great Commission?

15    A.   I do remember being asked about that.

16    Q.   When did you make those statements?

17    A.   Well, it appears that it was in December

18 of 2014, and this is from Baptist Life December

19 17th, 2014.  So, sometime before that.  My guess is

20 it's probably Monday, the 15th or Tuesday, the

21 16th.

Page 384

1      Q.    Of December of 2014?

2      A.    That would be my guess, but it might have

3  been the week before that.  We would have to look

4  in the records to see when the GMB met --

5           MR. MARTENS:  I don't have any further

6  questions.

7           THE WITNESS:  -- in December.

8           MR. GANT:  Just a couple of quick

9  follow-ups on this.

10          THE WITNESS:  Sure.

11                   REEXAMINATION

12          BY MR. GANT:

13     Q.    The paragraph that Mr. Martens was just

14 directing you to, I think there were five elements.

15 You characterized Dr. McRaney as, one, a man of

16 great vision; two, of courage; three, not afraid to

17 tackle hard issues; four, a man of truth; five,

18 living the Great Commission.

19          I'm just trying to establish a baseline.

20 So, do you agree there are five --

21     A.    Yes.

Veritext Legal Solutions
866 299-5127

1      Q.    -- statements there by you about

2  Dr. McRaney?

3      A.    Yes.

4      Q.    Okay.  And as Mr. Martens asked you, you

5  made those statements in December 2014, correct?

6      A.    Yes.

7      Q.    Sitting here today, do you take back any

8  of those?

9      A.    No.

10      Q.    Did any of the questions that Mr. Martens

11  has just asked you, were the answers that you gave

12  to them lead you to conclude that any of your

13  answers to my questions were in any way inaccurate

14  or incomplete?

15      A.    Well, we were wrong about the date.

16  That's pretty clear.

17      Q.    I -- I didn't ask you about the date, and

18  Mr. Martens has made a good point which, by the

19  way, I had not noticed.  I was not trying to trick

20  you.

21      A.    I know, but you --

Veritext Legal Solutions
866 299-5127

1          Q.   So, I -- I actually agree that does

2     appear to be the wrong -- the wrong date.  So,

3     kudos to Mr. Martens for catching that.

4               So, other than that, and I don't think

5     you testified about the date.  So, I don't think

6     that would be -- but putting that aside --

7          A.   No, I didn't, but you made a point that

8     it was the day after --

9          Q.   Yes, you're -- yes, that's --

10         A.    -- the firing.

11         Q.    -- fair enough.  Okay.  So, let's put

12    that question and answer about that document, which

13    I think was Exhibit 31, to the side.

14              Other than the revelation about that

15    missed date, did any of the questions that

16    Mr. Martens just asked you during cross-examination

17    or your answers to them lead you to conclude that

18    your answers to my questions were in any way

19    inaccurate or incomplete?

20         A.   I'd have to hear the questions again.

21         Q.   Okay.  You're not sure?

Veritext Legal Solutions
866 299-5127

1          A.    I'd have to hear the questions again.

2          Q.    All right.

3          A.    I doubt it, but I'd have to hear the

4     questions again.  We've been here since 10:30, so

5     I -- I don't want to speculate --

6          Q.    We'll be here until 10:30 at night if you

7     actually hear the questions again, so that's not a

8     good idea.

9                So, let me ask it this way:  Sitting here

10    now, other than the date in Exhibit 31, can you

11    think of any answers to my questions that you gave

12    that you now believe were inaccurate or incomplete?

13         A.    That's a long time and a lot of

14    questions.

15         Q.    I'm just asking if sitting here you have

16    an awareness or a belief that any of them are

17    wrong?  Anything you want to recant, change?

18    That's what I'm giving you an opportunity to do.  I

19    understand you probably don't -- you do not

20    remember all of the questions and the answers.  I

21    want to know what's in your head now.

1      A.    When I answered your questions, I spoke

2    the truth, so I stand by that.

3      Q.    All right.  And, again --

4      A.    My answers were the truth.

5            MR. GANT:  And I thank you for your time,

6    and if Mr. Martens has nothing further, I don't

7    either, and --

8            MR. MARTENS:  Thank you for coming in.

9            THE WITNESS:  Thank you.

10           MR. VITTOR:  Thanks, Dr. Warren.

11           THE VIDEOGRAPHER:  This marks the end of

12   the deposition.  We're going off the record.  The

13   time is 6:44 p.m.

14           (Whereupon, the deposition of William

15   Warren, Ph.D. was concluded at 6:44 p.m., and the

16   reading and signing of the transcript was not

17   waived.)

18

19

20

21

Veritext Legal Solutions
866 299-5127

```
1                    McRaney v. NAMB

2                 WILLIAM WARREN, Ph.D.

3            ACKNOWLEDGMENT OF DEPONENT

4          I, WILLIAM WARREN, Ph.D., do hereby

5     certify that I have read the foregoing pages and

6     that the same is a correct transcription of the

7     answers given by me to the questions therein

8     propounded, except for the corrections or changes

9     in form or substance, if any, noted in the attached

10    errata sheet.

11          _____          _____

12           DATE                SIGNATURE

13

14          Subscribed and sworn to before me this

15          ___ day of _____, 2023.

16

17          My Commission Expires: April 29, 2024

18          _____

19             Notary Public

20

21
```

Page 390

```
 1   State of Maryland

 2   County of Baltimore, to wit:

 3           I, Michele D. Lambie, a Notary Public of

 4   the State of Maryland, County of Baltimore, do

 5   hereby certify that the within-named witness

 6   personally appeared before me at the time and place

 7   herein set out, and after having been duly sworn by

 8   me, according to law, was examined by counsel.

 9           I further certify that the examination

10   was recorded stenographically by me and this

11   transcript is a true record of the proceedings.

12           I further certify that I am not of

13   counsel to any of the parties, nor related to any

14   of the parties, nor in any way interested in the

15   outcome of this action.

16           As witness my hand and notarial seal this

17   9th day of May 2023.

18

19

20

21           Reported By:  Michele D. Lambie, CSR-RPR
```

Page 391

1    Eric W. Gunderson, Esq.

2    egunderson@darslaw.com

3                                    May 9, 2023

4    RE: WILL MCRANEY vs. THE NORTH AMERICAN MISSION BOARD OF THE

     SOUTHERN BAPTIST CONVENTION, INC.

5    May 4, 2023, William Warren, Ph.D. (JOB NO. 5851132)

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25

                                            Page 392

1    _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2      Transcript - The witness should review the transcript and

3      make any necessary corrections on the errata pages included

4      below, noting the page and line number of the corrections.

5      The witness should then sign and date the errata and penalty

6      of perjury pages and return the completed pages to all

7      appearing counsel within the period of time determined at

8      the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10     requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 393

```
1   WILL MCRANEY vs. THE NORTH AMERICAN MISSION BOARD OF THE

    SOUTHERN BAPTIST CONVENTION, INC.

2   William Warren, Ph.D. (JOB NO. 5851132)

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____    _____

24  WITNESS                              Date

25
```

Page 394

**[& - 18]**

| & |
| --- |
| **&** 5:9 392:23 393:9 |

| 0 |
| --- |

**0001** 5:20 89:17
**0002** 5:11 42:2 42:12
**0005** 5:12 42:2 42:12
**001** 7:5 238:12 238:16
**002** 6:17 192:12,16
**0021** 237:15
**0029** 6:19 203:19 204:12
**0030** 6:20 203:19 204:12
**0085** 7:16 331:3,13
**00897** 125:13
**0095** 8:7 373:10,14
**0096** 8:8 373:11
**010664** 7:15 282:4,8
**012** 6:18 195:5
**013** 6:18 195:6
**0152** 6:6 140:16 141:4
**0153** 6:7 140:17 141:4

**031** 336:19
**0395** 6:10 150:20 151:4
**0396** 6:10 150:21 151:4
**041** 5:13 72:2
**042** 5:13 72:2
**054** 7:5 238:13 238:16
**06172** 132:4
**066** 337:6
**0664** 7:18 337:2,16
**0667** 7:19 337:3
**0682** 6:15 175:17 176:2
**0692** 6:16 175:18 176:3

| 1 |
| --- |

**1** 5:9 27:9,16 30:7 37:3 54:13,18 58:18 60:17 62:2 97:13 106:19 134:17 146:16 146:18 178:18 250:17 310:13 334:7 393:1
**10** 6:3 125:6,8 125:12 158:16 158:17 187:10
**10211** 4:6
**103** 6:2

**104** 166:6
**10:00** 253:3
**10:06** 106:2,7 106:14 114:15
**10:30** 388:4,6
**10:39** 1:16 9:3
**11** 5:3 6:5 130:7 131:3,5 131:8,15 132:3 133:12 134:17 137:16 139:1 281:13 282:11
**11:00** 253:3
**11:55** 89:7,8
**12** 6:6 30:6,11 140:16 141:3 144:11 197:15 198:3
**125** 6:3,3
**12:07** 89:9,11
**12:08** 74:6,19 343:18
**13** 6:8 144:1,3 144:5,14 145:3 145:5,8 146:13 148:19 197:16 198:4
**131** 6:5
**13th** 204:8,15
**14** 6:9 30:6,10 30:11 32:12 64:21 66:4 150:18,20 151:3

**140** 6:6
**1401** 2:6
**144** 6:8
**14th** 77:20 132:9 135:9 136:20 137:7 345:17 381:21
**15** 6:11 154:5,7 155:16,19 264:9
**150** 3:13 6:9
**154** 6:11
**157** 6:12
**15th** 384:20
**16** 6:12 157:5,7 161:11
**1600** 3:14
**165** 6:14
**16532** 391:20
**16th** 13:10 215:2 384:21
**17** 6:14 32:12 165:6,8 166:3 169:11 172:15 174:19,20 281:1 326:13 327:10,21
**175** 6:15
**17th** 384:19
**18** 6:15 110:19 111:4,18,19 116:8 119:15 120:9 175:15 175:17 176:1,5 177:20 178:19

Page 1

**[18 - 2016]**

| | | | |
|---|---|---|---|
| 210:21 211:11 | **1:01** 140:13,14 | 102:9,15 104:2 | 150:12 151:12 |
| 223:16 347:20 | **1:17** 1:8 9:10 | 104:15,16 | 151:13 152:10 |
| 348:6 | **1:57** 140:18,20 | 105:1,10,16 | 154:20 155:20 |
| **18,000** 236:19 | **1:8** 38:7 | 106:2,14 108:6 | 156:9,20 158:6 |
| **180** 316:8 | **1a** 300:19 | 113:19 114:7 | 158:13 162:10 |
| 318:15 | 301:9 309:9 | 116:13,16 | 163:19 164:3,9 |
| **1806** 7:13 | **2** | 117:7,8,15 | 164:17 166:20 |
| 279:19 280:2 | **2** 1:16 5:10 | 125:17,17 | 167:5 169:2,14 |
| **1807** 7:13 | 37:2,7,9,12 | 126:3 130:17 | 172:3 174:6 |
| 279:20 280:3 | 41:16,16 43:16 | 135:13 136:20 | 182:5 185:6,20 |
| **1838** 7:11 | 44:16 64:1,7 | 137:8 149:19 | 186:14 193:1 |
| 273:8,12 | 64:20 80:10,14 | 149:20,21 | 196:8 198:7,9 |
| 274:15 | 111:20 117:15 | 162:11 253:18 | 204:8,15 205:6 |
| **1839** 7:12 | 148:19 310:20 | 281:14 304:10 | 236:21 275:6 |
| 273:9 | 312:1 313:4 | 313:4 314:1,8 | 281:1 285:13 |
| **1875** 2:14 | 319:8 322:2 | 314:18 324:2 | 287:2,3 307:4 |
| **18th** 158:6,13 | 323:4,14 | 354:3,21 357:2 | 315:3 318:10 |
| 165:2 | 324:14,21 | 371:6 384:18 | 328:11 329:11 |
| **19** 6:17 192:10 | **20** 6:18 195:3,5 | 384:19 385:1 | 331:16 334:8 |
| 192:12,15 | 197:6,7,9,17 | 386:5 | 335:1 337:18 |
| 194:17 195:21 | 198:2,15,19 | **2014/2015** | 338:1,19 347:1 |
| 196:3,7 199:9 | 199:4 275:6 | 16:21 107:11 | 348:12,21 |
| **1910** 1:17 9:12 | **2000** 5:9 15:7 | 107:18 112:4 | 354:21 355:6 |
| **192** 6:17 | 19:13,16 27:6 | 134:11 | 357:2 359:12 |
| **195** 6:18 | 27:16,20 37:4 | **2015** 48:9 | 363:5 380:12 |
| **1953** 13:10 | **20005** 2:7 | 66:21 83:21 | 381:4 |
| **1963** 19:16 | **20006** 2:15 | 84:9 85:3,16 | **2016** 40:7 |
| **1979** 13:14 | **201** 4:14 | 86:6 88:7,12 | 68:14 73:13,15 |
| **1980s** 292:21 | **2012** 43:5,12 | 95:5 98:10,19 | 74:6,19 75:7 |
| **1984** 13:20 | 298:11 | 99:8 102:9 | 77:21 213:11 |
| **19th** 213:11 | **2013** 46:5 | 108:19 109:4 | 215:2,4 218:20 |
| 215:4 218:20 | **2014** 40:6 48:8 | 132:9 135:10 | 219:17 220:16 |
| 219:17 220:16 | 90:10 91:4 | 136:20 137:7 | 221:14 294:5 |
| 221:14 | 96:13 100:19 | 141:7 142:3 | 343:18 345:18 |
| | 101:5,11 102:2 | 145:10 146:14 | 381:21 |

**[2017 - 372]**

**2017** 237:6
366:5,18
**2018** 67:14
260:13
**2019** 209:20
**202** 2:8,16
**2020** 365:15
**2023** 1:15 9:3
390:15 391:17
392:3,5
**2024** 390:17
**2025.520** 392:9
392:12
**203** 6:19
**20th** 104:15
106:2,4,13
114:15 116:16
116:20 117:1,5
117:8,15
**21** 6:19 203:17
203:19 204:1
204:11 338:11
338:11,17
**2100** 3:6
**21044** 4:8
**212** 7:2
**213** 3:8
**22** 7:2 212:12
212:16 213:5
214:16 253:5
**222** 5:4
**225** 7:3
**23** 7:3 225:2,6
338:12,17
383:10,20

384:6
**237-2727** 2:8
**238** 7:5
**24** 7:5 238:12
239:2 246:16
252:6 259:20
336:20 338:5
340:16 344:20
358:4 374:17
381:11,19
**241** 7:6
**24th** 193:1
196:8 237:6
363:5
**25** 7:6 240:20
241:3
**250** 1:17
**25th** 165:3
198:7,9
**26** 7:9 260:7,11
**260** 7:9
**266** 7:10
**27** 5:9 7:10
266:1,4,12,15
267:10,13
268:3 271:19
272:2
**273** 7:11
**279** 7:13
**28** 7:11 273:8
273:12 274:14
374:17
**282** 7:14
**28:18-20** 21:12

**28:19-20** 38:6
**28th** 365:15
**29** 7:13 279:19
280:2 390:17
**2:5-8** 80:1
**2:56** 195:13,14
**2nd** 90:10 91:4
101:5,11 102:2
102:15 104:2
130:17 137:8
149:20,21
162:11 166:19
167:5 169:2,14
172:3 174:6
176:14 182:11
182:15 281:14
314:8,18 326:2
326:17 328:11
354:3,21 357:1

**3**

**3** 5:11 41:21
42:2,5,11,14,21
43:15 53:19
54:12 58:12
64:19,21
113:16 114:14
114:17 122:7
196:10 199:9
271:19 297:20
300:11 310:3
325:13,21
**3.37.** 222:4
**30** 7:14 180:13
230:3 282:4,7
282:9,14 358:4

393:1
**3000** 4:15
**305** 4:17
**31** 7:16 331:3,6
331:12 379:6
380:9 387:13
388:10
**32** 7:17 333:4,8
370:16
**33** 7:18 337:2,8
337:13,16
**331** 7:16
**33131** 4:16
**333** 7:17
**337** 7:18
**34** 7:20 337:5
346:7,9,10,17
**346** 7:20
**35** 8:2 362:9,12
364:16
**350** 3:5
**36** 8:3 203:14
307:19 308:14
365:7,11
**362** 8:2
**365** 8:3
**37** 5:10 8:5
69:19 70:3
71:13 101:15
177:11 329:8
370:11,15
**37-1** 260:12
**370** 8:5
**372** 8:6

**[37201 - 7638]**

**37201**  3:15
**373**  8:7
**377**  5:4
**38**  8:6 71:11,15
  190:2 372:18
  373:1
**385**  5:5
**39**  8:7 274:15
  292:20 294:17
  373:10,14
**3:03**  195:15,17
**3:20**  212:6,7
**3:28**  212:8,10
**3rd**  3:13 73:12
  338:19

**4**

**4**  1:15 5:13
  38:1 72:2,5
  73:5,9 87:11
  87:14 200:7
  271:13,15
  392:5
**40**  13:14
**41**  343:8,19
  345:5
**410**  4:9
**42**  5:11 343:10
  345:5
**43**  344:19
  345:8 346:15
  381:19
**443-5300**  3:8
**49**  266:5
**4:49**  300:3,4

**4th**  9:3 73:13
  74:6,18 125:16
  126:3 149:19
  151:12,13
  343:18

**5**

**5**  5:14 61:8
  77:4,6,9,15,19
  80:13,19
  119:16,17,18
  120:9 148:3,19
  149:13 173:10
  174:10,18
  270:3,5,14
  271:9,16 328:7
  335:10 339:7,8
  339:11 340:15
  347:20 348:1
  349:14
**500**  20:14,17
**5379**  7:2
  212:12,17
**5380**  214:15
**5382**  7:2
  212:13,17
**54**  247:4,10
  252:6 258:1
**58**  362:13
**5851132**  392:5
  394:2
**5:00**  300:5,7
**5:25**  106:6
  319:21 320:1
**5:28**  320:2,4

**5:56**  349:7,8
**5th**  104:16
  105:1,10,16
  108:6 113:19
  114:7 116:13
  117:7 125:17
  145:10 146:14
  150:11 260:13
  371:6

**6**

**6**  5:16 28:4
  80:4,6,9 230:3
  272:2 311:19
  339:9,11
  340:15
**6-24-15**  198:12
**600**  4:7
**615**  3:16
**62**  333:9
  365:12
**651-6700**  3:16
**663-6493**  2:16
**6645**  6:2
  102:21 104:9
**6648**  6:2 103:1
  104:9
**665**  7:15 282:5
  282:8
**6695**  7:3 225:2
  225:6
**67**  337:17
**6703**  225:7
  384:8
**6704**  7:4 225:3
  225:7

**6756**  8:2 362:9
  362:13
**6758**  8:2
  362:10
**6777**  144:6
**6782**  144:7
**679-5700**  4:17
**6981**  6:12
  157:7,11
**6982**  6:13
  157:8,11
**6:06**  349:9,11
**6:27**  375:4,5
**6:30**  375:6,8
**6:44**  389:13,15
**6th**  145:10
  146:14 150:12
  154:20 155:19
  156:9,20
  337:18 338:1

**7**

**7**  5:17 28:3
  87:1,3,7,7,11
  97:14 264:6
  272:11
**70**  294:9 296:2
**70s**  295:13,17
**7160**  7:17
  333:4,8
**7162**  7:17
  333:5
**72**  5:13
**75**  296:11,17
**7638**  8:6
  372:18 373:1

**[7667 - actions]**

**7667** 5:14 7:20
77:6,16 346:7
346:11
**7668** 5:15 77:6
77:16
**77** 5:14

**8**

**8** 5:20 29:3
80:14 81:5
89:15,17 90:1
94:1 95:3
96:12 97:19
100:19 102:16
104:3 116:5
188:10 329:11
347:1
**80** 5:16 297:8
**80ghd** 1:8 9:10
**80s** 297:15
**840** 145:4
**87** 5:17
**89** 5:20
**897** 126:1
**8th** 66:21 175:8
176:7,9,12,17
182:4,15 184:1
185:6,20
186:14 205:6
287:2 307:4
331:16 335:1
348:11,21
354:21 357:2
359:13 380:12
381:2,3,10

**9**

**9** 6:2 97:11
102:19,21
104:5,8,11
106:1 114:14
116:15 117:16
120:17 122:7
324:6 392:3
**90071** 3:7
**9061** 8:3 365:7
365:11
**9062** 8:4 365:8
**96** 373:15
**995-5800** 4:9
**9:12** 78:20
381:21
**9th** 141:6
332:14 391:17

**a**

**a.m.** 1:16 9:3
89:7,8
**aberdeen** 1:3
**abide** 236:8
**abided** 285:3
**able** 221:6
270:4,13
287:15 300:12
347:12 348:14
356:19 357:3
**above** 81:18
133:17 392:6
**abraham**
360:15
**absolutely** 53:4
56:4 68:8,12

75:14 82:3
97:9 98:8,11
98:13,17,20
99:1,6,9 101:2
113:2 135:4
137:2 152:11
152:13 172:5
226:7 229:15
248:7 297:6
310:1 341:12
351:21 352:11
353:3,5,7
378:20 379:4
383:4
**abundantly**
68:1
**accept** 230:19
**acceptable**
200:1
**acceptance**
183:1,1
**accepted** 228:1
241:9
**access** 239:11
**accountable**
64:2,9
**accounting**
233:8
**accuracy** 273:1
283:2,6,9
334:13 376:3
**accurate**
214:19 215:12
217:18 218:18
219:15 220:14

221:12 226:10
283:18 334:17
337:21 339:1
339:15 340:20
344:2 345:16
346:18 371:5,8
371:10,10
**accurately**
194:17 277:21
**accusation**
284:20
**accusations**
132:14 149:14
150:5 208:16
209:3,8 210:6
210:13 211:6
**accused** 201:8
**accusers**
347:13
**acknowledge**
314:10 326:15
332:17 350:19
**acknowledged**
304:21 314:6
347:7,9
**acknowledg...**
390:3
**act** 217:15
**acted** 328:21
375:13
**action** 1:7 7:8
241:1 265:4
391:15
**actions** 168:20
201:1,10,10,13

**[actions - agreed]**

264:13
**active** 294:21
**activity** 51:2
  112:21 113:8
  147:15
**acts** 38:6
**actual** 241:13
  241:15 261:1,2
  261:15 302:10
  320:16
**actually** 76:21
  217:5 253:16
  257:4 322:19
  323:1 332:15
  340:3 387:1
  388:7
**add** 36:10 71:7
  140:4 319:15
**adding** 113:17
  113:20 114:8
**address** 150:5
  153:9 240:3,6
**addressed**
  149:13 202:8
**addresses**
  240:11
**adequately**
  69:17
**adherence** 48:6
**adjourned**
  190:11
**adminis** 17:21
**administer**
  60:21

**administerial**
  146:12
**administration**
  58:21 306:18
**administrative**
  17:21 18:7
  21:16 73:18
  76:7,8,9 87:17
  92:9 145:9,11
  145:15,21
  146:13 147:4
  149:11 155:2,7
  155:15 162:8
  164:4 166:13
  170:2 175:4
  178:16 186:3
  186:20 190:18
  191:2 204:20
  302:2 304:4
  306:4,7,10
  307:2 327:13
  327:18 329:4
  329:14,17
  330:6 350:3
  362:2
**admirable**
  352:7
**admissions**
  166:16
**admonition**
  336:3
**adopted** 65:2
  65:10
**advance** 20:15
  20:21 168:4

294:12
**advanced** 21:9
**advantage**
  57:12
**adversarial**
  95:13,16,17,19
  96:2
**advisory** 30:18
**affect** 218:4
**affidavit** 5:17
  87:3 372:13
**affidavits**
  234:11,15
**affiliated** 14:9
  14:11 21:18
  26:14
**affiliations**
  9:17
**afforded**
  348:12
**afraid** 224:11
  383:13 384:12
  385:16
**afternoon**
  177:3 222:10
  222:11
**agencies** 31:17
  32:6
**agenda** 178:18
**agents** 382:18
**ages** 29:6 98:1
  98:7,16
**agnor** 4:3
  261:17 275:9
  276:8,12 277:1

278:17 279:5
**agnor's** 368:11
**ago** 176:10
  213:8 222:15
  253:6 254:20
  262:21 263:2
  269:5 288:4
  314:6 318:15
  325:6 331:13
  367:7 375:16
**agree** 22:2
  28:15,19 29:10
  30:1,3 31:1
  32:3,18 34:3
  59:4,11 96:5,6
  129:9,18
  132:10,13,17
  132:18,21
  134:10 135:19
  136:1 142:2
  159:4,21 207:1
  207:9 208:1,8
  213:21 223:13
  265:1 270:10
  270:13 285:12
  286:12 309:7
  312:21 315:8
  315:17 316:9
  385:20 387:1
**agreed** 190:14
  329:18 342:8
  342:10,12,15
  342:19 369:1
  376:6

**[agreeing - anybody]**

**agreeing**
129:18
**agreement** 7:9
19:12,15,19
42:15 43:17
53:20 54:12
58:13 59:2,5
60:17 61:7
65:10,14,20
66:5,6 90:21
94:3,7,13,18
115:10,12,20
122:15 123:8
123:10 132:11
132:11 136:9
148:4,20 149:8
164:19 201:14
217:4,8 259:8
260:3,7,13,18
261:8,15 264:7
264:15 265:5
265:18 277:2,3
277:14,15
281:7 283:5
284:1 285:4
286:17 287:5
287:18,21
288:3 297:18
298:3,21 299:4
299:15,18
302:16 309:10
309:15,18,21
310:9 312:16
315:7 373:20
374:4,10

**ahead** 55:8
62:19 69:16
71:1 110:12
184:19 207:7
231:17 254:13
254:15 290:2
301:2,4 319:12
378:1,3
**aiming** 220:10
220:18
**air** 165:11,18
**alabama** 362:3
**align** 211:8
**alive** 366:20
**allegation**
83:19 84:7
85:1 130:1
135:13 308:16
315:9 316:9
**allegations**
208:21 209:1
312:21 313:5
314:3,7,17,21
316:15 350:14
350:20
**alleged** 303:1,6
305:3 313:19
313:20
**allen** 13:16
14:4 15:18
16:8 20:8
**allenmemoria...**
240:4
**allow** 192:1
291:3

**allowance**
56:19 57:5
58:2,5,7,9
**allowed** 292:10
**amendment**
231:10,13,16
232:9,12
347:15
**america** 39:13
64:3
**american** 1:7
9:6 11:14
39:11 42:16
44:14 45:10
60:19 61:17
64:10 107:8,15
127:20 138:4
157:18 392:4
394:1
**andy** 220:4
**angeles** 3:7
**angry** 91:7,8
**annapolis** 1:16
1:17 9:12
**annual** 17:7,11
17:12,13,14
**annually** 61:11
**ans** 29:14
**answer** 23:6
29:13,14,20
66:12 69:17
76:1 84:17
91:13 103:2
109:20 110:3
111:11 146:6

175:10 194:20
198:21 199:1
207:16 208:9
222:18 227:1
231:14 233:20
255:19 259:5
268:8 269:2,18
279:13 290:2
290:20 291:5
316:16 319:16
341:2 376:8,12
387:12
**answered** 69:1
69:6 103:15
143:6 197:3
219:7 320:6
389:1
**answers** 12:9
13:3 194:11
223:14 235:6
249:16,18
256:19 376:7
386:11,13
387:17,18
388:11,20
389:4 390:7
**anticipate**
328:15
**anticipated**
254:18
**anybody** 92:19
165:20 188:15
203:15 228:11
231:3

Page 7

**[anyway - assuming]**

**anyway** 237:19
312:6 319:12
**apologize** 73:6
**appear** 85:7
97:6 230:13
387:2
**appearances**
2:1,21 4:1 9:17
**appeared**
205:19 206:7
319:11 391:6
**appearing**
11:20 206:2
226:14,16
228:6 229:14
229:16 392:18
393:7
**appears** 37:17
68:13 384:17
**applicable**
264:16
**application**
358:5 359:10
359:17
**applied** 33:3,10
359:7 360:7
**applies** 33:10
**apply** 25:17
45:13 312:16
**appreciate**
245:5 356:12
376:19
**approaches**
141:16 142:11
142:16 143:2,4

**appropriate**
152:3 269:1
350:15
**approval** 301:9
302:6
**approve** 301:21
**approved** 47:4
47:6 301:5
329:14,16
**approximately**
93:9 222:4
**april** 366:5,18
390:17
**area** 311:12
**areas** 60:20
76:18 108:3
**arising** 265:4
**armas** 265:10
265:12,14
266:16 267:13
272:12
**article** 343:16
**articulate**
23:13 352:15
**arts** 15:11
**aside** 27:12
265:8 273:5
281:10 333:1
334:19 338:3
339:3 341:13
341:18 343:7
344:16 346:2
346:21 364:16
371:20 373:8
387:6

**asked** 19:14
40:4 68:3 69:8
72:13 86:1
88:17 143:6
173:8 182:12
207:16 219:6
226:15 231:1,5
236:2 253:16
253:16 255:7
257:1,4 261:4
261:4 263:18
298:20,20
307:11,15
316:18 327:4
334:2 360:14
370:4 375:10
383:10,15
384:10,15
386:4,11
387:16
**asking** 37:15
69:11,19
124:17 147:21
175:9 200:13
224:1 256:11
267:19 269:21
279:5 285:18
290:4 350:7
364:19 366:1
388:15
**asks** 350:10
**aspect** 231:9
**assert** 249:9
279:11

**assertion** 256:1
**assertions**
267:12
**assessment**
129:10 142:2
207:10 208:2,9
**assigned** 139:9
**assist** 38:4
148:1
**assistance**
120:19 121:4,6
121:7
**assistant**
146:12 181:15
**associated** 28:7
87:20 89:1
**association**
31:10 33:4
36:16 49:5
**associations**
16:14 30:14
**assume** 43:2
46:8,12,15
47:1,2,4,17
105:12 147:2
178:6 190:1
251:4 325:15
358:1 359:8
**assumes** 71:5
315:12 316:12
317:18
**assuming** 43:9
157:19 187:10
189:21 191:14
209:12 262:3,4

