# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

Will McRaney,                    )
                                 )
    Plaintiff,                   )
                                 )CASE NO.
vs.                              )1:17-cv-00080-GHD-DAS
                                 )
The North American Mission       )
Board of the Southern Baptist    )
Convention, Inc.,                )
                                 )
    Defendant.                   )

DEPOSITION OF

30(B)(6) VIDEOTAPED DEPOSITION OF NAMB

THROUGH

KEVIN EZELL

March 3, 2023

8:58 a.m.


Butler Snow, LLP

1170 Peachtree Street NE

Suite 1900

Atlanta, Georgia


Robin K. Ferrill, CCR-B-1936, RPR

|  |  |
|---|---|
| Page 178 | Page 180 |

Page 178

1 NAMB, has NAMB produced to plaintiff already every
2 document in its possession, custody, or control
3 mentioning, referring to, describing, or using the
4 phrase "supporting organization"?
5   A.  I -- to my knowledge, I'm not aware of any
6 documents that we have not produced that you've
7 asked.
8   Q.  Did you ask anyone to confirm for you that
9 all such documents have already been produced to
10 plaintiff in order to prepare to testify today?
11      MR. PERLA:  Objection.  Asked and answered.
12  Scope.
13   A.  Not those specific words.  Our
14 relationships and partnerships with the states, the
15 specific words, they all know we're a supporting
16 partner.  We've been that for years.
17      MR. GANT:  Move to strike as nonresponsive.
18   Can you read back that question, Robin?
19      (WHEREUPON, the record was read back by the
20   reporter as follows:)
21      "Question:  Did you ask anyone to confirm
22   for you that all such documents have already
23   been produced to plaintiff in order to prepare
24   to testify today?"
25   Q.  (By Mr. Gant)  Yes or no?

Page 179

1      MR. PERLA:  Same objections.
2   A.  I did not ask anyone, no.
3      (Plaintiff's Exhibit 19, E-mail to Heider
4   from Mustard Seed Support, 6/1/17, Bates stamped
5   NAMB Supporting Organiztion 2491 - 92, marked
6   for identification.)
7   Q.  (By Mr. Gant)  Did you, in order to prepare
8 to testify today, review any of the documents
9 produced as NAMB Supporting Organization 001 through
10 3453?
11   A.  No.
12   Q.  I'm handing you what's been marked as
13 Exhibit 19.
14   A.  Okay.
15   Q.  It's Bates labeled NAMB Supporting
16 Organization 2491 through 92.
17      Have you ever seen this before?
18   A.  No.
19   Q.  Do you know who Scott Heider is?
20   A.  I do not.
21   Q.  Do you know whether that's someone who
22 works for NAMB?
23   A.  I don't know who Scott Heider is.
24   Q.  Do you know what mustard seed is?
25   A.  What a mustard seed is?

Page 180

1   Q.  Not the food, not the condiment.
2      Do you see at the top of this document it
3 says "from mustard seed support"?
4   A.  So you're asking me do I know what the
5 mustard seed organization is?
6   Q.  Correct.
7   A.  I do not.
8   Q.  Does NAMB sometimes receive contributions
9 from individuals through -- go ahead.
10   A.  Yes, sir.
11   Q.  And do you know how those are processed?
12      MR. PERLA:  Objection.  Vague.  Scope.
13   A.  Depends on how it's -- the money --
14 depending how it's given.  If it's -- some are
15 hand-delivered, but typically it's electronically.
16   Q.  (By Mr. Gant)  Okay.  Does this document
17 indicate that someone named Scott Heider
18 contributed $52.69 to NAMB on or around May 31, 2017?
19      MR. PERLA:  Objection.  Scope.
20   A.  Details, donation processing.  I mean, it's
21 a NAMB document so I believe it to be trustworthy.
22 It says donations, but that's a weird donation.
23   Q.  (By Mr. Gant)  What do you mean it's a weird
24 donation?
25   A.  We don't normally get $52.69 donations.

