# EXHIBIT D

Page 1

1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF MISSISSIPPI
2
                        CASE NO.:  1:17-cv-00080-GHD-DAS
3
4    Will McRaney,
5         Plaintiff,
6    v.
7    The North American Mission
     Board of the Southern Baptist
8    Convention, Inc.,
9         Defendant.
     _____/
10
11                VOLUME I (Pages 1-165)
12
     VIRTUAL ZOOM
13   DEPOSITION OF:       STEVE DAVIS
14   DATE:                February 9, 2023
15   TIME:                8:33 a.m. - 12:04 p.m.
16   TAKEN BY:            Plaintiff
17   PLACE:               Virtual Zoom
18   REPORTED BY:         SUSAN WINTER, CSR, RPR
                          Notary Public, State of Florida
19
20
21
22
23
24
25

Page 30

1 finishing -- do you do a dissertation to get a
2 doctorate in ministry?
3   A. Yes.
4   Q. Okay. So is that what was happening? You
5 had finished your classwork?
6   A. Yes.
7   Q. And what was your doctorate or your thesis
8 in?
9   A. In church planting.
10  Q. Do you remember the title?
11  A. I think the title was A Strategy For
12 Starting Southern Baptist Churches.
13  Q. And were you a pastor at University
14 Baptist Church?
15  A. Yes.
16  Q. And what was the time period you served as
17 pastor there?
18  A. '76, and I was there six years to '82.
19  Q. And where did you go from there?
20  A. I went to Castle Hills First Baptist in
21 San Antonio from '82 to '89, and I was the associate
22 pastor.
23  Q. Where did you go next?
24  A. First Baptist Church, Humble, Texas, in
25 the Houston area for five years from '89 to '94.

Page 31

1 Well, actually, December of '93, I guess. I started
2 then at First Baptist in Garland, Texas, in the
3 Dallas area in January of '94.
4   Q. Okay.
5   A. And was there 10 -- 10 years.
6   Q. All right. Until you became executive
7 director at the State Convention of Indiana?
8   A. That's correct.
9   Q. Okay. And how long did you have that
10 executive director position in Indiana?
11  A. Almost nine years.
12  Q. Is that similar to the position that
13 Dr. McRaney had at BCMD?
14  A. Yes. Yeah. Exact -- exact same position.
15  Q. Okay. And just for -- to make sure we're
16 on the same page.
17      What do you understand I'm referring to
18 when I say BCMD?
19  A. The Baptist Convention of Maryland/Delaware.
20  Q. Okay. And how long were you at the State
21 Convention Indiana as an executive director?
22  A. Almost nine years.
23  Q. Until --
24  A. February --
25  Q. -- 2000 --

Page 32

1   A. February of 2011 is when I went -- went on
2 board as a vice president for the midwest region
3 with the North American Mission Board.
4   Q. That was your first position at NAMB?
5   A. Yes, sir.
6   Q. Okay. So how long were you vice president
7 for the midwest region at NAMB?
8   A. Well, I was the vice president for --
9 right at two years. And then I was asked to move to
10 take over the south convention region, so -- and
11 then when we lost the executive director that
12 followed me in the midwest, I assumed -- most of the
13 midwest conventions was my responsibility.
14      And then when Jeff Christopherson at NAMB
15 moved into a different position, they asked me to
16 also work with the northeast conventions. So by the
17 time I retired with NAMB, I was covering that
18 large -- that large area. Basically everything from
19 Oklahoma and Texas east was -- were the conventions
20 I worked with.
21  Q. Okay. Did you still have responsibility
22 for the northeast at the time you retired from NAMB?
23  A. Yes.
24  Q. Okay. When, as best you recall, did you
25 assume responsibility for the northeast region at

Page 33

1 NAMB?
2   A. January of 2015, right about there. It
3 was kind of --
4      (Inaudible crosstalk.)
5   A. It was after our January meeting, so it
6 wasn't like January 1. It would be more like the
7 middle of January.
8   Q. (By Mr. Gant): Okay. So am I right that
9 you had responsibility for the northeast region at
10 NAMB for approximately four years from January 2015
11 to January 2019?
12  A. That's correct.
13  Q. Okay. And I think you said you retired on
14 or around January 1st, 2019; is that right?
15  A. That's right.
16  Q. Were you employed at NAMB into 2019 at
17 all, or did it end at the end of December 2018?
18  A. No. It end -- it ended there. Yeah.
19  Q. Okay. So you were not an employee of NAMB
20 at any time in 2019 or after, correct?
21  A. No. Now, I did -- I did some consulting
22 work for a couple of conventions. NAMB asked if I
23 could help them. They had lost their executive
24 directors and they asked if I could help them in
25 their executive director search.

