# EXHIBIT G

Page 1

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF MISSISSIPPI
2  ABERDEEN DIVISION
3  CASE NO.: 1:17cv080-GHD-DAS
4  WILL McRANEY,
5  Plaintiff,
6  vs.
7  THE NORTH AMERICAN MISSION
   BOARD OF THE SOUTHERN
8  BAPTIST CONVENTION, INC.,
9  Defendant.
   _____/
10
   VIDEOCONFERENCE
11 DEPOSITION OF:      DANNY DE ARMAS
12 DATE:               THURSDAY, FEBRUARY 16, 2023
13 TIME:               10:15 A.M. - 4:46 P.M.
14 PLACE:              VIA VIDEOCONFERENCING TECHNOLOGY
15 STENOGRAPHICALLY
   REPORTED BY:        JAZZMIN A. MUSRATI, RPR, CRR
16                     Registered Professional Reporter
                       Certified Realtime Reporter
17
18
19
20
21
22
23
24
25

Page 62

1 one time or another. I don't know which one came first.
2  Q. Okay. And when you heard it from -- from someone
3 at NAMB that a photo of Dr. McRaney had been posted at
4 the security desk at headquarters, do you believe it was
5 at a trustee meeting, or you're not sure?
6  A. I'm not sure. I don't believe it was at a
7 meeting when I first heard of it, but -- but I'm not
8 positive.
9  Q. Okay. I said that because I thought you said
10 that you thought it was at a meeting, but -- so is it
11 fair to say you just don't remember -- strike that.
12     Is it fair to say you're certain that someone at
13 NAMB made you aware that a photograph of Dr. McRaney had
14 been posted at the security desk at its headquarters,
15 but you're not sure who told you or the context of how
16 it was communicated to you; is that -- is that right?
17  A. Yes, that's correct.
18  Q. Okay. Do you remember what else, if anything,
19 was communicated to you about the posting of the photo
20 by someone at NAMB?
21  A. The -- as I recall, the context of the
22 conversation was in light of the fact that something was
23 being made of it; that it was wrong for them to do that.
24 And it was being reported -- yeah -- that we put a
25 picture there so they'd know if he came and -- and, you

Page 63

1 know, he found out about it and he's really upset about
2 it and making something of it.
3  Q. You understand that NAMB personnel posted the
4 photo of Dr. McRaney at the security desk for the
5 purpose of ensuring that he would not enter the
6 building, right?
7  A. That is not correct. That's not my
8 understanding.
9     MR. GANT: Okay. Let's bring up Tab 5 and mark
10 that as Exhibit 4.
11     (Whereupon, Plaintiff Exhibit 4 was marked for
12 identification.)
13 BY MR. GANT:
14  Q. And while we're bringing that up, that will be
15 Bates-labeled NAMB 5237.
16     Was it your decision to post the photo of
17 Dr. McRaney?
18  A. No.
19  Q. Were you consulted about it at the time?
20  A. No.
21  Q. Did the NAMB board of trustees -- strike that.
22     Was the NAMB board, of which you were a member at
23 the time, involved in the decision to post the photo of
24 Dr. McRaney at the NAMB security desk?
25  A. I don't -- not to my knowledge.

Page 64

1  Q. Okay. Do you have firsthand knowledge of -- of
2 what the reasoning was for posting it, given that you
3 weren't consulted?
4  A. I do not.
5  Q. Okay. This -- this is a document that was
6 produced to us by NAMB. As I mentioned, it's
7 Bates-labeled NAMB 5237.
8     Do you know who Tom Wigginton is?
9  A. Yes, I do.
10  Q. Who -- who is he?
11  A. He's one of the employees at NAMB.
12  Q. Do you know what his role was in February 2016?
13  A. I -- I do not know precisely. I believe in the
14 operations area. Facilities operations. Something like
15 that.
16  Q. Okay. And you see at the bottom of the text of
17 this exhibit, which is Exhibit 4, it says, "Owner
18 Tom" -- "Tom Wigginton"? Do you see that?
19  A. I do see that.
20  Q. And do you see that there's a due date and a date
21 completed, which are both Friday, February 5, 2016? Do
22 you see that?
23  A. I do see that.
24  Q. You see it says, "Status of the task"? Do you
25 see that?