Page 8

**[assuming - baptist]**

280:18 308:8
342:19
**assumption**
260:21
**assure** 283:6
**atlantic** 137:17
138:2 155:17
155:21
**attached** 5:8
153:2 341:16
390:9
**attachment**
153:8 362:19
**attack** 85:11,14
161:7
**attacking** 85:8
**attempting**
221:8
**attendance**
146:2
**attended**
176:20
**attending**
213:10,18
264:1,3
**attention** 16:21
46:4 48:8 74:2
78:15 141:9
195:20 240:8
343:17 365:13
**attitude** 182:20
**attorney** 245:1
247:15 252:14
260:19 261:17
272:12 369:3

**attorney's**
262:1 370:6
**attributed**
340:2
**audible** 13:2
233:20 235:6
235:10
**audibly** 341:2
**august** 198:7,9
298:11
**authority** 30:16
**authorized**
276:17
**autonomous**
25:10,14 28:6
**autonomy** 24:7
24:12,16 25:6
25:17 26:10
32:4 44:19
45:12 60:11
64:15 138:6,10
138:17 140:5
**avenue** 2:6,14
3:5
**avenues** 153:9
**aware** 43:11
46:1 108:6
113:19 114:3,5
114:7 210:12
234:1,6 254:4
259:11 272:21
273:3 278:7,11
278:20 279:2
281:18 282:12
295:16 297:12

304:12 354:9
375:19
**awareness**
388:16

**b**

**b** 11:17 67:6
230:3 393:1
**bachelor** 15:11
**back** 23:12
41:16 58:12
60:1 62:20
64:19 70:18
89:10,20 97:14
107:11,18
138:21 140:19
144:16 177:17
185:8 190:9
195:16 196:3
197:19 198:10
200:21 212:9
236:20 241:13
241:14,17
242:8 261:12
266:19 274:13
291:17 292:20
298:10 300:6
320:3 323:17
349:10 375:1,7
377:16 379:7,9
380:9 386:7
**background**
15:10
**bad** 221:7
235:12 236:16
319:6

**badger** 215:18
**badgered** 214:7
**bag** 243:4,6
**ball** 227:16
**ballot** 177:10
189:5,10 307:5
307:7
**baltimore**
107:17 391:2,4
**baptist** 1:9 5:9
5:18 9:7 11:14
13:16 14:5,6,8
14:10,12 15:2
15:4,14,16,18
15:19 16:8
17:8,15 19:8
19:12,15 20:8
22:2,15,19
23:16 24:1,3,4
24:13 27:1,2,6
27:16,19 32:3
33:16 35:14
36:6,16 37:4
38:3 39:12
42:17 44:12,20
45:9,12 48:6
48:13,18 49:5
49:17 50:7
51:14 60:6,7
61:6,17 65:3,3
65:11,14,21
66:5,7,14 87:4
97:13,15 115:2
129:7 131:17
137:17 138:2,5

Veritext Legal Solutions
866 299-5127

**[baptist - bcmd]**

138:9 139:5,8
139:9,16,21
155:17,21
157:20 315:5
384:18 392:4
394:1
**baptists** 24:17
25:7 139:19
**baptized** 28:7
**based** 82:4,5,16
84:5,21 85:13
85:20 86:4,12
94:21 97:6
122:18 123:1
135:5 152:3
187:1 268:5
286:20 296:4
323:11 332:17
375:12
**baseless** 173:19
174:11,15
175:2 176:13
**baseline** 385:19
**basically** 39:13
175:6 182:17
256:16 336:7
380:6
**basis** 61:11
75:15 266:14
267:11 271:18
272:1,18 273:1
273:3 279:12
279:17 324:13
334:12

**bates** 5:11,13
5:14,20 6:2,3,5
6:6,8,9,9,11,12
6:14,15,17,18
6:19 7:2,3,5,10
7:11,13,14,16
7:17,18,20 8:2
8:3,5,6,7 42:2,7
42:12 72:2
77:6,13,15
89:17 102:21
104:7,9 125:8
125:12 131:5
131:21 132:3
140:16 141:4
144:3,6 145:3
150:20,20
151:3 154:7,10
157:7,10 165:8
166:5 175:17
176:2 192:12
192:16 195:5
197:14 198:3
203:19 204:12
212:12,17
225:2,6 238:12
266:1,5 273:8
273:12 274:14
279:19 280:2
282:4,7 331:3
331:12 333:4,8
337:2,6 346:7
346:10 362:9
362:12 365:7
365:11 370:11

370:15 372:18
373:1,10,14
384:7
**battle** 205:20
**bcm** 112:3
**bcmd** 5:10 6:6
6:7,10,10,15,16
6:19,20 7:11
7:12,13,13,16
7:18,19 8:7,8
16:2,7,18 17:2
17:13,18 18:5
18:13,20 19:11
20:3,7,11
21:13,19 22:4
22:12 25:18
26:14 28:20
30:4 31:6,10
32:5,21 33:4
33:11 34:6
35:7 37:9,13
40:3,5,8 43:8
45:11,14 46:6
47:12,16,19
48:11 49:16
50:10 51:12,20
52:8,15,21
53:7,14 54:1
55:13,19 56:18
56:19 59:6,12
59:13,18 62:14
62:15 63:5
66:20 67:8,14
73:20 79:18
82:7,8,18,19,20

83:6,8,13
84:13,14 85:2
86:1,2,6,7,14
87:19,20 89:1
90:16 92:10,14
95:1,4 101:9
101:10 102:1
112:2,6,6,18,20
113:14 118:7
118:19 120:1
121:10 122:1
128:14 129:10
130:2,13,16
134:11,13
135:6 136:21
137:9,20
138:11 140:16
140:17 141:4
145:12 150:12
150:20,21
151:4 152:9,10
153:14,14,19
153:19 155:17
155:21 159:5
159:20 160:16
163:20 164:5
164:11 169:17
172:3 175:17
175:18 176:2
178:4 184:15
202:11 203:10
203:19,19
204:12 205:4
215:18,19,19
217:9 228:15

Veritext Legal Solutions
866 299-5127

**[bcmd - beyond]**

| | | | |
|---|---|---|---|
| 229:17 230:13 | 378:12 | **behalf** 2:2,10 | 283:8 285:12 |
| 230:16 237:8 | **bcmd's** 79:8 | 3:1 4:2 134:13 | 286:5 291:10 |
| 237:15 259:9 | 83:20 88:6,11 | 154:15 168:9 | 300:13,20 |
| 262:4,6,12,13 | 99:20 100:3 | 177:1 228:3,10 | 304:3 319:3 |
| 268:13 270:19 | 122:2 230:9 | 230:8,10 | 323:16 325:16 |
| 270:21 272:14 | 275:8 276:8,13 | 241:10 303:13 | 325:18 339:20 |
| 273:8,9,12,17 | 276:21 367:9 | 303:15 | 340:1 352:17 |
| 274:2,6,15 | 367:21 | **beings** 208:11 | 352:19 363:21 |
| 275:19 277:1,9 | **bd** 196:13 | 211:13 | 382:5 388:12 |
| 279:19,20 | **bearing** 83:20 | **belief** 49:2 | **believed** 290:14 |
| 280:2 281:14 | 84:8 95:3 | 286:15 289:9 | 291:11 341:10 |
| 281:21 282:14 | 104:9 125:12 | 308:16 377:11 | 344:8 350:13 |
| 283:3 284:5,7 | 141:3 144:6 | 378:12 388:16 | 380:3 |
| 285:2 291:11 | 145:3 151:3 | **beliefs** 14:17,19 | **believer** 353:6 |
| 291:21 292:14 | 154:10 157:10 | 15:1,3 50:7 | **believers** 28:7 |
| 292:15 293:6 | 166:5 176:2 | 291:15 351:4 | 29:7 98:1 |
| 293:14,15,18 | 192:15 197:14 | **believe** 31:5 | **believes** 350:19 |
| 293:19 294:5 | 198:3 202:6 | 32:20 33:2,9 | **believing** 318:7 |
| 298:8 299:17 | 204:11 212:17 | 34:5,18 35:6 | **bell** 233:16 |
| 304:8,12 306:2 | 384:7 | 35:11 36:2,13 | 373:16 |
| 313:21 315:1 | **bears** 77:15 | 47:13 48:12 | **best** 30:14 73:1 |
| 315:16,20 | **becoming** | 73:17 97:13 | 103:8,13 |
| 316:8,16 | 298:8 | 98:9,12,18,21 | 161:17 210:9 |
| 317:14 319:11 | **began** 307:1 | 99:7 105:18,20 | 211:16 223:19 |
| 331:3,13,17 | **beginning** 30:8 | 108:13,18,21 | 224:1 287:12 |
| 332:18,19 | 104:15 111:8 | 109:3,6,14 | 374:8 |
| 337:2,3,6,16 | 205:16 225:20 | 110:5 126:6 | **betray** 321:6,10 |
| 338:19 353:15 | 257:2 318:11 | 141:16 152:8 | 321:13,15,16 |
| 354:21 358:10 | 352:3 | 158:1 167:12 | **betrayed** 79:12 |
| 359:6,18 | **begins** 122:8 | 167:14 175:3 | **better** 159:16 |
| 363:19 364:6 | 137:17 138:2 | 186:5 219:19 | 191:5 290:11 |
| 364:11 368:8 | 141:10,14 | 220:1 226:5 | 302:6,8 |
| 368:16,21 | 199:5 204:14 | 246:7 260:14 | **beyond** 41:17 |
| 369:9 373:10 | 214:17 216:10 | 263:3 265:15 | 81:19 120:21 |
| 373:11,14 | 220:4,6 332:6 | 277:21 282:18 | |

Veritext Legal Solutions
866 299-5127

**[bible - call]**

**bible** 80:11
**biblical** 44:2
  115:20 119:10
  119:13 125:2,3
  140:7 336:3
  350:9
**big** 338:7,8
**bill** 9:5 146:19
  196:10 198:12
  201:19 208:16
  214:17 216:11
  220:6 334:2
**birth** 13:9
**birthday**
  294:12
**biscyane** 4:14
**bishop** 24:14
**bit** 34:7 91:13
  177:13,17
  207:7 239:10
  241:4
**blah** 361:10,10
  361:10
**blank** 175:9
  307:7
**blind** 351:12
**blue** 354:11
**blunt** 93:15
**bm** 155:21
  215:19
**board** 1:8 9:7
  11:14 16:9,10
  16:16 17:20
  18:10 21:16
  39:11 42:16

44:14 45:10
47:6,10 60:19
61:17 64:3,10
70:4 73:19
76:6 82:6,17
84:6 87:18
91:12,16 92:14
107:9,16
127:20 138:4
154:15,17
155:14,20
156:3 157:18
175:5 176:7
188:3 190:21
204:19 205:1
228:14,16
292:17 293:1,3
293:7 330:4,7
330:9 337:17
337:21 392:4
394:1
**bodies** 30:18
**body** 16:11,15
  16:17 20:13
  29:5 97:21
  98:6,15 99:5
  99:14,19 100:8
  108:14 109:1,7
  109:15 110:6
  110:20 111:3
  111:13,17
  210:17,19
  211:5,6,7
**boies** 2:3

**boise** 9:18
**book** 251:4
**booted** 27:3
**bottom** 74:11
  75:1 78:8
  122:7
**bought** 202:20
  202:21
**boulevard** 1:17
  4:14 9:12
**breach** 94:7,8
**breached** 82:9
  135:7 162:13
  277:2 283:21
  309:12
**break** 89:4
  130:9 140:10
  148:9 177:13
  177:17 195:7
  212:3 248:5
  258:19 299:21
  330:6 349:3
  374:21
**brian** 4:19 9:13
**brief** 21:3
**briefly** 15:9
  17:17 20:10
  57:4
**bright** 352:15
**bring** 172:15
  309:1,3
**broaden**
  257:14
**brother** 111:4
  111:10,10

116:9 119:18
  335:10,12
  348:1,4,6
**brought** 243:15
  244:1,2 264:15
  265:5 343:16
**bsfllp.com.** 2:5
**budget** 322:9
**building** 191:9
  352:5
**bullet** 199:4
  200:6 276:15
  276:20 278:9
  279:6 281:5
**bullets** 220:10
  220:19 277:20
**bully** 215:18
**burden** 244:11
**butler** 3:10
  10:7
**butlersnow.c...**
  3:12
**buy** 203:1

**c**

**c** 9:1
**c.webster** 4:13
**ca** 392:9,12,20
**calendaring**
  294:9
**california** 3:7
**call** 40:21 58:6
  72:17 92:18
  106:21 122:18
  175:6 194:2
  196:19 214:13

Page 12

**[call - change]**

215:2,13 216:5
217:20 329:3
330:18 335:14
354:10 367:7
367:15
**called** 10:19
93:7,7 146:19
168:1 182:16
183:9,10,10
193:21 286:9
297:6 299:4,15
310:5 350:4
354:12 364:19
365:16 366:19
372:14
**calls** 31:14,21
35:18,19 36:9
37:16 45:16
47:21 48:15
49:11,21 50:13
56:9,20 57:7
59:8 65:8,16
66:9 71:5 83:1
83:4,16 84:2
86:9,18 88:3
95:7 101:13
110:9 115:13
116:6 118:12
127:15 142:18
143:5 146:3
153:21,21
161:14 172:8
202:14 211:2
219:6 254:9
290:16 308:18

314:12 315:11
316:11,11
317:4,17
334:15 357:15
358:1 364:10
379:14 380:16
**calm** 161:8
**camp** 161:21
169:3 182:5,6
286:6,10
**candidacy**
361:16
**cantonbaptist**
78:7,13
**capacity**
226:13 228:7
229:13
**caps** 199:13
**car** 213:13
244:1,12
**care** 297:21
**career** 221:20
**careful** 107:1
134:18 135:1
284:4,8,12,15
314:2
**carrington**
3:11 10:6,6
222:21 223:4
**carry** 120:21
122:18 123:4,8
**case** 9:9 98:9
98:12,18,21
99:7 108:19
109:3 201:2

207:7 222:14
231:2,6 232:11
232:17 233:15
234:3,10
235:19 236:3,9
238:2,5 242:20
250:5 258:10
261:19 262:13
273:16,21
274:3 278:2
304:18 344:14
364:20 366:16
368:20 370:7
372:12
**catching** 387:3
**categorical**
287:10
**categorized**
172:1
**catholic** 35:11
36:2,5,5,13
49:2,19
**cause** 126:10
128:19 130:3
**caused** 82:20
148:12 169:13
272:15
**causing** 334:3
**cc** 158:8 364:14
**ccp** 392:9,12
**ceaseless**
208:15,21
209:8
**cell** 21:3

**censorious**
171:7,9
**centre** 1:17
9:12
**certain** 20:18
112:6 117:10
156:14 199:1
204:19 273:20
**certainly** 11:9
39:2 52:3
64:17 69:4
73:18 77:10
113:10 147:17
162:9 164:7
175:5 195:8
296:6 326:8
**certify** 390:5
391:5,9,12
**cfo** 181:13
183:14
**chain** 339:12
**chairman**
17:21 76:6
92:8 190:17
**chance** 12:16
23:3 70:8 73:1
377:14
**change** 126:6
146:5 203:6
287:17 299:17
303:17 321:21
388:17 394:4,7
394:10,13,16
394:19

**[changed - clear]**

changed
  182:20 287:3
  321:3
changes  79:13
  327:4 390:8
chapter  250:17
character  82:2
  109:20 110:7
  148:14 211:8
characterizati...
  334:13
characterize
  174:7
characterized
  385:15
charge  102:6
  161:10 181:10
  313:1
charged  39:12
charges  173:19
  174:11,14,17
  175:1 314:8
charles  233:12
  233:14,18
check  357:11
childs  220:4
chilly  165:12
  165:14
choose  199:1
  380:7
chose  198:21
christ  21:12
  22:9 28:6,9
  29:5 30:8,12
  40:1 54:10

55:11 80:20
81:4,13 82:2
97:21 98:6,15
99:5,14,19
100:9 108:14
109:1,7,15
110:6,7,15,20
111:1,3,14,17
118:14 210:18
210:19 211:5,7
211:7,8 353:12
379:1,2
christ's  110:18
111:18 353:4
christensen
  90:5
christer  101:6
christian  52:4,5
  111:12
christians
  140:8
christmastime
  304:16
christopherson
  90:5 101:6
  303:12 305:13
  305:15 312:5
  324:11
chronologica...
  125:21
chuckle  193:8
chuckled
  192:18
church  13:16
  14:4,5,6,8

15:18 16:8
19:8 20:8
21:18 22:14,16
24:13 26:13
27:1 28:4,5
29:5 32:15
35:14,15 36:5
36:6,7 38:11
52:9,9,12,17
53:16 54:15
55:16 56:1
57:8 61:1,19
63:18 97:16,21
99:4 102:6
107:10 113:6,8
113:12,14
114:17,20
115:1 120:1
128:3,11 143:4
149:7 176:18
181:11,12
205:18 206:3,7
206:18,19
208:10 231:21
232:1 288:16
294:15 304:15
312:2,7 322:8
322:8 338:18
369:3
churches  16:14
17:10 20:14,17
22:10 30:17
33:3,4 34:14
35:12,14 36:3
36:14 39:13,15

49:2 87:20
89:2 108:2
158:21 166:16
312:2 332:2,18
352:8
churning
  200:19
circle  4:6
circuit  264:16
circumstance
  290:15
circumstances
  303:1,5,20
  335:8
city  107:15
civil  1:7 7:8
  241:1 347:11
  392:19,20
claims  132:14
  134:19 284:5,9
clarence  4:12
  10:4
clarification
  78:6
clarifications
  233:2
clarify  34:8
  40:20 103:19
  228:17 254:14
clean  21:8
  251:15
clear  69:4
  70:16 122:15
  161:3,4 201:14
  201:18 264:21

**[clear - compound]**

290:5 291:18
312:5 328:6
341:7 355:15
360:2 386:16
**clearly** 340:13
**client** 245:1
**clint** 193:4,5,10
194:19 196:7
196:10,19
197:12 198:7
198:13,21
200:13 339:16
341:4,5,7
371:21 372:2
**close** 20:14
**code** 233:5
392:9,12,19,20
**coffee** 165:10
165:21
**cold** 223:10
**collected**
244:12 252:4
**collecting**
238:21
**collective**
117:19 118:3,6
**collectively**
118:19
**columbia** 4:8
160:18,19
**combine** 30:18
**come** 19:7
20:14 135:19
136:10 182:19
216:21 223:7

258:6 263:17
324:15 352:5
**comes** 35:13,15
36:4,6,15,17
49:4,6
**coming** 11:8
173:21 389:8
**command** 38:6
38:21 53:9
**commands**
38:13
**commencing**
1:16
**comment** 160:2
**comments**
109:19
**commission**
21:11 22:9
40:1 123:21
134:8,13
139:19 140:1
143:20 147:21
159:17 179:21
224:15 383:14
384:14 385:18
390:17
**commit** 158:17
**commitment**
59:20
**committed**
122:11 159:5
159:12 160:1
352:19 353:2
353:12

**committee** 18:1
18:8,9 21:16
73:18 76:7,8
76:10 87:17
92:9 145:9,11
145:15 146:1
146:13 147:4
149:10,11,15
155:2,8,15
162:9 164:4
166:13 170:2
175:4 178:16
186:3,20
190:18 191:2
204:20 302:2
304:4 306:5,7
306:10,16,18
307:3 327:13
327:18 329:4
329:15,17
330:7 350:3
362:2,3
**common**
171:12 317:20
**communicate**
194:14
**communicated**
257:15 276:17
283:12 303:12
306:20 329:3
354:2 356:12
356:21 362:5
**communicating**
70:17 375:20

**communication**
58:20 59:12
96:1 320:14
322:15 349:17
356:21 357:5
366:16
**communicati...**
105:13 262:13
303:9,11
354:20 357:8
**comparable**
347:18
**compensated**
20:2
**complained**
312:10
**complaint**
351:1,3,15
**complete**
223:14 325:17
376:7
**completed**
293:17 392:7
392:17 393:6
**completion**
393:10
**complex**
167:21
**compliance**
99:12
**complied** 97:8
**complimented**
161:8
**compound**
14:13 18:14

Veritext Legal Solutions
866 299-5127

**[compound - considering]**

19:17 25:19
26:15 27:21
28:16 31:2,20
32:8 33:5
35:17 45:15
48:15 50:13
51:15 52:18
53:11 54:5
59:7 63:8
65:17 72:12,13
75:8,17 82:11
82:21 83:15
84:1 86:9,18
88:2 95:6
96:14 100:2,12
102:12 108:10
110:8 112:7
116:6 119:1
120:3 122:3
123:5 137:10
138:12 139:17
142:4 145:18
164:13,21
172:7 178:12
202:13 210:8
215:8,20 219:6
266:17,20
267:3,14 268:6
378:15
**comprise** 332:1
**computer**
105:3 236:20
239:6,9,13,14
239:18,20,21
242:18 339:19

344:5
**concern** 76:18
95:8 300:19
303:16 328:7,8
382:6,10,10,12
382:14
**concerned**
170:20
**concerning**
88:17 97:16
100:9 157:19
163:19 176:8
210:19 289:7
302:14 320:16
322:12
**concerns** 77:1
90:13,15,19
129:6 132:21
135:2 136:2,4
136:5,7,12
164:18 166:18
169:8,9,15,21
170:12,14
171:2 175:10
176:14 180:11
182:1 184:8,9
202:7 302:4
307:1 350:6
351:12 371:17
**conclude**
386:12 387:17
**concluded**
285:8 389:15
**conclusion**
31:21 35:19

56:21 57:7
83:4 132:21
136:11 154:1
217:6 318:8
**conduct** 207:10
211:20 378:7
**conducted**
284:8
**conducting**
240:16
**conference**
92:18 167:12
214:13 215:1
215:13 217:20
**confident** 135:5
146:6 149:10
281:9 283:17
283:21 284:3,7
284:14,18
285:1 298:9
**confidential**
176:6
**confirm** 230:5
257:4
**conflict** 122:12
370:2
**confront** 174:8
347:13
**confrontation**
347:15
**confrontational**
174:8
**confronted**
107:3 173:18

**confronting**
174:3 208:2
**confuse** 27:12
**congregation**
28:7 38:9
**congregations**
38:5,20 53:9
99:2
**conjunction**
18:1
**connection**
233:4,8 262:1
264:14 275:15
322:19 323:3
349:14
**conscience**
189:14
**consider** 40:17
40:19 41:5
68:6,10 75:12
81:18 82:1
98:5,14 99:4
99:18 100:6
232:6 275:21
291:8 351:18
352:1 353:13
371:21 372:2,5
372:8 373:18
**consideration**
88:1 89:3
217:15
**considered**
75:10 87:16
**considering**
137:9,11

Page 16

**[consistent - cooperative]**

| | | | |
|---|---|---|---|
| **consistent** | **continue** 200:1 | 65:3 87:4 | **conversions** |
| 64:14 65:1 | 219:12 220:3 | 102:7 115:2 | 54:4,8 |
| 66:5 | 221:4 | 129:7 131:17 | **convey** 367:19 |
| **constituent** | **continued** 2:21 | 131:17 152:18 | **conveying** |
| 267:9 317:15 | 4:1 6:1 7:1 8:1 | 154:17 155:14 | 51:14 |
| **constituents** | **continues** | 156:3 157:20 | **convinced** |
| 129:7 | 199:17 208:15 | 157:21 170:16 | 281:6 382:3 |
| **constitution** | **continuing** | 170:19 184:13 | **cooler** 165:18 |
| 231:11,16 | 58:19 104:15 | 196:14 199:8 | **cooperate** |
| **consultation** | 138:3 | 210:20 229:12 | 25:11 26:4 |
| 301:13 327:17 | **contribute** 22:3 | 301:10,13 | 123:18,20 |
| 369:2 | **contribution** | 306:16 322:10 | 369:8,18 |
| **consulted** | 312:1 | 331:1 392:4 | **cooperated** |
| 252:13,13 | **contrition** | 394:1 | 217:2 |
| 260:19 | 351:10 | **convention's** | **cooperating** |
| **cont** 3:1 | **control** 149:6 | 15:3 62:7 | 17:10 19:8 |
| **contact** 195:9 | **controversy** | 63:17 | 119:21 323:15 |
| 392:9 | 171:1 324:19 | **conventions** | **cooperation** |
| **contacted** | **convention** | 30:14 | 22:20 23:16 |
| 193:13 | 1:10 5:18 9:7 | **conversation** | 26:7 30:7,12 |
| **contain** 241:13 | 11:15 14:10,12 | 93:13 104:1,4 | 30:15 32:4 |
| **contained** | 15:19 16:12,12 | 105:18 162:17 | 58:16,20 59:11 |
| 313:5 | 16:19 17:8,15 | 163:4 183:11 | 99:20 100:4,4 |
| **contemporan...** | 19:2,5 25:13 | 198:12 199:20 | 100:9 141:18 |
| 20:7 | 26:4,7 27:3 | 201:3 206:18 | 201:17 318:18 |
| **contend** 309:12 | 31:10,15,18 | 262:15,17 | 318:21 319:1 |
| **contending** | 32:5 33:10,16 | 272:20 278:1 | 319:13 |
| 162:12 302:12 | 35:16 36:7,18 | 311:10 330:16 | **cooperative** |
| 310:11 316:7 | 38:3 39:12 | 341:15 367:4 | 20:13 22:5,12 |
| **contention** | 42:17 44:13 | **conversations** | 24:18 25:8 |
| 310:15 | 45:9 46:13 | 75:18,19,20 | 59:19 99:21 |
| **contents** | 47:7,9 49:6 | 76:3 105:13 | 100:10 132:11 |
| 325:20 | 50:15,20 51:8 | 130:5 163:18 | 148:3,20 277:2 |
| **context** 51:4 | 60:19 61:4,6 | 170:1,2,3,6,9 | 277:14,14 |
| 233:13 357:14 | 61:18 64:2,9 | 170:10 194:18 | 281:7 301:16 |

Page 17

**[cooperative - covenant]**

| | | | |
|---|---|---|---|
| 319:7 320:12 | 162:13,18,21 | 356:14 357:9 | 258:3,11 275:8 |
| 321:7,11,17 | 196:8 197:16 | 357:15,17 | 276:1,8,13,21 |
| 368:1 | 198:4,5,9 | 358:13 359:8 | 315:16 333:18 |
| **coordinated** | 199:10 204:15 | 368:16 371:14 | 369:21 391:8 |
| 62:7 | 204:16 220:7 | 371:18 381:6 | 391:13 392:18 |
| **copied** 90:7 | 224:8,11,16 | 386:5 390:6 | 392:21 393:7 |
| **copies** 246:12 | 226:21 228:8 | **correcting** | **count** 187:1 |
| 255:11 339:15 | 232:14,17,19 | 278:8 | 205:10 |
| **copy** 5:10 27:5 | 232:21 238:7 | **correction** | **counted** 190:4 |
| 37:4,9,12,14 | 247:17 249:9 | 337:13 | 190:7 |
| 90:9 204:5 | 252:19 253:19 | **corrections** | **county** 264:16 |
| 244:4 253:17 | 259:16 265:6,7 | 390:8 392:14 | 391:2,4 |
| 253:18 254:17 | 269:9 271:11 | 392:15 393:3,4 | **couple** 226:13 |
| 273:15 274:4 | 275:9,16 276:9 | **correctly** 28:13 | 234:11 254:20 |
| 288:9,10 | 276:13,14,14 | 29:8 30:20 | 291:18 293:9 |
| 325:17 326:3 | 276:18,19 | 34:1 38:7 | 293:11 296:7 |
| 326:16 337:21 | 277:4 278:2 | 43:19 57:20 | 367:7 385:8 |
| 338:17 339:1 | 284:1,5,9,20 | 59:2 61:2,12 | **courage** 224:7 |
| 344:2 345:16 | 285:4 295:13 | 62:9 64:5,12 | 383:13 384:12 |
| 346:18 358:11 | 295:14 298:8 | 65:4 74:14 | 385:16 |
| 371:5 | 298:11 299:5 | 75:4 81:8 | **course** 126:7 |
| **copying** 276:8 | 304:18 307:20 | 107:5 122:20 | **court** 1:1 9:8 |
| 278:1 | 308:5,17 | 126:14 127:1 | 9:14 12:10 |
| **corner** 160:6 | 310:12 312:19 | 138:7 139:11 | 13:4 115:21 |
| 286:9 | 313:6 314:4,19 | 141:21 380:4 | 116:3 250:18 |
| **corporate** | 316:6 325:21 | **corresponden...** | 260:13 264:16 |
| 188:11,13 | 326:20 327:5,6 | 201:4 | 274:3 321:8 |
| 230:13,15,15 | 332:13,20 | **counsel** 9:16 | 360:16,19 |
| **correct** 12:13 | 334:8 335:12 | 12:12 227:21 | **courts** 264:17 |
| 13:21 17:15 | 339:12 340:16 | 238:18 240:17 | **covenant** 28:8 |
| 62:15 66:11 | 341:11,20 | 241:9 244:10 | 114:18,20,21 |
| 103:2 116:18 | 345:14 346:15 | 252:19 254:2,5 | 115:4,8,12,19 |
| 126:3 129:13 | 346:19 349:1,2 | 254:10,17 | 115:21 116:3 |
| 133:13 135:14 | 350:20 352:10 | 255:5,17 256:5 | 298:20 299:8 |
| 137:1,3,3 | 355:1,4,8 | 256:19 257:16 | 299:10,18 |

Page 18

**[cover - decide]**

**cover** 315:20
316:1,15 363:2
**covered** 41:18
271:15,16
**crawford**
112:12 113:4
113:13 119:3
151:10 181:7
181:11 183:19
183:20 281:8
300:21 301:20
303:18 304:4
320:9
**create** 123:17
**created** 289:6
**credit** 161:7
**criteria** 18:13
18:19 19:4
26:13 47:18
**critical** 171:10
288:13 377:20
**criticism**
290:12
**criticizing**
70:13 256:9
**croft** 181:13
**cross** 81:7
387:16
**crucifixion**
81:21
**csr** 1:20 391:21
**curiosity** 365:5
**current** 148:3
148:20