Page 181

1   Q.  I don't know.  Maybe there was a processing
2 fee charge.
3   A.  Typically -- I just -- I'm just saying
4 typically they're round numbers.
5   Q.  You can put that aside for now.
6      Based on your prior answer about the
7 authenticity of all documents produced by NAMB, I
8 take it that NAMB concedes that this is an authentic
9 document.
10   A.  Yes.
11      (Plaintiff's Exhibit 20, E-mail string to
12   Varnum from Smith, 11/8/17, Bates stamped NAMB
13   Supporting Organization 3450 - 3452, marked for
14   identification.)
15   Q.  (By Mr. Gant)  You now have Exhibit 20,
16 which is Bates labeled NAMB Supporting Organization
17 3450 through 3452.
18      MR. GANT:  I don't remember the particulars
19   of the protective order on these documents.  Do
20   you want Dr. McRaney to leave the room?
21      MS. HERRINGTON:  I don't think that's
22   necessary.  I think it's just a matter of
23   ensuring that the information does not leave
24   this room.
25      MR. GANT:  Okay.  I didn't think it

Page 182

1  required that. I just wanted to offer if you
2  thought that.
3      MS. HERRINGTON: Well, okay. I think we
4  should designate this part of the transcript as
5  confidential or sealed, however we want to go
6  about doing it.
7      MR. GANT: I don't remember what the order
8  provides for under that. If you want to make
9  that request on the record, I will take it --
10 I'm not taking a position on it right now.
11     MS. HERRINGTON: Okay. We'll -- at a break
12 we can see what it looks like and handle that
13 later.
14 Q.  (By Mr. Gant) Now, have you had a chance to
15 look at Exhibit 20?
16 A.  Yes, sir.
17     MR. PERLA: Let me make a standing
18 objection, at least what I hope you will agree
19 is a standing objection. I would object on the
20 basis of scope to any questioning about any
21 particular document pursuant to Topic 11. When
22 the topic simply identifies 3,453 documents,
23 it's not reasonable or within the scope to
24 expect the witness to be familiar with any one
25 of over 3,000 documents. That's my objection.

Page 183

1  May I have a standing objection?
2      MR. GANT: You may.
3      MR. PERLA: Thank you.
4      MR. GANT: Obviously, I don't -- I do not
5  agree with the objection, but your objection is
6  noted.
7  Q.  (By Mr. Gant) Is Exhibit 20 an authentic
8  document produced by plaintiff -- by NAMB in this
9  case?
10 A.  It's NAMB-produced and so...
11 Q.  And we discussed earlier Matt Smith.
12     Do you remember that?
13 A.  Yes.
14 Q.  And Matt Smith is on some of this e-mail
15 chain, correct?
16 A.  Yes.
17 Q.  And we were discussing Matt Smith's title,
18 at least at one point in time. Do you see this
19 e-mail chain is from November 2017?
20 A.  Yes, sir.
21 Q.  And at the time it says that Matt Smith was
22 chief accounting officer and controller of NAMB,
23 correct?
24 A.  Yes.
25 Q.  So he had responsibility for NAMB's money,

Page 184

1  right?
2  A.  Yes.
3  Q.  You can put that aside, then.
4      (Plaintiff's Exhibit 21, Document entitled,
5  The North American Mission Board of the Southern
6  Baptist Convention, Inc. Description of the
7  Organization, Bates stamped NAMB Supporting
8  Organization 2842 - 43, marked for
9  identification.)
10 Q.  (By Mr. Gant) Exhibit 21 is Bates labeled
11 NAMB Supporting Organization 2842 through 43. This
12 is an excerpt of a document. I don't remember
13 whether NAMB produced the entirety or whether they
14 just produced the excerpt, but as you can tell, it's
15 an excerpt from a broader document.
16     From looking at it, do you recognize what
17 document this comes from?
18     MR. PERLA: Can we confirm my standing
19 objection applies to this as well?
20     MR. GANT: Yes.
21     MR. PERLA: Thank you.
22 A.  It's a NAMB document, but I don't know from
23 what document that it comes from.
24 Q.  (By Mr. Gant) Do you have any reason to
25 doubt the authenticity of these pages?