Page 34

1  Q. When was this consulting work for NAMB?
2  A. I don't remember the date, but I helped
3  the Ohio Convention in their executive director
4  search. So that would have been probably three
5  years ago maybe.
6  Q. Any other consulting work for NAMB that
7  you recall?
8  A. No. That was it.
9  Q. Okay. And how were you compensated? Was
10 it hourly or on some other basis?
11 A. Just expenses basically and my time.
12 Yeah.
13 Q. Well, how did you charge for your time?
14 On an hourly basis or some other basis?
15 A. It basically just -- basic -- basically
16 the time it took me to go for a meeting and, you
17 know, if I had a phone conversation or something
18 that was an hour or so, it was kind -- kind of like
19 that.
20     It wasn't really -- it was more or less
21 just an honorarium plus expenses, I guess, is how I
22 would word it.
23 Q. So was it a flat fee that you came up with
24 or did it --
25 A. No. I didn't -- I didn't -- I didn't

Page 35

1 really ask for anything. They just said, Well,
2 we're going -- we're going to give you a couple
3 thousand dollars for what you've done.
4  Q. Do you have an ongoing or open-ended
5 consulting relationship with NAMB, or is it
6 concluded?
7  A. Oh, no. That was just for that specific
8 thing that they asked me if I would help them.
9  Q. Okay. Have you done any consulting work
10 for NAMB in connection with Dr. McRaney or this
11 case?
12 A. No, sir.
13 Q. Since you retired from NAMB at the end of
14 December 2018, who, if anyone, from NAMB either past
15 or current personnel have you spoken with about
16 Dr. McRaney or this case?
17 A. No one. The only one I've talked with
18 would be George McCallum, the -- NAMB's attorney
19 who -- who just called to let me know that, you
20 know, just an update that there would be a time of
21 deposition. So that -- but as far as any other
22 conversations, I've had no conversations with anyone
23 anywhere about this at all.
24 Q. Have you done any independent reading
25 about this case, any aspect --

Page 36

1  A. No.
2  Q. -- of it?
3  A. No.
4  Q. Have you read any articles in the media or
5 on blogs about this case?
6  A. The only articles I've read would be what
7 was posted in Baptist Press, the national Baptist
8 Press, a couple times where they had an article that
9 the case was moving forward and -- that's all.
10 Q. What about any other publications that
11 have discussed the case?
12 A. No, nothing.
13 Q. I take it from your answer you have not
14 read, let's call it the complaint, or supplemental
15 pleading? These are the documents that formally
16 describe the claims and allegations in the case.
17     Have you ever read any of those?
18 A. No, sir.
19 Q. Okay. Have you ever read any legal
20 filings by NAMB in this case that --
21 A. No, sir.
22 Q. -- you recall?
23 A. No, sir.
24 Q. Okay. When you spoke with Ms. Carrington
25 on the phone on either occasion, did she say