Page 65

1  A. Yes, I do see that.
2  Q. And it says, "Completed," correct?
3  A. Yes, it does say, "Completed."
4  Q. Okay. And what is the subject of that task for
5 Mr. Wigginton from February 5th, 2016? Can you read
6 that into the record, please.
7  A. Sure.
8     The subject says, "Will McRaney picture to lobby
9 desk -- no entry in building."
10  Q. Okay. And I'll represent to you we've already
11 deposed Mr. Wigginton and discussed this with him.
12     Do you have any firsthand knowledge that would
13 enable you to contradict the testimony of Tom Wigginton
14 about the purpose of posting the photo of Dr. McRaney?
15     MR. RAJAVUORI: Object to form.
16  A. I do not.
17 BY MR. GANT:
18  Q. Okay. And do you have any firsthand knowledge
19 that would provide a basis for you to assert that this
20 document produced by NAMB is inaccurate in any way?
21     MR. RAJAVUORI: Object to form.
22  A. No, sir.
23 BY MR. GANT:
24  Q. And let's -- just keep this date in mind,
25 February 5th, 2016, when this task was completed. And

17 (Pages 62 - 65)

Page 66

1  let's flip back to Exhibit 3.
2        THE VIDEOGRAPHER: Just one moment. Sorry.
3  I'm having a technical difficulty here.
4  BY MR. GANT:
5    Q. While we're waiting for that to get pulled up, I
6  saw you just write down something. Were you writing
7  down the date I asked you to keep in mind or something
8  else?
9    A. Just the date.
10       MR. GANT: Okay. And if we could make it
11  smaller, I want to look at the bottom right -- the
12  bottom right-hand corner. Can you blow that up a
13  little bit. I'd like Mr. de Armas to see the date
14  of -- on this document.
15  BY MR. GANT:
16   Q. It's a little cut off, but do you see on the
17  bottom right-hand corner, 2/5/2016?
18   A. Yes, I do.
19   Q. Okay. That's the same date associated with Tom
20  Wigginton's task of Will McRaney picture at lobby desk,
21  no entry in building, correct?
22   A. Yes, it is.
23      MR. GANT: If you could take that down, please.
24  BY MR. GANT:
25   Q. When's the last time you saw that photograph of

Page 67

1  Dr. McRaney?
2    A. I don't have recollection of seeing that
3  photograph until just now.
4    Q. Okay. And before I just showed it to you, had
5  you previously seen what was marked as Exhibit 4, which
6  was Tom Wigginton's task of posting Dr. McRaney's
7  picture into the lobby for no entry in building?
8    A. I'm sorry. Would you repeat the question.
9    Q. Yes.
10       Before I just showed you Exhibit 4, which was the
11  Tom Wigginton task of Will McRaney picture to lobby, no
12  entry in building, had you seen that exhibit before I
13  showed it to you?
14   A. I had not seen it.
15   Q. Who is R. David de Armas?
16   A. My older brother.
17   Q. Is he an attorney?
18   A. He is.
19   Q. And do you know what, if any, relationship he has
20  with Dr. McRaney or had with Dr. McRaney?
21   A. I'm sorry.
22   Q. Do you know what relationship, if any, he had or
23  has with Dr. McRaney?
24   A. I do not know the full extent of that
25  relationship, but I do know he has represented Will.

Page 68

1    Q. Okay. Including any connection with issues
2  related to Dr. McRaney's termination by NAMB --
3  excuse me -- by BCMD, correct?
4    A. Yes.
5    Q. Are you on good terms with your brother?
6    A. Yes.
7    Q. I take it you're very familiar with him, being
8  your brother; is that fair?
9    A. That's fair.
10   Q. Okay. Do you consider your brother to be an
11  honest person?
12   A. Yes.
13   Q. Do you believe he would lie?
14   A. No.
15   Q. Do you believe he would lie under oath?
16   A. No.
17   Q. So if your brother, R. David de Armas, swore to
18  something in an affidavit, you would expect that the
19  information was true and accurate, correct?
20       MR. RAJAVUORI: Object to form.
21   A. Yes. Yes.
22       MR. GANT: All right. Let's bring up Tab 29,
23  please, and mark that as the next exhibit, which I
24  believe is Exhibit 5. For the record, this is
25  Bates-labeled WM48 through 49.