**currently** 13:15
**cut** 288:19
360:3
**cutting** 180:17
**cv** 1:8 9:10

**d**

**d** 1:18,20 9:1
62:4 63:7
107:14 364:14
391:3,21
**d.c.** 2:7,15
**damage** 315:14
315:17 317:11
**damages**
141:20
**danny** 265:10
265:11
**darkness**
117:20 118:4
118:10,20
**darslaw.com**
392:2
**darslaw.com.**
4:5
**das** 1:8 9:10
**date** 13:9 46:7
46:8 150:3
165:1 198:17
330:20 380:12
380:14 381:6,9
386:15,17
387:2,5,15
388:10 390:12
392:16 393:5
394:24

**dated** 106:2
166:19 198:9
331:16 334:7
338:19 363:5
365:15 371:6
381:3,21
**dates** 339:17
**dating** 236:20
**david** 43:6
102:4,14 104:1
265:14 267:12
368:13
**davis** 4:3
157:17 158:1
333:17 334:1,7
334:13
**day** 67:17
116:17,19
155:19 161:6
167:15 177:5
180:10 186:20
191:18 193:13
193:15,16,18
202:21 203:14
207:19 239:17
387:8 390:15
391:17
**days** 213:8
253:6 254:20
326:19
**de** 196:13,13
199:7 265:10
265:12,14
266:16 267:12
272:11

**deal** 119:10
155:6,10 252:4
**dealing** 107:16
111:2
**deals** 18:10
**dealt** 179:20
242:12
**death** 81:7,7
**december**
90:10 91:4
93:11 96:13
100:19 101:5
101:11 102:2
102:15 104:2
104:16 105:1
105:10,16
108:6 113:19
114:6 116:12
117:7,14
125:16,17
126:3 130:17
135:13 136:20
137:6,8 149:19
149:20,21
162:11 201:12
253:18 281:14
304:10 313:4
314:1,7,18
341:8 354:3,20
357:1 360:9
361:20 371:6
384:17,18
385:1,7 386:5
**decide** 70:21
312:18

Veritext Legal Solutions
866 299-5127

**[decided - detrimental]**

| | | | |
|---|---|---|---|
| **decided** 249:17 | 270:17 271:3 | 80:5 87:2 | 252:14 |
| 329:3 | 271:11 | 89:16 102:20 | **describe** 17:17 |
| **decision** 67:18 | **delaware** 15:20 | 125:7 131:4 | 20:10 194:5 |
| 67:21 68:5,6 | 17:8 19:9 | 140:15 144:2 | 251:21 261:10 |
| 68:10 70:4 | 20:20 22:15,16 | 148:15 150:19 | 299:7,7 |
| 79:8 83:20 | 27:1 38:3 | 154:6 157:6 | **described** |
| 84:8 85:3,15 | 42:17 44:13 | 165:7 175:16 | 99:10 224:6,10 |
| 88:6,11 89:2 | 45:9 61:6,18 | 192:11 195:4 | 232:8 238:18 |
| 95:3 177:16 | 102:8 115:2 | 203:18 212:11 | 255:13 |
| 179:12,14 | 118:21 129:8 | 225:1 230:12 | **describes** |
| 289:2 329:12 | 131:18 157:21 | 234:12 238:11 | 276:11 |
| 349:18 361:16 | 158:21 193:6 | 240:19 245:21 | **describing** |
| 368:15 382:15 | **delaware's** | 246:5 248:13 | 336:19 |
| 383:2,4 | 5:18 87:4 | 251:13 252:1 | **description** |
| **decisions** 87:16 | **delay** 334:4 | 254:18 256:6 | 52:3 335:1 |
| 88:17 | **delete** 237:21 | 256:12 257:2 | **designated** |
| **declaration** | **deleting** 236:17 | 257:19,21 | 230:15 231:1,3 |
| 233:15,18 | **demean** 126:11 | 258:5 259:8 | **designed** 30:18 |
| 344:13 372:12 | **denomination** | 260:6 262:2 | **designee** 62:8 |
| 372:14 | 33:20 | 265:21 273:7 | 230:13 |
| **deeds** 139:14 | **dep** 309:1 | 275:16 279:18 | **desire** 194:13 |
| 140:7 | 323:7 | 282:3 288:1,6 | 367:11 |
| **deep** 122:16 | **depend** 121:17 | 288:12,21 | **despite** 202:19 |
| **deeply** 208:12 | **dependency** | 304:18 331:2 | 217:3 |
| 211:11 | 120:20 121:12 | 333:3 337:1 | **details** 59:1 |
| **defendant** 1:11 | **depends** 122:10 | 343:13 346:6 | 119:5 284:16 |
| 2:10 3:1 9:21 | **deponent** 10:19 | 358:16 362:8 | 301:1 |
| 10:20 | 390:3 | 365:6 370:10 | **determine** |
| **defends** 208:13 | **deposed** 262:18 | 372:17 373:6,9 | 308:21 |
| **define** 60:18 | 263:4,6 367:10 | 384:4 389:12 | **determined** |
| 273:18 | 367:12 | 389:14 392:19 | 314:3 392:18 |
| **defined** 377:10 | **deposition** 1:14 | 392:22,24 | 392:22 393:7 |
| **defines** 380:1 | 9:5,11 12:2 | 393:8,10 | **detrimental** |
| **definition** | 27:15 37:8 | **depositions** | 184:13,14 |
| 268:12,17,21 | 42:1 72:1 77:5 | 234:10 249:11 | |

[develop - dispute]

**develop** 60:20
**developing**
  55:15
**development**
  55:21
**devotion**
  178:19 179:1,4
**devotional**
  146:20 147:5
  151:17,20
  179:8
**devotionals**
  152:10
**dictate** 317:21
**dictated** 45:4
  121:18
**difference**
  135:16 191:20
  202:5 286:10
  311:21
**differences**
  353:16
**different** 132:1
  144:9 194:9
  225:15 248:2
  248:10 290:11
  298:21 302:9
  320:21 339:6
  377:18 382:17
  382:17,18
**differently**
  268:1 336:9
**difficult** 68:5
  171:16 235:14

**difficulties**
  159:15,19
**diocese** 35:14
  36:5,16 49:4
**direct** 30:19
  74:2 78:15
  97:14 141:9
  195:20 267:16
  303:8,9 307:18
  310:15 330:11
  331:8 333:11
  339:6 365:13
**directing** 16:21
  46:4 48:8
  112:16,17,20
  385:14
**direction** 52:17
  103:10 170:16
  170:19 182:2
**directly** 191:17
  354:2
**director** 18:2,4
  18:5 21:14
  40:14 43:5
  46:6 47:12,16
  47:19 48:11
  49:16 50:10
  51:7 56:7,18
  62:8 66:20
  67:8,14 70:5
  79:18 82:8
  86:1,6,14
  90:16 101:10
  102:1 107:10
  134:4,20 135:6

150:13 152:9
162:5 166:16
169:16 177:6
181:15 192:6
202:11 203:10
205:3 282:15
293:3 306:19
358:8 359:7,18
378:11
**director's** 43:3
  51:10,13,20
  52:8,16 53:1,7
  53:15 54:2
  55:14,20
**directors** 177:9
**disagree**
  122:17 255:21
  270:10,13
**disagreement**
  97:7 99:10
  123:4,7 163:20
  164:5,11
  351:16
**disappointed**
  185:12,16
**disappointment**
  166:13
**discern** 325:19
**disciples** 38:15
**discrete** 362:14
**discuss** 96:15
  116:9 206:19
  263:1 329:4
**discussed** 133:2
  133:3,3,4

206:7 262:5
283:13 307:1,2
318:9
**discussing** 98:3
  133:6 302:7
  326:6
**discussion** 82:5
  136:14,16,17
  149:2 156:15
  187:4,8 188:5
  298:18
**discussions**
  70:2 71:14
  82:16 84:5
  85:13,20 86:4
  86:12 94:21
  97:6 162:15
  164:3,9 190:10
  364:11
**dismayed**
  312:4
**dismiss** 175:1
  176:13
**dismissed**
  173:18
**dismissing**
  174:11,14
**disparaging**
  82:19
**dispose** 237:21
**dispute** 36:7
  99:13,16,18
  100:6,8 112:2
  112:5 113:20
  114:7 210:19

**[dispute - doing]**

368:9
**disputes** 35:13
35:15 36:4,15
36:17 49:4,6
110:19 111:2
120:1
**disputing**
266:14 267:11
271:19 272:1
272:19 334:12
**disregard** 94:3
106:20
**disregarded**
135:14
**disregarding**
111:21
**disrespect**
311:2,11
**dissatisfied**
199:19
**dissemble**
328:17,19
**distinct** 105:6
**distinctive**
22:19 23:16
24:2,5
**distinctly**
193:20 350:6
**distinguish**
267:8
**district** 1:1,2
9:8,9
**disturbed**
319:13

**divinity** 15:13
**division** 1:3
**doctrinal** 14:19
15:1,3 18:13
18:18 26:13
47:18 59:19
353:16
**document** 5:20
6:11,17 7:16
7:18,20 8:6
60:13 65:1
66:10,13 78:2
79:4 87:13
89:17 104:8,18
114:2,13,14
120:14 125:12
141:3 144:6,10
144:18,21
145:3 151:3,14
153:2,8 154:7
154:10,11
155:5 157:10
157:11,13
159:8 161:11
161:16 166:5,6
166:8,19 167:4
168:18 172:15
172:20 176:2
192:12,15,18
195:1 197:14
198:3 204:11
208:5 212:16
212:19 213:2
216:4 217:12
218:13 238:18

239:13 241:21
242:14,15
250:2,13
253:12 254:6
258:14 260:11
266:9 268:11
274:19,21
280:6 283:2
286:4 299:3
300:17 310:18
311:18 318:19
318:21 323:8
323:17,21
324:10 327:9
331:3 332:15
336:15 337:2
338:6,15
339:12 345:1
346:7 359:20
371:1 372:18
375:12,17
380:18 383:17
387:12
**documentation**
76:19 93:10
105:17 130:19
**documents**
5:11,13,14 6:2
6:3,5,6,8,9,12
6:14,15,18,19
7:2,3,5,6,10,11
7:13,14,17 8:2
8:3,5,7 42:2
72:2 77:6
102:21 125:8

131:5 132:2
140:16 144:3
150:20 157:7
165:8 175:17
189:2 195:5
203:19 212:12
225:2 234:20
235:1,18 236:3
237:7 238:1,5
238:12,17
239:1,8,18
240:17,20
241:7 242:6,9
242:12,17
243:11 246:21
247:16 253:13
254:3 255:10
255:16 256:2,4
258:2,2,4,7,11
259:14 260:1
266:1 273:8,17
274:2,5 278:14
279:19 282:4
285:20 288:15
288:17 322:7
333:4,18
338:12 355:8
356:3 357:11
362:9 365:7
370:11 373:10
381:12
**doing** 37:2 51:9
57:12 70:11
185:14 221:19
261:2 316:8

Veritext Legal Solutions
866 299-5127

[dollars - dubois]

| | | | |
|---|---|---|---|
| **dollars** 50:21 | **dr** 4:20 10:2,5,9 | 168:4,11 | 322:12 323:2 |
| 121:17 | 10:11 11:6 | 169:16 170:13 | 323:13 326:3 |
| **doms** 330:11 | 46:5 47:15 | 172:2 176:8 | 326:15 327:20 |
| **don'ts** 252:14 | 49:1 50:9 56:6 | 180:3,12,20 | 328:10,21 |
| **donna** 146:8,11 | 56:17 66:19 | 181:18 185:7 | 330:15 332:12 |
| **dooley** 5:17 | 67:7,13 69:9 | 185:20 186:9 | 332:19 334:21 |
| 76:6 87:3 92:5 | 70:4 82:7,19 | 222:10,13 | 340:15 347:3 |
| 92:12 131:18 | 82:20 83:9,14 | 224:7,10,14 | 348:11,19 |
| 151:9 154:15 | 83:19 84:7,14 | 226:3 234:2 | 349:19 350:13 |
| 156:12,15 | 85:2,8,14,16,21 | 238:2 243:3 | 350:16,19 |
| 158:3 167:13 | 86:5,13,15 | 244:9 254:3 | 351:2,18 352:1 |
| 168:14 178:21 | 88:7,12 89:14 | 255:11,17 | 352:10 353:13 |
| 204:4 234:17 | 89:21 90:15 | 259:9,15 260:3 | 353:15 355:1 |
| 234:18 235:3 | 93:20 94:2 | 262:14 263:18 | 355:19 357:1,8 |
| 260:20 262:16 | 95:2,4 96:11 | 265:17 272:12 | 359:6,18 362:5 |
| 262:17 263:1 | 96:13,18 97:5 | 272:13,16 | 363:16,18,19 |
| 327:14 329:2 | 97:5,8 98:5,14 | 276:5,16,21 | 364:1,6,9,10 |
| 329:12 330:16 | 99:12 100:7,7 | 277:1 278:8 | 371:6 373:19 |
| 331:17 332:5 | 100:9,19,21 | 280:21 281:5 | 376:2 383:3,12 |
| 332:18 338:18 | 101:5,7,9,21 | 283:21 284:9 | 384:11 385:15 |
| 374:12 | 102:2 105:21 | 284:20 285:2,8 | 386:2 389:10 |
| **door** 182:19 | 108:7 114:8 | 286:6,15,16 | **draft** 260:2 |
| 319:19 | 116:13 121:11 | 287:4,17 289:9 | 376:2 |
| **dos** 252:14 | 123:3,3 127:12 | 289:17 290:10 | **drafted** 265:18 |
| **doubt** 41:11 | 128:18 129:3,9 | 290:15 291:8 | 298:2 327:9 |
| 158:10,15 | 132:10 134:10 | 291:10 300:13 | **drafting** 261:15 |
| 275:3 280:20 | 135:14 136:5,6 | 302:12 303:2,6 | **drawn** 18:9 |
| 281:2,4 337:20 | 136:11,21 | 305:4 306:3,14 | 37:17,18 |
| 338:2,21 | 137:8,9,12 | 307:5,20 | **driven** 43:17 |
| 339:14 357:21 | 141:2 142:3,16 | 308:15 309:12 | **drs** 99:3,11 |
| 357:21 363:10 | 146:12 150:4 | 310:12,16 | 113:20 |
| 363:13 371:4,7 | 150:13 151:15 | 313:6 314:7,11 | **dry** 195:10 |
| 388:3 | 156:2,8,20 | 314:18 315:6,9 | **dubois** 181:6 |
| **doug** 181:6,12 | 157:18 162:12 | 316:6,10 | 181:13 183:19 |
| 183:18 | 164:19 166:14 | 317:16 318:7 | |

**[due - employment]**

due 353:16
duly 10:20
  391:7
dust 239:10
duties 50:11
  152:8

**e**

e 9:1,1 107:14
  392:9,12 393:1
  394:3,3,3
earlier 45:3
  48:18 63:16
  69:1 96:8
  97:15 116:17
  173:10,16
  181:16 182:1
  191:18 217:3
  277:16 281:13
  282:18 291:20
  292:16 297:17
  298:18 318:9
  326:7 349:14
  350:18 352:9
  353:19 370:5
  375:11 376:6
  380:11
earshot 206:19
earth 28:13
ease 16:1
ecclesiastical
  33:20 34:12,17
  34:19
edge 148:14
edit 278:2

editing 278:8
educational
  15:10
effect 175:11
  200:14 383:11
  384:11
effective 30:20
  143:16
effects 118:18
effort 54:3
  108:2 263:8,10
  367:9 381:2
efforts 54:3
egunderson 4:5
  392:2
eight 197:5
  200:12 252:11
  288:4 325:6
  357:20
either 131:10
  183:10 228:15
  229:21 263:18
  277:2 295:10
  307:10 362:18
  389:7
elected 16:14
  17:5,6,11
  46:13 154:17
  155:13 156:2
election 292:7
element 82:2
  95:8
elements 65:1
  385:14

elicit 30:18
email 68:14
  73:11 74:5
  76:14 77:19
  78:3,7,16,20
  104:13,21
  105:21 106:2
  108:5 111:21
  113:18 114:6
  114:15 115:9
  116:12,15,16
  116:19 117:4,7
  117:8,14 119:8
  120:12 123:2
  125:15,19,20
  126:2 129:1,16
  130:1 141:5
  151:8,15 153:2
  157:17 158:5
  158:11 162:20
  163:4,13
  192:21 194:8
  194:17 196:7
  197:12 198:6
  202:2,8 204:4
  204:7,10,14
  205:17 209:17
  237:6,18 240:3
  240:6,11 275:4
  276:4,5 279:6
  280:19,21
  281:4 324:3,4
  333:16 334:6
  334:14 336:19
  339:12 343:17

344:3 345:11
  345:13,17,20
  346:4,13,18
  356:16,17,18
  362:19 363:2
  363:11 364:15
  365:14 366:15
  371:5,12,13,13
  374:13 375:16
  381:1,4,20
emailed 255:4
  336:15
emailing
  364:18
emails 133:8
  163:6,12 171:7
  171:13,15
  209:12,13,14
  209:16,20
  210:1 236:17
  236:19,20
  237:21 239:5
  239:11 240:2
  339:15 340:10
  340:11,12,16
  340:18 342:1
  342:17 356:3
  357:10 364:11
employed
  13:15 107:8
employees
  184:10
employment
  79:9 95:4
  101:10 210:20

**[emulate - exchange]**

| | | | |
|---|---|---|---|
| **emulate** 81:3 | **entities** 44:20 | **esquire** 2:4,12 | **exactly** 21:21 |
| **endeavor** 38:16 | 45:7,12 61:10 | 3:3,11 4:4,12 | 47:3 213:14 |
| 38:18,21 39:16 | 138:15 368:9 | **establish** 359:3 | 214:14 251:1 |
| **endeavors** | **entitled** 28:4 | 385:19 | 287:14 |
| 14:16 | 30:7,11 32:13 | **estimate** 224:2 | **examination** |
| **ends** 28:12 | 38:2 58:16 | 356:20 357:3 | 5:1 10:19 11:2 |
| 32:16 138:1 | 60:14 62:2 | **estimation** | 79:4 87:13 |
| 219:11,11 | 64:1,20 153:9 | 79:16 | 120:14 155:5 |
| **enemies** 96:4 | 225:10 290:5 | **evaluate** 60:21 | 157:13 161:16 |
| **enemy** 122:13 | **entity** 39:12 | **evaluation** | 166:8 212:19 |
| 124:3,5 125:4 | 45:4,5 49:17 | 218:5 | 213:2 222:8 |
| **energies** 30:19 | 49:19 | **evangelism** | 258:14 266:9 |
| **energizing** | **entrusted** | 51:21 53:2 | 268:11 274:19 |
| 126:12 | 122:19 139:9 | 54:15 55:17 | 280:6 300:17 |
| **engaged** 193:10 | **ephesians** | 56:2 61:2 | 310:18 311:18 |
| 262:12 315:6 | 250:17 251:6 | 112:16,17,20 | 323:21 371:1 |
| **engagement** | **equality** 44:7 | 181:12 | 380:18 387:16 |
| 370:5 | 44:10 | **evangelistic** | 391:9 |
| **engaging** | **eric** 4:4 10:1 | 99:21 100:11 | **examined** |
| 206:17 | 131:10,10 | **evangelization** | 391:8 |
| **enjoyed** 341:15 | 215:7 227:2 | 120:2 | **example** 109:8 |
| 352:18 | 230:4 242:7 | **events** 89:21 | 109:16 110:1,7 |
| **ensure** 283:2,9 | 247:17 249:9 | 258:5 329:5 | 289:18 347:16 |
| **entail** 50:10 | 252:18 253:16 | **eventually** | **examples** |
| **entered** 274:2 | 253:17 255:10 | 294:20 | 310:21 |
| **entertain** | 256:7 261:18 | **everybody** | **excellent** |
| 330:15 | 280:15,16 | 187:21 188:1 | 184:10,11 |
| **entire** 14:2 | 356:10 392:1 | **evidence** 71:5 | **except** 390:8 |
| 37:19 83:6 | **errata** 390:10 | 315:12 316:12 | **exception** |
| 162:8 268:9 | 392:14,16 | 317:18 328:3 | 282:12 |
| 362:21 | 393:3,5 | 356:18 | **exchange** 73:11 |
| **entirely** 57:9,9 | **especially** | **ex** 135:2 | 77:20 104:13 |
| **entirety** 268:3 | 132:1 166:14 | **exact** 112:15 | 123:2 125:15 |
| 325:14 | **esq** 392:1 | 181:9 329:5 | 204:7 344:3 |
| | | | 345:11 |

Veritext Legal Solutions
866 299-5127

**[exchanged - exhibit]**

| | | | |
|---|---|---|---|
| **exchanged** | 203:10 205:3 | 125:6,7,11 | 260:11 261:3 |
| 339:16 355:7 | 282:15 293:2 | 130:7 131:3,4 | 265:21 266:4 |
| **exchanges** | 306:18 358:7 | 131:8,15 132:3 | 266:12,15 |
| 162:20 | 359:7,18 362:1 | 133:11 134:17 | 267:10,13 |
| **exclusively** | 378:11 | 137:16 139:1 | 268:3 271:19 |
| 63:19 264:15 | **exercising** | 140:15 141:3 | 272:2 273:7,12 |
| **excuse**   21:2 | 28:10 | 144:1,2,5,11,14 | 273:14 274:13 |
| 117:14 138:1 | **exhibit**   5:7,9,10 | 145:3,5,8 | 274:17 279:18 |
| 151:11 280:12 | 5:11,13,14,16 | 146:13 148:19 | 280:2,9 281:13 |
| 364:9 369:15 | 5:17,20 6:2,5,6 | 150:18,19 | 282:3,7,8,14 |
| **exec**   133:20 | 6:8,9,11,12,14 | 151:3 153:4 | 288:1 297:20 |
| **executed** | 6:15,17,18,19 | 154:5,6 155:16 | 300:11 309:13 |
| 272:15 298:7 | 7:2,3,5,6,9,10 | 155:19 157:5,6 | 310:3 324:6 |
| **executive**   18:1 | 7:11,13,14,16 | 161:11 165:6,7 | 325:13,21 |
| 18:4,5 21:14 | 7:17,18,20 8:2 | 166:3 169:11 | 326:8,13 |
| 40:14 43:2,4 | 8:3,5,6,7 27:9 | 172:15 173:10 | 327:10,21 |
| 46:5 47:12,16 | 27:15 30:7 | 174:10,18,19 | 331:2,6,12 |
| 47:19 48:11 | 37:2,3,7,8,12 | 174:20 175:15 | 333:3,8 336:20 |
| 49:16 50:9 | 41:16,21 42:1 | 175:16 176:1,5 | 337:1,5,11,16 |
| 51:7,10,13,20 | 42:5,11,14,21 | 177:20 178:19 | 338:5 339:4 |
| 52:8,16 53:1,7 | 43:15 53:19 | 192:10,11,15 | 340:16 344:20 |
| 53:15 54:2 | 54:12 58:12 | 194:17 195:3,4 | 345:4 346:6,9 |
| 55:14,20 56:6 | 72:1,5 73:5,9 | 195:21 196:7 | 346:10,14,17 |
| 56:17 62:8 | 77:4,5,9,15,19 | 197:6,7,9,17 | 349:14 358:4 |
| 66:20 67:7,13 | 80:4,5,9 87:1,2 | 198:2,15,19 | 362:8,12 365:6 |
| 70:5 79:18 | 87:7,11 89:15 | 199:4,9 203:17 | 365:11 370:10 |
| 82:8 86:1,6,14 | 89:16 90:1 | 203:18 204:1 | 370:15 372:17 |
| 90:15 101:10 | 94:1 95:3 | 204:11,13 | 373:1,9,14 |
| 102:1 134:3,12 | 96:12 97:11,13 | 212:11,16 | 374:17 375:15 |
| 134:19 135:6 | 100:19 102:15 | 213:5 214:16 | 379:6 380:9 |
| 150:13 152:9 | 102:19,20 | 225:1,6 238:11 | 381:11,19 |
| 156:1 162:5 | 104:3,5,8,11 | 239:2 240:19 | 383:10,20 |
| 169:16 181:15 | 106:1 114:14 | 241:3 246:16 | 384:6 387:13 |
| 190:17 196:12 | 116:15 117:15 | 252:6 253:5 | 388:10 |
| 199:6 202:11 | 120:17 122:7 | 259:20 260:6 | |

[exhibited - factual]

| | | | |
|---|---|---|---|
| exhibited | exploration | 114:16 116:15 | f |
| 173:17 | 134:19 135:2 | 116:17 117:7,9 | |
| exhibits 6:1 7:1 | 284:4,8,12,15 | 123:3 130:18 | f 44:19 |
| 8:1 27:11 | 314:2 | 132:8 133:9 | fabric 141:19 |
| 148:15 245:21 | express 49:1 | 136:21 137:8 | face 348:9,9 |
| 254:18 | 96:12,18 | 150:1 158:1 | facebook |
| expect 252:16 | 101:20 203:11 | 160:9 162:12 | 209:13,14,18 |
| 351:2 378:11 | 218:9 302:13 | 162:18,21 | 210:2,5,13,18 |
| expectation | 335:5 | 163:7 196:11 | 211:6 |
| 52:4 | expressed | 199:5 200:15 | facing 126:12 |
| expectations | 49:10,17 177:5 | 202:2 215:18 | fact 24:17 25:7 |
| 123:19 | 229:4 303:15 | 253:17 302:17 | 76:9 135:1 |
| expedition | expressing | 302:18,20 | 174:14 189:9 |
| 193:11 194:6 | 129:6 183:16 | 305:15 311:9 | 238:4 278:17 |
| expenditure | 335:9 | 333:17 334:1,7 | 287:4 310:12 |
| 64:3,10 | expression | 334:7,14 | 335:4 354:10 |
| expense 193:11 | 166:12 | 345:13,17 | factor 289:2,4 |
| experience | extend 28:12 | 346:16,18 | 289:5,6 382:6 |
| 296:4 | extending | 354:2,20 355:8 | 383:2 |
| experiences | 119:9 | 355:16 356:13 | factors 382:18 |
| 347:5 | extent 35:19 | 357:1,8 362:4 | facts 71:5 |
| expert 231:2,4 | 57:6 83:3 | 363:3,11,14,18 | 119:11 126:11 |
| 231:6,7,9 | 153:21 254:8 | 363:19 364:5 | 128:20 312:16 |
| 232:1,3,3,4,9 | 267:8 272:3 | 364:10,18 | 314:3 315:12 |
| 232:12 234:2,4 | ezell 40:11,13 | 365:15 366:1 | 316:12 317:18 |
| expires 390:17 | 40:15 77:20 | 366:16 371:13 | 320:16,20,21 |
| explain 124:12 | 90:4 91:9 93:4 | 371:16 375:16 | 321:1,2 323:6 |
| 200:10 207:17 | 95:2,21 96:13 | 375:19 | 323:8,12 |
| 322:5 367:8 | 97:5 98:14 | ezell's 93:20 | 351:16 359:4 |
| explained | 99:3,11 100:7 | 105:21 111:20 | factual 136:15 |
| 367:11 | 100:19 101:5 | 136:5,6,11 | 266:15 267:11 |
| explains 324:4 | 102:2 104:14 | 201:1 304:17 | 267:12,16 |
| explanation | 105:9,15 | 305:14,16 | 272:18,21 |
| 200:12 324:18 | 106:13 108:6 | 324:18 | 273:3 299:3 |
| | 113:19,20 | | 321:18 |

Veritext Legal Solutions
866 299-5127

**[fail - first]**

fail 263:13
failed 77:1,2
  263:8,11
failing 254:1
fair 22:4 93:18
  136:19 164:19
  180:5 217:18
  218:18 219:15
  220:14 221:12
  283:16,19
  287:1 289:4,20
  290:1 308:14
  327:7,19
  336:17 387:11
fairly 161:11
  171:12 377:10
faith 5:9 15:4
  19:12,16 22:2
  27:2,6,16,19
  28:8 37:4 48:6
  48:13,19 60:6
  65:3,11,15,21
  66:5,7,14
  97:13,15 224:1
  291:15 297:2
  361:3,5
false 122:15
  284:19 314:10
  315:1,8,9
  316:10,14,15
familiar 15:19
  24:6 27:19
  39:4 45:19
  58:1,1,8 80:1
  80:13,15

110:18 209:21
233:3 275:18
304:7,9 377:4
377:6
family 374:9
fan 91:17 352:9
far 122:9
  281:18 282:11
  302:3 371:10
  384:3
fashion 81:6
father 81:20,21
fault 182:18
  183:1 289:18
  348:3
favor 69:19
  149:5 157:3
  189:20
favored 33:21
  34:18
february
  145:10 146:14
  150:11 151:11
  151:13 152:9
  154:20 155:20
  156:9,20 275:6
  281:1 337:18
  338:1 363:5
federal 264:17
  393:1,8,9
feel 189:13
  282:19 367:18
fees 113:17,21
  114:9

fellow 111:12
fellowship 28:8
felt 205:13
  311:11 319:8
  325:8 336:12
  351:13 374:4
fewer 328:11
  328:16
field 126:13
figured 358:18
file 163:10
  239:7 243:21
  243:21 259:12
  280:19
filed 260:12
  366:5,17,18
  368:7
files 237:19
  260:3
fill 112:14
  223:11
filled 307:8
final 376:4
finally 239:10
financial 61:9
  61:14 63:12
  121:6,16
  153:10,13
financially 22:3
  62:6,11 63:6
  63:13 271:8
find 221:6,8
  248:9 253:18
  274:3 341:16
  383:16

fine 23:9,9
  70:11 91:14
  230:21 245:2
  247:7 256:10
  259:6 272:5
  331:10 376:17
finish 200:8
  306:1
finished 46:16
  46:18,20
  187:19 256:9
  280:4
fire 86:2,7
  100:20 101:7
  199:21 207:17
  214:7 215:19
fired 74:11
  75:1
firing 382:6
  387:10
firm 261:18
  275:14,14
  370:6
firmly 160:5
first 10:20 28:5
  30:12 72:6
  74:3,16 78:19
  90:12 94:4,6,9
  106:1,7,8,9
  119:7,10
  125:20 138:21
  167:4 204:10
  231:10,12,15
  232:9,12 276:3
  276:11 293:4