Page 185

1  A.  No, sir.
2  Q.  It says -- in the first paragraph do you
3  see there's a heading, One Description of the
4  Organization?
5  A.  Yes.
6  Q.  Okay. It says, "The North American Mission
7  Board of the Southern Baptist Convention, Inc., NAMB
8  or Board, is incorporated in the State of Georgia as
9  a not for profit organization and has been approved
10 by the Internal Revenue Service as a tax exempt
11 organization under Section 501(c)(3) of the Internal
12 Revenue Code."
13     Do you see that?
14 A.  Yes.
15 Q.  Is that an accurate statement?
16     MR. PERLA: Objection. Vague. Calls for a
17 legal conclusion.
18 A.  What was the question?
19 Q.  (By Mr. Gant) Is that an accurate
20 statement?
21 A.  I would -- I'm not an attorney. I don't
22 know.
23 Q.  The next sentence says, The Board --
24 referring to NAMB -- is classified as a publicly
25 supported organization.

Page 186

1   Do you see that?
2   A.  Yes.
3   Q.  Which is not a private foundation under
4 Section 509(a)(1) of the Code.
5   Do you see that?
6   A.  I do.
7   Q.  Do you have any basis for disputing the
8 accuracy of that sentence?
9       MR. PERLA:  Objection.  Vague.  Calls for a
10  legal conclusion.
11  A.  I have no legal training so I would not
12 know.
13  Q.  (By Mr. Gant) You're not aware of any basis
14 for disputing or asserting that this is inaccurate,
15 are you?
16      MR. PERLA:  Same objections, plus asked and
17  answered.
18  A.  I don't have legal training.  I couldn't
19 answer.
20  Q.  (By Mr. Gant) You are the president of
21 NAMB, correct?
22  A.  Yes.
23      MR. PERLA:  Objection.  Same objections,
24  plus argumentative now.
25  Q.  (By Mr. Gant) And you have been the

Page 187

1 president of NAMB since 2010, correct?
2   A.  Yes.
3       MR. PERLA:  Same objection.
4   Q.  (By Mr. Gant) Do you know whether NAMB is
5 classified as a publicly supported organization under
6 the Internal Revenue Code?
7       MR. PERLA:  Objection.  Asked and answered.
8   It calls for a legal conclusion.
9   A.  I'm not an accountant or an attorney so I
10 don't know the legal -- I know we're nonprofit.
11  Q.  (By Mr. Gant) And sitting here, you don't
12 have any facts to dispute or disprove that NAMB is
13 classified as a publicly supported organization under
14 the Internal Revenue Code, do you?
15      MR. PERLA:  Same objections, including
16  asked and answered.
17  A.  Yeah, same answer.  Again, I have no legal
18 training or accounting training.
19      MR. GANT:  Can you read back my question,
20  please?
21      (WHEREUPON, the record was read back by the
22  reporter as follows:)
23      "Question:  And sitting here, you don't
24  have any facts to dispute or disprove that NAMB
25  is classified as a publicly supported

Page 188

1 organization under the Internal Revenue Code, do
2 you?"
3       MR. PERLA:  Same objections.
4   A.  No.
5   Q.  (By Mr. Gant) Do you?
6   A.  I don't have the ability to answer that
7 based on -- I don't know the legal or the accounting
8 terms involved.
9   Q.  So you're not a lawyer?
10  A.  I can't say because I don't know.
11  Q.  Okay.  So you don't know what a supported
12 organization is, do you?
13      MR. PERLA:  Objection.  Calls for a --
14  Q.  (By Mr. Gant) You just said you don't know.
15 You're not a lawyer.  You're not an accountant.  So
16 as a matter of --
17  A.  You said --
18  Q.  -- as a matter of the Internal Revenue
19 Code, do you know what a supported organization is?
20      MR. PERLA:  Objection.  Calls for a legal
21  conclusion.
22  A.  As I said, I know we're a nonprofit.  I
23 don't know the legal terms or the accounting terms,
24 but we're a nonprofit.
25  Q.  (By Mr. Gant) So you don't know whether