Page 37

1 anything about NAMB's position? NAMB says, It's not
2 true, we deny the allegation, the allegations are
3 false, anything like that?
4  A. No, sir.
5     MS. CARRINGTON: Objection to the form of
6    the question.
7     But you can answer.
8  A. No.
9  Q. (By Mr. Gant): So I take it then you
10 don't actually know what Dr. McRaney is alleging in
11 his lawsuit; is that correct?
12    MS. CARRINGTON: Object to the form of the
13   question.
14 A. Not to the specifics, just the
15 generalities that I've shared with you earlier.
16 Q. (By Mr. Gant): Okay. But if you haven't
17 read the lawsuit, how do you even know the
18 generalities of what Dr. McRaney is alleging?
19 A. That's what I explained to you before.
20 That's -- that's kind of what -- I can't remember
21 whether it was Kat or Derek that was sharing with me
22 this -- these are the things.
23 Q. Okay.
24 A. Just in general.
25 Q. Oh, NAMB's lawyers described to you some

```
                                                              Page 247                                                                Page 249
 1   break that Kat requested.                                         1         THE CONCIERGE:  Sorry, Counsel.  That was
 2         THE VIDEOGRAPHER:  We're going off the                      2   Tab 25.  One moment.
 3   video record.  The time is 2:42.  This                            3         MR. GANT:  Tab 37, please.
 4   concludes Media Unit 3.                                           4         THE CONCIERGE:  (Complies.)
 5         You may proceed.  Sorry.                                    5         MR. GANT:  That's it.  Okay.
 6         We're going off the record.                                 6         (Deposition Exhibit No. 25 was marked for
 7         (A brief recess was taken.)                                 7         identification.)
 8         THE VIDEOGRAPHER:  We're back on the video                  8     Q.  (By Mr. Gant):  And I'm just going to ask
 9   record.  The time is 2:53 p.m.  This begins                       9   about -- like the previous exhibit, you're welcome
10   Media Unit 4.                                                    10   to review as much as you want, but I'm only going to
11         MR. GANT:  Okay.  Our next exhibit is                      11   ask you about the top email.
12   going to be 24, which is Tab Number 18, I                        12     A.  Okay.
13   believe.                                                         13     Q.  So the top email there is an email from
14         THE CONCIERGE:  (Complies.)                                14   you to Dr. McRaney dated February 10, 2015.
15         MR. GANT:  It's Bates-labeled NAMB 6790                    15         Do you see that?
16   through 93.                                                      16     A.  Yes.
17         (Deposition Exhibit No. 24 was marked for                  17     Q.  Okay.  Do you have any reason to doubt
18         identification.)                                           18   that you received that email from -- strike that.
19     Q.  (By Mr. Gant):  You're welcome to read the                 19         Do you have any -- do you recognize the
20   whole exchange, but I'm actually only going to ask               20   email?
21   you about the top email there which is right in                  21     A.  Yes.  I mean, I don't recall it, but I'm
22   front of you on the screen.                                      22   reading it and I know it's from me, so yes.
23     A.  Okay.                                                      23     Q.  You -- you believe that that is an email
24     Q.  Is this an email from Dr. McRaney to you                   24   that you sent to Dr. McRaney?
25   dated February 9, 2015?                                          25     A.  Yes.

                                                              Page 248                                                                Page 250
 1     A.  That's what it looks like, yes.                             1     Q.  Okay.
 2     Q.  Okay.  Do you remember receiving this                       2         MR. GANT:  All right.  You could put that
 3   email?                                                            3   aside for now.  Thank you.
 4     A.  I'm reading it now.                                         4         THE CONCIERGE:  (Complies.)
 5                                                                     5         MR. GANT:  The next exhibit is 26, Tab 19,
 6         THE WITNESS:  Okay.  You can scroll down.                   6   Bates-labeled NAMB 6802 through 6805.
 7   Is there more?                                                    7         THE CONCIERGE:  (Complies.)
 8     Q.  (By Mr. Gant):  I'm just asking you about                   8         (Deposition Exhibit No. 26 was marked for
 9   the top email.                                                    9         identification.)
10     A.  Okay.  Yeah.  Sure.  I mean, I don't -- I                  10     Q.  (By Mr. Gant):  I'm going to have the
11   didn't remember it, but, yes, I read it and I see                11   court reporter (sic) go to the bottom, the first
12   the content.  Yes.                                               12   email in time, and then ask to scroll up at your
13     Q.  Okay.  Do you have any reason to doubt                     13   direction so that you can look at the whole thing
14   that you received this email from Dr. McRaney?                   14   and then I'm going to ask you similar questions I've
15     A.  No.                                                        15   asked the past few exhibits.
16     Q.  Do you have any reason to doubt that it is                 16     A.  Okay.
17   an accurate copy of the email that Dr. McRaney sent              17         THE WITNESS:  Okay.  You can scroll up.
18   to you?                                                          18         THE CONCIERGE:  (Complies.)
19     A.  No.                                                        19         THE WITNESS:  Whoa, whoa, whoa, whoa.
20         MR. GANT:  All right.  You can put that                    20   Okay.  Hold on just a second.  Can you back it
21   aside.                                                           21   up just a little?
22         THE CONCIERGE:  (Complies.)                                22         THE CONCIERGE:  (Complies.)
23         MR. GANT:  The next exhibit is 25, Tab 37,                 23         THE WITNESS:  A little more.
24   which is Bates-labeled NAMB 6807 through 6813.                   24         Is that a response?
25   No.  That's the wrong one.                                       25         THE CONCIERGE:  (Complies.)
```