Page 69

1       (Whereupon, Plaintiff Exhibit 5 was marked for
2  identification.)
3  BY MR. GANT:
4    Q. As always, I said at the beginning, you can
5  always review as much of any exhibit you like as -- at
6  whatever pace you would like and make it bigger or
7  smaller. If I ask you a question and you need more time
8  to review, please let me know.
9       Just based on the first page of this exhibit, do
10 you believe you've seen it before?
11   A. I believe I have. Yes, I believe I have.
12   Q. When did you last see it?
13   A. I do not recall. It's not been recently.
14   Q. Okay.
15   A. May I have a minute to read it?
16   Q. Absolutely. Just you can -- the court reporting
17 staff -- tell them bigger, smaller, up, down, and then
18 let me know when you're ready for a question.
19   A. Well, I can actually adjust the size on my own
20 screen.
21   Q. You can? Okay. Great.
22   A. Yeah.
23   Q. But you probably can't scroll to the next page.
24 So if you need to do that, let us know.
25   A. Thank you. I will in just a minute.

Page 70

1  Next page, please.
2  Okay. I have read the document.
3  Q. Okay. This is an affidavit signed by your
4  brother, correct?
5  A. Yes.
6  Q. And are you familiar with his handwriting? His
7  signature?
8  A. Actually, no.
9  Q. Okay. Do you have any reason to doubt that that
10 is your brother's signature on the second page of the
11 exhibit?
12  A. I have no reason to doubt that.
13  Q. Okay. And as we discussed earlier, is your -- is
14 your answer different to my earlier question? Would
15 your brother swear to something under oath that he
16 believes to be untrue?
17  A. No, he would not.
18  Q. Okay. Have you ever told your brother that you
19 believed that Dr. McRaney was a physical threat to
20 anybody?
21  A. I'm not sure if I discussed that with David or
22 not.
23  Q. Well, discuss -- when you say "discussed that,"
24 what are you referring to?
25  A. That I discussed the -- the incident that

Page 71

1 happened, the conversation we had, and the way it made
2 me feel and the concern that I had. I'm not sure that I
3 ever had a conversation with him about that. To my
4 knowledge, I didn't, but if -- if he has said that I
5 did, then I would --
6  Q. I'm not trying -- I'm at no point trying to trick
7 you, and I'm not suggesting he did say that. To the
8 contrary, I am not -- I'll represent to you I'm unaware
9 of any such communication, but I'm just trying to find
10 out the facts.
11      So is it fair to say that you do not have a
12 recollection of ever telling your brother, David, that
13 you considered Dr. McRaney a physical threat? Is that
14 accurate? Is that right or fair?
15  A. That is -- yes, that is right.
16  Q. Okay. Did you ever -- strike that.
17      And you don't have any recollection of ever
18 telling your brother that you felt threatened,
19 physically or otherwise, by Dr. McRaney, correct?
20  A. I do not have recollection of that.
21  Q. Okay. If you thought your brother was in any
22 danger from Dr. McRaney, you would've let your brother
23 know to protect him, correct?
24  A. Certainly, yes, I would have.
25  Q. Okay. Did you ever express any concerns to your

Page 72

1 brother, David, about his representation of Dr. McRaney?
2  A. I think I did.
3  Q. What do you think you said?
4  A. I think I -- I -- let me recall. It's been a
5 while, but I think I said something like, "I think
6 there's more to this than you understand, and it's way
7 more complicated. But I understand what you did and
8 what you had to do. And I just want you to be aware" --
9 at the time, he was not aware that I was a trustee. To
10 my -- at least that's the best of my knowledge. He
11 didn't know until I just explained to him that I was
12 and -- "just making sure you're aware. I don't think
13 you know about the way the system works, but it is what
14 it is."
15      And that was the end of the conversation. Very
16 friendly. We're on really good terms. And so it was
17 just more of a -- "I want to make sure you're aware."
18  Q. Did you provide him any specific information?
19  A. I did not.
20  Q. Do you recall approximately when this
21 conversation occurred?
22  A. I do not, but my -- I believe it would've been,
23 you know, within a reasonable amount of time or a
24 logical amount of time after this had been -- and I
25 don't know what it was -- I don't know how it was