Page 28

**[first - frankly]**

330:14 333:16
333:21 342:3
352:14,15
365:14 381:20
382:2
**firsthand** 268:5
302:21 303:4,7
304:21 305:7
305:17 322:18
**fishing** 193:10
194:5
**fit** 111:17
210:20 211:3
211:11
**five** 76:21
177:6 181:4,17
183:3,7 184:9
184:12 186:4,8
187:5,9 188:18
192:20 203:5
222:5 224:3,5
289:12 290:8
291:1 300:8
339:9 374:21
383:8 385:14
385:17,20
**fix** 71:1 185:16
357:6
**fixed** 171:1
**flat** 183:20
**fleece** 359:20
359:21
**flew** 81:14
**flexner** 2:3 9:19

**flip** 241:18
**floats** 317:2
**floor** 243:8
245:13,15
**florida** 4:16
**focus** 105:21
272:11
**focused** 313:7,8
313:9 356:2
**focusing**
318:13 333:15
**follow** 91:16
136:9 177:18
376:14 385:9
**follower** 353:12
**following**
168:20
**follows** 11:1
392:8
**forced** 22:17
25:14
**foregoing**
390:5
**forget** 317:2
**forgetting**
70:10
**forgive** 352:20
**form** 34:18
169:13 185:7
308:19 390:9
**formal** 130:14
130:16 292:15
293:14,19
**format** 326:16

**formed** 324:13
**former** 229:11
**forth** 261:12
267:12
**forty** 343:10
**forward** 139:2
**forwarded**
254:19
**found** 81:5
132:12 242:11
318:6 339:18
351:6
**foundation**
19:18 23:17
24:19 25:20
26:16 31:13,21
32:9 33:6 35:3
35:18 37:16
38:10 44:1
45:16 47:20
48:14 49:20
50:12 52:11
55:7 56:8,20
57:7 59:8
61:15 63:9
64:16 65:7,16
66:8 69:16
71:4 79:11,19
82:12 83:1,16
84:2 85:17
86:8,17 88:3
95:7 96:3
100:1,13
101:12 107:21
108:9,15 109:9

110:9 112:8
114:2 115:5,13
116:4 118:5,11
120:4 121:5,14
122:4 123:6
127:15 134:14
142:18 143:5
143:15 145:17
147:16 152:1
153:20 159:13
161:13 163:2
164:6,12,20
168:12 172:8
178:13 179:15
184:18 196:20
202:14 206:5
207:12 208:4
211:1 212:2
219:5 378:2,8
378:14 379:13
380:15
**four** 92:15 96:9
133:4 168:10
183:5 186:18
186:18 192:20
192:20 195:18
220:9 385:17
**fourth** 117:18
120:11 141:10
199:4
**foyer** 206:18
**frank** 161:3
**frankly** 95:18
191:7

Page 29

**[frcp - gant]**

**frcp** 393:1
**free** 25:11
  189:13
**freedom** 32:15
  33:2,9,19
  35:12 36:3,14
  49:3,18
**friction** 311:1
**friend** 40:17,21
  91:19 216:7,19
**friends** 249:11
**frivolous** 71:18
  71:21 72:6
**front** 173:13
  193:19 239:1
  251:17 345:9
**fulfill** 38:6 53:9
**fulfilling**
  123:21
**fulfillment**
  38:21
**full** 13:6 32:15
  33:2,9 117:13
  302:6 325:17
**fully** 128:4
**functioned**
  107:9
**fund** 57:9
  128:3,6
**funded** 62:3
**funding** 64:1
  82:14 129:5
  148:4,20
  173:21 200:16
  201:16 202:12

203:12 217:15
**funds** 57:10
  61:16 63:17
  74:13 75:3
  86:15 119:2,3
  200:1 202:4
  270:19 382:4
  382:13,20
**further** 136:13
  136:14,15,16
  188:5 325:21
  385:5 389:6
  391:9,12
**future** 138:3
  141:20 182:2

**g**

**g** 9:1
**gant** 2:4 5:4,5
  9:18,18 10:10
  10:14 12:15,19
  14:13 18:14,21
  19:3,6,17
  20:12 22:13
  23:1,3,7,9,12
  23:17 24:8,19
  25:2,9,19 26:8
  26:15,20 27:21
  28:16,21 31:2
  31:7,13,20
  32:8 33:5,12
  35:1,3,8,17
  36:8,19 37:14
  38:10,17 39:1
  39:5,9,17 41:6
  41:13 42:6

44:1,6,11 45:2
45:15 46:11,16
46:18 47:20
48:4,14 49:11
49:20 50:4,12
51:3,15 52:1
52:11,18 53:3
53:11 54:5
55:2,7 56:3,8
56:13,20 57:6
57:14,18 59:7
59:15,21 60:4
61:15 62:18,20
63:8,15 64:16
65:7,16 66:8
67:2,9 68:7
69:11,15 70:7
70:12,16 71:4
71:17,21 72:6
72:10,16,21
73:6 75:8,17
77:12,17 78:1
78:9,18 79:10
79:19 82:11,21
83:3,10,15
84:1,10,15
85:4,9,17 86:8
86:17 88:2,8
88:14,19 93:1
93:6 94:15
95:6 96:3,14
99:15 100:1,12
101:1,12
102:11 103:9
104:6,17

107:21 108:9
108:15 109:9
109:17 110:8
110:12 112:7
113:1,9 114:1
114:10 115:5
115:13,18
116:4,6 118:5
118:11 119:1
120:3,8 121:5
121:14 122:3
123:5,11 124:7
124:12 126:16
126:18 127:7
127:15 128:1,8
128:13 129:11
130:20 131:9
131:20 132:5
134:6,14
135:21 137:10
138:12 139:12
139:17 140:2
142:4,18 143:5
143:15 144:9
144:16,19
145:1,17 146:3
147:16 148:11
152:1,12,16
153:5,15,20
159:7,13
161:13 162:2
163:1,8,14,21
164:6,12,20
165:17 168:12
169:4,18 172:7

**[gant - given]**

| | | | |
|---|---|---|---|
| 178:5,12 | 270:20 272:5,8 | 379:3,13,20 | **geographically** |
| 179:15,19 | 272:10 273:10 | 380:15 385:8 | 20:17 |
| 182:7 184:16 | 275:2 277:7,12 | 385:12 389:5 | **getting**   42:6 |
| 184:18,20 | 277:19 278:6 | **gather**   239:4 | 127:21 249:4 |
| 185:8,11 186:1 | 278:12,19 | **gears**   377:21 | 274:7 302:7 |
| 191:21 196:2,5 | 279:3,11,15,21 | **general**   16:9,10 | 365:19 |
| 196:20 202:13 | 280:8 282:6 | 16:16 17:20 | **gifts**   28:10 |
| 206:5,14 207:4 | 290:19 299:20 | 18:10 19:19 | **gist**   132:7 |
| 207:6,12 208:4 | 300:9 301:6 | 21:16 22:1 | **give**   12:9 13:2 |
| 209:1,4 210:8 | 309:5,16,19 | 43:15 47:6,10 | 23:3 29:17,19 |
| 210:14 211:1,9 | 310:1,2,6,8 | 54:12,19 60:14 | 67:18 70:7 |
| 211:21 212:2 | 311:4 312:9 | 64:20,21 70:3 | 72:21 131:11 |
| 215:7,14,20 | 314:16 315:19 | 73:19 76:5 | 152:4 180:7,8 |
| 218:10 219:5 | 316:20 317:13 | 82:6,17 84:6 | 180:10 185:15 |
| 222:3,5,9,13 | 318:1 319:18 | 87:18 90:20 | 192:6 199:18 |
| 223:3,9,12 | 320:5 321:12 | 91:15 92:13 | 200:11 223:13 |
| 225:4 227:1,4 | 324:5 328:9 | 154:15 155:20 | 231:6 246:15 |
| 227:8,15 | 329:9 331:5 | 175:5 176:7 | 258:11 270:19 |
| 229:20 230:1,4 | 333:6 334:11 | 188:3 190:21 | 271:4,5 280:16 |
| 230:9,17,18 | 334:18 337:4 | 204:18,21 | 290:21 296:9 |
| 238:10,14 | 337:12,15 | 228:14 292:16 | 322:16 327:20 |
| 241:2 243:16 | 340:7,10,12,14 | 293:1,3,7 | 350:10 360:12 |
| 244:9,15 245:2 | 342:13 345:3,6 | 299:14 310:20 | 369:6 376:6 |
| 245:4,7 247:3 | 345:7 346:10 | 323:14 330:4,9 | 377:13 |
| 249:4,8,12 | 346:12 349:3 | 337:17,21 | **given**   12:5 |
| 250:3,14,21 | 349:13 360:18 | **generally** | 21:12 67:15 |
| 251:7,10,11 | 361:1 362:11 | 273:19 369:11 | 69:9 122:19 |
| 254:13,15 | 364:2,4 365:9 | **gentlemen** | 150:4 172:18 |
| 255:2,6,8,15,21 | 370:13,18,20 | 191:7 208:14 | 173:20 177:15 |
| 256:3 258:17 | 371:3 372:20 | 291:1 301:3,4 | 180:3 191:19 |
| 260:9 266:3,11 | 373:12 374:20 | 302:3 | 280:13 326:16 |
| 266:19 267:3,6 | 375:9 376:13 | **genuine**   339:20 | 327:1,3 333:18 |
| 267:7,18,21 | 376:18 377:13 | 353:6 | 335:1 336:14 |
| 268:2,14 | 377:17 378:2,8 | **genuinely** | 336:16 379:8 |
| 269:12,19 | 378:14,19 | 291:10 | 390:7 |

Veritext Legal Solutions
866 299-5127

[gives - government]

| | | | |
|---|---|---|---|
| **gives** 148:14 | 254:15 288:14 | 42:18 68:13,18 | 309:2 311:5 |
| **giving** 12:16 | 290:2 291:17 | 72:5,9,14,15 | 316:16 319:12 |
| 202:17 228:7 | 292:20 297:7 | 77:3,3 78:16 | 319:20 322:10 |
| 228:13,18,21 | 301:9 318:6,19 | 80:3,4 86:21 | 328:7 331:8 |
| 240:17 242:9 | 319:12,18 | 87:11 89:6,15 | 333:11 339:6 |
| 388:18 | 323:17 335:11 | 97:10 102:18 | 346:3 349:6 |
| **glad** 182:12 | 335:18,19 | 102:18 115:21 | 361:9,9 362:14 |
| 251:18,19 | 343:7 348:2,4 | 125:5 130:6,7 | 365:13 366:8 |
| 263:13 369:15 | 348:7 361:6 | 130:20 131:2,2 | 368:17 373:4 |
| 369:18 | 377:21 378:2 | 140:12 143:21 | 375:3 379:7,9 |
| **gmb** 16:17 | 380:9 381:19 | 146:5 150:17 | 389:12 |
| 47:13 85:1,14 | 384:6 | 154:4 157:4,4 | **good** 11:4,5,7 |
| 85:21 86:5,13 | **goal** 58:19 59:4 | 160:13 165:5,5 | 27:14 41:5 |
| 95:1 164:10,15 | 59:13 | 165:18 166:2 | 122:13 126:7 |
| 178:3 188:16 | **god** 30:16 | 168:5 175:15 | 139:7 140:6 |
| 216:1 218:8 | 41:12 51:9 | 177:15 178:9 | 141:18 185:3 |
| 385:4 | 55:10,10 81:21 | 180:1,9 183:4 | 187:6 222:7,10 |
| **go** 29:3 41:16 | 147:8,21 152:3 | 186:6,18 | 222:11 224:1 |
| 42:21 43:14 | 152:4,5 179:3 | 187:20 192:9,9 | 248:17 251:21 |
| 50:20 55:8 | 202:4 219:13 | 195:2,3,12 | 291:15 297:3 |
| 58:12 62:4,19 | 219:20 295:3 | 196:3 201:13 | 352:14 361:9 |
| 64:19 69:16 | 296:15,19 | 201:16 203:16 | 384:3 386:18 |
| 71:1 72:9,15 | 297:4,11 353:9 | 203:16,17 | 388:8 |
| 72:20 110:12 | 353:13 359:21 | 212:5,15,16 | **gospel** 20:15,21 |
| 111:5 116:2,3 | 369:6 372:3,9 | 218:2 221:9 | 21:9 28:8,12 |
| 116:8 119:19 | 380:1,2 | 223:9 238:10 | 56:15 353:2 |
| 120:11 141:13 | **god's** 68:11 | 243:6 248:9,16 | **gotten** 193:20 |
| 163:16 170:9 | 147:9,11 | 249:17 250:4 | 240:15 302:6 |
| 177:17 184:19 | 179:13 207:19 | 252:17 262:18 | 350:5 |
| 191:3,12 | **goes** 271:1 | 263:20 272:5 | **governed** 28:9 |
| 194:12 195:11 | 376:15 | 281:17 282:8 | **governing** |
| 207:7 212:4 | **going** 9:2 11:15 | 287:10 289:13 | 264:10 |
| 220:9 222:6 | 11:17 23:5 | 289:19 290:13 | **government** |
| 231:17 241:19 | 27:8,11 37:1,1 | 294:9 300:2 | 35:12 36:3,14 |
| 245:15 254:13 | 37:6 41:20 | 306:21 308:21 | 49:3 |

Veritext Legal Solutions
866 299-5127

**[governs - head]**

governs  24:13
  45:4 273:20
grabbed
  251:14
grace  211:19
graduated
  15:11
grand  3:5
great  21:2,11
  22:9 30:15
  39:21 123:21
  134:7,13
  139:19 140:1
  143:20 147:21
  159:17 179:21
  219:13,20
  224:7,15 252:4
  352:14 383:12
  383:14 384:12
  384:14 385:16
  385:18
greek  81:16
ground  123:19
grounded
  139:6 140:4
group  33:20
  34:12,18,20
  91:12,15
guess  68:21
  223:19 224:5
  243:5 251:15
  259:21 262:21
  354:18 384:19
  385:2

guidance  68:11
  119:21 120:7
  158:18 159:14
  160:1 179:13
  369:6
guided  87:19
  89:1
guiding  242:5
guilty  175:7
gunderson  4:4
  10:1,1 27:10
  70:11 90:17
  103:14,20
  106:9 131:12
  148:7,13
  165:12,14,16
  197:18,20
  215:6 227:3,6
  227:10,13
  229:18 230:7
  230:11 243:10
  243:13 244:21
  245:3 250:10
  254:12,14,16
  255:4,7 266:18
  267:15,20
  268:7 269:15
  272:3,7 290:18
  309:14,17,20
  314:14 315:13
  316:13 317:6
  317:19 328:4
  329:1 340:5,8
  340:11 342:10
  363:21 370:17

370:19 381:13
381:16 392:1
guy  221:7
  251:10
guys  183:6
  296:1

**h**

h  394:3
half  186:18
  366:9
hand  133:13
  151:2 169:10
  391:16
handed  27:13
  171:6 225:5
  238:15 241:3
  266:4 273:11
  280:1 331:6
  333:7 337:5
  365:10
handing  125:11
  260:10 370:14
  372:21 373:13
handled  300:21
  392:8
handling  27:11
  90:20
hands  189:15
handwritten
  169:10
hang  296:1
  297:5
happen  156:6
happened
  182:10 190:9

200:13 285:13
287:15 297:11
301:15 316:2,5
318:9 322:19
359:17 367:6
happening
  192:2 278:21
happens  360:1
happy  93:17
  97:1 206:8
  218:3 227:5
  294:12 340:17
hard  124:10
  224:11 244:3
  246:12 352:1,7
  383:13 384:13
  385:17
harm  272:14
harmed  317:16
harold  76:7
  92:4,7 131:19
  151:9 158:4
  167:13 168:13
  179:5,6 190:12
  191:5 204:5
  327:15 330:7
  335:14 336:8
  374:13,15
harold's  190:15
hate  122:11
head  13:3,3
  128:7 160:20
  186:21 222:17
  233:19 294:15
  304:19 314:20

**[head - humble]**

388:21
**header** 139:1
**heading** 148:3
155:16
**headquarters**
157:20,21
160:16
**healthy** 158:19
**hear** 23:12
59:21 62:20
93:15 180:9
185:8 187:5,20
191:16 194:9
203:11,14
206:10 218:8
223:10 243:4
266:19 321:9
322:17 328:18
348:14 351:3
353:9 387:20
388:1,3,7
**heard** 11:13
49:16 164:18
186:4 187:1
205:14 206:2,6
269:5 318:6
330:10,10,12
330:13 335:13
347:13,14
367:2 370:3
**hearing** 170:12
187:8 188:17
**hearsay** 277:5
277:10,17
278:4,10

334:10,16
**heart** 79:13
180:8 352:16
**heavy** 171:6
**hebrews** 140:8
**heed** 236:7
**held** 135:12
291:15
**help** 23:6,8,8
147:9,11
340:17 367:1
**helps** 23:7 57:9
57:9
**hey** 201:19
301:17 357:5
**hide** 227:16
237:10
**hierarchical**
59:19
**high** 111:1
185:5
**higher** 223:8
376:11
**highly** 91:11
171:10 206:20
207:11
**hire** 119:3
361:17
**hired** 112:13
113:4,12,14
304:5 319:3
**hires** 313:13
**hiring** 112:2,6
281:7 300:20
313:12 318:17

**hirings** 320:8
320:17 325:9
**historic** 138:5,9
141:20
**history** 24:4
324:19
**hmm** 10:15
74:4 117:17
122:21 241:20
362:20
**hold** 17:1 56:7
144:19 159:7
215:6 334:1
374:5
**holy** 158:18
159:14 160:1
336:12
**home** 191:14
193:21 240:14
243:17
**honest** 221:16
350:10
**honestly** 295:9
**honors** 138:5
**hope** 219:11
**hopefully**
315:15
**hopes** 302:7
**horizon** 317:8
**hotter** 165:18
**hour** 253:1
**hours** 186:19
222:15 335:21
336:7 361:8

**housekeeping**
273:13
**housing** 58:7,9
**howard** 264:16
**huh** 165:13
233:19 235:5
356:2
**hum** 12:14
53:21 58:14
60:15 74:7,7
98:4 118:1
133:14 141:12
149:17 160:20
196:1,15
218:17 225:21
225:21 238:8
238:20 244:5
245:12 264:8
264:11 271:17
282:16 292:13
297:19 299:2
315:4 326:5
331:15 334:20
337:19 341:1
343:9,11
344:18 347:14
347:17,17
**human** 208:11
211:12
**humble** 79:8,17
81:16 82:1
109:8,16 110:1
110:16 173:17
378:18

Veritext Legal Solutions
866 299-5127

[humbled - individuals]

**humbled** 81:6
**humility**
182:21 185:17
185:19 202:6
**hunch** 327:13
327:14,14
369:19
**hundred** 149:6
149:6
**hurt** 66:1
208:12 211:12
**husband**
207:17
**hypothesize**
290:8
**hypothetical**
36:10 109:10
110:9 211:2
379:14

**i**

**icloud** 240:5,6
**idea** 58:2,8
305:5 363:17
388:8
**identical**
281:19
**identification**
27:17 37:10
42:3 72:3 77:7
80:7 87:5
89:18 103:1
125:9 131:6
140:17 144:4
150:21 154:8
157:8 165:9

175:18 192:13
195:6 203:20
212:13 225:3
238:13 241:1
260:8 266:2
273:9 279:20
282:5 331:4
333:5 337:3
346:8 362:10
365:8 370:12
372:19 373:11
**identified**
275:9
**identify** 122:14
285:6 300:12
**ignoring** 94:12
**ii** 301:7 302:15
310:13
**images** 246:12
**imagine** 124:10
297:16
**immediately**
190:4,7
**implement**
327:4
**implementati...**
59:1
**implementing**
50:14
**implication**
199:17
**implied** 201:11
**imploring**
374:13

**imply** 199:20
200:18 201:5
**importance**
288:14
**important**
179:12 288:17
288:20 347:12
379:11 380:6
**impossible**
308:21
**impressed**
91:17 352:2,10
**impression**
236:12,14
352:13,15
367:20
**improper**
206:20 207:11
208:3 262:10
**improve** 58:20
168:19
**improving**
59:11
**inability**
170:21
**inaccurate**
215:15 386:13
387:19 388:12
**inappropriate**
279:16 313:15
**include** 36:9
51:14,21 52:9
52:17 53:2,8
53:16 54:3
55:21 122:1

340:16 358:17
378:18 379:1
**included** 55:15
88:20 355:3
364:12 371:10
392:14 393:3
**includes** 22:9
29:6 97:21
**including** 31:17
32:5 52:9
53:16 160:5
257:18,20
264:1,3 302:14
**income** 57:20
**incomplete**
36:10 109:10
110:9 211:2
379:14 386:14
387:19 388:12
**incorporated**
9:8
**index** 5:1,7
**indicated**
339:17
**indicating**
278:16 342:7
**individual**
44:19 45:12,19
118:18 228:7
229:8,11
**individually**
228:20
**individuals**
234:3

Veritext Legal Solutions
866 299-5127

**[inertia - january]**

**inertia** 237:1,3
**inferred** 201:1
  201:9
**influenced**
  214:7 308:16
  349:18
**influential**
  354:16
**inform** 205:17
**information**
  7:7 194:15
  240:20 249:5
  289:8 290:10
  324:13,15,20
  371:9
**ingram** 3:11
**inherited**
  298:13
**initial** 183:11
**initials** 39:10
**initiative**
  301:12
**injure** 314:11
  315:9 316:10
**input** 62:6
  276:12
**inspection** 7:7
  240:21
**inst** 25:11
**instance** 45:7
  61:7
**institutions**
  25:11
**instructions**
  249:8

**instructs** 122:9
**integrity**
  156:13 202:20
  291:3
**intelligent**
  351:18
**intend** 272:13
**intended**
  200:20
**intention** 38:4
  295:4
**intentionally**
  38:4
**interaction**
  265:16
**interactions**
  84:21 216:1
**interdepende...**
  139:6 140:3
**interdependent**
  289:11
**interest** 331:8
  333:13 362:13
  370:2
**interested**
  331:9 333:12
  391:14
**interfere** 259:4
**interference**
  35:13 36:4,15
  49:3
**internal** 233:5
**internet** 239:12
**interpersonal**
  122:11

**interpret** 66:6
  100:20 312:15
**interpreted**
  321:2
**interpreting**
  65:13,20 66:13
  66:16
**interrupt** 223:1
**interruption**
  21:4
**interview** 69:18
**introduce**
  337:11
**invested** 28:11
**investigate**
  320:16
**investigation**
  136:15 313:21
  321:19
**invited** 348:13
  352:4
**involve** 150:6
  229:3
**involved** 40:9
  47:11 67:18
  70:2 71:14
  81:21 238:21
  303:19
**involvement**
  16:4,6 82:4
  302:21 303:5
  305:1
**involves** 78:7
**ipad** 246:3,4
  247:2,21

**isaac** 360:15,18
**isolate** 289:11
**issue** 82:14
  135:17 163:7
  206:7 214:9
  303:5 313:8,9
  317:10 322:13
  322:20 323:4
  323:14 324:14
  324:21 332:8
  332:19 369:13
**issued** 154:19
**issues** 108:7
  120:2 132:16
  224:11 313:9
  353:17 371:17
  383:13 384:13
  385:17
**item** 61:8 62:4
  111:20 113:16
  146:18 148:2
  148:19 149:13
  158:16,17
  187:10 188:10
  196:10 199:9
**items** 172:4
  174:20 239:15

### j

**jackson** 102:4
  102:14 104:2
**james** 80:11,18
**january** 129:20
  132:8,8 133:9
  135:9 136:19
  137:7 141:6

Page 36

**[january - kevin]**

142:3 315:3
**jeff** 90:4 101:5
107:3 261:17
275:9 276:8,12
276:16,17,21
278:1,1,7
305:15
**jefferys** 146:9
146:11
**jesus** 21:11
22:9 28:6 38:6
38:13,21 40:1
53:9 54:10
55:11 80:20
81:11 118:14
380:5
**job** 51:9,13,21
52:3,8,16 53:1
53:7,15 54:2
55:14,20
159:16 220:11
221:2,6,8
290:12 291:12
316:19 317:1,3
352:4 360:6
384:3 392:5
394:2
**joel** 112:12,13
181:6,12
183:18 300:21
301:17 303:16
304:5
**john** 68:14
**join** 369:1

**joint** 313:12
**jointly** 60:20
62:3
**jones** 4:11 10:5
**joneswalker....**
4:13
**josh** 223:11
**josh's** 249:15
**joshua** 3:3 9:20
**joshua.vittor**
3:4
**journal** 250:16
250:20 251:3
**jr** 13:8,10
**judge** 72:9,15
**judgment**
318:16 319:7
**july** 298:11
**jumbo** 241:4
**juncture**
248:12
**june** 66:21
67:14 68:14
73:12,12,15
74:5,18 75:7
77:20 83:21
84:9 85:3,16
86:6 88:7,12
95:5 166:19
167:5 169:2,14
172:3 174:6
175:8 176:7,9
176:12,14,16
182:4,11,15,15
184:1 185:6,20

186:14 193:1
196:8 198:8
205:6 237:6
287:2 307:4
318:11 326:2
326:17 328:10
329:11 331:16
332:14 334:7
335:1 343:18
345:17 347:1
348:11,21
354:21 357:2
359:12 380:12
381:3,21
**jurisdiction**
73:21 264:10

## k

**kat** 10:6 223:9
**kat.carrington**
3:12
**kathleen** 3:11
**keep** 70:9 72:8
72:15 94:15
105:12 236:9
249:18 259:21
295:4,13 317:3
329:8 339:4
384:4
**keeping** 50:6
60:7 183:3
**ken** 293:2
**kentucky** 15:15
**kept** 221:20
237:1 316:19
316:21 317:1

**kevin** 40:11,13
40:15 77:20
78:4 90:4 91:9
93:4 95:21
104:14 105:9
105:11,15
106:13,21,21
107:7 108:5,7
108:13 111:20
113:18 114:15
116:15,17
117:7,9 129:20
130:18 132:8
133:8 150:1
158:1 160:9
161:3,9 162:12
162:18,20
163:7 196:11
199:5,20
200:15 201:1,4
202:2,21
213:19 214:7
215:18 216:6
216:18,21
218:14 219:3
219:12,20
220:10,19,21
293:21 302:17
302:18,20
304:17 305:14
305:15,16
311:9,12 324:4
333:17 345:13
345:17 346:16
346:18 354:2

Page 37

**[kevin - lead]**

354:20 355:8
355:16 356:13
357:1 362:4
363:3,11,14
364:5,18
365:15 366:1
366:16 371:13
371:16 375:16
375:19
**kevin's** 117:4
164:18 220:11
221:2
**kind** 161:10
171:10 186:21
201:4 245:10
305:18
**kinds** 242:17
**king** 80:10,18
**kingdom** 30:15
122:13
**kirk** 175:4
349:15
**knew** 192:2
202:15,16
263:8 361:7
366:3
**knocking**
319:19
**know** 11:17
29:12 37:20
40:11 43:1,3
48:16 50:6
54:21 60:5
66:1 70:12
73:1 81:18

93:16,17 105:8
105:9 126:12
129:13 131:10
139:4 143:7
164:15 190:6
190:12 191:14
192:20 194:14
205:13 207:19
208:19,19
209:7 213:14
221:19 222:12
227:21 231:3
231:15 233:7
233:10,12,14
239:10 242:4
251:1 254:6
265:10,14
266:6 267:10
268:4 269:6
270:11,17
274:16 280:3
282:20 287:14
293:20 295:8
295:20 297:1
297:12 298:2
301:18 302:1,3
302:20 303:3
304:6,20
305:17 307:21
308:2,6 309:2
309:4 310:21
311:3,6,6
315:16 317:1
323:1 325:8
329:21 347:10

352:7 356:3
357:14 358:21
362:4,7 363:14
363:18 364:5
364:13 365:20
366:11 367:5
367:16,17
368:2,20
369:21 370:1
373:16 376:5,7
381:9 386:21
388:21
**knowing** 66:7
270:12
**knowledge**
66:14 71:12
83:6,17 84:7
84:16 216:1
237:20 268:5
271:20 302:21
303:4 305:1,7
305:17,18,18
307:18 322:19
**knows** 211:11
**kudos** 387:3

**l**

**labeled** 225:6
266:5 273:12
274:15 280:2
282:7 331:12
333:8 337:6,16
346:10 365:11
370:15 373:1
373:14

**lack** 79:8,17
118:13 319:13
**lacking** 320:12
**lambie** 1:18,20
9:15 391:3,21
**lanes** 122:16
**language** 125:2
125:3 301:7
**laptop** 10:10,12
**large** 161:10
**larger** 317:9
**larson** 107:1,13
108:8,21 311:1
311:10
**late** 295:13
**laugh** 68:3
248:16
**law** 264:10
347:11 391:8
**laws** 28:10
**lawsuit** 46:2
366:5,8
**lawyer** 230:2
232:14 257:10
264:20 265:17
368:4,12,13,16
**lawyer's**
230:19
**lay** 123:17,19
263:16
**layman** 138:19
**layman's** 16:11
113:6
**lead** 55:9
152:10 168:16

Page 38

**[lead - little]**

180:1 294:15
386:12 387:17
**leader** 77:2
91:19 150:7
152:17 182:3
196:12 199:7
**leaders** 107:3
138:16 184:11
338:19
**leadership**
17:19 50:16
74:12 75:2,19
76:4,4,17
79:14 92:5
131:16 154:17
155:13 156:3
166:17 170:15
184:8,10 289:7
315:17 330:13
335:14,16
363:19 364:6
364:12
**leading** 143:6
211:21 380:16
**learn** 90:12,14
152:4,20
**learned** 90:19
254:9 318:6,14
**leave** 183:4,17
186:6 289:13
367:19 383:8
**leaving** 203:7
**led** 89:21
136:10 169:21
287:16 289:9