Page 189

1 NAMB is a supported organization under the Internal
2 Revenue Code, do you?
3       MR. PERLA:  Same objection, plus asked and
4   answered.
5   A.  I don't have legal background or accounting
6 background, and I know we're a nonprofit.
7   Q.  (By Mr. Gant) Are you able to answer my
8 question?
9       MR. PERLA:  Same objections, plus asked and
10  answered again.
11  Q.  (By Mr. Gant) I'm going to give you one
12 last chance.
13  A.  We're a nonprofit.  I don't have legal or
14 accounting background enough to -- I don't know the
15 code.  I know we're a nonprofit.
16      (Plaintiff's Exhibit 22, Letter to Williams
17  from Smith, 11/17/2017, Bates stamped NAMB
18  Supporting Organization 1253, marked for
19  identification.)
20  Q.  (By Mr. Gant) Exhibit 22 is Bates labeled
21 NAMB Supporting Organization 1253.  You see on the
22 bottom of this it says Matthew T. Smith, controller?
23      MR. PERLA:  Like to apply my standing
24  objection to this as well.
25      MR. GANT:  The point of a standing

48 (Pages 186 - 189)

| | |
|---|---|
| Message | |
| **Sent**: | 11/8/2017 5:25:15 AM |
| **To**: | Kaylyn Varnum [Varnum@nonprofitcpa.com] |
| **CC**: | Michele Wales [Wales@nonprofitcpa.com]; Mike Batts [Batts@nonprofitcpa.com] |
| **Subject**: | RE: Use of Send Relief for disaster relief and compassion ministry activities |



## Matt Smith CPA, CGMA
*Chief Accounting Officer & Controller*
North American Mission Board
770.410.6433
NAMB.net

*This message is for the designated recipient only and may contain privileged, proprietary, or otherwise private information. If you have received it in error, please notify the sender immediately and delete the original. Any other use of the email by you is prohibited.*

*We value your feedback. Please click here to complete a short survey. Thank you!*

**From:** Kaylyn Varnum [mailto:Varnum@nonprofitcpa.com]
**Sent:** Wednesday, November 1, 2017 4:51 PM
**To:** Smith, Matthew <msmith@namb.net>
**Cc:** Michele Wales <Wales@nonprofitcpa.com>; Mike Batts <Batts@nonprofitcpa.com>
**Subject:** Use of Send Relief for disaster relief and compassion ministry activities

Matt:

We are writing to you as a follow up to our call late last month regarding NAMB's use of Send Relief, Inc. f/k/a FamilyNet, Inc. ("Send Relief") to conduct certain compassion and disaster relief ministries historically conducted by NAMB. Before we begin researching and evaluating specific tax compliance implications of this change in structure, we wanted to summarize our understanding of the facts and issues to be addressed in order to make sure you are in agreement regarding the scope and focus of our work on this project.

It is our understanding that Send Relief has been in existence since 1983, was originally formed to conduct certain radio and television ministry activities of the Radio and Television Commission of the Southern Baptist Convention (a separate entity which later merged with a few other entities into what is now known as NAMB). In its historical Forms 990, Send Relief reported to the IRS that it was a functionally-integrated Type III supporting organization of NAMB. Based on the available information, it is unclear what Send Relief's public charity classification was at the time it was formed, but the language within its original Articles of Incorporation appears to indicate that it may have been formed as a supporting organization of the Radio and Television Commission of the Southern Baptist Convention. Based on our conversations and a reading of the information you have forwarded to us, it is our further understanding that Send Relief has been dormant with no activities since the late 2000s. In its 2009 Form 990 (the most-recently-filed Form 990), Send Relief disclosed that during 2008 it "completely ceased all operations and became dormant."