Page 251

1  THE WITNESS: Okay.
2  MS. CARRINGTON: I think that's the
3  signature line for Jeff for the next email.
4  THE WITNESS: Okay. You can scroll on up.
5  THE CONCIERGE: (Complies.)
6  THE WITNESS: Okay. Scroll on up.
7  THE CONCIERGE: (Complies.)
8  THE WITNESS: Okay. Scroll on up.
9  THE CONCIERGE: (Complies.)
10  THE WITNESS: Okay.
11  THE CONCIERGE: (Complies.)
12  THE WITNESS: Okay. Scroll on up.
13  THE CONCIERGE: (Complies.)
14  THE WITNESS: Okay. Scroll up.
15  THE CONCIERGE: (Complies.)
16  THE WITNESS: All right.
17  THE CONCIERGE: (Complies.)
18  THE WITNESS: Okay.
19  THE CONCIERGE: (Complies.)
20  THE WITNESS: Okay. You can scroll up.
21  MR. GANT: That's the last -- that's the
22  first page.
23  THE WITNESS: Okay.
24  Q. (By Mr. Gant): All right. Have you had a
25  chance to review Exhibit 26?

Page 252

1  A. Yes.
2  Q. Is Exhibit 26 a series of emails that you
3  either wrote or received?
4  A. Yes.
5  Q. Do you have any reason to doubt that these
6  are true and accurate copies of emails that you
7  wrote and received?
8  A. No.
9  MR. GANT: You can put that aside. Thank
10  you.
11  THE CONCIERGE: (Complies.)
12  MR. GANT: The next exhibit is 27, Tab 20,
13  please.
14  THE CONCIERGE: (Complies.)
15  MR. GANT: This is Bates-labeled NAMB 6896,
16  one-page document.
17  (Deposition Exhibit No. 27 was marked for
18  identification.)
19  Q. (By Mr. Gant): I'd ask you to direct the
20  court reporter (sic) and just read this and then
21  I'll ask you a couple of questions.
22  A. Okay.
23  THE WITNESS: Okay. You can scroll up.
24  THE CONCIERGE: (Complies.)
25  THE WITNESS: Okay.

Page 253

1  THE CONCIERGE: (Complies.)
2  THE WITNESS: Okay.
3  THE CONCIERGE: (Complies.)
4  MR. GANT: I should have said the exhibit
5  is 96 to 97, but there's no substantive content
6  on 97, but it is part of the exhibit.
7  Q. (By Mr. Gant): Have you had a chance to
8  review Exhibit 27?
9  A. Yes.
10  Q. Do you recognize this?
11  A. Yes.
12  Q. What is it?
13  A. I'm sorry?
14  Q. What is it?
15  A. It's an email regarding how -- how we were
16  going to handle insurance for Michael Crawford.
17  Q. And it's an email that you wrote to
18  Dr. McRaney on March 2nd, 2015, correct?
19  A. That's correct. Right.
20  Q. Okay. All right. For some reason NAMB,
21  when they produced it, blocked out all the money
22  figures in the email that you wrote. I'm not sure
23  why. But speaking of money, I didn't ask you
24  earlier and meant to.
25  What was your salary from NAMB at the time

Page 254

1  you retired?
2  A. I don't remember. I'm sorry.
3  Q. What's your best estimate?
4  A. I'd say 90,000, maybe 100. I'm not sure.
5  Somewhere in that neighborhood.
6  Q. Okay. And then did you receive benefits
7  in addition?
8  A. Benefits such as?
9  Q. Health insurance.
10  A. Yes, health insurance and reimbursement
11  for business expenses. Yeah.
12  Q. Okay. Any other benefits you can think
13  of, financial benefit?
14  A. No.
15  Q. Okay. Have you ever heard the term
16  supporting organization used at the time you worked
17  at NAMB?
18  A. Supporting organization? No. I don't
19  recall that.
20  Q. Okay. Are you personally aware of
21  Dr. McRaney ever having lied to anyone?
22  MS. CARRINGTON: Object to the form of the
23  question.
24  A. I'm having a hard time trying to answer
25  that because in a meeting -- in that February