Page 73

1 delivered or made public or whatever, but, you know, it
2 was -- when I heard about it, I -- I called him.
3  Q. When you say "it," what are you referring to?
4  A. The document. The affidavit.
5  Q. Okay. So you read the affidavit, and then you
6 contacted your brother about it?
7  A. I heard about the affidavit and contacted my
8 brother about it.
9  Q. How did you hear about it -- strike that.
10      How did you hear about the affidavit that your
11 brother had executed?
12  A. I don't recall.
13  Q. Okay. And when do you think you first saw the
14 affidavit?
15  A. Shortly after -- I believe the order was: I
16 heard, I talked to my brother, and then I saw a copy of
17 it, all within a short amount of time. Probably within
18 30 days of each other. And I would expect it would have
19 been shortly after he provided it.
20  Q. Your brother provided you with a copy of the
21 affidavit?
22  A. No. I --
23  Q. I'm sorry. When you say he provided it, you mean
24 he -- he wrote and signed it?
25  A. Correct.

19 (Pages 70 - 73)

Case: 1:17-cv-00080-GHD-DAS Doc #: 265-8 Filed: 05/18/23 6 of 7 PageID #: 2999



Exhibit
McRaney v NAMB
Danny de Armas
0005

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

**WILL McRANEY**　　　　　　　　　　　　　　　　　　**PLAINTIFF**

**V.**　　　　　　　　　　　　　　　　　　**No. 1:17cv080-GHD-DAS**

**THE NORTH AMERICAN MISSION BOARD**
**OF THE SOUTHERN BAPTIST CONVENTION, INC.**　　　　　**DEFENDANT**

### AFFIDAVIT OF R. DAVID DE ARMAS, ESQ.

**STATE OF FLORIDA**
**COUNTY OF ORANGE**

I, R. David de Armas, do hereby affirm under penalty of perjury, that the matters set forth below are true:

1. I am over the age of eighteen (18) and am competent to execute this affidavit, the substance of which is based on my personal knowledge as former counsel for Will McRaney.

2. I am an attorney licensed to practice in Florida as a member of The Florida Bar, and have been so licensed since 1985. I represented Dr. McRaney during the process of his leaving the employ of the Baptist Convention of Maryland/Delaware, Inc. ("BCMD") in 2015.

3. I personally reviewed and approved the Separation Agreement and Release signed by Dr. McRaney as part of the settlement with BCMD.

4. As part of the process of advising Dr. McRaney, I confirmed that BCMD annually sent substantially more money to the North American Mission Board ("NAMB") than the NAMB sent to BCMD.

5. Thus, it was obvious that the NAMB was not a supporting organization of the BCMD. Indeed, it is BCMD which supported (and likely continues to support) the NAMB, not the other way around. Assertions to the contrary are misleading, at best.

6. Before executing the Separation Agreement and Release in favor the BCMD, Dr. McRaney specifically asked me whether the Separation Agreement and Release would preclude claims against the NAMB. Based on the records provided to me showing that NAMB was clearly not a supporting organization of the BCMD, I advised Dr. McRaney that he could execute the Separation Agreement and Release and maintain his claims against the NAMB.

WM00048

7. At no time did Dr. McRaney intend that his settlement with BCMD would release the NAMB for the harm caused by the NAMB, nor did the release executed by Dr. McRaney serve to release NAMB. Rather, that release included only those churches in Maryland and Delaware which actually supported (and continue to support) the BCMD.

_____
R. David de Armas, Esq.

SWORN TO AND SUBSCRIBED BEFORE ME, this 21st day of November, 2018.

_____
NOTARY PUBLIC

My Commission Expires:



Notary Public State of Florida
Stephen H Price
My Commission FF 930843
Expires 11/30/2019

(SEAL)

2

WM00049