318:6 320:17
321:21 324:21
**lee** 15:12 43:6
**left** 43:1 103:11
133:13 169:10
173:2 177:2
190:8 245:9,19
349:4 358:13
367:8,14
374:21
**legal** 31:14,21
35:19 56:21
57:7 83:4
154:1 229:17
232:16 241:4
251:15,20
268:18 270:17
275:8 279:16
315:16 369:21
392:7
**legally** 319:5
**length** 187:6
252:10
**leon** 13:8
**letter** 44:19
90:4,7 91:5,6
92:20 93:5,18
94:1 95:2 96:9
96:13,19
100:18 101:5
101:11,19
102:2,15 104:2
130:17 131:16
132:8,19
136:21 137:8

149:15,18,19
150:1,5 162:11
193:16 201:12
214:12 253:17
281:15 283:17
283:20 284:19
285:2,3 304:9
313:5 314:1,8
314:19 323:3
331:16 338:18
339:1 354:3
358:21 370:5
**letterhead**
281:21 282:13
282:14
**letting** 330:9
**level** 111:1
200:2
**leveled** 350:14
**levels** 202:17
207:18
**lexington** 15:12
**liar** 291:8
371:21 372:6
**liberty** 32:13
48:19
**library** 213:13
**lie** 223:17
**lied** 83:9,14,20
84:8
**lieutenants**
305:12
**life** 54:9 68:5
384:18

**light** 270:7
**liked** 290:11
352:17
**likely** 47:8
188:14 202:16
287:6 296:15
296:18,21,21
**likeness** 379:2
**limit** 292:12
**lindsey** 233:14
233:18
**line** 14:16,21
22:1,1 39:21
54:18 74:11
75:1 94:7,9
114:16 117:18
120:17 141:14
158:8 167:4
216:13 332:6
333:21 379:10
392:15 393:4
394:4,7,10,13
394:16,19
**lines** 220:6,9
221:4
**list** 44:17
308:12
**listed** 158:2
275:1 371:18
**lists** 256:20
**literally** 247:21
**litigation**
260:12
**little** 148:14
207:7 241:4

Page 39

**[live - make]**

live  122:10
lived  173:20
lives  224:15
  383:14 384:13
living  385:18
llc  4:3
llp  2:3 3:10
  4:11 10:7
load  120:21
local  28:6 99:2
  106:19
located  20:18
locked  392:12
  393:1
lodge  70:19
long  11:16
  13:13,18 21:20
  139:8 177:3
  180:12 186:13
  186:16 187:4,5
  187:13,20
  196:11 199:6
  252:16,18
  292:20 295:5
  388:13
longer  91:13
  151:17 193:7
look  23:5 53:19
  54:11 58:15
  61:8 64:1
  103:10 111:20
  113:16 117:13
  119:7 125:1,5
  126:8 133:11
  143:21 148:2

150:17 154:4
158:16 163:9
173:10 175:14
194:21 197:6
216:10 225:15
241:4,14 242:5
247:5 248:4
253:21 258:18
259:2 266:6
274:16 282:11
282:17 299:12
322:7 325:20
338:6 342:3
355:12,13,16
355:21 356:4
357:19 381:11
385:3
looked  48:18
  60:13 97:15,19
  155:3 173:10
  173:16 239:5,7
  239:9 240:1
  241:18 277:16
  281:13 282:18
  285:20 297:17
  346:14 375:15
  380:11
looking  94:8
  103:9 117:3,4
  144:12,20
  163:12 243:10
  245:8 247:19
  248:17 270:2,3
  300:10 301:17
  301:19 309:20

324:6 325:10
356:4
looks  338:9
  371:15
loop  105:12
loose  148:12
lord  28:6 54:10
  360:9,11,12
los  3:7
lose  184:11
  382:3,12 383:6
losing  139:7
  184:14 218:4
  382:15,18,19
  382:20 383:1
loss  74:13 75:3
  202:4 217:14
lost  23:13
  158:20 352:16
lostness  54:14
  54:21 55:16
  56:1 61:1
lot  11:15
  171:15 193:21
  207:18 211:13
  213:12 223:21
  256:15 305:13
  352:8 359:20
  361:8 388:13
lots  130:4
  251:20
louisville  15:14
love  139:7
  140:6 380:1,5

low  81:14
lower  133:12
lunch  177:1
  186:12,21
  330:6
lust  217:16
lying  201:8
lyle  293:2

**m**

m  11:17
mac  240:9,10
mackey  4:19
  9:13
made  75:6
  79:14 87:21
  88:17 89:2
  193:8 226:6
  266:15 276:12
  284:19 290:9
  291:2 312:5
  314:17 318:14
  328:20 340:6
  352:13 368:15
  373:19 383:11
  384:11 386:5
  386:18 387:7
maintain
  203:12 237:19
major  47:5
  51:17 108:2
  122:15 317:11
  317:11 328:8
  382:6 383:2
make  38:15
  70:20 72:7,17

Page 40

**[make - martens]**

| | | | |
|---|---|---|---|
| 79:13 127:7 | 199:18 201:15 | 144:4 150:21 | 20:1,16 21:6 |
| 152:20 226:9 | 286:5 287:2 | 151:2 154:7 | 22:18 23:14,15 |
| 226:12 227:5 | 318:10 355:6 | 157:8 165:9 | 23:19 24:10,21 |
| 227:16 235:13 | **mark**  5:17 27:8 | 166:2 175:18 | 25:5,16 26:1 |
| 238:4 255:10 | 37:2,7 41:21 | 192:12 195:6 | 26:11,18 27:4 |
| 255:20 256:16 | 68:18 77:4 | 203:19 212:13 | 27:8 28:2,18 |
| 268:8 279:15 | 80:4 87:1,3 | 225:3,5 238:13 | 29:2 31:4,9,16 |
| 279:17 288:19 | 89:15 92:5,12 | 238:15 239:1 | 32:11 33:8,14 |
| 303:17 304:11 | 97:10 102:19 | 241:1 246:16 | 35:5,10 36:1 |
| 327:4 330:9 | 125:6 130:7 | 260:7,10 266:2 | 36:12,21 37:11 |
| 353:21 359:10 | 131:3,18 | 273:9,11 | 37:21 38:12,19 |
| 361:11 384:16 | 143:21 150:17 | 279:20 280:1 | 39:3,7,14,19 |
| 392:14 393:3 | 151:8 154:4,14 | 282:5 300:11 | 41:8,15 42:4,9 |
| **makes**  182:18 | 156:12,15 | 327:10 331:3 | 42:11,13 44:3 |
| **making**  75:15 | 157:1,5 158:3 | 333:5,7 337:3 | 44:9,15 45:6 |
| 165:18 210:5 | 165:6 167:13 | 345:3 346:7 | 45:18 46:14,21 |
| 210:13,18 | 168:13 175:15 | 362:10 365:8 | 48:2,7,17 |
| 211:6 226:2 | 178:19,20,21 | 365:10 370:12 | 49:14 50:2,8 |
| 260:21 382:15 | 192:10 195:3 | 370:14 372:18 | 50:17 51:5,18 |
| **man**  41:11 81:6 | 203:17 204:4 | 372:21 373:11 | 52:6,14,20 |
| 156:12 202:20 | 212:16 238:10 | 373:13 | 53:5,13 54:7 |
| 219:13,20 | 260:20 262:15 | **marks**  389:11 | 55:4,12 56:5 |
| 224:7,15 297:2 | 262:17,17 | **marriage** | 56:11,16 57:3 |
| 319:2 353:8,13 | 281:17 327:14 | 361:10 | 57:11,16,21 |
| 372:2,9 383:12 | 329:2,12 | **married**  13:11 | 59:10,17 60:9 |
| 383:14 384:12 | 330:16 331:17 | 13:13 | 61:21 63:2,4 |
| 384:13 385:15 | 338:18 346:3 | **marsico**  106:21 | 63:11,20 64:18 |
| 385:17 | 374:12,15 | 107:7 108:7,13 | 65:12,19 66:18 |
| **manner**  30:20 | **marked**  27:16 | 311:12 | 67:3,11 68:9 |
| 306:17 | 37:9 42:3 72:3 | **marten**  203:21 | 69:12,14,21 |
| **mar**  5:9 | 77:7 80:6 87:5 | **martens**  2:12 | 71:9,18 72:4,8 |
| **march**  158:6,13 | 89:17 97:12 | 5:3,4 9:20,20 | 72:11,19 73:4 |
| 162:10 163:19 | 103:1 125:9,11 | 10:8 11:3 | 73:8 75:11,21 |
| 164:3,9,17 | 126:1 131:6 | 12:21 14:18 | 77:8,15,18 |
| 165:2 169:5 | 140:17 141:3 | 18:17 19:10 | 78:5,12,19 |

Veritext Legal Solutions
866 299-5127

**[martens - matter]**

| | | | |
|---|---|---|---|
| 79:1,6,15,21 | 131:14 132:3,6 | 212:14,20 | **maryland** 1:18 |
| 80:8 82:15 | 134:9,16 136:3 | 213:4 215:10 | 4:8 5:18 9:12 |
| 83:7,12,18 | 137:14 138:20 | 215:17 216:2 | 13:17 15:18,20 |
| 84:4,12,20 | 139:15,20 | 218:12 219:10 | 17:8 19:9 |
| 85:6,12,19 | 140:9 141:1 | 221:21 226:15 | 20:19 22:15,16 |
| 86:11,20 87:6 | 142:7,21 143:9 | 234:18,21 | 27:1 38:3 |
| 87:15 88:5,10 | 143:18 144:5 | 246:17,20 | 42:17 44:13 |
| 88:15 89:4,13 | 144:11,13,17 | 251:8 253:5,8 | 45:9 61:6,18 |
| 89:19 91:1 | 145:2,20 | 254:8 255:14 | 87:4 102:8 |
| 93:3,8 94:17 | 146:10 147:18 | 255:19 257:1 | 115:2 118:21 |
| 95:10 96:7,17 | 148:8,16 151:1 | 266:17 267:5 | 129:8 131:18 |
| 99:17 100:5,15 | 152:7,14 153:1 | 267:14 268:6 | 157:21 158:21 |
| 101:3,17 | 153:7,17 154:3 | 269:10 270:15 | 160:19 264:17 |
| 102:13 103:5 | 154:9 155:9 | 277:5,10,17 | 265:6 391:1,4 |
| 103:12,17,21 | 157:9,15 159:9 | 278:4,10,18 | **master** 15:13 |
| 104:8,10,20 | 159:18 161:19 | 279:1,9,13 | **material** 245:9 |
| 106:11 108:4 | 162:6 163:5,11 | 285:18 286:3 | 256:14 273:20 |
| 108:12,17 | 163:17 164:2,8 | 290:16 298:19 | 350:4 |
| 109:13,21 | 164:16 165:4 | 308:18 314:12 | **materials** 243:7 |
| 110:17 112:10 | 166:1,10 | 315:11 316:11 | 245:20 246:10 |
| 113:3,11 114:4 | 168:15 169:6 | 317:4,17 | 246:13 252:5 |
| 114:12 115:6 | 169:20 172:14 | 323:19 328:2 | 253:20 256:16 |
| 115:16 116:1 | 175:19 176:1,4 | 334:10,15 | 280:13 286:20 |
| 116:11 118:8 | 178:7,17 | 337:7 340:4 | 288:10 |
| 118:15 119:6 | 179:17 180:2 | 353:8 375:1,10 | **math** 294:8 |
| 120:6,10,15 | 182:9 185:1,18 | 376:14,21 | **matt** 77:12 |
| 121:8,21 122:6 | 186:7 192:3,14 | 377:3 378:5,10 | 94:15 104:6 |
| 123:9,12 | 195:8,11,19 | 378:17,21 | 124:13 131:20 |
| 124:10,16,21 | 196:3,6 197:1 | 379:5,16 380:8 | 223:11 267:3 |
| 125:10 126:17 | 198:1 203:2 | 380:20 381:18 | **matt's** 124:16 |
| 126:20 127:9 | 206:9,16 207:8 | 385:5,13 386:4 | 249:15,16 |
| 127:18 128:5 | 207:14 208:6,7 | 386:10,18 | **matter** 9:5 |
| 128:10,17 | 209:5 210:11 | 387:3,16 389:6 | 103:4,7 312:13 |
| 129:14 130:8 | 210:16 211:4 | 389:8 | 330:3 335:12 |
| 130:12 131:1,7 | 211:14 212:3 | | 345:6 374:6,9 |

Page 42

**[matter - mean]**

| | | | |
|---|---|---|---|
| 374:11 | 101:7 104:14 | 242:14 243:3 | 355:19 357:1 |
| **mattered** | 106:1,13 108:7 | 254:3 259:9,15 | 359:6,18 362:5 |
| 201:21 305:9 | 111:21 113:20 | 260:3 262:14 | 363:16 364:1,6 |
| **matters**   18:10 | 114:8,16 | 263:18 272:13 | 364:9 371:6 |
| 122:17 380:2 | 116:13,17 | 272:16 276:5 | 373:19 376:2 |
| **matthew**   2:12 | 117:18 121:11 | 276:16,21 | 381:3 383:3,3 |
| 9:20 21:12 | 123:3 125:16 | 277:1 280:21 | 383:12 384:11 |
| 38:6 110:19 | 126:3 127:12 | 281:5 283:21 | 385:15 386:2 |
| 111:4,18,19 | 128:18 129:3 | 284:9,20 285:2 | 390:1 392:4 |
| 116:5,8 119:15 | 129:21 131:18 | 285:8 286:15 | 394:1 |
| 119:16,17,18 | 132:10 133:18 | 286:16 287:4 | **mcraney's**   50:9 |
| 120:9,9 210:20 | 135:3,14 137:1 | 287:17 289:9 | 56:6,17 66:19 |
| 211:11 335:10 | 137:9,12 141:6 | 289:17 290:10 | 67:7 76:16 |
| 347:20,20 | 142:3,16 | 290:15 291:8 | 79:7 89:21 |
| 348:1,6 | 146:12 149:13 | 291:10 300:13 | 90:15 94:2 |
| **matthew.mar...** | 150:4,13 151:8 | 302:12 303:2,6 | 95:4 99:12 |
| 2:13 | 151:15 154:16 | 305:4 306:3,14 | 100:9 101:9,21 |
| **matthews** | 155:13 156:2,8 | 307:5,20 | 117:8,14 129:9 |
| 251:7 | 156:20 157:18 | 308:15 309:12 | 134:10 166:14 |
| **mcraney**   1:4 | 162:12 163:19 | 310:12,16 | 167:1 169:3,16 |
| 4:20 9:6 10:9 | 164:19 168:4 | 313:6 314:7,18 | 182:5 208:2 |
| 45:20 46:5 | 168:11 170:13 | 315:6 316:6 | 265:17 272:12 |
| 47:12,15 49:1 | 172:2 176:8,13 | 317:16 318:7 | 278:8 286:6 |
| 50:6 67:13 | 180:3,12 | 322:12 323:2 | 314:11 315:9 |
| 69:9 70:4 | 181:18 183:18 | 323:13 326:3 | 316:10 332:9 |
| 76:11,14 79:17 | 185:7,20 186:9 | 326:15 327:20 | 332:19 351:2 |
| 82:7,19,20 | 196:12 199:6 | 328:10,21 | **md**   196:13 |
| 83:9,14,19 | 202:10 203:4 | 330:15 332:12 | 199:7 |
| 84:7,14 85:2,8 | 203:10 204:15 | 334:21 347:3 | **mean**   11:18 |
| 85:14,16,21 | 205:3 207:10 | 348:11,19 | 14:7,11 21:1 |
| 86:5,13,15 | 210:2 215:19 | 349:19 350:13 | 21:10 22:7,11 |
| 88:7,12 90:6 | 217:13 222:13 | 350:16,19 | 23:20 43:21 |
| 96:11,18 97:5 | 224:7,10,14 | 351:18 352:1 | 44:5 45:1 |
| 97:8 98:5 99:3 | 226:3 234:2 | 352:10 353:13 | 50:18 63:12 |
| 99:11 100:7,21 | 238:2 239:6 | 353:15 355:1 | 65:6,13 76:4 |

**[mean - mentioned]**

76:17 81:15
95:11,14,17
96:15 111:10
115:4,8 134:2
134:5 143:13
155:10 162:1
170:5,11,18,18
171:5,9,14
180:6 187:15
189:7 193:12
194:11 202:17
214:2 219:1
245:21 246:12
301:16 303:7
309:1 312:11
316:4 329:17
353:10 356:4
377:19 378:6
**meaning** 20:4
95:20 98:6,15
99:5 102:9
114:14 115:9
136:4 169:9
192:4 207:3
361:2
**meaningful**
87:21 89:3
**means** 14:15,15
22:8 55:1 65:9
81:17,17
138:17 229:19
230:2,5 271:4
271:7,7 381:4
**meant** 128:3
201:9 258:10

309:17 353:10
359:21 360:6
363:21
**media** 9:4
89:11 140:20
195:17 300:7
349:11
**meet** 129:20
155:2 160:7
186:20 252:18
263:19 330:5
335:13,15
**meeting** 17:7
17:11,12,13,14
96:8,11 126:7
129:19 133:9
133:10 145:10
146:7,14,19
147:4,4,13,14
150:11 155:3,7
155:15,21
157:19 158:17
159:4 160:4,8
160:8,15 161:2
161:4,9,12,20
162:9 167:5,9
167:11,18
168:1,5,7
172:2,16,18,21
173:3,6 174:5
174:6 175:8
176:7,9,12,17
177:3,21
178:18 179:1,7
179:10 180:4

180:18 181:1
182:4,13,14,16
184:1 185:6,20
186:3,9,13,16
187:3 190:5
199:18 201:4
201:15 205:7
213:10,15,18
214:20 216:17
218:19 220:16
221:14 294:7
326:2,17
329:11,21
330:1,1,8,19
335:21 347:1
348:12,21
349:20 355:5
357:6 375:21
381:5
**meetings** 16:20
145:16 146:1
152:6 178:3
203:8 294:1
306:20 355:4
**meets** 47:9
**member** 21:20
73:17,18,19
98:6,15 108:14
108:21 111:13
111:17 166:15
175:3 178:15
204:18,21
210:17,18
211:5,7 306:4
362:1,2

**members** 17:10
44:12 70:3
82:6 84:6 85:1
85:14,21 86:5
86:13 95:1
99:3,4,19
100:8 101:15
109:7,15 110:6
110:20 111:2
164:4,10
166:15 172:1,3
181:1,3 182:16
203:6 206:19
228:14 289:12
290:9 347:5
**memo** 380:11
**memorial**
13:16 14:4
15:18 16:8
20:8
**memory** 80:16
103:13 184:4
189:2 197:4
231:12 252:11
254:1 258:5
261:1,2 286:21
**men** 95:18,20
184:9,12 185:4
186:4,8 187:6
187:9 188:18
318:17
**mention** 237:9
**mentioned**
168:10 171:4
180:20,21

**[mentioned - mission]**

181:16 182:1
186:12 188:9
189:4 253:4
307:4 349:15
**merit** 136:2,6
136:11 175:10
**meritorious**
290:12
**mess** 173:20
357:6
**message** 5:9
15:4 19:13,16
22:2 27:2,6,16
27:20 37:4
48:6,13,19
51:14 60:6
65:3,11,15,21
66:6,7,15
97:13,16 353:4
367:19,19
**messed** 221:8
**messenger** 19:2
19:5
**messengers**
17:7,9 46:13
47:5
**met** 40:15 41:1
164:15 328:8
328:10 385:4
**method** 356:20
**metropolitan**
108:2
**miami** 4:16
**michael** 68:15
73:12,15

112:12 113:4
113:13 119:3
141:11 151:9
181:7,11
183:19,20
281:8 300:21
301:19 303:18
304:4
**michele** 1:18,20
9:15 391:3,21
**microphone**
223:1,3
**mid** 137:17
138:2 155:17
155:21 286:4
287:2 295:13
295:17 315:3
318:10
**middle** 74:3
171:7,16 330:1
343:18
**midnight**
171:13
**midway** 119:8
**mike** 75:7 76:6
177:15 190:12
190:19 191:6
204:4,14,17
205:9,13,15,17
206:3,8,11,17
207:9,15 208:1
208:3,8,15,20
209:7 343:20
344:3

**mike's** 206:7
**milder** 174:8
**millwood** 181:7
181:10 183:18
**mind** 80:19
81:3,13 203:13
217:14 227:1
248:5 287:3,17
321:21 328:20
330:10
**mine** 144:8
249:11 336:2,6
**minimal** 315:15
315:18 316:18
317:8
**minister** 47:15
52:5 56:7,15
58:3,10
**ministry** 22:5
51:1 90:20
119:4 128:4
152:2
**minute** 87:9
176:10 290:21
375:21
**minutes** 145:9
145:15,21
146:6,14 155:2
175:13 176:6
177:4,20 178:3
178:11,15
180:14 181:21
183:20 184:2
214:13 222:5
269:5 337:18

338:1 374:21
375:11,15
376:3
**mischaracteri...**
66:9 78:1
104:17 114:1
159:8 162:2
163:2 164:21
208:5
**misconduct**
313:2 314:9
**misguided**
314:4 350:14
**mispronounc...**
275:11
**misread** 74:16
**missed** 126:16
353:9 387:15
**mission** 1:8 9:6
11:14 14:16
16:9,10,16
17:20 18:10
21:16 38:2
39:11 42:16
44:14 45:10
47:6,10 60:19
61:17,19 63:18
64:3,10 70:4
73:19 76:5
82:6,17 84:6
87:18 91:16
92:14 99:21
100:11 107:9
107:16 121:18
121:19 122:19

Veritext Legal Solutions
866 299-5127

**[mission - namb]**

123:4 126:13
127:20 138:4
143:17,19
154:15 155:20
157:18 175:5
176:7 184:15
188:3 190:21
204:19,21
228:14 292:17
293:1,3,7
330:4,9 337:17
337:21 392:4
394:1

**missional**
133:21 134:5

**missionally**
141:17 143:11
143:13

**missionaries**
62:4

**missionary**
62:3

**missions** 22:5
177:7,9

**mississippi** 1:2
9:9 263:20

**misspoke**
309:19

**misstated**
70:20

**misstates**
269:10 328:2

**mock** 256:19

**moment** 148:5
159:7 195:7

200:18 314:6
318:15 331:13
366:12 376:18

**monday** 384:20

**money** 14:15
129:5 201:20
217:14,16
218:4 271:4
383:7

**month** 285:15
294:10 304:15

**months** 95:15
216:6,18

**morning** 11:4,5
11:7 151:18
184:3 222:12
245:10

**mosaic** 289:6

**motion** 5:18
87:4 368:7
369:1

**motive** 358:21
359:1

**mound** 350:4

**mouth** 268:16
353:21

**move** 41:17
319:4,6 320:9
320:17 361:9
368:21 369:7

**moving** 301:2,3

**mumbo** 241:4

**mutual** 43:18
138:6,10,13
139:5,6 140:3

140:4 310:20

| n |
|---|

**n** 9:1 11:17
107:14

**n.w.** 2:6,14

**nail** 194:11

**namb** 5:11,14
5:20 6:2,2,12
6:13 7:2,3,4,14
7:15,17,17,20
8:2,2,3,4,6 10:7
11:17 25:18
26:4,7 39:4,8
40:9,14 42:2
42:12 45:13
59:12 62:11
63:6 64:3,11
74:13 75:3
77:6,16 82:9
82:18,18 83:8
83:13 84:13
85:7,15 86:1,7
86:14 89:17
90:12,14,19
91:9 92:19
95:9 99:20
100:10,20
101:4 102:15
102:21,21
104:9 106:20
112:2,5 114:8
118:7,19 119:2
120:1,19 121:4
121:10,17,19
122:2 123:3

128:6 129:10
130:1,14,16
133:1 135:17
135:20 138:11
138:17,18
142:3,14
143:11 144:6
148:4,21 149:5
149:14,18
151:20 153:13
153:18 157:7,7
157:10 159:5
159:20 163:20
164:5,11
166:15 171:1
173:21 196:13
199:7 200:16
202:12 212:12
212:17 213:11
214:8 216:5
217:2,8,14,20
218:20 219:16
220:15 221:13
225:2,2,6
227:9,12,20
253:14 254:16
255:12 256:5
256:15 257:11
257:16 258:3
258:10 263:18
270:18,21
272:14,15,16
280:14,16
281:7 282:4,5
282:8 283:3

Veritext Legal Solutions
866 299-5127

**[namb - notice]**

| | | | |
|---|---|---|---|
| 284:19 291:12 | **nations** 38:15 | **negotiation** | **nods** 13:3 |
| 301:4,10,13 | **nature** 171:8 | 261:7 319:10 | **nomination** |
| 303:15 311:21 | 284:11 | **neither** 277:1 | 360:9 |
| 312:10 313:17 | **necessary** 66:2 | **network** | **nonchrist** 96:2 |
| 313:18,18,19 | 79:17 187:20 | 137:17 138:2 | **nonprofits** |
| 313:20 315:8 | 392:14 393:3 | 155:17,21 | 233:9 |
| 316:7 319:10 | **need** 23:3 29:13 | 166:17 277:8 | **nontaxable** |
| 322:14 324:2 | 70:16 71:17 | 331:19,19 | 58:9 |
| 324:15,20 | 72:19 101:14 | **never** 11:10 | **north** 1:7 9:6 |
| 333:4,4,8,19 | 147:9,11 148:5 | 84:18 199:19 | 11:13 39:11,13 |
| 346:4,7,11 | 148:8,13 | 200:17 201:3 | 42:16 44:13 |
| 347:4 362:9,9 | 150:16 168:19 | 201:18 205:10 | 45:10 60:19 |
| 362:12 365:7,7 | 194:21 207:6 | 217:15 236:1 | 61:16 64:2,10 |
| 365:11 372:18 | 222:18 235:15 | 240:7,8,15 | 107:8,15 |
| 373:1 382:4,13 | 236:1,11,16 | 257:5,8,9 | 127:20 138:4 |
| 390:1 | 237:19 239:16 | 313:13 354:1 | 157:18 392:4 |
| **namb's** 111:21 | 244:21 251:19 | 367:16 | 394:1 |
| 122:1 135:2,13 | 267:8 270:10 | **new** 2:6 5:16 | **northern** 1:2 |
| 142:16 153:9 | 318:2 325:20 | 15:15 28:5 | 9:9 |
| 203:12 214:6 | 362:17 | 29:4 69:11 | **notarial** 391:16 |
| 254:6,17 263:8 | **needed** 79:14 | 80:6,10 97:20 | **notary** 1:18 |
| 281:14 284:5,9 | 179:9,13 | 196:2 239:14 | 390:19 391:3 |
| 314:3 371:17 | 187:18 202:5 | 251:5 291:2 | **notating** |
| **name** 9:13 13:6 | 319:9 | 321:18 | 392:15 393:4 |
| 137:20 176:19 | **needs** 173:5 | **news** 208:12 | **note** 133:8 |
| 222:12 243:12 | 263:21 354:17 | **nice** 126:9 | 183:19 197:10 |
| 249:14,15,15 | **negative** | 128:19 130:2 | 248:12 |
| 275:12 310:5 | 109:19 118:17 | **night** 171:7,16 | **noted** 230:11 |
| 349:15 361:12 | 177:5 181:18 | 336:14,17 | 230:12 390:9 |
| **named** 45:19 | 219:8 377:20 | 388:6 | **notes** 198:11,19 |
| 391:5 | **negotiated** | **nine** 13:19 | 247:15 250:16 |
| **narrow** 286:3 | 61:10 265:19 | 294:18 | 250:16,18,19 |
| **nashville** 3:15 | **negotiating** | **nodding** 128:7 | 251:2,12 |
| **nation** 29:8 | 260:18 261:5 | 160:20 222:17 | **notice** 132:12 |
| 98:3 | | 314:20 | 230:12 296:9 |

**[noticed - objection]**

| | | | |
|---|---|---|---|
| **noticed**  165:20 | 6:14,15,17,18 | **obedient**  81:7 | 68:7 69:15 |
| 245:9 248:11 | 7:2,3,5,10,11 | 81:20 | 70:19,21 71:4 |
| 358:10 386:19 | 7:13,14,16,17 | **obey**  380:5 | 71:19 72:7,17 |
| **notions**  138:5,9 | 7:18,20 8:2,3,5 | **object**  23:4 | 75:8,17 78:1 |
| **notwithstandi...** | 8:6,7 42:2,12 | 29:18 71:19 | 78:10 79:10,19 |
| 135:12 136:20 | 72:2 77:6 | 272:3 308:19 | 82:11,21 83:15 |
| 137:7 | 89:17 102:21 | 378:1 | 84:1 85:9,17 |
| **novem**  93:11 | 106:16,19 | **objected** | 86:8,17 88:2 |
| **november**  40:6 | 114:14,17 | 322:14 | 90:17 93:1,1,6 |
| 47:9 104:15 | 125:8 132:4 | **objecting**  72:11 | 95:6 96:3,14 |
| 106:2,4,13 | 140:16 144:3 | **objection**  14:13 | 99:15 100:1,12 |
| 114:15 116:16 | 146:15 150:20 | 18:14 19:6,17 | 101:1,12 |
| 116:20 117:1,5 | 154:7 157:7 | 20:12 22:13 | 102:11,11 |
| 117:8,15 294:7 | 165:8 174:20 | 23:1,17 24:8 | 104:17 107:21 |
| **number**  6:5,10 | 175:17 192:12 | 24:19 25:19 | 108:9,15 109:9 |
| 9:4,10 42:7 | 195:5 212:12 | 26:15 27:21 | 110:8 112:7 |
| 77:13,16 89:12 | 225:2 238:12 | 28:16,21 31:2 | 113:1,9 114:1 |
| 93:14 125:12 | 266:1 273:8 | 31:7,13,20 | 114:10 115:5 |
| 131:5 140:21 | 279:19 282:4 | 32:8 33:5,12 | 115:13 116:4 |
| 141:4 144:6 | 331:3 333:4 | 35:1,3,17 | 118:5,11 119:1 |
| 145:4 146:15 | 337:2 346:7 | 37:15 38:10,17 | 120:3,8 121:5 |
| 150:20 151:3 | 362:9 365:7 | 39:1,5,9,17 | 121:14 122:3 |
| 154:10 157:10 | 370:11 372:18 | 41:6,13 44:1 | 123:5 124:7,11 |
| 166:5 176:2 | 373:10 | 45:15 46:11 | 127:15 129:6 |
| 192:16 195:18 | **numbers**  104:7 | 47:20 48:14 | 129:11 134:6 |
| 197:15 198:3 | 104:9 131:21 | 49:11,20 50:12 | 134:14 135:21 |
| 212:17 260:12 | 169:10 274:14 | 51:3,15 52:1 | 137:10 138:12 |
| 300:8 349:12 | **numerous** | 52:11 53:3,11 | 139:17 142:4 |
| 354:13,14,14 | 75:18 | 54:5 55:2,7 | 142:18 143:5 |
| 354:17,19 | | 56:8,20 57:6 | 143:15 145:17 |
| 384:7 392:15 | **o** | 57:14 59:7 | 147:16 152:1 |
| 393:4 | | 60:4 61:15 | 152:12,16 |
| **numbered**  5:11 | **o**  9:1 | 62:17 63:8 | 153:5,15,20 |
| 5:13,14,20 6:2 | **oath**  12:5,8 | 64:16 65:7,16 | 159:13 161:13 |
| 6:3,6,8,9,11,12 | 222:16 | 66:8 67:2,10 | 162:2 163:1,8 |
| | **obedience** | | |
| | 379:21 380:2 | | |