NAMB recently received approval from its Board and the Executive Committee of the Southern Baptist Convention to use Send Relief for activities including disaster relief activities, ministries for victims of human trafficking, hunger relief ministries, English as a second language ministries, and ministries for refugees. In light of this, it is our understanding that NAMB has worked with its general counsel to "clean up" the governing documents of Send Relief, including formally changing the entity's legal name to Send Relief, Inc., updating its Texas registration, and updating certain provisions of Send Relief's governing documents—and that such changes were effective on October 5, 2017. Further, it is our understanding that the Executive Committee of the Southern Baptist Convention



included Send Relief (under its former name, FamilyNet, Inc.) in its most recent group exemption ruling letter submitted to the IRS in June 2017. The group exemption letter listed Send Relief as an organization which should be added as a subordinate organization in the group exemption ruling and further indicated that Send Relief was inadvertently deleted from the letter in a previous year, but remains a subordinate organization. The group exemption letter further indicated that there were no subordinates in the group exemption that had made changes to their purposes, character, or method of operation and did not disclose Send Relief's name change (as such changes as not been formally adopted as of the date that the group exemption submission was filed).

Send Relief is currently listed on the IRS' exempt organization master listing under the name FamilyNet, Inc. and is currently classified by the IRS as a church and a subordinate under the group exemption ruling issued to the Executive Committee of the Southern Baptist Convention. NAMB plans to transition the disaster relief and compassion ministry activities to Send Relief in late 2017.

Finally, it is our understanding that Send Relief plans to solicit contributions from the general public, including from sources that might not otherwise be able to/be willing to contribute to a church, or an otherwise overtly religious entity. Send Relief's funding sources may include government grants, contributions from for-profit organizations, contributions from individuals, contributions from churches and/or related entities, etc.

You recently asked us a specific question regarding the transition of employees from NAMB to Send Relief and the related payroll tax filings associated with such a transition. You also asked us for any additional tax compliance considerations we had regarding the use of Send Relief for these activities.

Given the change in name and purpose/use of Send Relief, together with the fact that Send Relief has been dormant for a number of years and was apparently previously classified as a Type III supporting organization, we have identified the following items of consideration with regard to this new structure and Send Relief's new activities, which are summarized in bullet form below:

- Whether Send Relief should request confirmation of Form 990 exemption as an integrated auxiliary of NAMB or the Executive Committee of the Southern Baptist Convention and, if so, a determination of the appropriate format for such a request

- Whether Send Relief should request reclassification as a publicly supported organization described in §509(a)(1) and §170(b)(1)(A)(vi) of the Internal Revenue Code and, if so, a determination of the appropriate format for such a request

  o As we discussed, there are certain restrictions applicable to supporting organizations, including specific types of restrictions with respect to contributions that may be made to supporting organizations. Recognition by the IRS as a publicly-supported organization would provide broader opportunity regarding the types of contributions that the organization would be eligible to receive.

- Whether Send Relief is required to notify the IRS of the changes in its purpose, activities, governance, and name and, if so, a determination of the appropriate method for such notification (including the potential filing of a Form 1023 exemption application in order to receive affirmative confirmation from the IRS of Send Relief's tax exempt status, public charity classification, and Form 990 exemption)

- Whether Send Relief must apply for (or renew its) Texas franchise tax exemption

- Additionally, you asked whether and to what extent the receipt of governmental grants would impact the BMWL audit work (including specifically, what amount of government grants would trigger the need for an A-133 audit).

Before we begin researching and evaluating the appropriate method for addressing each of the questions above, please confirm (by responding affirmatively to this email) that you would like for us to evaluate the issues summarized above and provide our recommendations thereon.

If you have any questions concerning the above, please contact me accordingly. As always, we greatly appreciate the opportunity to be of service, and look forward to receiving confirmation from you that you would like for us to proceed with our evaluation as outlined above.