23 (Pages 251 - 254)

Page 255

1 meeting Will was -- I can't remember what was --
2 what was said. All I remember was there were things
3 that he said that were complete opposite that
4 contradicted what Kevin had said.
5     And at one point in the meeting one of his
6 board officers said, But we don't believe our
7 executive director is a liar and we don't believe
8 Kevin is a liar. That statement was made at a
9 meeting. And I remember sitting there thinking,
10 Well, one of them isn't telling the truth.
11     Because you can't say this and you can't
12 say that, the direct opposite, and say that both of
13 them are true when both of them are the exact
14 opposite of what was said.
15     So I guess that's the only way I can
16 respond. Other than that, I would say no.
17   Q. Okay. So you don't remember any instance
18 in which you heard Dr. McRaney say something that
19 you -- or write something that you knew based on
20 your own personal experience or observations was
21 false?
22   A. No.
23   Q. On your LinkedIn page you have written
24 Senior Pastor Baptist Southern Convention June 1976
25 to June 2011.

Page 256

1     Were you aware of that?
2   A. To June 2011?
3   Q. Yes.
4     MR. GANT: Let's just bring it up.
5   A. No.
6     MR. GANT: It's Tab -- Tab 1.
7     THE CONCIERGE: (Complies.)
8     MR. GANT: I guess we'll mark it as
9 Exhibit 28.
10    (Deposition Exhibit No. 28 was marked for
11    identification.)
12    (By Mr. Gant): Before we go to this
13 exhibit, just to follow up on something I asked you
14 a moment ago.
15    I asked you if you'd ever heard the phrase
16 supporting organization. You said, no, correct?
17   A. That's correct.
18   Q. Did you ever hear anyone describe NAMB as
19 a supporting organization of BCMD?
20    MS. CARRINGTON: Object to the form of the
21    question.
22   A. I don't remember that term.
23   Q. (By Mr. Gant): So I take it -- I take it
24 you don't remember anyone ever referring to NAMB as
25 a supporting organization of BCMD; is that correct?

Page 257

1   A. Like I said, I don't remember that term,
2 no.
3   Q. So you don't remember anyone using it in
4 that way, correct?
5   A. That's correct. And this -- this -- this
6 that you put up, that's -- that's not me. I've
7 never been a part of Trinity Evangelical Theological
8 Seminary.
9   Q. Well, that would explain --
10   A. It's got to be a different Steven Davis.
11   Q. Okay. All right.
12   A. There's a lot of us around.
13   Q. I guess so. Okay.
14    Do you have a LinkedIn page?
15   A. I used to. I don't -- haven't had it for
16 some time.
17   Q. Okay. All right. Thank you for
18 clarifying that mystery.
19    MR. GANT: I think we're on Exhibit 29.
20    THE VIDEOGRAPHER: Pardon the
21    interruption.
22    Dr. Davis, can you tilt your camera down
23    just a little bit?
24    THE WITNESS: Sure.
25    THE VIDEOGRAPHER: Thank you.

Page 258

1    THE WITNESS: Is that better?
2    THE VIDEOGRAPHER: Yep. Thank you.
3    THE WITNESS: Okay.
4   Q. (By Mr. Gant): Do you recall who first
5 informed you that BCMD was going to be terminating
6 Dr. McRaney?
7   A. I didn't get a call by anyone stating they
8 were going to terminate him.
9   Q. Okay. Well, do you remember how you found
10 out?
11   A. I read it in the Baptist Press. I was
12 kind of -- kind of surprised, to be honest with you.
13   Q. Why were you surprised?
14   A. Just because, like I said, my role and my
15 responsibility was to try to help move things
16 forward in a positive direction, which I felt like
17 that's where we were going. You know, I received a
18 call saying that they were having a meeting that
19 afternoon, but they didn't tell me what the meeting
20 was about and so I was at the convention when I
21 found out the news, so --
22   Q. No --
23   A. -- that's why I was surprised.
24   Q. No --
25   A. (Inaudible.)