**[objection - okay]**

| | | | |
|---|---|---|---|
| 163:14,21 | **objections** | **observing** 28:9 | 251:6 259:12 |
| 164:6,12,20 | 12:16 18:21 | 375:12 | 270:6 291:13 |
| 168:12 169:4 | 25:2,9 26:8,20 | **obvious** 138:14 | 292:19 293:11 |
| 169:18 172:7 | 29:15 35:8 | **obviously** | 295:18 338:8 |
| 178:5,12 | 36:8,19 44:6 | 185:13,14 | 340:8 342:16 |
| 179:15 182:7 | 44:11 45:2 | 244:11 268:18 | 358:6,21 |
| 184:16 185:11 | 48:4 50:4 | 274:21 | 359:14 360:8 |
| 186:1 191:21 | 52:18 56:3,13 | **occasion** 30:9 | 374:3 377:15 |
| 196:20 202:13 | 57:18 59:15 | 30:13 | **okay** 10:14 |
| 206:5,14 207:7 | 63:15 83:10 | **occasions** 107:4 | 12:18 13:4 |
| 207:12 208:4 | 84:10,15 85:4 | **occurred** | 16:2,3 23:11 |
| 210:8 211:1,21 | 88:8,14,19 | 141:15 186:14 | 27:7 29:20 |
| 215:7,8,20 | 109:17 115:18 | **october** 40:6 | 30:1 34:13,17 |
| 218:10 219:5 | 123:11 128:1,8 | 260:13 294:5 | 37:6 41:19 |
| 244:11,16 | 128:13 140:2 | 365:15 | 42:19,20 43:7 |
| 254:8 255:14 | 146:3 179:19 | **offended** | 43:11,14 46:9 |
| 266:17,18 | 210:14 211:9 | 205:18 | 48:10 53:21 |
| 267:14,15 | 215:14 255:20 | **offer** 119:9 | 60:10,12 68:21 |
| 268:6,7 269:10 | 279:16 316:13 | **offering** 232:11 | 69:3,15 70:1 |
| 270:15 277:5 | 317:6,19 319:2 | 232:16 | 73:3 79:5 87:9 |
| 277:10,17 | 377:21 378:19 | **office** 167:13 | 87:14 89:5 |
| 278:4,10,18 | 379:3,20 | 167:15,21 | 97:3,5 100:6 |
| 279:1,9,12 | **objects** 7:7 | 227:7 282:15 | 105:4,21 |
| 290:16,18 | 30:15 240:21 | 304:14 368:10 | 106:10,16 |
| 308:18 314:12 | 324:2 | 368:11 392:11 | 111:9 124:8,15 |
| 314:14 315:11 | **obligations** | **oh** 12:18 22:21 | 124:19 126:21 |
| 315:13 316:11 | 304:12 | 29:21 94:10 | 137:13 145:1 |
| 317:4,17 | **observations** | 110:3 117:1 | 158:9 163:18 |
| 323:19 328:2,4 | 75:20 170:1,4 | 124:14 130:19 | 165:19 166:4 |
| 328:5 329:1 | 170:7,8 | 137:4 148:7 | 167:18,20 |
| 334:10,15 | **observe** 352:12 | 161:1 164:1 | 173:12 177:19 |
| 340:4 356:8 | **observed** 99:11 | 165:16 192:19 | 186:4 189:1 |
| 378:2,8,14 | 100:7 175:12 | 197:19 198:10 | 195:2 196:5 |
| 379:13 380:15 | 176:13 | 222:19 233:21 | 198:10,18 |
| | | 239:3 250:12 | 201:14 205:16 |

**[okay - organization]**

| | | | |
|---|---|---|---|
| 213:3 215:9 | 280:7 281:3,10 | 360:19 361:11 | **opinions** 185:7 |
| 223:4 224:21 | 281:20 282:2 | 361:21 366:7 | 229:4 232:16 |
| 225:13 226:5 | 282:10,17 | 371:16 373:8 | **opportunity** |
| 227:18 228:2,5 | 284:18 285:15 | 374:17,19 | 67:15,19 69:9 |
| 229:6,16,20 | 286:19 287:1,8 | 377:15,21 | 150:4 176:21 |
| 230:17,20 | 289:17 290:7 | 378:4 380:10 | 180:3,7,10 |
| 231:19 232:5 | 291:14 292:6 | 381:8,11,17 | 187:16 191:19 |
| 233:1,12 234:9 | 295:12,21 | 384:2,5,9,9 | 192:6 348:19 |
| 234:12 235:3 | 296:20 297:2 | 386:4 387:11 | 388:18 |
| 236:10,15,18 | 297:11 298:1 | 387:21 | **opposed** 17:14 |
| 237:1,14,20 | 298:12 299:16 | **old** 223:17 | 121:20 263:20 |
| 240:1 241:8,11 | 299:16 303:14 | 239:9,13,21 | **opposite** 221:9 |
| 242:4 243:13 | 304:14 310:4 | 251:10 | **opposition** |
| 243:17 245:18 | 310:10 311:15 | **once** 41:4 91:12 | 156:16,19 |
| 246:2,10,15 | 313:21 318:4 | 91:15 245:4 | **optimistic** |
| 247:12,18 | 320:13 322:18 | 333:10 | 357:12 |
| 248:3,11,19 | 323:1,17 324:8 | **open** 138:3 | **oral** 303:10 |
| 249:3,13 | 324:17 325:7 | 179:1 182:19 | **ordained** 47:15 |
| 250:12 251:12 | 325:12,19 | 246:4 | **order** 18:19 |
| 251:16,21 | 326:2,14 328:6 | **opened** 188:15 | 146:19 199:21 |
| 252:9,15,21 | 329:10,19 | **openly** 107:2 | 202:11 203:12 |
| 253:2 255:3,8 | 330:3 331:12 | 109:6,14,18 | 248:2 256:5 |
| 255:21 257:7 | 332:4 333:1,15 | 110:5,14 | 259:7 270:10 |
| 258:12,20 | 334:6,19 335:4 | 111:16 | 273:16,18,19 |
| 259:7,21 | 335:17 336:21 | **operating** | 273:19 274:1,8 |
| 261:21 262:18 | 338:4,8 339:10 | 115:10 | 329:5,13 356:1 |
| 263:4,14 264:4 | 341:13 342:16 | **operative** 348:9 | 362:17 384:5 |
| 265:9 266:10 | 342:21 343:7 | **opinion** 135:17 | **ordinances** |
| 267:6 268:15 | 344:7,16,21 | 184:21 194:13 | 28:9 |
| 269:3 270:4,9 | 345:2,8 346:5 | 221:16,18 | **organization** |
| 270:12,16 | 346:17 348:11 | 263:12 285:5 | 22:5 107:20 |
| 271:2,12,15 | 349:5 352:21 | 311:21 312:13 | 153:18 233:4,8 |
| 272:7 273:6 | 355:21 356:7 | 323:5,11 | 233:11 268:13 |
| 274:9 276:20 | 356:19 357:7 | 324:14,21 | 268:20 269:6 |
| 278:13 279:15 | 359:15 360:5 | 328:8 380:3 | 270:11,18 |

Veritext Legal Solutions
866 299-5127

**[organization - paragraph]**

271:4,6,7,10
**organizations**
30:16 119:21
**organize** 24:17
25:7 30:13
**organized**
21:13
**original** 358:11
392:10,21
**originally**
367:8
**originated**
258:8
**orthodox**
378:12,12
**orthodoxy**
377:4,10
379:11
**orthopraxy**
377:7 378:6,18
379:1,12,15,17
379:18 380:1,6
**outcome**
391:15
**outside** 27:1
141:18 182:5
348:20 364:6
**overall** 28:1
189:19
**overlooking**
354:7
**oversaw** 52:12
**oversight** 52:17
53:8,16 54:3,3

**overwhelming**
177:5
**owes** 32:14
**own** 120:21
180:10 369:21
**ownership**
185:17,19
**owning** 182:17

**p**

**p** 9:1
**p.m.** 74:6,19
78:20 89:9,11
106:2,14
114:15 140:13
140:14,18,20
195:13,14,15
195:17 212:6,7
212:8,10 300:3
300:4,5 319:21
320:1,2,4
343:18 349:7,8
349:9,11 375:4
375:5,6,8
381:21 389:13
389:15
**packet** 338:7,8
343:8
**pad** 248:13
251:15
**pads** 251:20
**page** 28:3 29:3
29:3 30:6,10
30:11 32:12
38:1 41:16
42:21 43:14

54:12 58:15
60:12 62:1
63:21 64:19,20
64:21 74:3
78:20 97:14,19
106:1,7,8,9
117:15 120:17
120:18 122:7
126:1,1 133:11
134:17 137:15
137:15 138:21
139:1 146:16
148:2,19
149:12 153:3,6
167:2 178:18
199:5 204:13
214:15,16
225:7,8 241:14
241:17 248:1
250:11 251:17
264:6 333:16
338:11 339:7,7
339:8 343:8,18
344:19 345:5,8
358:4 363:2
365:14 381:19
381:20 384:6,7
392:15 393:4
394:4,7,10,13
394:16,19
**pages** 241:13
247:4,10 252:7
252:10 258:1
338:17 339:11
340:15 342:18

390:5 392:14
392:17,17
393:3,6,6
**pagination**
247:17
**paid** 20:4
**pain** 211:13
**painful** 68:4
**pakistan** 367:1
**paper** 148:6
168:8 189:8
307:7
**papers** 27:12
**paragraph**
29:4 30:12
43:15 44:16
54:13,14,18
58:18 60:17
62:2 63:7 64:1
64:7 66:4
78:16,19 87:11
94:4,6,9,11
97:19 106:19
114:13,17
117:13 119:7
120:11,16
122:8 124:1
126:5 127:6,8
127:10 134:18
137:16,16
138:2 141:10
151:14 168:19
173:16 214:16
215:11 216:10
219:11 220:3

Veritext Legal Solutions
866 299-5127

**[paragraph - people]**

225:18 264:9
270:2,5,14
271:19 272:2,4
272:11 276:3
276:11 332:4
385:13
**paragraphs**
106:17 146:15
**paraphrase**
111:6
**parking** 213:12
**parsonage**
56:18 57:5
58:2,5
**part** 20:19
25:13 32:6
98:5,14 112:1
112:5 160:11
194:7 332:2
336:20 371:12
382:15
**participant**
303:8
**participate**
22:16 25:15
62:5
**participated**
203:9 213:15
215:1
**participation**
22:17
**particular** 15:1
45:8 48:12
61:7,19 87:10
158:14 225:17

240:2 261:13
279:7 318:5
366:12 369:12
**particularly**
52:4 63:18
130:1 319:1
**parties** 32:7
140:5 279:12
283:13 391:13
391:14
**partner** 62:12
63:6,13 94:3
94:13,16
311:20
**partners** 58:19
60:20 62:7
366:21
**partnership**
42:15 43:16
53:20 54:11
58:13 59:2,5
94:16,18 138:3
139:8 141:19
158:20 277:15
284:1 285:4
286:17 287:5
287:18,21
288:3 297:18
298:3 299:4,18
309:18 310:9
315:7
**parts** 119:4
246:4 267:9
320:6

**party** 303:9
**pass** 31:11
**passage** 31:11
31:18 38:14
76:13 80:21
81:12
**passages** 38:14
**passed** 381:13
**pasted** 371:12
**pastor** 14:1
15:17 16:7
20:8 73:20
78:14 176:19
193:6 294:15
294:15 295:16
297:3 304:15
336:1 344:12
350:2 362:3
**pastor's** 57:10
**pastoring**
288:16 295:5
295:13 296:11
297:14
**pastors** 57:8
75:19 126:12
170:3 209:17
295:12,16
297:12,14
331:19 336:1
338:18 352:5
352:17
**patient** 161:8
**pause** 12:17,18
21:3 70:10
73:1 79:3

87:12 120:13
155:4 157:12
161:15 166:7
212:18 213:1
258:13 266:8
268:10 274:18
280:5 300:16
310:17 311:17
323:20 370:21
380:17
**pay** 126:9
130:2 240:8
368:17
**paying** 128:18
261:21
**payments**
373:19 374:14
**pdf** 392:12
393:1
**peace** 122:10
**peer** 43:18,18
44:4,4 45:13
45:13
**penalty** 392:16
393:5
**pending** 132:12
**penetrating**
54:14,21 55:16
56:1 61:1
**pennsylvania**
2:14
**people** 29:7
30:8,13,19
54:9 55:9
69:19 70:3

Page 52

**[people - planters]**

71:11,15 96:10
96:10 98:2
99:13 126:10
128:20 129:7
147:8,9 162:9
168:10 179:2
180:21 189:15
202:19 203:14
276:6 283:14
290:9 306:9
307:8,11,19
308:14 313:11
315:15 317:2
329:8 352:16
374:3
**peoples** 229:4
**percent** 149:6
312:1 319:9
322:3 323:4,14
324:14,21
**percentage**
313:13,14
322:6,7
**percentages**
113:17,21
114:9
**perceptions**
122:15
**perform** 168:19
**performance**
99:20 100:10
166:14 169:16
290:13 291:12
**period** 17:1
48:9 112:5

134:11 262:14
287:7,15
292:18 305:16
327:1 356:13
357:9 392:18
393:7
**perjury** 392:17
393:6
**permission**
29:13,20
**permit** 7:7
240:21
**permitted**
347:3,8
**persecuted**
367:1
**persistent** 94:2
**person** 41:1,5
92:16,17 264:1
264:2,3 297:4
354:16 355:3,5
364:10
**person's**
182:13
**personal**
117:20 118:4,9
118:13,20
132:14 199:20
201:3
**personally**
91:18 169:15
175:12 286:15
303:19 305:20
320:15 330:14
352:17 391:6

**personnel**
18:11 62:2,3
82:18 83:8,13
84:13 87:16
88:18 112:6,11
300:19,19
302:14 306:15
309:9
**persons** 155:6
155:10
**perspective**
85:7
**ph.d.** 1:14 5:3
9:5 10:18
15:15 389:15
390:2,4 392:5
394:2
**phase** 377:18
**philippians**
5:16 80:1,6,10
80:14
**phillips** 76:7
92:5,7 131:19
151:9 158:4
167:13 168:13
179:6 204:6
335:14 374:13
**phone** 21:3
40:21 106:21
175:6 198:12
214:10 354:13
356:6 357:14
358:1
**phrase** 11:16
21:9 31:11,18

353:8,10
**picture** 225:11
225:18
**piece** 189:8
285:19 289:8
307:7
**pike** 174:1
**pile** 358:13
**pit** 200:19
**place** 9:11 43:7
171:11 363:7
391:6
**places** 20:18
**plain** 207:18
208:10
**plaintiff** 1:5 2:2
9:19 10:9 46:1
**plaintiff's**
238:19
**plan** 55:15,21
60:21 61:9
64:5,12
**planning** 58:21
136:21 150:12
296:5
**plans** 294:19
294:21 295:1
**plant** 108:2
158:21
**planter** 115:1
**planter's**
114:18,20
**planters** 113:17
113:21 114:9
312:2,8

Page 53

**[planting - preparation]**

planting 22:10
39:13,15 52:10
52:12,17 53:16
54:15 55:16
56:1 61:1,19
63:18 102:7
107:10 113:7,8
113:13,14
120:2 126:9
127:14,21
128:3,11 130:2
143:4 149:7
181:12 322:8
plants 322:8
platitudes
323:15
play 79:8 85:2
85:15 261:14
players 218:15
219:4
playing 261:7
pleasant
171:18,20
please 9:16
10:16 18:16
25:4 35:20
55:18 59:9
60:1 64:8
65:18 72:21
83:11 88:9
104:6 109:12
131:21 137:5
148:18 159:7
200:10 222:18
235:6 237:17

266:21 267:10
274:16 280:3
314:15 326:12
334:19 341:2
341:14,16
373:8
plus 13:14
point 90:14,18
91:2 105:19
129:12 135:19
135:20 149:11
150:16 152:20
156:18 160:5
162:10,18
163:6 175:9
182:6 183:2
184:6 186:19
188:4 191:10
199:4 200:6
203:5 224:13
235:17 257:11
285:7,10 286:5
286:13,16
287:2 289:14
296:16 309:11
342:11 348:2
359:12 362:6
366:9 383:5
386:18 387:7
pointed 309:8
pointing 310:6
points 122:14
276:15 326:4
326:10,16
327:9

policies 311:19
policy 313:9
poor 96:1
367:1
pope 24:15
por 177:9
portion 5:16
80:6,9 177:9
202:6,7 333:12
portray 321:13
position 17:1
50:10 112:13
113:4 121:16
190:15,19
263:16 294:4
358:7 359:8
361:15 382:5
positive 158:19
possibility
291:4
possible 74:13
75:3 122:9
161:6 226:10
244:14 256:20
308:11,20
309:4
possibly 311:19
posted 209:17
posts 209:13,14
210:2,5,13,18
potential 260:2
312:3
potentially
297:10 310:19

power 329:7
376:12
practice 145:14
178:2 226:8
256:20 378:6
378:13
pray 67:21
188:5,15
359:20 369:4
prayed 252:2
335:16
prayer 87:21
89:3 146:20
147:5,9 158:18
159:6,12 160:1
179:5,7,9
188:7,11,13,21
366:21
praying 366:21
precip 329:10
precipitated
329:11
precise 165:2
300:12
precisely
201:10 219:2
285:7
prefer 263:19
preference
264:5
premises 7:7
240:21
preparation
257:18,20
288:5,12

[prepare - proceeded]

**prepare** 252:1 256:6,12 258:4 259:7 288:21 343:12 358:15 373:5

**prepared** 263:21

**preprinted** 307:11

**presence** 101:20 215:21 348:20 363:20 364:7

**present** 4:19 10:9 71:11 155:7,11,14 167:8 168:10 178:11 186:8 190:2 205:6 242:13,15 295:4 330:3

**presentation** 150:9

**presentations** 347:4

**presented** 181:1,3 186:9 253:14

**presenting** 168:11

**preserve** 235:18 236:2 236:12 237:7 355:10

**preserved** 236:21 239:13

**president** 17:3 17:4,18,20 18:13,19 19:11 20:3,6 21:17 28:20 30:4 31:6 32:21 34:6 35:7 40:2 40:5,8 43:8 45:11 51:12,20 52:7,15,21 53:6,14 54:1 55:13,19 59:6 59:14 62:15 63:5 76:5 82:7 82:18 87:19 92:13 105:14 153:14,19 178:4 229:11 275:19 291:21 292:14 293:5 293:14,18 298:8,16 299:16 304:8 306:2,6,8,10,19

**presidents** 225:10

**press** 133:8 218:15

**pressure** 189:14

**pressured** 86:7

**presumably** 323:11

**pretty** 172:9,11 187:6 201:14 201:18 248:1 258:7 264:21 327:12 350:2 386:16

**previous** 133:7 133:7 202:17

**previously** 87:7

**primarily** 107:16

**primary** 371:17

**principle** 24:6 24:12,16 25:6 25:17 32:4 60:11 64:15,21 242:5 347:12

**principles** 43:15 54:13 60:8,14 64:20 299:15 310:20 348:9

**printed** 244:3

**prior** 108:5 113:18 114:6 138:21 159:4 273:16 274:4,5 283:2 288:1 293:5 298:7 326:17 332:12 348:21 361:16

**privately** 350:5

**privilege** 245:1 249:5 255:9

**pretty** 279:9,11

**privileged** 250:5

**privileges** 28:11

**privy** 272:20

**probably** 11:16 47:8,9 68:4 80:16 115:1,15 136:16 165:20 186:11,18 224:17 261:16 261:17 286:1 288:4 292:21 292:21 318:10 330:5 355:9 356:5 369:20 374:21 384:20 388:19

**problem** 235:9 337:14 356:4 377:1

**problems** 201:17

**procedural** 313:8

**procedure** 301:15 303:16 303:17 320:11 392:19,20

**procedures** 311:20 318:16

**proceeded** 173:7

Page 55

**[proceeding - question]**

**proceeding** 147:10,12 265:4 330:8
**proceedings** 264:13 391:11
**process** 230:14 281:8 301:9 313:12 361:7
**processes** 112:1
**produce** 7:6 240:20 260:4
**produced** 238:17 244:13 247:10 254:3 258:2,10 273:17 274:6 278:16 338:13 346:4
**product** 255:14 255:18,18
**production** 132:2 238:4,19 259:16 338:6 339:12 345:1,9 381:12
**productions** 254:6
**promised** 327:21
**promotion** 58:21
**prompted** 105:9
**proper** 206:12 211:19

**properly** 301:1
**propounded** 390:8
**prospect** 218:3
**protection** 32:15
**protective** 273:16,18,19 274:1,7
**protects** 138:5
**proud** 81:19
**proven** 185:5
**provide** 17:19 61:17 63:17 119:17,20 153:13 242:19 244:10 254:16 259:16 265:3
**provided** 56:18 61:10 119:2,3 138:4 247:20 254:17 255:11 256:5 258:2 273:15 315:20 326:3 333:19 392:19 393:8
**providing** 33:19 50:15 244:16 254:2 356:8
**provision** 48:19 302:11,13 309:10 310:14
**provisions** 54:19 300:13

325:20 331:9 348:8
**public** 1:18 390:19 391:3
**puff** 81:17
**pull** 281:12 297:21
**pulled** 105:2
**purportedly** 322:12
**purpose** 60:17 123:15 151:19 205:19
**pursuant** 11:21 226:16
**pursue** 21:2,5,5 21:11 22:8 50:21 61:18
**pursuing** 134:12 139:18 139:21 143:16 159:16
**pursuit** 32:15 63:17 134:7 147:20 179:21
**push** 148:13
**pushing** 242:8
**put** 27:11 77:13 157:2 202:3,3 223:2 226:8 239:14 247:20 265:8 268:16 269:4 273:5 279:4 281:10 292:6 333:1

334:19 338:3 339:3 341:13 341:18 343:7 344:16 346:2 346:21 353:20 361:12 364:16 371:20 373:8 387:11
**putting** 171:11 189:15 387:6

**q**

**qualify** 18:19
**quality** 185:5
**quash** 5:19 87:5 263:8,11 367:9 368:8,21 369:7
**quashed** 369:20
**quashing** 367:21
**question** 18:16 21:7 23:12 25:4 29:13,15 35:20 46:19 55:18 59:9 63:2 65:18 68:19 69:5,11 69:18 70:18 71:1,20 72:18 83:11 88:9 109:11 137:4 148:17 182:12 187:17 231:14 232:4 253:4,8

Veritext Legal Solutions
866 299-5127

**[question - reason]**

266:7,19
267:10 269:16
269:17 270:7
272:6 273:4,13
282:20 283:11
290:3 291:1
293:16 299:3
302:9 311:5
316:16,18
338:15 350:11
358:18 366:2
373:4 379:10
387:12
**questioning**
273:1
**questions** 12:10
72:12 177:18
194:1,2,3,10
197:11 198:21
199:2 200:14
208:9 222:1
223:10,14
243:7 249:16
255:20 256:19
256:20,20
279:6,14
362:14 375:10
376:7,14,15
385:6 386:10
386:13 387:15
387:18,20
388:1,4,7,11,14
388:20 389:1
390:7

**quibble** 58:4
271:9,13
**quick** 151:16
183:7 374:20
385:8
**quickly** 122:14
234:16
**quiet** 172:9,9
172:11 223:5
**quit** 290:14
295:6
**quite** 95:18
191:6 293:12
**quoting** 199:9

**r**

**r** 5:4,5 9:1
394:3,3
**r&s** 393:1,9
**radical** 27:2
**rainey** 112:12
112:13 181:6
181:12 300:21
301:18 303:16
320:8
**raised** 133:1
176:14 307:1
319:2
**randy** 181:7,9
183:18
**rapaport** 4:3
**rare** 352:16
**rather** 13:3
59:19 237:2
317:15 380:3

**ratio** 61:10
**reach** 132:20
158:20
**reaction** 49:15
117:11 172:12
**read** 28:13 29:8
30:20 31:12,19
33:21 38:7,14
42:7 43:19
59:2 60:2 61:2
61:11 62:8,21
63:7 64:5,8,12
65:4 71:2
74:13,18 75:3
76:14 78:17,21
81:8 87:8,10
87:14 107:4
122:20 124:2
126:13,21
138:6 139:10
141:21 171:16
177:11 184:2
185:9 192:19
210:10 234:7,9
234:11,13,15
234:16 256:14
264:21 266:10
266:20 267:1
267:18,21
268:3,9 281:5
281:9 286:20
304:17 331:7
344:13 350:4
359:19 372:11
390:5

**reading** 58:18
117:8 123:2
224:17 225:7
225:17 233:17
237:14 389:16
392:23 393:9
**reads** 28:5 29:4
30:8,12 32:14
33:19 60:16
61:8 62:4 64:1
64:21 80:19
81:5 106:19
126:5 139:4
141:15 158:17
217:12 220:10
382:2
**ready** 266:7
282:20,21
**real** 122:13
124:3,5 183:1
**realities** 119:11
**realize** 216:6
216:18,21
291:18
**realized** 186:10
200:20 262:16
**really** 74:8,19
172:12 194:13
194:14 218:13
295:8 301:4
351:13 353:12
361:5,6 367:11
**realm** 291:4
**reason** 115:11
218:6,7,9

**[reason - record]**

275:3 280:20
281:2,3 291:5
307:19 308:7
308:11,12
325:16,18
337:20 338:2
338:21 339:14
360:12,13
363:10,13
371:4,7 394:6
394:9,12,15,18
394:21
**reasons** 307:12
307:14 308:1,5
308:9 317:9
335:2 336:14
336:16
**recall** 47:3
48:20 49:8
57:20 67:17
69:7 74:8,20
92:17 93:12,21
96:21 102:5,17
103:3,3,15,16
104:1,4 107:14
112:15 116:14
119:5 128:16
130:4 136:13
136:18 142:6
145:19 156:14
164:14 168:17
170:8 175:9
177:10 180:13
180:14,16,16
181:11 183:11

187:14 188:6,8
188:21 190:10
191:15 199:3
213:10 215:12
219:2,9 222:15
224:12 226:16
229:1 231:17
235:4 243:1
244:2 249:1
255:4 259:17
261:12 265:20
269:15,17,20
274:7,20 283:4
283:7 284:16
285:10 287:9
293:20 301:1
302:4 304:2,3
307:9 310:21
311:10 322:6
325:2,3,5
327:11 329:5
329:20,21
344:15 347:6
349:19 354:5,6
359:11 362:20
364:17,21
365:19,20
373:17 374:16
**recalling** 57:20
**recant** 388:17
**recap** 157:19
158:16 161:12
**receipts** 322:9
**receive** 90:9
192:21 193:3

204:7 256:18
**received** 91:4
100:16,18
105:7 117:6
128:21 141:6
162:11 163:6
208:12 227:6
237:18 253:13
254:5,5 275:4
280:21 281:4
314:1
**receiving** 96:9
104:21 105:4,5
108:5 113:18
114:6 116:12
200:1 274:20
**recent** 15:6
65:10 206:19
**recently** 65:2
238:7
**recess** 89:8,9
140:14,18
195:14,15
212:7,8 300:4
300:5 320:1,2
349:8,9 375:5
375:6
**recipient** 158:5
158:11
**recitation**
214:19 215:12
**recite** 80:16
**recognize** 37:3
37:12 42:5
68:15 73:9

77:9,19 80:9
90:1 104:11,13
125:13,15
131:8,13 141:5
145:4 151:5
153:3 154:11
157:11 166:6
167:1 175:20
192:19 197:7
198:6 204:1
280:11
**recollection**
40:7 92:4
103:8 105:6
108:1 114:21
121:15 128:2
157:1 158:3
161:18 168:6
173:1 193:17
209:16 214:14
226:2 261:6
287:12 300:18
301:5
**recommended**
87:17 186:2
**recommending**
373:18
**record** 9:3,17
10:9 13:4,7
21:8 42:8,11
60:2 62:21
70:16 71:2
77:14 89:7,11
140:13,20
144:5 176:1

**[record - relating]**

185:9 195:11
195:13,17
212:4,6,10
213:20 214:2
237:14 267:1
300:3,7 319:18
319:21 320:4
330:21 336:18
349:7,11
355:15 367:13
374:18 375:4,8
389:12 391:11
**recorded**
391:10
**recording**
375:13
**records**  357:7
358:2 385:4
**recounts**  221:5
**redeemed**  29:6
98:1,7,16
**redirect**  222:2
**reduce**  117:19
118:3,20
120:20 201:16
**reducing**
121:11
**reduction**
173:21
**reelected**  292:5
**reexamination**
377:2 385:11
**refer**  15:2 16:1
16:17 17:12
18:3,3,7 42:18