Best regards,

**Kaylyn A. Varnum, CPA**
Manager • Tax Services

**BATTS MORRISON WALES & LEE, P.A.**
CERTIFIED PUBLIC ACCOUNTANTS

Audit & Assurance • Tax • Advisory Services

KEEPING WATCH FOR NONPROFITS ACROSS THE UNITED STATES
NATIONAL HEADQUARTERS – ORLANDO

800.960.0803 ext. 322 • www.NonprofitCPA.com

The information contained in this message is privileged and confidential information and protected from disclosure. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately and permanently delete the message from your devices and systems. Thank you. Batts Morrison Wales & Lee, P.A.

The North American Mission Board of the  
Southern Baptist Convention, Inc.

5

## 1    Description of the Organization

The North American Mission Board of the Southern Baptist Convention, Inc. (NAMB or Board) is incorporated in the state of Georgia as a not-for-profit organization and has been approved by the Internal Revenue Service as a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code (the code). The Board is classified as a publicly supported organization, which is not a private foundation under Section 509(a)(1) of the code. Contributions received are tax-deductible within limitations prescribed by the code.

The Board is an agency of the Southern Baptist Convention (SBC) and receives most of its financial support from gifts received through the Executive Committee of the SBC, mainly through the Cooperative Program (CP) and the annual Annie Armstrong Easter Offering™ (AAEO). The CP is Southern Baptists' method of supporting missions and ministry efforts of state conventions, associations, and the SBC. The Board received revenues ratably over the course of the year based on the annual budget allocation of the SBC. For 2011 and 2010, the Board received 22.79% of the CP's funds and recorded these funds as unrestricted contribution revenue on the consolidated statement of activities. The AAEO honors the life and work of Annie Walker Armstrong and is given to the Board to enable missionary personnel to share the good news of Jesus Christ. The Board works in partnership with state conventions to distribute monies given through the offering to missionaries and their efforts. The Board records this offering as unrestricted contribution revenue on the consolidated statements of activities. The SBC also funds other programs (e.g., disaster relief and hunger relief). Total support received from the SBC for the years ended December 31, 2011, and 2010, was $99,544,976 and $99,253,968, respectively.

The Board aids and shares in the support of Southern Baptist churches, media, missions, and missionary efforts in the United States, Canada and their territories by providing direct programs and activities and by sharing in the funding of state convention programs and activities. For the years ended December 31, 2011 and 2010, the Board provided $44,856,234 and $45,718,242, respectively, in funding to SBC state conventions and associations for these activities.

The consolidated financial statements of the Board include the accounts of its affiliates, subsidiaries and supporting organizations: NAMB Covenant Productions, Inc. (Covenant), Family Net, Inc. (Family Net), TimeRite Agency, Inc. (TimeRite), and New Orleans Baptist Ministries, Inc. (NOBM). All significant intercompany transactions have been eliminated in the accompanying consolidated financial statements.

FamilyNet, Covenant, and NOBM are also exempt from federal income tax under Section 501(c)(3) of the code. TimeRite is a corporation subject to income tax. The Board records income taxes with respect to its for-profit entity as well as any unrelated business income generated at the tax exempt entities using the asset and liability method under which deferred tax assets and liabilities are determined based on the differences between the financial accounting and tax bases of assets and liabilities. Deferred tax assets and liabilities at the end of each period are determined using the currently enacted tax rate expected to apply to taxable income in the period that the deferred tax asset or liability is expected to be realized or to be settled.

Certain information concerning the Board's affiliates, subsidiaries, and supporting organizations is as follows:

**Covenant** is a nonprofit supporting organization of the Board established to assist the Board in effecting the Board's religious purposes by the placement of communication media. Covenant had no financial activity in 2011 or 2010.

**FamilyNet** is a non-profit corporate affiliate of the Board that discontinued operations in 2007. FamilyNet had no financial activity in 2011 or 2010.

**TimeRite** is a for-profit corporate subsidiary of the Board, which operates in conjunction with FamilyNet. TimeRite had no financial activity in 2011 or 2010.



EXHIBIT NAMB 21

The North American Mission Board of the  
Southern Baptist Convention, Inc.