24 (Pages 255 - 258)

|  |  |
|---|---|
| Page 259<br>1  Q. I'm sorry. I keep talking over you by<br>2 accident.<br>3  A. That's okay.<br>4  Q. Please finish.<br>5  A. No. I said I -- no one gave me any<br>6 heads-up that anybody was going to -- going to be<br>7 fired or let go.<br>8  Q. Did anyone from leadership at BCMD contact<br>9 you in May or early June 2015 and ask your opinion<br>10 about whether they should keep on Dr. McRaney?<br>11    MS. CARRINGTON: Object to the form of the<br>12  question.<br>13  A. Absolutely not.<br>14  Q. (By Mr. Gant): So BCMD didn't give you an<br>15 opportunity to express your view that the March and<br>16 April meetings had gone well and you were making<br>17 progress with Dr. McRaney and moving things in a<br>18 positive direction?<br>19    MS. CARRINGTON: Object to the form of the<br>20  question.<br>21  A. Well, I mean, they already had copies of<br>22 emails that stated that, right? So --<br>23  Q. (By Mr. Gant): They did.<br>24  A. -- no.<br>25  Q. But didn't they also have copies of emails | Page 261<br>1  A. Okay.<br>2    THE CONCIERGE: You mean Exhibit 19, sir,<br>3  not Tab 19, correct?<br>4    MR. GANT: Correct. Exhibit 19, Tab 28.<br>5    THE CONCIERGE: (Complies.)<br>6    MR. GANT: If you could scroll down to the<br>7  bottom half of the page first.<br>8    THE CONCIERGE: (Complies.)<br>9    MR. GANT: Right there.<br>10  Q. (By Mr. Gant): You wrote on June 9th: I<br>11 refigured the hundred percent plan for -- for<br>12 Maryland/Delaware based on resignation of Will<br>13 McRaney.<br>14    Do you see that?<br>15  A. I do. Yep.<br>16    MR. GANT: And then let's scroll back up<br>17  to the top -- the middle of this page.<br>18    THE CONCIERGE: (Complies.)<br>19  Q. (By Mr. Gant): You wrote also on June<br>20 10th -- not also.<br>21    On June 10th you wrote: The exec resigned<br>22 yesterday morning.<br>23    Do you see that?<br>24  A. Yes.<br>25  Q. So does that refresh your recollection |
| Page 260<br>1 that accused Dr. McRaney of violating the SPA and<br>2 other misconduct?<br>3  A. I don't -- I don't know about that. That<br>4 was -- that was before my time. All I'm saying is,<br>5 is I know, you know, that -- that we were moving<br>6 along in a positive direction and his officers were<br>7 aware of that.<br>8  Q. Do you remember what day you found out<br>9 that Dr. McRaney resigned?<br>10  A. It was either the day after it happened --<br>11 shortly right after it happened because it was on<br>12 Baptist Press. That's when I -- that's when I saw<br>13 it.<br>14  Q. June 8th --<br>15  A. That's when I --<br>16  Q. June 8th or 9th, does that sound about<br>17 right?<br>18  A. Sometime in June, yes. I don't know the<br>19 exact date. Whenever it showed up in Baptist Press,<br>20 that's when I read it.<br>21    MR. GANT: Let's pull Exhibit 19 back up.<br>22    THE CONCIERGE: (Complies.)<br>23  A. I'm sorry. Did you ask me a question?<br>24  Q. (By Mr. Gant): No. I asked the court<br>25 reporter staff to pull up Exhibit 19, please. | Page 262<br>1 about when you learned Dr. McRaney had been<br>2 terminated by BCMD?<br>3  A. Right.<br>4  Q. So you think it was June 9th?<br>5  A. Well, it had to be, yep.<br>6  Q. Okay. All right.<br>7  A. It would have been -- it would have been<br>8 in Baptist Press -- if he resigned that morning,<br>9 then it would have been in Baptist Press by late<br>10 that morning or that afternoon. And that's when I<br>11 would have learned about it.<br>12  Q. Okay.<br>13    MR. GANT: Let's go to Exhibit 29, please,<br>14  which is Tab 27.<br>15    THE CONCIERGE: (Complies.)<br>16    MR. GANT: Which is Bates-labeled NAMB 7172<br>17  through 76, but I'm only going to ask you about<br>18  the top third of the first page. But you're<br>19  welcome to look at as much as you'd like.<br>20    THE WITNESS: Okay.<br>21    (Deposition Exhibit No. 29 was marked for<br>22    identification.)<br>23  Q. (By Mr. Gant): So in the middle of the<br>24 page there's an email from you. It's unclear who<br>25 it's to. It says: Take a look at this. |