76:11,13,16
121:13 171:12
174:10 277:9
311:16
**reference**  54:13
114:17 119:14
124:1 140:7
143:1,3,10
155:12 173:15
174:3,4 188:10
208:20 277:8
277:13 282:14
299:10 343:15
**referenced**
38:14 96:8
149:14 169:9
175:6 176:10
209:8 392:6
**references**
178:19 358:5
381:1 382:19
**referencing**
152:21 174:18
301:8
**referred**  60:6
115:11 128:18
318:15 322:2
344:10 382:9
**referring**  15:2
17:13 18:4
33:15 34:14,15
34:15 45:8
91:3 109:19
112:18 113:13
119:15 121:4

127:13 128:21
129:4 142:17
188:1 208:20
209:7,11,12,15
214:15 227:14
228:4 246:18
252:6 290:9
322:5 340:5
382:10
**refers**  44:16
61:5 94:2,6,11
113:16 117:19
121:11 125:4
127:21 133:20
134:18 142:10
151:15 167:4
**reflect**  43:18
194:18
**reflected**  177:4
277:21
**refresh**  189:2
226:1 231:12
252:11 258:5
286:21
**refreshed**
184:4
**regard**  26:6
88:18 135:3
142:3 163:13
203:9 208:20
312:1
**regarding**
162:21 163:7
164:5,10

**regardless**
29:15 99:2
356:20
**region**  117:20
118:4,21
120:21 126:13
126:19 141:17
143:11
**regional**  107:10
**regret**  335:5,9
**regular**  145:7
145:14 178:2
**regus**  1:16 9:11
**reid**  151:10
**reinstate**  381:3
**reinstatement**
205:11,20
206:4 332:9
**reiterate**  256:1
256:1
**relate**  25:7
238:1 242:9
243:2 251:13
**related**  235:18
236:3 237:7
239:8 242:17
259:15 260:1
274:2 288:17
303:1 363:15
391:13
**relates**  242:8
325:1
**relating**  264:13
265:4

Veritext Legal Solutions
866 299-5127

**[relationship - requires]**

**relationship**
25:18 44:4,8
45:13 55:10,10
59:18 95:9
118:14 122:1
138:11 154:21
158:20 166:15
191:5 348:7
**relationships**
43:19 60:18
**relative** 166:14
323:8
**release** 7:9
260:7,14
272:14,15,16
**released** 392:21
**relevant** 24:16
239:19 242:20
**reliable** 275:21
**relied** 283:8
**religious** 18:12
32:13 38:16
48:19 49:17,18
87:19 89:1
**reluctantly**
369:2,3
**remain** 320:20
**remains** 138:3
**remarks**
225:10
**remember** 43:4
46:7,9 97:16
98:3 104:21
105:2,4,5
117:6,11 149:2

149:4 150:8
158:14 160:4,7
160:11 161:2
163:12 167:11
168:2 171:3
172:11 176:16
176:19 177:3
178:10 181:5,9
183:21 187:11
191:13,14
193:20 233:17
236:2 237:5,12
237:13 240:14
253:7 254:2
256:4 257:4,5
257:6 261:3
274:14 279:5
284:11 286:7
292:19 293:6
299:1 307:6,10
320:10 326:6
330:20 335:8
343:15 349:20
350:7 364:18
366:19 370:4
374:1,1,12
375:11,17
383:15 384:10
384:15 388:20
**remembered**
49:9 256:17
**remind** 249:1
**reminded**
251:18

**reminder** 12:17
104:6 131:21
**remotely** 72:13
213:16
**removed** 316:1
**repeat** 18:15
25:3 55:18
59:9 65:18
83:11 84:3
88:9 109:11
148:17 293:16
**repeatedly**
94:12
**rephrase** 67:4
67:12 159:10
**reported** 1:20
317:15 391:21
**reporter** 9:14
10:16 13:4
250:18 321:8
360:16,19
**reports** 234:2,4
**represent**
11:13 17:11
222:13 229:7,9
238:16 241:5
278:13
**representation**
217:19 218:19
219:16 220:15
221:13 227:5
278:8 370:6
**representations**
230:19 266:15

**representative**
107:15 229:17
230:3 330:11
**representatives**
16:13
**representing**
10:2,5 12:12
177:7 257:11
261:19 262:1
262:11 275:15
**reputation**
221:7 314:11
315:10 316:10
317:12
**request** 77:13
177:2 236:7
244:9 255:10
256:2 276:12
**requested** 60:3
63:1 71:3
185:10 213:19
252:5 267:2
393:1,9,10
**requesting**
237:6
**requests**
241:14,15,21
**require** 65:20
66:14,16
**required** 25:12
48:12 139:5
**requires** 12:9
30:9,13 65:14
66:4

Page 60

**[reserve - right]**

**reserve**  222:1
**residence**  57:10
**resident**  230:15
  230:16
**resign**  67:15,16
  67:19 69:10
  70:5 191:19
  192:2,7 217:13
**resignation**
  69:20 242:10
  242:12,16
  288:18
**resigned**
  382:21 383:1
**resigning**
  332:12
**resolution**
  154:14,16,18
  155:1 156:1
  159:15 161:5
**resolutions**
  158:19
**resolve**  110:19
  120:1 132:15
**resources**  64:4
  64:11
**respect**  43:18
  122:17 138:6
  138:10,14,15
  139:6 140:4,5
  152:5 271:18
  305:13 310:20
  313:8,12
  369:11,12

**respected**
  91:20
**respecting**
  313:11
**respond**  194:10
  249:2 348:17
  348:20 356:1
  362:17
**response**  71:8
  93:20 96:12
  116:16 129:15
  129:17 130:14
  130:17 132:7
  149:16 172:6
  181:17 194:21
  197:3,10,10
  211:10 238:19
  253:4,7 255:12
  257:13 281:14
  350:5,8,15
  351:2,6,8
  355:13 365:19
**responses**
  198:20 350:10
**responsibilities**
  51:13,21 52:9
  52:16 53:1,8
  53:15 54:2
  55:14,20 60:18
  306:14
**responsibility**
  306:3
**rest**  97:1
  152:19 330:8

**restate**  21:7
  137:4 208:6
  284:5
**restore**  221:6
  348:7
**restroom**
  299:20
**result**  58:2,9
  126:8
**resume**  192:7
**resumption**
  202:17
**retain**  202:11
**retched**  74:12
  75:2 76:17
**retire**  294:19
  295:1 296:16
**return**  392:17
  393:6
**returned**
  106:21
**revelation**
  387:14
**revenue**  233:5
**reverence**
  152:5
**reverse**  26:6
**review**  62:5
  244:21 258:3
  259:8,13
  282:19 288:5
  288:11,20
  333:10 358:17
  362:16 373:5
  376:3 392:8,10

  392:13 393:2
**reviewed**  61:11
  252:10 253:6
  254:21 256:16
  274:11,12
  280:9 288:2
  343:12 358:15
**reviewing**
  258:1 273:16
  274:5 280:4
  375:12
**reviews**  62:6
**rid**  200:16
  201:5,19
**right**  11:11,20
  11:21 74:10,21
  80:17 127:3
  130:21 133:18
  135:10,17
  140:9 173:5
  198:14,16
  199:11,11
  205:5 216:7,19
  217:1 227:5,8
  231:17 233:1
  235:16 237:3,3
  244:8 245:18
  248:8 252:8
  255:1,8 257:8
  262:14 269:7
  270:4 274:13
  275:13 278:21
  284:17 285:16
  285:21 286:11
  292:1 294:6,8

Page 61

**[right - scripture]**

294:9,10
295:11,14,19
296:8 297:9
306:9,11,12
308:3,10,13
310:1 311:8
312:17,20
315:2 318:2
322:4 324:12
325:5 329:13
330:5 331:18
331:20,21
333:10 334:9
336:5 337:7
339:5 345:8,15
347:15 348:10
348:12 350:21
351:5,7 354:4
354:5 359:3
360:5 362:16
368:6,13,14
370:9 374:20
376:13 377:10
378:6 380:14
381:9 382:3
384:4 388:2
389:3
**rights** 28:10
**rigorously**
322:14
**ring** 233:16
**ringing** 373:16
**rising** 264:14
**road** 361:8

**role** 17:17 67:1
79:7,18 85:2
85:15 134:10
260:17 261:4,7
261:14 283:10
292:15 293:14
293:19 336:2
**roman** 35:11
36:2,5,5,13
49:2,18
**romans** 122:8
**ron** 107:1,13,14
108:7,21 311:1
311:10
**room** 167:12
**roughly** 291:21
**rpr** 1:20 391:21
**ruined** 84:14
85:2
**rules** 123:19
393:8
**ruling** 16:11,15
16:17
**run** 161:4
327:11,12
**running** 222:3

**s**

**s** 9:1 107:14
298:14 394:3
**sacrifice**
360:15,16,18
**saddened**
207:16
**sadly** 221:9

**sake** 336:18
**salisbury** 13:16
213:13
**sandy** 167:14
167:16 173:4
207:16 208:9
211:12
**sat** 245:10
**satan** 124:6,20
125:4
**save** 63:3
258:18 272:8,8
324:12 338:16
**savior** 54:10
**saw** 150:16
237:18 259:12
**saying** 94:16
103:14 171:20
183:21 215:13
221:5 248:21
253:7 255:15
313:19 316:8
336:12 342:14
342:17 350:7
361:15
**says** 58:18 62:2
116:21 117:1
119:18 139:1
144:8 146:18
149:13 155:19
168:18 183:20
198:11 199:12
205:9,17
217:12 242:14
264:12 277:6

277:20 327:12
332:8 333:21
335:10 337:17
342:15,20
348:1
**sbc** 31:17 32:5
33:11,15 36:18
49:7 141:20,21
343:16
**scalp** 220:11
**scalped** 220:21
**scanned** 234:16
**scenario** 291:4
**schedule**
186:17 392:10
**scheduled**
180:13
**schiller** 2:3
9:18
**scott** 2:4 9:18
71:18 72:7,8
181:13 193:4,5
194:19 196:8
196:10,19
197:12 198:7
198:13,21
222:13 223:1
223:21 249:14
279:14 339:16
340:6 371:21
372:2
**screen** 246:9
**screwed** 185:14
**scripture** 53:10
119:20 152:21

**[scripture - sending]**

347:10,19
**scriptures**
152:18
**seal** 391:16
**search** 240:16
**searches**
301:12
**searching**
242:6
**second** 43:14
54:12 60:12,16
78:16 114:16
117:13 120:17
133:11 134:17
148:2 153:3,6
167:2 168:18
173:15 196:4
199:5 204:13
214:16 215:6
225:8 243:8
250:11 264:12
291:17 294:2
319:2 382:9
**secondhand**
305:18
**secretary**
375:13
**section** 28:4
30:6,11 32:12
38:2 60:13
62:2 64:20
87:14 97:15
225:10 300:19
301:7 302:14
307:11 309:9

310:13,19
**secure** 30:14
**see** 28:4 32:13
33:18 44:16
50:20 54:15,20
58:16 74:6
78:8 94:1,6,11
94:14 106:3,16
114:13,18
117:21 119:11
121:1 124:1,19
127:5,8,10
130:20 133:21
134:20 137:18
139:2 142:11
143:10 146:16
146:20 148:4
148:21 149:16
153:10 156:3
158:8,21 167:5
168:21 174:1
174:12,15
182:19,21,21
188:11 191:7
191:12 194:20
196:16 198:13
198:18 199:13
200:2 202:6
203:6 205:9,16
205:21 206:1,1
206:17,21
207:15,20,21
208:15,18
213:7 216:7,8
216:16,19

217:16,17
218:16 219:13
220:4,11
221:10 224:19
225:9,20 226:4
236:11,13,16
237:11 239:7
241:21 243:9
247:13,16
248:3 249:21
253:9 258:12
258:15 264:9
264:10,12,18
264:19 266:20
268:4 272:16
272:17 273:21
278:3,14
298:10,12
299:10,13
300:15 317:11
326:10 330:4
332:5,10
333:21 334:4
340:17,18
341:21 342:2,9
343:1,19 344:1
349:4 357:19
363:2 365:17
366:20 375:1
380:12 381:20
382:7 385:4
**seeing** 193:8
**seek** 54:4
120:20 179:13

**seeking** 28:12
51:8 55:9
120:18,19
**seem** 182:18
321:6,10,15
326:1
**seemed** 95:12
95:15 161:6
311:1 320:11
**seeming** 170:21
**seems** 341:19
**seen** 87:7,8
202:5 213:5
241:12,13
242:2,3 260:14
266:12 274:17
331:10,14
333:14 362:18
370:16 371:2
373:2,15
**selected** 46:5
46:10 153:9
191:3 255:16
**selection** 47:11
**semiannual**
62:5
**seminary** 15:14
15:16
**send** 14:15
105:10 107:14
107:15,20
130:13,16
288:8
**sending** 210:1
237:5 245:5

Page 63

**[senior - signed]**

**senior** 14:1
15:17 16:7
75:20 166:16
182:14 330:12
**sense** 162:8
171:17,17
174:9 298:13
317:20
**sent** 204:5
209:16,19
227:21 247:16
247:17 283:3
345:17 363:14
375:16 376:2
381:1,5
**sentence** 28:5
32:14 33:18
60:16 61:4
74:16 138:1
141:15 142:10
143:10 216:15
264:12 272:19
332:5 382:9
**sentences** 382:2
**separa** 260:2
**separate** 107:4
337:11 368:8
**separately**
345:3
**separation** 7:9
231:20 232:1
259:8 260:2,7
260:13 261:8
261:15 264:7
265:5,18 309:9

309:14,21
373:20
**september** 46:4
47:8 116:21
204:8,15
338:19 381:2
381:10
**serious** 94:2
313:1,5 314:8
315:6
**seriously**
330:14
**serve** 16:14
77:2 81:19
231:2,5 272:16
292:11
**served** 16:9
47:16 293:6,13
375:20
**service** 58:3,10
228:3 293:10
**services** 181:11
**serving** 20:6
30:4 228:16
**session** 16:13
47:7 156:1
**set** 213:20
214:2 235:18
267:12 367:13
391:7
**setting** 50:14
51:2
**settlement**
272:13

**setup** 70:15
**seven** 189:20
370:17,19
**seventy** 296:3
**several** 222:15
276:6
**severance**
373:19 374:14
**sgant** 2:5
**shakes** 13:3
**shaking** 233:19
304:19
**share** 180:7
194:12
**shared** 43:17
44:2 146:19
151:16
**sharing** 374:12
**sheet** 390:10
**shielded** 255:17
**shift** 377:20
**shirt** 223:8
**shocked** 350:8
354:11,13,14
**shoes** 211:17
**short** 42:18
141:17 299:20
349:3
**shortcut**
254:14
**show** 27:5 37:1
37:6 41:20
68:13 70:1
72:5 73:5 77:3
80:3 86:21

89:14 97:10
102:18 104:5
130:6 131:2
141:2 156:19
157:4 165:5
166:2 173:9
175:14 189:1
192:9 195:2
203:16,17
211:18 212:15
274:10 379:6
**showed** 231:8
234:18,21
286:4
**shown** 287:21
**side** 133:13
169:10 180:8,9
256:15 387:13
**sides** 253:20
**sighted** 141:17
**sign** 172:20
283:14,14
392:16 393:5
**signatories**
132:19
**signature** 43:1
133:12,17
167:2 390:12
391:20 392:21
392:23,23
393:9
**signed** 43:12
283:5,17,20
284:19 285:2
298:11 301:5

Page 64

**[signed - specific]**

| | | | |
|---|---|---|---|
| 327:21 332:15 | **sixth** 216:13 | 196:2 207:4,5 | 162:13 217:10 |
| **significance** | 281:5 347:15 | 222:21 229:9 | 285:8 288:11 |
| 189:9 | **skalny** 4:3 | 233:21 235:9 | 288:19 289:1 |
| **significant** | **sketch** 15:9 | 235:11 244:7 | 291:17 298:16 |
| 177:8 289:2,5 | **skills** 182:3 | 267:3 279:10 | 300:10,13 |
| **signing** 389:16 | **slamming** | 305:21 309:16 | 302:11,13 |
| **silent** 336:2,6 | 91:18 | 316:21 321:8 | 303:2,6 304:7 |
| **similar** 372:15 | **slow** 29:16 | 328:18 337:13 | 305:3 308:17 |
| **simpson** 176:18 | 207:6 | 339:8 360:2,17 | 310:16 312:12 |
| **sincerely** | **smart** 309:2,6 | 364:2 369:16 | 313:1 316:7 |
| 219:19 | **smith** 293:21 | 370:18 377:13 | 317:16 318:8 |
| **single** 242:13 | **snow** 3:10 10:7 | 377:15 | 320:18,19 |
| 242:13 | **solutions** 392:7 | **sort** 171:10 | 323:3 325:1,10 |
| **sinned** 348:6 | **somebody** | **sought** 68:11 | 325:17,20 |
| **sins** 111:5 | 173:5 291:2 | 133:10 | **speak** 83:5 |
| **sir** 212:15 | 335:13,15 | **sounds** 27:14 | 92:19 93:4 |
| **sit** 218:2 294:1 | **somebody's** | 254:20 | 102:14 105:11 |
| **sitting** 251:20 | 302:7 | **south** 3:5,13 | 107:2 110:14 |
| 300:11 309:11 | **soon** 186:10 | 4:14 | 116:13 155:12 |
| 356:19 369:20 | 244:13 294:6 | **southern** 1:9 | 176:21 180:4 |
| 386:7 388:9,15 | 328:20 329:2 | 9:7 11:14 14:6 | 180:12 200:8 |
| **situation** | **sorry** 23:1,2,13 | 14:8,9,12 15:2 | 205:14 214:8 |
| 162:21 211:19 | 30:10,11 35:1 | 15:13,16 17:14 | 229:11 230:2 |
| **six** 76:18,21 | 35:2 46:17 | 19:8 22:15 | 296:18 341:4 |
| 95:15 169:8,9 | 59:21 64:6 | 24:4,13 26:21 | **speaker** 214:10 |
| 169:15 172:4 | 70:9 78:18 | 33:15 39:12 | **speaking** 109:6 |
| 173:18 174:14 | 83:3 90:5 | 65:2 139:9 | 109:14,18 |
| 174:17,20 | 94:15 102:11 | 392:4 394:1 | 110:5 111:16 |
| 175:1 176:13 | 110:3 117:2 | **spa** 42:19 43:7 | 168:9 221:5 |
| 177:6 180:11 | 120:16 124:7,9 | 43:11 59:13 | 263:17 282:13 |
| 181:17 239:14 | 127:4 131:20 | 63:14 64:19 | 313:17 369:16 |
| 326:4,10,16,19 | 133:16 137:4 | 82:10 97:8 | **speaks** 29:4 |
| 327:9 349:12 | 144:12 161:1 | 99:12 123:13 | 97:20 |
| 350:6 351:12 | 165:21 178:8 | 123:14,15 | **specific** 97:4 |
| 383:8 | 183:13 185:8 | 135:7,14 | 170:8 261:6,10 |

**[specific - statement]**

267:16 274:1
295:1 301:7
309:10 310:14
310:21 318:2
331:9

**specifically**
52:13 235:18
261:4 287:16
300:12 318:14
323:10,13,15

**specifics** 64:4
64:11 219:9

**specious**
290:21

**speculate**
289:19,20
290:5 388:5

**speculating**
290:6

**speculation**
31:14 35:18
36:9 37:16
45:16 47:21
48:15 49:12,21
50:13 56:9,21
59:8 65:8,17
66:9 71:6 83:1
83:16 84:2
86:9,18 88:3
95:7 101:13
110:10 115:14
116:7 118:12
127:16 142:19
143:6 146:4
153:21 161:14

172:8 202:14
211:2 219:6
290:17 308:19
314:13 315:12
316:12,17
317:5,18
334:16 379:14
380:16

**speech** 107:1
279:1

**spend** 50:21

**spill** 148:12

**spilled** 148:7

**spirit** 79:8,12
79:17 82:1
109:8,16 110:2
110:15 141:18
173:17 277:3
285:3 318:18
318:20 319:1,7
319:13 320:12
320:19 321:7
321:11,17
323:3,8 336:12
378:18

**spirit's** 158:18
159:14 160:1

**spiritual** 18:12
26:12 32:16
38:18,21 39:15
51:2 68:6
112:21 113:8
117:20 118:3,9
118:20 122:12
124:2 147:14

179:14 184:15
185:4

**spoke** 389:1

**spoken** 11:10
105:15,19
200:20 257:3,5
257:10,14

**spread** 315:5

**spreading**
353:4

**spurring** 139:6
140:6

**stack** 245:9
362:21 363:1
381:12

**staff** 21:15
75:20 106:20
151:17,21
152:10 170:3
170:11,12,20
171:4 177:6
181:1,3 182:2
182:14 203:5
289:12 290:9
330:12 347:4
382:4,12,15,19
382:20 383:1,6
383:8

**stamped**
362:12

**stand** 39:10
219:12 389:2

**standard** 125:2
125:3

**standing** 77:12
139:8 189:15
193:19 350:7

**start** 125:19
179:3 364:2

**started** 216:6
216:18 246:7
249:15 305:21
309:20

**starting** 38:4
146:15 235:17
288:1

**state** 9:16 13:6
25:13 26:3,7
32:5,14 33:10
33:21 34:19
35:16 36:7,18
49:6 50:15
51:8 72:19,20
102:7 152:18
199:7,21 202:8
210:20 216:3
216:17 229:12
231:21 232:2
264:17 306:16
314:15 322:10
340:13 358:21
391:1,4 392:9
392:12

**stated** 82:9
194:10 202:2,8
216:5 292:16
318:17

**statement** 30:1
30:3 75:6,16

**[statement - successor]**

88:16 226:9
267:16 268:9
273:2
**statements**
94:19 95:2
226:2,6 276:16
283:18 340:1,2
340:6 343:5
344:7 345:20
346:19 383:11
384:11,16
386:1,5
**states** 1:1 9:8
38:2 43:16
97:20 108:3
111:4 148:19
151:16 166:17
194:8 216:4
218:13 231:10
231:16 233:5
303:11 332:21
**stating** 159:11
201:12
**stay** 187:20
196:12 199:6
347:4,8 383:9
383:9
**stayed** 183:17
382:4
**stays** 183:4,7
**stenographic...**
391:10
**steps** 27:1
111:2 132:20
133:5 283:1,6

**sterrett** 151:10
**steve** 78:7,13
78:14 157:17
158:1 333:16
344:11 372:5,8
372:11 381:2
382:2
**stick** 288:16
**sticker** 337:12
**stipulation**
392:20
**stolle** 151:9
181:6,13
183:12,13
204:6 330:18
**stomach**
200:19
**stop** 188:4
**story** 180:8
**straight** 213:20
214:3 367:13
**strategic** 42:15
43:16 53:20
54:11 55:15,21
58:12 59:1,5
60:21 61:9
64:5,12 94:3
94:12 141:16
142:11,16
143:1,4 277:15
284:1 285:4
286:17 287:4
287:18,21
288:3 297:17
298:2 299:4,18

309:18 310:9
315:7
**strategically**
122:18
**strategist**
133:21 134:12
**strategy** 53:17
**strengthening**
38:5,20 53:8
**stretching**
130:10,11
**strike** 16:5
23:21 26:12
40:3 41:17
51:10 66:3
67:6 70:1
76:11 82:4
90:13 94:19
97:12 100:17
105:8 112:3
114:5 115:7
130:15 137:6
142:9 143:2
145:7 159:3
162:16 169:13
170:6 188:9
204:10 209:6
210:4 213:9
216:3 232:7
257:2 276:4
286:13 305:20
323:10 327:1
371:11 377:9
**strikes** 302:9

**string** 125:20
**stuck** 186:17
**stuff** 245:13
247:1 291:2
**stunned** 50:1
146:7
**style** 170:15
**submit** 361:5
**subpoena** 7:6
11:21 226:16
226:19,21
227:7,9,11,20
227:21 231:8
238:19 240:20
241:6 263:8,11
367:10 368:8
369:19
**subpoenaed**
263:9
**subpoenas**
228:4 356:1
**subscribed**
390:14
**subsequent**
367:4
**subsequently**
293:18 359:7
**substance**
390:9
**substantively**
281:18
**succeed** 359:18
**successor**
293:21 294:6

Page 67

**[sued - taken]**

| | | | t |
|---|---|---|---|
| **sued** 366:4 | 63:13 122:2 | 287:13 296:1 | **t** 394:3,3 |
| **sufficient** | 153:18 233:4,7 | 297:12,13 | **table** 245:14,17 |
| 319:17 | 233:10 268:13 | 300:1 304:5 | **tablet** 245:11 |
| **suggesting** | 268:17,20 | 308:13 311:7 | **tacked** 312:7 |
| 374:2 | 269:6 270:11 | 313:3 314:17 | 313:13,14 |
| **suggestion** | 270:18 271:3,6 | 322:9 325:9 | **tacking** 312:1 |
| 127:7 | 271:6,10 | 327:12 330:2 | 319:9 322:3 |
| **suit** 265:3 | **supportive** | 330:21 331:10 | **tackle** 224:11 |
| **suite** 1:17 3:6 | 162:4 | 333:14,20 | 383:13 384:13 |
| 3:14 4:7,15 | **suppose** 51:16 | 344:5 350:2,12 | 385:17 |
| **suits** 264:13 | 316:5 | 350:17 353:21 | **tactics** 141:16 |
| **summaries** | **supposed** | 355:9 356:15 | 142:16 |
| 358:2 | 262:16 367:17 | 357:4 361:11 | **take** 53:19 |
| **summarized** | **sure** 12:20 | 362:15 368:17 | 54:11 87:9 |
| 276:16 | 18:18 21:21 | 383:18 385:10 | 89:4 124:16 |
| **sunday** 207:19 | 40:4 42:9 57:2 | 387:21 | 125:1,5 129:5 |
| 208:10 | 69:1 71:10 | **surprise** 263:5 | 130:8 132:20 |
| **supervise** | 96:20 129:18 | 364:21 365:2,3 | 133:5 140:9 |
| 306:18 | 136:13 152:20 | **surprised** | 148:8 173:9 |
| **supervising** | 156:7,10,18 | 93:15 172:10 | 178:3,11 |
| 306:3 | 158:2 160:3 | 172:13 263:10 | 185:13 212:3 |
| **supplied** | 163:3 164:1 | 296:10 | 212:21 233:17 |
| 149:15 | 177:2 181:15 | **surrender** 54:9 | 247:5 257:13 |
| **support** 5:18 | 187:12 189:3 | **surrounding** | 266:6 274:16 |
| 14:16 53:2 | 190:13 191:8 | 245:16 | 283:1 299:20 |
| 61:9,14 63:13 | 218:5 219:8 | **swear** 10:16 | 320:7 322:16 |
| 87:3 153:10,13 | 220:17 223:11 | **sweater** 160:10 | 349:3 360:1 |
| 154:14,16,18 | 224:20 226:12 | 160:13 | 374:20 386:7 |
| 155:1 156:2,8 | 229:18,21 | **switched** 145:1 | **taken** 1:15 12:2 |
| 156:19,21 | 243:14 245:14 | **sworn** 10:20 | 13:2 89:8 |
| 196:13 199:7 | 248:1,7 250:1 | 228:18,21 | 140:14 145:15 |
| 270:19,21 | 256:16 258:7 | 390:14 391:7 | 146:1,7,8 |
| 271:8 310:15 | 260:19 261:9 | | 195:14 212:7 |
| **supporting** | 261:11 268:8 | | 300:4 320:1 |
| 62:6,11 63:6 | 283:11 286:10 | | |

Page 68

**[taken - testament]**

349:8 375:5
**taker** 375:21
**talk** 89:20
116:9 119:10
129:21 172:4
190:13 191:4
213:19 262:7
301:18,20
335:18,19
352:5
**talked** 92:1
253:1 298:19
302:1 320:8
324:11
**talking** 46:19
231:20 329:8
**talks** 324:10
**tangentially**
242:8
**task** 51:17
52:13 177:15
**tax** 57:12
**taxable** 57:19
**taxes** 233:9
**teaching**
110:18 111:18
**team** 92:6
166:17 172:1
**technical** 102:6
**technically**
277:3
**telephone**
105:16 162:17
163:4 196:18
356:13

**tell** 10:20 57:4
74:10,21 81:12
83:8,13 84:13
101:4 126:10
128:19 138:17
138:18 176:16
177:16 214:4
218:5 231:18
263:15 285:11
285:15 287:16
295:3 296:16
297:4 305:6
318:5,13
320:15 356:11
360:11 367:5,6
367:12 368:1
**telling** 332:18
**tells** 295:6
296:19
**ten** 224:5
**tenants** 87:20
**tendency** 194:8
**tendered** 250:2
250:13
**tenet** 350:9
**tenets** 89:1
**tennessee** 3:15
**tenure** 15:17
16:7 28:20
40:2,8 43:8
45:11 50:9
51:12,19 52:7
52:15,21 53:6
53:14 54:1
55:13,19 56:6

56:17 59:6,13
62:14 63:5
66:19 67:7,9
82:7,17 87:19
153:14,19
178:4 332:19
352:8
**term** 63:7
102:6 111:9,10
174:9 233:3,7
237:4 268:18
292:3,4,12
294:2 377:4,6
**terminate** 79:9
82:20 83:21
84:8 85:3,15
88:7,12 95:4
101:9,21
189:18 192:5
201:14 202:10
203:3 205:1
286:14 289:10
307:5,20
308:15 329:7
330:15 349:19
381:6 383:2
**terminated**
67:8,9,13 82:8
82:13 85:21
86:5,13,16
191:20 192:8
203:12 290:15
326:19 328:21
334:21 349:1
353:15 354:21

359:6 373:20
374:14
**terminating**
137:1,9,12
150:13 382:16
**termination**
89:21 100:16
102:1 130:14
132:12 149:14
149:18 176:8
189:20 194:4
203:9 206:20
281:15 289:3
307:16 313:4
314:1,8,18
317:9,10,14
329:13 354:3
**terminology**
134:3
**terms** 16:11
50:11,21 84:17
113:6 121:19
138:19 189:15
202:6 230:6
283:6 288:19
292:11
**terrible** 208:12
**test** 228:18
360:21 361:3,3
361:5
**testament** 5:16
15:15 28:5
29:4 80:6,10
97:20 251:5,10