6

**NOBM** is a nonprofit supporting organization of the Board and consists of three ministry centers conducting ministry evangelism throughout the city of New Orleans and one ministry center in New York City. The ministry centers include: Baptist Friendship House, Carver Baptist Center, Rachel Sims Baptist Mission, and David Dean Mission House. The Board transferred its membership interest in NOBM to The New Orleans Baptist Association on February 26, 2010.

## 2  Significant Accounting Policies

### Basis of Accounting

The consolidated financial statements of the Board are prepared under the accrual method of accounting.

### Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts that are reported in the consolidated financial statements and accompanying disclosures. Although these estimates are based on management's best knowledge of current events and actions that NAMB may undertake in the future, actual results may be different from the estimates. Significant items subject to such estimates and assumptions include but are not limited to, fair value of investments, carrying amount of property and equipment, allowances for receivable balances, discount rates used for beneficial interests, allowances for loans and liability for post retirement medical benefits.

### Cash and Cash Equivalents

For purposes of the consolidated statements of cash flows, cash and cash equivalents include all highly liquid investments with original maturities of three months or less with the exception of cash and cash equivalents held for reinvestment. These accounts, at times, may exceed federally insured limits. The credit risk is the amount of deposit in excess of federally insured limits. NAMB mitigates this risk by depositing and investing cash with major financial institutions. NAMB has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash.

### Receivables

Accounts receivable are reported net of any anticipated losses due to uncollectible accounts. The Board's policy for determining when an account is past due or delinquent is when it is 90 days past due. Provisions for uncollectible accounts are recorded as additions to the allowance for doubtful accounts when it is determined that the amount will be uncollectible.

The allowance for doubtful accounts is maintained at a level, which in management's judgment, is adequate to absorb potential losses inherent in the receivables portfolio. The amount of the allowance is based on management's evaluation of the collectability of the receivables portfolio, including the nature of the portfolio, trends in historical loss experience, specific impaired notes, and economic conditions.

### Investments

Investments are stated at fair value. Fair value is determined from quoted market prices, market prices of similar instruments, or estimates developed using assumptions or models. Investment expenses were $710,790 and $581,626 for the years ended December 31, 2011 and 2010, respectively and have been included in investment income.

The Board accounts for its investments in marketable securities with readily determinable fair values at fair value with realized and unrealized gains and losses included in the consolidated statements of activities.

Investment income and realized and unrealized gains (losses) are allocated to net asset classes dependent upon donor specifications if applicable or the Board's interpretation of relevant state law for endowment investments. Investment expenses are reported as a reduction of net realized gains (losses) on investments.

November 17, 2017

Sherry Williams
7000 Mill Creek Rd
Shawnee, KS 66217-9526

Dear Mrs. Williams,

Thank you for your charitable gift in the amount of $2,000.00 from your Individual Retirement Account with Scottrade designated for Hurricane Relief. We received your gift, via check issued on October 18, 2017, directly from your plan custodian on October 30, 2017 and acknowledge that it is your intention to make a "Qualified Charitable Distribution" from your IRA as allowed under section 408(d)(8) of the Internal Revenue Code.

In that connection, we warrant to you that our organization is qualified under section 170(b)(1)(A) of the Internal Revenue Code and that your gift was not transferred to either a donor advised fund or a supporting organization as described in section 509(a)(3). We further warrant that no goods or services of any value were or will be transferred to you in connection with this gift. **Please note: A QCD is not a tax-deductible charitable gift. A QCD may, however, count towards the annual IRA required minimum distribution (RMD) and not be deemed taxable income. Please consult with your own professional tax advisor regarding this and all appropriate matters.** Please retain this letter with your important tax documents and provide a copy to your tax preparer.

Through your partnership with us you have brought compassion to those who have found themselves in desperate places. Thank you again for your investment in Kingdom work and may God bless you!

Sincerely,


Matthew T. Smith
Controller


EXHIBIT RKF
NAMB 22