**[testified - thorough]**

| | | | |
|---|---|---|---|
| **testified** 11:1 | 333:1,15 | 124:8 129:2 | 334:17 335:3 |
| 291:20 350:18 | 337:13 339:3 | 130:20,21 | 340:20 341:19 |
| 353:19 387:5 | 344:17 346:2 | 131:10 138:13 | 350:18 351:10 |
| **testify** 269:5 | 376:20 381:15 | 158:7 161:21 | 352:3 353:19 |
| 364:20 365:17 | 389:5,8,9 | 165:1,15,17 | 355:12,18,20 |
| 367:10 368:3 | **thanks** 233:1 | 167:21 172:10 | 358:20 359:21 |
| **testifying** 10:3 | 346:21 389:10 | 172:12 173:4,7 | 362:17,21 |
| 228:10 | **theological** | 177:12 181:16 | 365:16 366:3 |
| **testimony** 12:5 | 15:14,16 | 186:13,21 | 370:1,3 372:14 |
| 162:3 163:2 | **theology** | 187:17 191:1 | 372:16 373:21 |
| 164:21 227:20 | 353:16 | 193:17 206:12 | 374:3 376:1,7 |
| 228:1,7,13,19 | **thin** 208:17 | 209:20 221:9 | 376:13 379:15 |
| 228:21 231:6 | **thing** 14:14 | 226:20 231:14 | 381:13,14 |
| 232:11 237:15 | 119:10,13 | 240:7 241:16 | 385:14 387:4,5 |
| 269:11 285:9 | 170:21 201:7 | 241:18 243:9 | 387:13 388:11 |
| 291:6 | 299:13 301:17 | 245:17 246:17 | **thinking** 187:2 |
| **text** 367:15 | 383:6,7 | 247:15 248:9 | 200:21 320:17 |
| **texts** 355:7,11 | **things** 82:19 | 253:5 255:9 | 320:18 |
| 355:16,20 | 160:12 173:2 | 256:8 257:7 | **third** 32:14 |
| 356:7 357:11 | 201:8 226:13 | 265:13 269:1,5 | 94:7,9 120:16 |
| 357:13,20 | 283:14 287:15 | 269:14,18 | 151:14 225:18 |
| 363:15 364:10 | 291:11,19 | 283:10 286:9 | 276:20 278:9 |
| **thank** 11:8,20 | 318:5 352:2 | 288:9,13 | 279:6 292:9 |
| 12:19 73:2 | 376:21 | 289:20 290:1 | 332:4,6 342:1 |
| 77:17 78:9 | **think** 20:14 | 291:14 293:11 | **thirds** 141:13 |
| 131:12 132:5 | 21:21 26:9 | 293:12 294:2,2 | 346:13 |
| 215:7 223:16 | 34:7,11 41:18 | 294:8 296:15 | **thirty** 13:19 |
| 224:4,6 230:17 | 48:5 57:1,19 | 297:20 298:20 | 189:20 294:18 |
| 233:1,2 234:1 | 63:19 66:11 | 301:2,19 306:1 | 337:7 370:17 |
| 235:8,13 | 69:8 70:19 | 309:6,17 317:9 | 370:19 |
| 237:20 240:16 | 93:11,18 95:18 | 317:14,20 | **thomas** 178:15 |
| 244:20 245:6 | 95:21 96:5 | 322:15 324:3,6 | 363:3,7,11,15 |
| 264:4 266:7 | 103:9,10 | 325:5 327:7,16 | 375:13,17,20 |
| 272:9 281:11 | 106:12 107:9 | 327:19 330:2,2 | **thorough** |
| 294:13 310:6 | 107:16 110:1 | 332:14,14 | 134:18 135:2 |

Veritext Legal Solutions
866 299-5127

**[thorough - told]**

| | | | |
|---|---|---|---|
| 187:14,15 | **ticked** 218:13 | 288:2,14 292:9 | 75:13 98:12,21 |
| 284:4,8,12,15 | 218:14 | 292:18,20 | 163:13 173:11 |
| 314:2 | **tim** 176:18 | 293:4 294:4 | 193:9 202:9 |
| **thought** 46:18 | **time** 14:2 17:1 | 296:6,16 297:4 | 205:19 226:14 |
| 77:1 91:11 | 29:17,19 30:4 | 300:3,7 301:14 | 227:20 228:6 |
| 136:14 143:7 | 48:9 63:3 67:1 | 317:1 319:21 | 228:19 229:17 |
| 146:20 147:5 | 70:10 73:7 | 320:4,7 324:11 | 234:21 254:19 |
| 184:12 236:1 | 89:7,11 92:7 | 324:12 331:8 | 258:6 262:12 |
| 236:10,11 | 92:12 95:12,14 | 333:13 335:2 | 277:16 285:9 |
| 239:16 251:14 | 102:5,9 105:5 | 338:17 349:7 | 288:1,2 296:17 |
| 258:6 288:20 | 112:4 124:17 | 349:11 360:4 | 300:11 309:12 |
| 311:9 313:14 | 134:11 135:18 | 362:6,13 366:3 | 310:11,15 |
| 315:1 319:6 | 137:12 140:13 | 375:4,8 376:19 | 343:16 356:19 |
| 325:5 329:12 | 140:20 143:8 | 376:20 388:13 | 386:7 |
| 335:17 336:11 | 151:17 163:15 | 389:5,13 391:6 | **today's** 252:1 |
| 336:12 351:9 | 173:20 180:14 | 392:10,18,24 | 256:6,12 258:4 |
| 351:14 352:6 | 181:14 185:13 | 393:7 | 259:7 288:12 |
| 354:1 364:19 | 185:16 187:5,6 | **times** 41:3 | 288:21 343:12 |
| **thoughts** 186:5 | 187:6,19 | 171:11 192:20 | 358:16 373:5 |
| 217:4 | 188:11,21 | 223:20 356:21 | **together** 20:15 |
| **threat** 199:21 | 190:16,20 | 357:4 | 22:8 25:12 |
| **threatened** | 193:6 195:13 | **timing** 304:6 | 38:5 40:9 92:1 |
| 86:15 | 195:17 197:4 | **tip** 334:3 | 92:15 119:10 |
| **three** 96:10 | 204:17 205:1 | **tipping** 184:5 | 121:20 122:16 |
| 140:21 168:2,3 | 212:6,10,21 | 203:5 289:14 | 123:18,20 |
| 192:20 313:10 | 219:19 221:16 | 383:5 | 132:15 168:3 |
| 335:21 336:7,7 | 222:1,1,3 | **title** 112:15 | 185:15 285:19 |
| 337:7 340:17 | 228:15 235:17 | 299:9,11,12,14 | 329:3 357:5 |
| 340:18 342:2,6 | 257:11 258:18 | 299:17 | **told** 91:12,15 |
| 342:9,14,17 | 262:1 265:17 | **titled** 111:21 | 160:12 168:4 |
| 366:9 371:17 | 272:13 275:19 | **titles** 181:9 | 173:4 223:17 |
| 371:18 385:16 | 281:4 285:5,7 | **today** 9:14 11:8 | 291:11 295:10 |
| **thursday** 1:15 | 285:10 286:2 | 11:16,21 12:9 | 308:2,6,6,11 |
| 116:21 | 286:14,16 | 12:13 13:2 | 313:15 328:11 |
| | 287:6,15,20 | 16:1 48:18 | 336:13 360:9 |

Veritext Legal Solutions
866 299-5127

**[told - turned]**

360:14 363:18
366:17 368:2
369:8 371:16
**tom** 151:9
181:6,13
183:12,13
204:6 330:18
361:21
**ton** 360:3
**tone** 171:10
**tongue** 29:7
98:2
**took** 91:18
178:14 180:15
187:5,6 194:10
198:19 222:15
248:11 249:6,6
360:20
**top** 58:15 78:20
131:16 149:12
177:6 282:13
333:16 337:17
339:5 345:13
346:13 365:14
381:20 383:8
**total** 129:5
**totally** 81:20
122:11
**tough** 173:6
**toward** 139:7
140:6 158:19
159:15 181:18
**towel** 148:6
**town** 1:17 9:12

**trammell** 68:15
73:12,16 75:7
177:15 190:12
204:5,14,17
208:3 343:20
344:4
**trammell's**
190:19 206:3
207:9 208:1,8
**transcript** 5:8
389:16 391:11
392:6,8,10,13
392:13,21
393:2,2
**transcription**
390:6
**transcripts**
234:10,12
**transfer** 239:17
**transmitted**
276:21 280:16
**treat** 138:14
**treated** 218:15
219:3
**treatment**
170:17 171:4
182:1
**trial** 263:18
264:1
**tribe** 29:7 98:2
**trick** 354:8
386:19
**tricky** 165:17
227:17

**tried** 210:7,9
288:16
**trouble** 126:10
128:19 130:3
**troubled** 351:8
**true** 75:6 88:6
88:11,13
107:18 147:1
156:6 200:7
218:1,2 224:13
226:6 271:14
337:21 339:1
339:15 341:10
343:5 344:2,8
345:16,20
346:17,19
371:5 391:11
**truly** 131:19
285:11
**trust** 305:12
**trusted** 305:14
305:15,16
**trustees** 213:20
214:8 216:5
217:20 218:20
219:17 220:16
221:14
**trusting** 197:4
202:4
**truth** 10:21,21
10:21 75:10,12
214:4,5 218:6
224:15 263:15
356:11 367:5,6
367:13 368:1

383:14 384:13
385:17 389:2,4
**truthful** 12:9
223:13 226:10
350:9 376:6
**try** 103:18
111:6 116:9
122:14 173:7
189:2 198:2
202:21 206:3
230:6 304:11
327:3
**trying** 29:17
70:12,14 73:1
221:6 227:16
235:13 237:10
274:3 286:3
287:11 334:1
353:20 354:8
385:19 386:19
**tuesday** 167:5
193:14,17
198:18 253:1
384:20
**turn** 28:3 30:6
32:12 38:1
60:12 62:1
63:21 165:11
204:13 223:5
241:17 250:4
264:6 274:13
294:9 338:5,11
344:19 375:1
**turned** 223:16
314:21

Veritext Legal Solutions
866 299-5127

**[turning - unwillingness]**

| turning 138:21 | **u** | 63:13 139:4 | 271:10 287:14 |
|---|---|---|---|
| twenty 253:10 | ugly 161:9 | 149:13 225:18 | 322:11 323:12 |
| two 28:9 58:19 | uh 233:19 | 225:18 290:15 | 332:16 |
| 60:20 61:10 | 235:5 356:2 | 299:14 309:9 | understands |
| 78:19 89:12 | ultimately | 373:19 | 229:19 230:6 |
| 96:1 99:13,19 | 104:14 | undercuts | understood |
| 100:8 107:4 | ultimatum | 141:19 | 124:11 130:6 |
| 138:15 141:13 | 100:20 101:6 | understand | 183:16 301:14 |
| 151:16 168:20 | um 10:15 12:14 | 12:8 24:11 | undertaken |
| 191:3 220:6 | 53:21 58:14 | 29:21 33:16,17 | 304:13 |
| 226:19 228:4 | 60:15 74:4,7,7 | 66:12,13,15 | undoubtedly |
| 240:12 241:21 | 98:4 117:17 | 85:10 112:1,4 | 146:8 |
| 249:10 253:10 | 118:1 122:21 | 115:9 119:13 | unfortunate |
| 262:21 263:1 | 133:14 141:12 | 121:3,13 | 132:13 139:10 |
| 291:21 292:2,3 | 149:17 160:20 | 127:12 129:3 | unfounded |
| 292:11 293:13 | 196:1,15 | 134:5 143:3,14 | 350:15,20 |
| 293:17 302:2 | 218:17 225:21 | 151:20 159:11 | unit 9:4 140:20 |
| 318:17 320:6 | 225:21 238:8 | 208:14 211:15 | 195:17 300:7 |
| 327:3,20 | 238:20 241:20 | 226:13 230:4 | 349:11 |
| 328:12,16 | 244:5 245:12 | 235:11,15 | united 1:1 9:8 |
| 335:21 340:15 | 264:8,11 | 256:12 270:5 | 108:3 231:10 |
| 341:19 342:1,6 | 271:17 282:16 | 277:9,14 285:9 | 231:16 233:5 |
| 342:18 346:13 | 292:13 297:19 | 287:11 312:6 | universe |
| 348:3 382:2,17 | 299:2 315:4 | 323:13 353:21 | 316:17 |
| 382:17,18 | 326:5 331:15 | 361:12 368:4,7 | university |
| 383:6 385:16 | 334:20 337:19 | 388:19 | 15:12 213:13 |
| type 14:4 18:18 | 341:1 343:9,11 | understanding | 213:14 |
| types 121:7 | 344:18 347:14 | 24:3 26:3 | unsound |
| 170:14 | 347:17,17 | 61:20 64:14 | 141:17 143:11 |
| typical 301:15 | unanimously | 65:14,21 80:21 | 143:13 |
| typically 146:1 | 156:1 157:2 | 81:2 107:2 | untrue 268:5 |
| 178:11 | unclear 67:5 | 110:13 118:2 | unusual 70:17 |
|  | under 12:5,8 | 123:1,18 | 295:12,14,15 |
|  | 32:3 43:15 | 128:20 142:8 | unwillingness |
|  | 54:12,19 62:1 | 142:15 227:19 | 79:13 |

**[update - violates]**

| | | | |
|---|---|---|---|
| **update** 148:3 | 54:5 55:7 56:8 | 191:21 202:13 | 89:10 140:12 |
| 148:20 | 59:7 60:4 | 206:5,14 | 140:19 195:12 |
| **updated** 306:21 | 61:15 63:8 | 207:12 210:8 | 195:16 212:5,9 |
| **ups** 385:9 | 64:16 65:7,17 | 211:1,21 215:8 | 222:4 300:2,6 |
| **urging** 374:15 | 66:8 67:2,10 | 215:20 218:10 | 319:20 320:3 |
| **use** 240:7 282:8 | 68:7 69:15 | 219:5 378:8,14 | 349:6,10 375:3 |
| **used** 21:9 31:11 | 71:4 72:12,13 | 379:13 380:15 | 375:7 389:11 |
| 31:18 63:7 | 75:8 79:10 | **values** 43:17 | **videotape** 1:15 |
| 70:14 115:8 | 82:11,21 83:15 | 44:2,17 141:20 | **view** 49:17 |
| 176:18 191:20 | 84:1 85:9,17 | **various** 16:13 | 66:17 75:9 |
| 194:15 233:4,8 | 86:8,17 88:2 | 140:5 | 96:18 99:12 |
| 240:3 254:19 | 88:19 90:17 | **vatican** 36:16 | 101:21 119:20 |
| 273:20 303:16 | 93:1 95:6 96:3 | 49:4 | 135:9,12 |
| 303:18 320:11 | 96:14 99:15 | **verbal** 208:16 | 147:14 177:5 |
| 353:8 | 100:1,12 101:1 | 209:8 | 179:14 182:13 |
| **using** 11:15 | 101:12 109:9 | **verbally** 222:18 | 183:16 203:11 |
| **usually** 47:9 | 110:8 112:7 | **veritext** 9:13,15 | 270:16,18 |
| **v** | 113:1 114:2,10 | 10:11 392:7,9 | 297:3 374:5 |
| | 115:5 116:4 | 392:11 | 381:7 |
| **v** 63:21 390:1 | 118:11 119:1 | **verse** 80:19,21 | **viewpoint** |
| **vague** 14:13 | 120:3 122:3 | 81:5,10 335:17 | 171:6 |
| 18:14 19:17 | 123:5 129:11 | **verses** 80:13 | **views** 181:17 |
| 20:12 22:13 | 134:6,14 | 151:16 | **violate** 65:10 |
| 23:17 24:8,19 | 135:21 138:12 | **version** 15:5 | 281:6 310:12 |
| 25:19 26:15 | 139:17 142:5 | 48:12 65:2,11 | 316:7 318:7 |
| 27:21 31:13,20 | 147:16 152:12 | 80:11 281:17 | **violated** 132:11 |
| 32:8 33:5 34:8 | 153:5,15,20 | 282:1 346:3 | 217:8 285:8 |
| 34:11 35:3,17 | 159:8 161:13 | **versions** 132:1 | 286:16 287:4 |
| 37:15 38:10,17 | 163:1,8,14,21 | **versus** 9:6 | 287:18 289:1 |
| 39:1,5,17 41:6 | 164:12,20 | **vi** 97:15 | 300:14 302:13 |
| 41:13 44:1 | 168:12 169:4 | **victor** 175:4,9 | 308:16 310:16 |
| 45:15 46:11 | 169:18 178:5 | 349:15 | 323:2 374:4,10 |
| 47:20 48:14 | 178:12 179:15 | **videographer** | **violates** 115:20 |
| 49:20 50:12 | 182:7 184:16 | 4:19 9:2,14 | 116:2 |
| 51:3,15 52:1 | 185:11 186:1 | 10:13,15 89:6 | |
| 52:11 53:3,11 | | | |

Veritext Legal Solutions
866 299-5127

**[violating - warren]**

| | | | |
|---|---|---|---|
| **violating** 217:4 | 203:3 205:1,10 | 144:16 148:17 | **wanting** 200:11 |
| **violation** | 289:3,10 307:4 | 173:9 184:11 | 334:2 |
| 111:19 302:10 | 335:2 349:18 | 191:7 194:11 | **wants** 130:1 |
| 303:6 312:11 | 383:4 | 194:14 200:8 | 220:11,11 |
| 312:19 313:1 | **voted** 69:19 | 222:5,6 226:12 | 251:1 |
| 317:15 319:5 | 87:18 101:15 | 227:4 242:7 | **war** 122:12 |
| 320:18,19 | 101:16,21 | 244:19 250:7 | 124:2 198:3 |
| **violations** | 156:1 157:2 | 259:2,4 266:20 | 336:19 |
| 303:1 305:3 | 177:11 192:1 | 267:16 268:15 | **warm** 165:15 |
| 315:7 | 207:17 286:14 | 282:19 291:17 | 165:16 |
| **virginia** 15:13 | 294:6 307:20 | 296:18 301:18 | **warn** 148:11 |
| **vis** 306:14,14 | 308:15 | 309:11 312:7 | **warr** 5:13 6:17 |
| **vision** 50:15,18 | **voting** 192:5 | 318:20 319:15 | 6:18,18 7:5,5 |
| 51:2 224:7 | 218:7 307:12 | 320:6 323:12 | 72:2 192:12,16 |
| 383:12 384:12 | 330:15 | 337:10 359:3 | 195:5,5 197:15 |
| 385:16 | **vs** 1:6 392:4 | 360:2 361:6,6 | 197:16 198:3 |
| **vittor** 3:3 9:21 | 394:1 | 361:11 367:5 | 238:12,12,15 |
| 144:20 337:10 | | 367:20 368:1 | 336:19 338:11 |
| 345:5 346:9 | **w** | 379:6 383:9,16 | 358:4 |
| 389:10 | | 383:18 388:5 | **warren** 1:14 |
| **vividly** 177:4 | **w** 4:4 392:1 | 388:17,21 | 5:3 6:1 7:1 8:1 |
| **voicemail** | **wait** 71:17 | **wanted** 50:20 | 9:5 10:2,3,5,18 |
| 367:8,14,16 | 243:5 297:4 | 105:12 121:16 | 11:6 13:8 27:9 |
| **volume** 223:5 | **waiting** 295:2 | 129:10 161:4,5 | 27:10,15 29:12 |
| **voluntarily** | **waived** 389:17 | 180:17 187:17 | 37:7,8 42:1 |
| 368:15 | 392:23,23 | 188:15 189:13 | 72:1 77:5 80:5 |
| **voluntary** | **waiver** 249:9 | 192:6 194:14 | 87:2 89:14,16 |
| 30:17 32:6 | **waiving** 392:20 | 217:13,13 | 102:20 125:7 |
| **vote** 66:21 | **walker** 4:11 | 220:21 221:2 | 131:4 140:15 |
| 71:12 156:8 | 10:5 | 247:16 263:15 | 141:2 144:2 |
| 177:10,12,12 | **want** 29:16 | 290:10 291:18 | 146:19 150:19 |
| 183:7 188:7 | 70:21 71:7 | 325:19 335:13 | 154:6 157:6 |
| 189:4,10,13,17 | 74:2 78:15,21 | 367:12,12,13 | 165:7 175:16 |
| 189:18,19,21 | 86:21 87:10 | 367:19 368:21 | 192:11 195:4 |
| 190:4,9 202:10 | 89:20 121:18 | 374:3,8 | 196:11 198:12 |
| | 124:16 126:9 | | |
| | 127:13 130:8 | | |

Veritext Legal Solutions
866 299-5127

**[warren - witness]**

203:18 208:16
212:11 214:17
216:11 220:7
222:10 225:1
238:11 240:19
244:9 246:20
247:1 255:11
260:6 265:21
273:7 279:18
282:3 331:2
333:3 334:2
337:1 340:15
342:20 346:6
346:15 362:8
365:6 370:10
372:17 373:9
374:17 389:10
389:15 390:2,4
392:5 394:2
**warren's** 10:11
255:17
**warrens** 27:18
32:2
**washington** 2:7
2:15 15:12
**way** 24:18 25:1
25:6,8 27:2
70:17 93:17
96:2 103:18
139:5,8,16,18
139:21 141:14
171:21 172:1
181:20 184:3
194:9,16
205:13 217:3

218:14 223:5
261:21 269:4
278:2,7 292:20
307:12 309:3
319:8 321:1
323:2 325:8
377:20 386:13
386:19 387:18
388:9 391:14
**ways** 271:1
**we've** 21:20
41:18 187:1
271:15,15
325:10 388:4
**wear** 160:13
**wearing** 160:9
208:17
**website** 5:10
37:9,13,14,19
37:19
**webster** 4:12
10:4,4
**wedded** 152:18
**wednesday**
196:8 198:11
198:17
**weeds** 302:17
302:19
**week** 105:3
158:17 159:5
352:4 385:3
**weeks** 168:20
262:21 263:2
296:7 327:3,20
328:12,16

367:7
**welcome** 72:16
73:6 230:5
240:18 247:5
248:4 281:12
282:17 331:7
**welshbaptist....**
363:3
**went** 95:12,14
173:4 190:13
242:11 352:8
367:9,21
**whatsoever**
41:14 356:9
**whichever**
103:6,8,13
324:1
**white** 160:10
**wife** 167:17
208:2 361:8
**will's** 90:19
100:4 116:19
134:3 160:6
161:21 167:13
184:8 194:3
201:13,17
221:20 243:12
293:21 350:8
**willfully** 94:12
**william** 1:14
5:3 10:2,3,18
13:8 342:20
389:14 390:2,4
392:5 394:2

**willing** 132:15
172:10 211:18
263:17 367:5
**wilmerhale**
2:11 3:2
**wilmerhale.c...**
2:13 3:4
**win** 206:3
**winborn**
178:15 361:21
363:7,12,15
375:13,17,20
**wincopin** 4:6
**wing** 383:19,21
384:1
**winning** 205:20
**wish** 26:4
129:20
**wit** 391:2
**withdraw**
272:6 360:10
360:12 361:4
**withdrawal**
153:10
**withdrew**
360:8 361:16
**withhold** 86:15
**witness** 4:2
10:3,17 12:18
12:20 14:14
18:15 19:1,7
19:19 20:13
21:5 22:14
23:2,5,8,11,18
24:9,20 25:3

Page 76

**[witness - wm00837]**

| | | | |
|---|---|---|---|
| 25:10,21 26:9 | 90:18 93:2,7 | 165:10,13,15 | 308:20 310:19 |
| 26:17,21 27:14 | 95:8 96:4,15 | 165:19 166:9 | 311:19 314:15 |
| 28:1,17 29:1 | 99:16 100:3,14 | 168:13 169:5 | 315:14 316:14 |
| 31:3,8,15 32:1 | 101:2,14 103:2 | 169:19 172:9 | 317:7,20 |
| 32:10 33:7,13 | 104:19 106:10 | 178:6,14 | 321:10 324:1 |
| 35:2,4,9,20 | 108:1,11,16 | 179:16,20 | 328:6 329:2 |
| 36:11,20 37:17 | 109:11,18 | 182:8 184:17 | 334:17 337:8 |
| 38:11,18 39:2 | 110:11,13 | 184:19,21 | 337:14 342:12 |
| 39:6,10,18 | 112:9 113:2,10 | 185:12 186:2 | 349:5 360:20 |
| 41:7,14 42:10 | 114:3,11 | 192:1 195:7,9 | 371:2 376:17 |
| 44:2,7,12 45:3 | 115:15,19 | 196:21 197:19 | 376:20 377:1 |
| 45:17 46:12,17 | 116:8 118:6,13 | 197:21 202:15 | 377:15,19 |
| 46:20 48:1,5 | 119:2 120:5,9 | 206:6,15 207:5 | 378:4,9,16,20 |
| 48:16 49:13 | 121:6,15 122:5 | 207:13 209:3 | 379:4,15,21 |
| 50:1,5,14 51:4 | 123:7 124:8,14 | 210:9,15 211:3 | 380:19 381:15 |
| 51:16 52:2,12 | 124:19 127:17 | 211:10 212:1 | 381:17 385:7 |
| 52:19 53:4,12 | 128:2,9,14 | 213:3 215:9,15 | 385:10 389:9 |
| 54:6 55:3,9 | 129:12 130:10 | 215:21 218:11 | 391:5,16 |
| 56:4,10,14 | 130:21 131:13 | 219:8 222:7 | 392:13,16 |
| 57:1,8,15,19 | 134:7,15 136:1 | 223:7 226:21 | 393:2,5 394:24 |
| 59:9,16 60:5 | 137:11 138:13 | 227:11,14 | **witnesses** 336:2 |
| 61:16 62:17,19 | 139:13,18 | 229:21 231:2,4 | 336:5 |
| 63:10,16 64:17 | 140:3,11 142:6 | 243:11,14 | **wives** 208:13 |
| 65:9,18 66:11 | 142:20 143:7 | 246:19 247:1 | **wm** 144:8 |
| 68:8 69:17 | 143:16 144:8 | 249:6,10 | 258:9 |
| 70:9,14 71:7 | 145:19 146:5 | 250:12,19 | **wm00048** 7:10 |
| 73:3 75:9,18 | 147:17 148:5 | 251:9 254:11 | 266:1,5 |
| 78:3,11,21 | 148:10 152:2 | 254:20 255:1 | **wm00049** 7:10 |
| 79:5,12,20 | 152:13,17 | 258:15 266:10 | 266:2 |
| 82:13 83:2,5 | 153:6,16 154:2 | 268:12 269:17 | **wm00103** 6:14 |
| 83:11,17 84:3 | 155:6 157:14 | 270:16 274:20 | 165:8 166:6 |
| 84:11,16 85:5 | 159:14 161:17 | 277:6,11,18 | **wm00104** 6:14 |
| 85:10,18 86:10 | 162:4 163:3,9 | 278:5,11 279:2 | 165:8 |
| 86:19 87:14 | 163:15 164:1,7 | 279:10 280:7 | **wm00837** 6:8 |
| 88:4,9,21 89:5 | 164:14 165:1 | 300:1,18 | 144:3 145:4 |

Veritext Legal Solutions
866 299-5127

**[wm00840 - years]**

**wm00840**  6:8
144:4
**wm00846**  6:11
154:7,11
**wm00895**  6:3
125:8,12
**wm00897**  6:4
125:9
**wm06171**  6:5
131:5 132:4
**wm06172**  6:5
131:5
**wm831**  8:5
370:11,15
**wm832**  8:5
370:11
**wolverton**  74:9
74:20 78:14
234:17 235:3
344:10,11
372:5,8 381:2
**wolverton's**
372:12
**wondered**
93:14
**wondering**
165:20
**word**  28:11
58:4 81:16
85:11 94:8
115:3,8,20
126:16,17
141:10,14
147:8 152:3,4
152:5 179:2,3

191:20 247:8
286:6 305:14
305:16 315:5
342:8,10,12
**wording**  34:7
**words**  25:12
135:16 161:21
200:6 211:18
264:21 268:16
340:21 341:3,9
341:17 343:3
353:1,20
**work**  20:2
21:15 22:8
90:15 111:6
116:9 117:19
118:3,6,20
122:2,16
132:15 173:20
185:15 193:21
237:7 255:14
255:17,18
348:5
**worked**  352:7
363:8
**working**  40:9
121:20 352:1
352:18
**works**  139:7,13
376:16
**world**  315:6
**worldwide**
139:10
**worry**  249:5

**worse**  351:14
**write**  189:8
307:12 341:5
**writes**  119:8
120:18 206:17
**writing**  194:11
205:17 226:9
249:16,18
307:6 340:9
**written**  130:16
149:15 156:13
198:20 303:10
358:2 370:5
**wrong**  93:16
103:10 117:3
144:12,21
185:15 196:14
198:16 199:8
201:7 207:18
208:10 236:14
253:19 291:14
310:5 319:4,6
320:9 322:12
323:14 351:4
351:11,14
353:1 382:5
386:15 387:2,2
388:17
**wrote**  74:5,8,19
124:18 199:15
200:4,6 207:15
249:14 272:12
332:5 334:1
340:3,18,21
341:3,11

343:17 344:7,8
345:21 365:16
**wwarren**  240:4
**wwarren1953**
240:7

| x |
|---|

**x**  393:1

| y |
|---|

**yard**  193:19
**yeah**  23:14
29:19 69:8
74:17 103:20
124:14 185:17
186:11 190:3
216:12 230:7
232:5 246:19
248:7 249:10
254:11 269:14
270:6 290:4
291:7 292:2
294:7 295:15
313:18 315:21
329:6 336:12
337:8 340:20
342:5 343:2,2
364:2 366:10
367:2 369:5,10
**year**  285:13
292:3,4
**years**  13:14,19
185:5 197:5
200:12 209:19
223:16,21
252:11 288:4

Page 78

**[years - zoom]**

291:21 292:2
292:20 293:9
293:12,13,17
294:17,18
325:6 357:20
366:9
**yellow**   248:13
**york**   2:6
**younger**   225:13

**z**

**zoom**   3:10 4:11
10:11,13,14

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.