**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

Will McRaney,

        Plaintiff,

        v.

The North American Mission Board of the
Southern Baptist Convention, Inc.,

        Defendant.

Case No. 1:17-cv-00080-GHD-DAS

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**OPPOSITION TO NAMB'S FOR SUMMARY JUDGMENT**

"Summary judgment is appropriate only when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law." *Roe v. Cypress-Fairbanks Independent School District*, 53 F.4th 334, 340 (5th Cir. 2022). NAMB is not entitled to such relief, and its motion for summary judgment must be denied.

NAMB's first argues this Court is barred by the First Amendment from adjudicating Plaintiff's civil tort claims. NAMB is wrong. As it did years ago when previously convincing this Court to dismiss (Doc. 9), NAMB advances a skewed vision of the First Amendment's Religion Clauses. Here, NAMB relies on inapposite cases and then distorts the record in an effort to conform the facts to inapplicable decisional law. As discussed below, this is not the first time NAMB has misled the Courts in this case while promoting its version of the First Amendment. But, in reality, it is NAMB which threatens the First Amendment. As Professor Barry Hankins explained in his expert report: "NAMB's First Amendment defense in this case, if accepted by courts, would actually undermine religious liberty rather than safeguard it." Doc. 133 at 17-18.

NAMB next argues the Separation Agreement between Dr. McRaney and BCMD entitles it to summary judgment. But NAMB has that backwards: it is Plaintiff that is entitled to summary judgment with respect to NAMB's "Separation Agreement Defenses"—as explained in Plaintiff's motion for summary judgment, and memorandum in support, which are incorporated herein. *See* Doc. 265 (motion); 266 (memorandum in support).

Finally, NAMB contends there are no "triable issues" with respect to any of the six causes of action in Plaintiff's Supplemental Pleading (Doc. 191). *See* Doc. 264 at 13-25. About that too, NAMB is incorrect. In addition to a threshold error about the applicable state law governing Claims 4, 5 and 6 (the post-termination claims), NAMB offers a one-sided view of the record, ignoring reams of evidence contradicting its account of events. The record as a whole

1

demonstrates there are genuinely disputed material facts which preclude the entry of summary judgment, and there is sufficient evidence for a jury to return a verdict in favor of Plaintiff. Moreover, as explained below, there are ample grounds for a jury to disbelieve key NAMB witnesses. When deciding a summary judgment motion a court "may not presume" the jury would find the movant's witnesses credible, *Cypress-Fairbanks*, 53 F.4th at 345, and the entry of summary judgment "is not appropriate" when there are questions about the credibility of key witnesses. *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009).

For the reasons detailed below, and in the filings accompanying this memorandum, NAMB's motion for summary judgment should be denied.

## ARGUMENT[1]

### I.    The First Amendment Does Not Support NAMB's Motion for Summary Judgment

#### A.    The "Ministerial Exception" Is Inapplicable Here

Early in this case NAMB sought dismissal in the district court on the basis of the "ministerial exception" (Doc. 9), but that motion was denied. Doc. 19 at 4-6. On appeal to the Fifth Circuit, NAMB dropped its reliance on the ministerial exception, with the Fifth Circuit noting "[b]oth parties agree" "the ministerial exception is not before us." *McRaney v. North American Mission Board of the Southern Baptist Convention, Inc.*, 966 F.3d 346, 350 n.3 (5th Cir. 2020).

But NAMB has changed its mind again, asserting the ministerial exception requires the entry of summary judgment in its favor. *See* Doc. 264 at 7. NAMB is wrong.

In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), the Supreme Court, for the first time, recognized the "ministerial exception." In *Our Lady of*

---

[1] Testimony and documents cited in this Memorandum which have not previously been filed with the Court are exhibits to the May 18, 2023, Declaration of Scott E. Gant (Doc. 265-1), and to the June 1, 2023 Declaration of Scott E. Gant filed in connection with this Memorandum.

*Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020), the Court applied that exception to "teachers at religious schools who are entrusted with the responsibility of instructing their students in the faith." *Id*. at 2055.

Recognizing that Dr. McRaney was never employed by NAMB, and worked for a separate, autonomous organization, NAMB portrays Dr. McRaney's case as an "employment" dispute, suggesting that *Hosanna-Tabor* and *Morrissey-Berru* apply. This sleight of hand is unavailing. Employment disputes are disputes *between employer and employee*. Dr. McRaney does not bring a claim against BCMD, his former employer. He filed a lawsuit against a separate, non-profit corporation—NAMB.

*Hosanna-Tabor* bears no resemblance to this case. The question there was whether the Religion Clauses of the First Amendment bar an employment discrimination lawsuit "when the employer is a religious group and the employee is one of the group's ministers." 565 U.S. at 176-77. The Court held that both Clauses "bar the government from interfering with the decision of a religious group to fire one of *its* ministers." *Id*. at 181 (emphasis added); *id*. at 188 ("ministerial exception" concerns "the *employment relationship* between a religious institution and *its* ministers") (emphasis added). NAMB's attempt to extend *Hosanna-Tabor* also ignores the narrowness of its holding. As the Supreme Court explained: "We express no view on whether the [ministerial] exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." 565 U.S. at 196. In short, the idea that *Hosanna-Tabor* entitles NAMB to summary judgment is fanciful.

*Morrissey-Berru* likewise offers no support to NAMB. There, as in *Hosanna-Tabor*, the Court focused on protecting the autonomy of religious institutions "with respect to *internal* management decisions that are essential to the institution's central mission," while reaffirming

such institutions do not "enjoy a general immunity from secular laws." 140 S. Ct. at 2060 (emphasis added). Here, McRaney was not an employee of NAMB, and his lawsuit concerns NAMB's actions directed toward him, which are alleged to be actionable under generally applicable state tort law, not NAMB's "internal management."

NAMB's attempted misdirection also features invocation of *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328 (4th Cir. 1997). NAMB cites *Bell* as supposed support for its assertion that the ministerial exemption applies "even if the plaintiff is not suing his employer." Doc. 264 at 7. But NAMB's reliance on *Bell* is misplaced. The plaintiff in *Bell* was the former executive director of an interfaith organization that terminated him. The plaintiff named as defendants the "four principal constituent religious organizations" of the interfaith group, 126 F.3d at 329, which the Fourth Circuit determined to be a "joint ministry of its constituent churches." *Id.* at 332. Thus, the plaintiff in *Bell* effectively *sued his employer*—in contrast with Dr. McRaney, who never directly or indirectly worked for NAMB (and there is no "joint ministry" between BCMD and NAMB).[2] Moreover, even if *Bell* were relevant, it is not authoritative in this Court. NAMB's unsuccessful petition to the Supreme Court contended that the Fifth Circuit's decision in this case "stands in stark contrast" with *Bell*. Petition for Writ of Certiorari, U.S. Supreme Court, No. 20-1158 (filed Feb. 17, 2021), at 24; *id.* at 26 ("The Fifth Circuit's decision here is irreconcilable with the Fourth Circuit's decision in *Bell*."). If NAMB was being honest with the Supreme Court, then *Bell* cannot control the outcome here.

---

[2] Apparently trying to make this case look like *Bell*, NAMB twice misleadingly describes the SPA as a "joint ministry agreement." Doc. 264 at 1, 2. Those words are NAMB's *post hoc* label. The SPA itself never uses that language.

4

**B.** *Kedroff* **Lends No Support to NAMB**

While NAMB's First Amendment arguments depend almost exclusively on inapposite "ministerial exception" case law, NAMB also cites *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952). That case concerned a "New York statute putting the Russian Orthodox churches of New York under the administration of the Russian Church in America," *id*. at 120. As the Court recounted in *Hosanna-Tabor*, 565 U.S. at 186:

> At issue in *Kedroff* was the right to use a Russian Orthodox cathedral in New York City. The Russian Orthodox churches in North America had split from the Supreme Church Authority in Moscow, out of concern that the Authority had become a tool of the Soviet Government. The North American churches claimed that the right to use the cathedral belonged to an archbishop elected by them; the Supreme Church Authority claimed that it belonged instead to an archbishop appointed by the patriarch in Moscow. New York's highest court ruled in favor of the North American churches, based on a state law requiring every Russian Orthodox church in New York to recognize the determination of the governing body of the North American churches as authoritative.

This case has nothing relevant in common with *Kedroff*. And to the extent *Kedroff* articulates general First Amendment principles, the Fifth Circuit's decision in this case cited *Kedroff*, and is fully in accord with it. *McRaney*, 966 F.3d at 348. Thus, any suggestion that *Kedroff* requires, or warrants, summary judgment for NAMB, is misguided.

**C. The Fifth Circuit's Decision In This Case Does Not Compel Summary Judgment for NAMB**

NAMB also suggests the Fifth Circuit's decision in this case supports its bid for summary judgment. It does not. In reversing dismissal, the Fifth Circuit explained:

> *If* further proceedings and factual development reveal that McRaney's claims cannot be resolved without deciding *purely ecclesiastical questions*, the court is free to reconsider *whether* it is appropriate to dismiss some or all of McRaney's claims. NAMB broadly objects that it *may* have "valid religious reason[s]" for *its* actions. On remand, *if* NAMB presents evidence of these reasons *and* the district court concludes that it cannot resolve McRaney's claims without addressing these reasons, then there *may* be cause to dismiss.

*McRaney*, 966 F.3d at 350-51 (emphasis added; footnote and internal citations omitted).

5

NAMB acknowledges the Fifth Circuit's determination that claims can be dismissed only if they cannot be resolved without "deciding purely ecclesiastical questions." *See* Doc. 264 at 7-8. Yet NAMB conspicuously avoids using that language after citing it. That is because none of Dr. McRaney claims require that the Court or jury "decide" any "purely ecclesiastical question." *Cf. Burri Law PA v. Skurla*, 35 F.4th 1207, 1212 (9th Cir. 2022) (finding ecclesiastical abstention doctrine inapplicable to claims for defamation and tortious interference). The questions which must be decided are whether NAMB engaged in tortious interference with Dr. McRaney's business relationships, defamed him, and inflicted emotional distress. As is evident from Dr. McRaney's Supplemental Pleading (Doc. 191), none of his claims require a decision about "purely ecclesiastical questions." Nor do any of NAMB's defenses. If NAMB wants to tell the jury it did not interfere with Dr. McRaney's business relationships with BCMD or prospective employers, it may do so. If NAMB wants to tell the jury it did not defame Dr. McRaney, it may do so. If NAMB wants to tell the jury it did not inflict emotional distress, it may do so. The jury can decide who to believe—but it will not be asked to decide matters of theology or internal governance of any religious body. As for BCMD, it is not a party, and is not subject to potential liability, judgment or override of any decision or action.

NAMB contends that issues concerning Dr. McRaney's termination by BCMD "require resolution of ecclesiastical questions." Doc. 264 at 8. They do not. Even former BCMD President, Bill Warren, testified at his deposition that "Dr. McRaney was not terminated by BCMD due to differences over theology or doctrinal issues." Doc. 263-4 (Tr. 353:15-18). The jury can evaluate if NAMB's disparagement of Dr. McRaney's and threats to withhold funds interfered with the relationship he had BCMD, without "deciding" any "purely ecclesiastical" matter.

NAMB also argues it is entitled to summary judgment because the SPA which NAMB

(falsely) alleges Dr. McRaney "breached" makes reference to religious documents. But Dr. McRaney's claims are not about those references in the SPA. His claims are about whether NAMB lied when it alleged Dr. McRaney "breached" the SPA, and the harm caused by that lie and other civil misconduct by NAMB. Notably, NAMB's letter setting out the allegation of breach against Dr. McRaney made no reference to any religious dispute. *See* Doc. 263-11. NAMB's letter asserts "breach"—which is a well-recognized civil law term, not a religious concept. *See* BLACK'S LAW DICTIONARY 232 (11th ed. 2019) ("A violation or infraction of a law, obligation or agreement, esp. of an official duty or legal obligation, whether by neglect, refusal, resistance, or inaction."). Consistent with that, NAMB's then-Executive Vice President and Chief Financial Officer, Carlos Ferrer, testified at his deposition that the SPA is "a contractual agreement." Ferrer Tr. 108:19. NAMB's own counsel referred to the SPA as a "contract" when objecting to a deposition question. Ezell Tr. 188:4-12.

As Professor Hankins explained in this expert report: "There is no valid factual foundation for NAMB's First Amendment defense in this case." Doc. 133 at 14-17.

*    *    *    *

Current Supreme Court and Fifth Circuit law lend no support to NAMB's motion for summary judgment based on the Religion Clauses of the First Amendment. NAMB already led this Court astray once with its efforts to push First Amendment doctrine beyond existing parameters. The Court should decline NAMB's invitation to do so again.

### D.    NAMB's History of Misleading the Courts About the First Amendment

NAMB's distorted vision of the First Amendment must also be viewed against the backdrop of its history of misleading the Courts in this case.

7

After Dr. McRaney's state court lawsuit was removed to federal court, NAMB convinced this Court to dismiss the complaint for lack of subject matter jurisdiction. NAMB pressed its subject matter jurisdiction argument in face of the Supreme Court's admonition that federal courts generally have a "virtually unflagging obligation . . . to exercise the jurisdiction given them" by Congress, *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), and even though there was no credible basis for NAMB's claim that this Court lacks subject matter jurisdiction—a contention NAMB has left aside in its current motion for summary judgment. *Cf. Hosanna-Tabor*, 565 U.S. at 195 n. 4 ("We conclude that the exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar."). After NAMB's invited error, a multi-year appellate process ensued, during which the Fifth Circuit reversed and reinstated McRaney's case. NAMB then petitioned the Supreme Court of the United States, making the same First Amendment arguments it makes now at summary judgment. The Supreme Court denied NAMB's request for review, with no recorded dissents.

In the Fifth Circuit, NAMB's conduct got even worse. Following an adverse 3-0 panel decision, NAMB filed a petition for rehearing *en banc*. NAMB, an agency of the Southern Baptist Convention (SBC), sought amicus support for its rehearing petition from another agency of the SBC: the Ethics and Religious Liberty Commission (ERLC). The ERLC joined up with the Thomas More Society to file an amicus brief in support of NAMB's rehearing petition ("the ERLC Amicus Brief").

The ERLC Brief was notable for two reasons. First, neither the ERLC nor NAMB disclosed to the Fifth Circuit that they are part of the same organization—the Southern Baptist Convention. One of Plaintiff's experts, Dr. Hankins, compared this "to Chevrolet issuing a brief on behalf of Buick, both companies being constituents of General Motors—i.e. part of the same

corporation." Doc. 133 at 10; *see also* Ezell Tr. 158:8-11 (acknowledging the ERLC is another SBC entity, and "[k]ind of a sister organization of NAMB"); de Armas Tr. 106:4-14 ("NAMB and ERLC are sister agencies"); Ferrer Tr. 201: 21-23 (agreeing "NAMB and ERLC are parts of the SBC"). The failure to disclose this relationship exhibited a lack of candor before the Fifth Circuit. Second, ***the ERLC Amicus Brief contained several false statements about Baptist polity***. For example, the ERLC Amicus Brief inaccurately described the SBC as a "hierarchy" that serves as an "umbrella Southern Baptist governing body over all of the various groups of churches." *See* Doc. 133 at 8-10; Ferrer Tr. 202:12-15) (agreeing "the ERLC brief contained misstatements about the nature of Southern Baptists"); de Armas Tr. 175:13-15 (the misstatements in Amicus Brief "would be obvious to anyone with knowledge of Baptist polity"); NAMB 30(b)(6) Tr. __ (falsity of statements in ERLC Amicus Brief were "obvious."). The Brief's false statements led to a firestorm of criticism and controversy within and outside the SBC. *Id.*; *see also* Ezell Tr. 294:2-8 (acknowledging "a lot of controversy and complaints" and "SBC drama" about the Amicus Brief); de Armas Tr. 172:3-7 ("our Southern Baptist family was up in arms about what the ERLC had . . . been part in stating, because our SBC family know what not to be true. And they were appalled at which ERLC did.").

Aware of these serious errors, neither NAMB nor the ERLC brought them to the attention of the Fifth Circuit as it considered NAMB's petition for rehearing. Instead, months later, only after rehearing was denied (over the dissents of eight judges who issued opinions based on a record containing false statements) did the ERLC publicly apologize, and send a belated letter to the Fifth Circuit confessing the errors. *See* Letter of Amici Curiae Ethics and Religious Liberty Commission and Thomas More Society, at 1, *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346 (5th Cir. 2020) (No. 19-60293) (filed Dec. 14, 2020)) ("[I]t has

come to the attention of Amici that the Brief Amici Curiae includes certain factual statements that inaccurately describe the Southern Baptist Convention's polity and theology of cooperative ministry.").

For its part, "NAMB never corrected or repudiated ERLC's misrepresentations to the Court." Doc. 133 at 9. *While that was bad enough, it turns out the full truth is even worse.* Through third-party discovery, Plaintiff learned that NAMB was coordinating with the ERLC and Thomas More Society before the ERLC Amicus Brief was filed. The same third-party discovery also revealed that NAMB's counsel had the amicus brief *before* it was filed.[3] Thus, NAMB knew the Fifth Circuit was being presented false statements both before and after the amicus brief was submitted. Yet NAMB allowed the brief to be filed, and then sat by silently for months while the Fifth Circuit decided rehearing. NAMB's egregious conduct before the Fifth Circuit should cast further doubt on NAMB's distorted and self-serving account of the First Amendment presented in its motion for summary judgment.

## E.  NAMB's Version of the First Amendment Would Deprive Dr. McRaney of His Constitutional Rights

"NAMB's First Amendment defense in this case, if accepted by courts, would actually undermine religious liberty rather than safeguard it." Doc. 133 at 17-18.

As Dr. Hankins explained in his expert report:

Dr. McRaney's claims against NAMB are, from a First Amendment standpoint, no different than if he worked for a secular organization separate from NAMB. He

---

[3]  In response to a subpoena, the Thomas More Society produced to Plaintiff a privilege log showing that NAMB's outside counsel received draft of the ERLC amicus brief shortly before it was filed. NAMB 30(b)(6) Dep. Exhs.10 & 11. NAMB acknowledged at its 30(b)(6) deposition that it has no basis for disputing the accuracy of that privilege log. Tr. 89:4-16. Notably, NAMB did not disclose to Plaintiff its pre-filing communications with the ERLC or the Thomas More Society about the ERLC Amicus Brief, or that it has a copy of the draft brief before filing—even though Plaintiff served discovery clearly calling for the disclosure of such information. *See* Plaintiff's Third Set of Requests for Production.

claims that an organization he did not work for (NAMB) improperly interfered in his relationship with his employer (BCMD), and then after he was terminated (due to that interference), NAMB continued to interfere with his ability to make a living as a preacher or religious executive. NAMB wants to deprive Dr. McRaney of his right to pursue relief in the courts of this country, on the ground that Dr. McRaney makes his living working with religious people and groups. Thus, under NAMB's view of the world, a citizen working with religious people and groups loses the right to challenge the conduct of a separate religious organization for which the citizen was never an employee or a member, simply because the citizen makes his living working with religious people and separate religious groups. That is an upside down understanding, where NAMB claims First Amendment protection to interfere in Dr. McRaney's free exercise of religion. Again, this would make some sense if Dr. McRaney worked for NAMB, but he never did.

Moreover, if NAMB's interpretation of the First Amendment prevailed (an interpretation that matches the erroneous and rescinded view of the ERLC in its amicus brief), every Baptist entity that cooperates in any way with the SBC would be put at risk—congregations, associations, and state conventions. The view that the SBC can claim itself as a "hierarchy" or "umbrella organization" over other Baptist entities essentially transforms the SBC, making it akin to hierarchical or presbyterian denominations from which Baptists have always distinguished themselves. It is not going too far to say that one of the principal reasons Baptists came into existence was because of the theological belief that religious authority resides only in local congregations, not in a hierarchy of bishops or in a presbyterian body claiming to represent those congregations. Should the courts accept NAMB's interpretation, we would have a most curious situation, to put it mildly, where Baptists say they are one thing, but the courts treat them as something else. In short, the U.S. court system will have transformed and redefined Baptists into something they have always insisted they are not. That would be an affront to religious liberty.

## II. Dr. McRaney's Separation Agreement With BCMD Does Not Entitle NAMB to Summary Judgment

NAMB contends the Separation Agreement between Dr. McRaney and BCMD entitles NAMB to summary judgment.[4]  NAMB's contention is without factual, legal or evidentiary support.

---

[4] NAMB does not identify the Counts of the Supplemental Pleading to which this argument relates. But it cannot be for any conduct after the date on which the Separation Agreement was executed— and therefore cannot provide a defense to Counts 4, 5 or 6 of the Supplemental Pleading.

Instead, NAMB has things backwards: it is Plaintiff that is entitled to summary judgment with respect to NAMB's "Separation Agreement Defenses"—as explained in Plaintiff's motion for summary judgment, and memorandum in support, which are incorporated herein.  *See* Doc. 265 (motion); 266 (memorandum in support).  As demonstrated in those filings, *Plaintiff* is entitled to summary judgment for at least four independent reasons, none of which are negated by NAMB's motion.

*First*, NAMB is violating a mandatory forum selection clause in the Separation Agreement, which provides: "All suits, proceedings and other actions *relating to*, arising out of or *in connection with* this Agreement **shall** be brought **exclusively**" in state or federal court in Maryland.  *See* Doc. 37-1 at 7 (emphasis added).  Flouting Supreme Court and Fifth Circuit law, which apply a strong presumption in favor of the enforcement of mandatory forum selection clauses, NAMB presses its (meritless) defenses based on the Separation Agreement, yet fails to abide by the Agreement's forum selection provision.  That is not permitted, and is an independent and threshold basis for the entry of summary judgment in favor of Plaintiff on the Separation Agreement Defenses.

NAMB's motion fails to advise the Court about the mandatory forum selection provision in the Separation Agreement.

*Second*, the Separation Agreement provides it is to be "construed and governed in accordance with the laws of the State of Maryland."  Doc. 37-1 at 7 (Section 15).  Maryland law principles of contract interpretation dictate that the term "supporting organization" in the Agreement be construed in accord with the ordinary meaning of that term.  And that ordinary meaning—well-established in the world of non-profit organizations, including many religious organizations—refers to the way "supporting organization" is used in the Internal Revenue Code. NAMB acknowledges it is not a supporting organization of BCMD under that definition.

NAMB's motion does not dispute it is well-established in the world of non-profit organizations, including religious organizations, that "supporting organization" refers to the way the term is used in the Internal Revenue Code. Nor has NAMB proffered any expert testimony refuting the opinions of Mr. Lindsay and Dr. Sharp about the meaning of the term. *See* Doc. 85-1 (Declaration of Charles R. Lindsay, CPA at ¶¶ 6-8); Doc. 134-1 (Expert Report of D.C. Sharp at ¶ 44). Instead, NAMB claims that cannot be the ordinary meaning of the term because it is "technical." Doc. 264 at 12. But the Separation Agreement is one between a non-profit organization and its terminated employee. Contrary to NAMB's claim, there is nothing "illogical" (Doc. 164 at 12) about the parties using in the Separation Agreement a phrase with a well-established meaning in the non-profit world. As one of the cases cited by NAMB makes clear, Maryland courts looks for "evidence of what a reasonable person *in the position of the parties* would have understood those terms to mean." *W.F. Gebhardt & Co. v. Am. Eur. Ins. Co.*, 252 A.3d 65, 74 (Md. Ct. Spec. App. 2021) (emphasis added).[5]

*Third*, while NAMB's Separation Agreement Defenses fail as a matter of Maryland law, discovery has confirmed that those defenses also lack factual merit.

In a section outside of its recitation of supposedly "Undisputed Facts" (Doc. 264 at 1-6), NAMB makes the conclusory assertion that "[t]here is no genuine dispute that NAMB is a 'supporting organization' released under the Separation Agreement." Doc. 264 at 11. That contention is preposterous, as is evident from Plaintiff's motion for summary judgment. But even NAMB's supposed facts offer it little support or are distortions of the record.

---

[5]  NAMB's motion does not offer an alternative definition of "supporting organization." Presumably that is because its apparent construction—any organization, which provides any support—is so ambiguous and open-ended that it cannot be taken seriously.

For example, NAMB cites the SPA itself and a document drafted by Dr. McRaney which use the words "support" or "supporting." But neither uses the term "supporting organization" at all, let alone to describe NAMB's relationship to BCMD. And neither is inconsistent with NAMB's *own documents* which employ the term supporting organization as it used in connection with the Internal Revenue Code (*see* Doc. 265-3 at 6-8), or with NAMB's description of itself as a "suppor*ted* organization." *See* Doc. 265-3 at 9-10.

NAMB similarly refers to a deposition answer from Dr. Barry Hankins, in response to a question about language in the SPA. Hankins Tr. 198:1-199:1. But Dr. Hankins did not testify in his report, or at his deposition, that NAMB is a supporting organization of BCMD. To the contrary, Dr. Hankins explained his opinion why, as a scholar and observer of Baptist entities and organizations, he concluded that NAMB's purported interpretation of the term "supporting organization" in the Separation Agreement is wrong. *See* Doc. 133-1 at 13-14.[6]

NAMB also cites deposition testimony from former BCMD President Bill Warren as support for its motion. As a threshold matter, the answer cited by NAMB was in response to a question objected to at the deposition, and is inadmissible for the reasons stated on the record. Doc. 263-4 (Warren Tr. 99:10-100:14). But NAMB's citation is also misleading. Later in the deposition Mr. Warren testified he does not know what "supporting organization" means. Doc. 263-4 (Warren Tr. 233:10-11). Mr. Warren then explained that: "if the definition of a supporting organization means that they give us [BCMD] more money than we give them, then – then they're

---

[6] The specific deposition testimony from Dr. Hankins cited by NAMB is inadmissible with respect to whether NAMB was a "supporting organization" of BCMD.

[NAMB] *not* a supporting organization . . . ." *See* Doc. 263-4 (Warren Dep. Tr. 271:3-7) (emphasis added).[7] Thus, Mr. Warren's testimony does not support NAMB's motion.[8]

Like the dog that did not bark in Sir Arthur Conan Doyle's *Silver Blaze* tale, the fact that NAMB has not adduced a single contemporaneous document referring to itself as a "supporting organization" of BCMD tells us what is apparent to even those without Holmesian powers of observation: NAMB is not a support organization of BCMD.

*Fourth*, NAMB seeks to enforce provisions of the Separation Agreement as a non-party to the contract. But Maryland law is restrictive about when a party can enforce a contract as a third-party beneficiary. *CX Reinsurance Co., Ltd. v. Levitas*, 207 F. Supp. 3d 566, 570 (D. Md. 2016) ("Maryland law is *quite restrictive* on the issue of whether one may be considered a third-party beneficiary."), *aff'd*, 691 F. App'x 130 (4th Cir. 2017) (emphasis added). "An individual is a third-party beneficiary to a contract if the contract was intended for his or her benefit and it clearly appears that the parties intended to recognize him or her as the primary party in interest and as privy to the promise. It is not enough that the contract merely operates to an individual's benefit: An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee." *CR–RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 212 (2012); *Cushman & Wakefield of Maryland, Inc. v. DRV Greentec, LLC*, 203 A.3d 835, 838 (2019) ("A person is a third-party beneficiary only where the promise sought to be enforced was intended for that person's benefit and the parties intended to recognize that person as the primary party in interest with respect

---

[7] The specific deposition testimony from Mr. Warren cited by NAMB is inadmissible with respect to whether NAMB was a "supporting organization" of BCMD.

[8] NAMB also cites a motion filed BCMD using the term "supporting organization." Doc. 264 at 11 (citing Doc. 38 at 2). That motion, however, is inadmissible.

to that promise."). NAMB's motion concedes it "was not a party to the Separation Agreement" (Doc. 264 at 13 n. 6), but fails to acknowledge this feature of Maryland law.

Here, discovery made clear that NAMB had no role in, or knowledge about, the Separation Agreement when it was negotiated and executed. NAMB did not even see a copy of the Agreement until after this lawsuit was filed, and there is no evidence that the parties intended for the Agreement to benefit NAMB. To the contrary, the undisputed evidence shows that Dr. McRaney intended to preserve his claims against NAMB when he signed the Separation Agreement. [Doc. 267 at ___].[9] Under these facts, Maryland law does not permit NAMB to enforce the Separation Agreement.

## III. There Are Triable Issues With Respect to Each of Dr. McRaney's Claims

NAMB contends there are no "triable issues" with respect to any of the six causes of action in Plaintiff's Supplemental Pleading (Doc. 191). *See* Doc. 264 at 13-25. NAMB is incorrect. The record as a whole demonstrates there are genuinely disputed material facts which preclude the entry of summary judgment, and there is sufficient evidence for a jury to return a verdict in favor of Plaintiff. Moreover, as explained below, there are grounds for a jury to disbelieve key NAMB witnesses. When deciding a summary judgment motion a court "may not presume" the jury would

---

[9] *Brethren Mutual Insurance Co. v. Buckley*, 437 Md. 332 (2014), lends no support to NAMB. *See* Doc. 264 at 13 n. 6. There, the court said the release "must be read with an eye towards the parties' overall intent," and rejected the argument for release of the non-party. *Id*. at 349. Here, the *only* evidence of the parties' intent shows Dr. McRaney intended to preserve his claims against NAMB when he signed the Separation Agreement. Doc. 52-1 (David de Armas Affidavit). NAMB contends it would "make no sense" for BCMD to "allow" "claims to be brought against NAMB" (Doc. 164 at 11 n. 5), but NAMB's self-serving supposition is not evidence. And when it comes to evidence there is none showing what BCMD intended by including the term "supporting organization," in contrast with the evidence about Dr. McRaney's intentions and the understanding of Dr. McRaney and his counsel. Doc. 52-1. Moreover, NAMB overlooks the obvious point it would have made no sense for Dr. McRaney to release his claims against NAMB in order to obtain a few months of severance benefits from BCMD.

find the movant's witnesses credible, *Cypress-Fairbanks*, 53 F.4th at 345, and the entry of summary judgment "is not appropriate" when there are questions about the credibility of key witnesses. *Deville*, 567 F.3d at 165. Instead, "at summary judgment, credibility calls go to the plaintiff." *Rushing v. Mississippi Department of Child Protection Services*, 2022 WL 873835 at *5 (5th Cir. 2022).

### A.     NAMB's Choice of Law Errors

NAMB is correct that a federal court with diversity jurisdiction over state law claims applies the choice of law test of the forum state when deciding which State's law to apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). However, NAMB seemingly contends that Maryland law applies to *all* of Plaintiff's causes of action. Doc. 264 at 13 n.7. But "courts are to undertake a separate choice-of-law analysis for each claim." *Viridis Corp. v. TCA Global Credit Master Fund, LP*, 721 Fed. App'x 865, 875 n.11 (11th Cir. 2018); *see also Mallek v. Allstate Life Ins. Co.*, 581 Fed. App'x 243, 244 (4th Cir. 2014) (remanding for "a choice of law assessment for each of [Plaintiff's] claims"); *Price v. Litton Systems, Inc.*, 784 F.2d 600, 603, 606 (5th Cir. 1986) (claim-specific choice of law analysis).

Applying Mississippi's choice of law test to each Plaintiff's six causes of action, it is obvious that neither Maryland (nor Mississippi law, which NAMB address in the alternative) apply to Plaintiff's Counts 4, 5 and 6, which concern NAMB's conduct and injuries *after* Dr. McRaney was terminated by BCMD.

Mississippi has adopted the "most significant relationship test" from the Restatement (Second) of Conflict of Laws (1971). *Mitchell v. Craft*, 211 So. 2d 509 (Miss. 1968). Under that test, for tort claims, relevant factors include "the place where the injury occurred" and "the domicile . . . of the parties." *Williams v. Liberty Mut. Ins. Co*., 741 F.3d 617, 622 (5th Cir. 2014).

17

While Dr. McRaney worked for BCMD, he and his wife maintained a home in Florida, where they lived before taking the job with BCMD. Sandy McRaney Tr. 185:18-25. They moved back to Florida almost immediately after the termination. *Id.* at 192:25-193:9. Dr. McRaney resided in Florida during the entire period he has suffered post-termination injuries as a result of NAMB's misconduct. Moreover, some of the specific acts alleged in the Supplemental Pleading occurred in Florida. Doc. 191 at 6-8. Thus, Florida law should apply to Counts 4, 5 and 6.[10]

### B. Genuinely Disputed Material Facts Preclude Summary Judgment With Respect to Plaintiff's Six Causes of Action

The record as a whole demonstrates there are genuinely disputed material facts which preclude the entry of summary judgment, and there is sufficient evidence for a jury to return a verdict in favor of Plaintiff.

*     *     *     *

NAMB disparaged Plaintiff with the serious assertion to his employer, BCMD, that Plaintiff violated a civil legal agreement (the "Strategic Partnership Agreement" or the "Agreement") between BCMD and NAMB. In a December 2, 2014 letter, NAMB told BCMD it was terminating its Agreement with BCMD, falsely asserting that Plaintiff had: engaged in "serious and persistent disregard of the Strategic Partnership Agreement between BCMD and NAMB [which] resulted in breach of the Agreement"; that Plaintiff's "multiple failures . . . to abide by the Agreement" led NAMB to terminate the Agreement and stop providing funds to BCMD; and that Plaintiff had "willfully and repeatedly ignor[ed] the Strategic Partnership Agreement." Doc. 263-11.

After sending the December 2, 2014 letter, NAMB continued to disparage Dr. McRaney,

---

[10] Maryland has no meaningful relationship to the post-termination conduct or injuries. Plaintiff does not contest the application of Maryland law to Counts 1, 2 or 3.

making false accusations of misconduct directly to BCMD leadership, including members of BCMD's Board. *See* NAMB 6772 (February 2015: Ezell to John Manry); NAMB 6756-58 (February 2015: Ezell to Thomas Winborn).

NAMB disseminated its disparagement and falsehoods about Plaintiff beyond BCMD, as well. For instance, NAMB personnel contended that Plaintiff lied, and that he "almost single-handedly ruined" the BCMD. NAMB 7711.

After months of disparagement and falsehoods by NAMB, on June 8, 2015, BCMD's General Mission Board voted to terminate Plaintiff's employment with BCMD—effectively firing him.

At the time Plaintiff was terminated by BCMD, and at the time the Separation Agreement between Plaintiff and NAMB was executed, NAMB's notice of termination of its relationship with BCMD remained in effect. Davis Tr. 268:14-269:8.

Soon after Plaintiff was terminated by BCMD, NAMB rescinded the December 2, 2014 termination letter and restored its relationship with BCMD. In fact, one day after Plaintiff was terminated by BCMD, on June 9, 2015, Steve Davis—NAMB's Northeast Regional Vice President in 2015—sent an email to NAMB President Ezell noting that he had "refigured the 100% plan for MD/DE based on resignation of Will McRaney, and moving forward." NAMB 7230. After BCMD terminated Plaintiff, NAMB rewarded BCMD by enhancing NAMB's financial contributions to BCMD beyond the levels during or prior to Plaintiff's tenure at BCMD. NAMB 7200.

NAMB asserts Dr. McRaney was terminated by BCMD for reasons having nothing to do with NAMB's conduct. Doc. 264 at 14-15. That is a dubious claim when considering the record as a whole. However, for purposes of summary judgment, what matters is that claim is the subject

19

of a genuine factual dispute. Two witnesses have provided sworn testimony contradicting NAMB's account, and supporting Dr. McRaney's allegation that his termination was significantly influenced by NAMB's financial threats and inducements. *See* Declaration of Clint Scott at ¶ 5) (reporting firsthand on a meeting with BCMD leaders, during which it was admitted that "Kevin Ezell and the withholding of funds was a significant factor for Will McRaney's termination"); Declaration of Steve Wolverton at ¶ 8-10) ("Dr. [Bill] Warren stated that Dr. Ezell had convinced him that NAMB was going to withhold funding from BCMD for as long as Dr. McRaney remained Executive Director. Dr. Warren said that he had relayed this information to BCMD's General Mission Board and that the organization would lose funding, and thus resources and staff, if Dr. McRaney remained in his position. After hearing this, the Board voted to terminate Dr. McRaney."); NAMB 7638 (Wolverton: "[Bill Warren told me that he did not feel he could risk losing the funding" from NAMB "so he did what he felt like he had to do"); *see also* Doc. 232-2 (Barker Declaration ¶ 12) ("From personal experience and knowledge, I know that Kevin Ezell has used NAMB's funding and resources to control state conventions."); Barker Tr. 35:20) (with Ezell, "[i]t was his way or the highway").

NAMB seizes upon statements by Bill Warren suggesting other reasons for Dr. McRaney termination. While those reek of pretext, even Mr. Warren acknowledged in 2016 that he was "convinced" BCMD would lose "NAMB funds if Will stayed in his position," NAMB 7667, and that Mr. Wolverton "may well be right" about his recollection of their conversations. Doc. 263-4 (Warren Tr. 74:18-75:14).

There is also evidence that NAMB and BMCD were communicating and coordinating in advance about Dr. McRaney's dismissal. For example, a June 1, 2016 email from NAMB Vice President Steve Davis to NAMB President Kevin Ezell says about scheduling a meeting with Dr.

McRaney that Davis was "trying to hold off **as asked by Bill Warren**, but also **not wanting to tip Will off that something else is causing the delay**." NAMB 7160 (emphasis added). The "something else" was Dr. McRaney's removal, as the remainder of the email makes clear: "[I]f he is removed, we can change the funding back to our original proposal." *Id*. Later that afternoon, in the same email chain about restoring funding to BCMD after Dr. McRaney is removed, Ezell wrote to Davis: "We want to be cautious **until we know who the new guy will be**." NAMB 7172-76 (emphasis added). *See also* Barker Tr. 75:25-76:9 (Former NAMB employee Barker "learned from the people within the Maryland/Delaware Convention" that "Kevin [Ezell], behind the scenes, manipulated it so" the BCMD Board dismissed Dr. McRaney because he "did not cooperate with Kevin in what Kevin wanted done.").

Once BCMD followed through by removing Dr. McRaney, an internal NAMB email to NAMB President Ezell, sent hours after McRaney was terminated, presented Ezell with the new BCMD funding plan which "represents the essence of our discussions for your review," reflecting that NAMB employees had been discussing and planning the enhancement of BCMD's funding following Dr. McRaney's forthcoming termination.

NAMB referred to its now-rescinded threat that it would sever relations with BCMD if it did not get its way as the "Maryland/Delaware disciplinal process." NAMB 5351.

Since Plaintiff's termination by BCMD, NAMB has engaged in additional tortious conduct, which has interfered with Plaintiff's prospective business relationships with third-parties, injured his professional and personal reputation, and caused emotional distress.

This conduct includes NAMB's disparagement of Plaintiff. For example, NAMB has told people outside of NAMB that Plaintiff lies, and that he is "delusional." WM04574.

NAMB also disparaged and harmed Plaintiff by taking the unprecedented step of posting

a photo of Plaintiff at the reception desk of NAMB's headquarters—first put up on or around February 5, 2016. *See* NAMB 5327; Wigginton Tr. 72:16-18. The purpose of posting the photo was to deny Dr. McRaney entry to the building, as the NAMB document memorializing the task explicitly stated. *See* NAMB 5237 ("no entry in building"); Davis Tr. 81:8) ("Kevin [Ezell] had told us that he posted – had posted a picture down there at the receptionist to make sure that if he came to the building, not to let him in"); *see also* Barker Tr. 117:6-9 (former NAMB employee, testifying the photo was posted because Dr. McRaney "was not welcome in the building").

This no-entry-photo, in the lobby of NAMB's building, was visible to NAMB personnel and visitors,[11] and kept up for at least many months in 2016, and perhaps longer.[12] The no-entry-photo of Plaintiff communicated that Plaintiff was not to be trusted and an enemy of NAMB. The no-entry-photo of Plaintiff was posted by NAMB at the direction of its President, Kevin Ezell. *See* Carlos Ferrer Tr. 87:4-6.

Numerous NAMB witnesses confirmed that Dr. McRaney alone received the treatment of having his photograph posted at NAMB's reception desk for the purpose of denying him entry. *See* Ferrer Tr. 90:7-22 (never seen "a similar photograph of anyone else posted in the same or similar position); Wigginton Tr. 60:8-13 (unable to recall any other circumstance where "a photograph of an individual was put up at the reception desk at NAMB's headquarters for the

---

[11]  The desk was a circular shape, with people "able to circulate freely 360 degrees around" it. Wigginton Tr. 25:1-6; Davis Tr. 83:13-16 ("people could walk freely around the entire 360-degree perimeter of the desk"); *see also* Ferrer Tr. 84:14-15 (photo could be "if somebody came from behind [the administrative assistant], which is what I did"); Davis Tr. 80:16-24) (saw photo "just passing by the reception desk, but not intentionally going to the desk"); Wheeler Declaration (non-NAMB employee saw photo will attending a meeting at NAMB). Photographs of the desk are included among the exhibits to the June 1, 2023 Declaration of Scott E. Gant. NAMB falsely claims the photo was "out of public view." Doc. 264 at 21.

[12]  During discovery NAMB was unable to determine when the photo was removed. One witness stated that he saw the photograph still posted in August 2016. *See* Wheeler Declaration.

purpose of ensuring that the person did not enter in NAMB's headquarters or offices"); Barker Tr. 117:13-21) (17-year employee testifying that Dr. McRaney was the only example of someone whose photo was "posted at the NAMB reception or security desk for the purpose of keeping out someone or making sure that they were not welcome"); de Armas Tr. 104:21-25; Wood Tr. 112:9-19. The posting of photo was discussed at NAMB Board meeting, but NAMB refused to let the witness testify about the Board's discussion of the photo. *See* Wood Tr. 114:2-118:14. Former NAMB Executive Vice President, Carlos Ferrer, testified it is not unreasonable for Dr. McRaney to believe that NAMB's posting of his photograph at the NAMB reception desk injured his reputation. *See* Ferrer Tr. 99:23-100:12.

NAMB suggests in its motion that the photo was posted based on a legitimate concern that Dr. McRaney posed a security threat. That claim is nonsense (and itself defamatory)—but at the very least the subject of a genuine factual dispute. No NAMB witnesses was able to identify any facts supporting the notion that Dr. McRaney posed a danger. *See*, *e.g.*, de Armas Tr. 41:16-19 (Never threatened anyone with physical harm in presence); Wood Tr. 121:6-17 (not aware of physical threats against anyone at NAMB); Wood Tr. 122:9-16 (not aware of any reason for anyone to fear for their safety having Dr. McRaney at NAMB's headquarters); Davis Tr. 84:23-86:4) (no threats or fear for physical safety). And the NAMB employee responsible for posting the photo testified at his deposition that the photo was *not* posted "out of concern about security or a risk of violence posed by Dr. McRaney." Wigginton Tr. 76:25-77:4. Only Kevin Ezell suggested he "felt that it was a possibility" that Dr. McRaney might poses physical threat, but he was unable at his deposition to identify "an actual threat that Dr. McRaney made to [his] physical well-being." Ezell Tr. 97:10-98:2.

NAMB's conduct after Plaintiff's termination by BCMD has had the purpose and effect of

blackballing or blacklisting him, impeding his ability to earn a living after his termination by BCMD—resulting in a significant loss of income. Doc. 134-1 (economist's estimate of actual economic harm to Dr. McRaney).

For example, according to a sworn affidavit, in the summer of 2015 Scott Thomas—the President of Safari Christian Business Alliance (SCBA)—was looking to hire an "expert in the field of ministry who could work to advance the mission and objectives of SCBA." Thomas discussed the possibility of hiring Plaintiff for this role with SCBA's Executive Director and they both "agreed that [Plaintiff] was the strongest person we knew for the job and possessed the experience and attributes SCBA needed in an executive leader of SCBA earning multiple six figures and up." However, Thomas noted that "the perception portrayed by NAMB among SBC leaders was that Dr. McRaney was a trouble maker with NAMB as the Executive Director of Maryland/Delaware Baptist Convention." As a result, Thomas testified in an affidavit that the SCBA "regrettably determined that in spite of our personal relationship with and professional support for Dr. McRaney, we could not hire Dr. McRaney because SCBA could not afford the perception problems and potential hurt to SCBA with NAMB and SBC leaders." Doc. 263-31.

In a separate example, about a year after McRaney's forced departure from BCMD, Jimmy Crosby—President of Jacksonville Baptist Theological Seminary (JBTS)—failed to hire Plaintiff for similar reasons. In a sworn affidavit, Crosby testified that "[a]fter meeting Dr. McRaney [in October 2016] and talking with more trusted friends, I was impressed with his academic and ministry credentials." Crosby noted that "[a]s the President of JBTS, I am always looking to upgrade the quality of teaching and training we seek to provide to our students, and quickly began considering ways to incorporate Dr. McRaney into the life of JBTS in several leadership roles." However, "[a]fter learning from various SBC leaders in Florida that NAMB leadership was not

pleased with Dr. McRaney," Crosby "made the decision in late 2016 that I could at that time not hire Dr. McRaney in fear of damage to JBTS and backlash from some SBC leaders." Doc. 263-30.

In addition to being unable to find a full-time job for years after his termination by BCMD, NAMB's conduct also impeded Plaintiff's opportunities as a speaker and presenter at conferences and meetings—opportunities which enhanced Plaintiff's professional profile, gave him forums to promote, and sometimes sell, his books and publications, and were a source of personal enjoyment and satisfaction. For example, Plaintiff was scheduled to speak at a large event in Louisville, Winston County, Mississippi on October 23, 2016, but was uninvited after interference by a member of NAMB's Board of Trustees. Specifically, Plaintiff was uninvited to speak at the event after Rob Paul—who had extended the invitation to Plaintiff—had a phone call with then-NAMB Board of Trustees member, Danny Wood, during which Wood told Paul that it "makes sense" for Paul to uninvite Plaintiff. Wood made this statement to Paul approximately one month after Wood declared in an email to NAMB's President, Kevin Ezell, that Wood was ready to "go to battle" with Ezell against Plaintiff. Wood-000001. Dr. McRaney later learned that Paul had replaced him with Ed Litton (who became the SBC President), the husband of NAMB employee Kathy Ferguson Litton. Paul Tr. 135:2-20.

In a similar incident, Plaintiff was invited to speak at a November 2016 conference in Clearwater, Florida. After learning of the invitation to Plaintiff, NAMB President Ezell launched an effort to get Plaintiff removed as a speaker. Event organizer, Joel Breidenbaugh, President of the Florida Baptist Convention Pastor's Conference, was informed of Ezell's anger, but bravely resisted NAMB's pressure, and kept Plaintiff as a speaker. The incident, however, further damaged Plaintiff's professional and personal reputation, and illustrates NAMB's post-termination

tortious conduct directed at Plaintiff.  *See* Breidenbaugh Declaration.

NAMB has also deployed other arms of the SBC in its campaign against Plaintiff.  For instance, the SBC's Baptist Press, told a prominent journalist who had previously worked as a freelancer, that she might get future work if she "would stop writing about Will McRaney."  Doc. 235-1.

As part of its post-complaint-filing misconduct, NAMB has made numerous out-of-court misrepresentations about Plaintiff's positions and purported demands with respect to this litigation.  These misrepresentations have also disparaged Plaintiff, further damaging his professional standing and status, and causing him emotional distress.

For example, in out-of-court public statements, NAMB has:

    i. Falsely claimed that Plaintiff "resigned" from BCMD despite knowing that BCMD's Board voted to terminate his employment; (NAMB 7236)

    ii. Falsely disparaged Plaintiff, portraying him as unreasonable, greedy, and seeking to unfairly *enrich himself*, by disclosing confidential settlement negotiations with Plaintiff and asserting Plaintiff "demand[ed] that NAMB pay him more than $7.7 million" (NAMB 6408); and

    iii. Falsely suggested that Plaintiff has refused to engage with NAMB in "biblical reconciliation"—a falsehood NAMB knows is injurious to Plaintiff's reputation.

In addition, as detailed above, NAMB also engaged in egregious misconduct by its intentional and strategic silence before the Fifth Circuit concerning the ERLC Amicus Brief.

### 1.  Tortious Interference

NAMB claims there is no evidence of a causal relationship between NAMB's actions and any purported interference.  The foregoing recitation of facts shows otherwise.

Other evidence of NAMB's interference in Plaintiff's relationship with BCMD includes:

- When Kevin Ezell falsely told BCMD's Bill Warren in December 2104 that Plaintiff had "disregard for NAMB staff," "disregarded NAMB processes," and added percentages fees to planters.  *See*, *e.g.*, WM00831a.

- Sending a document to BCMD in February 2015 which falsely asserted Plaintiff "[f]ail[ed] to follow a Partnership Process in Hiring Jointly Funded Missionaries," had "[d]isregard for National Agreements," a "complete lack of cooperation with NAMB's local initiatives," and "disregard for NAMB staff." *See* NAMB 6744-45; *see*, *e.g.*, NAMB 6756-58; 6772. NAMB repeated these false allegations to BCMD throughout 2015, leading up to Plaintiff's termination.

- NAMB "put[ting] a moratorium on conversations" with Plaintiff, in or around February 2015, impeding Plaintiff's ability to perform his job. *See* NAMB 6752.

- Kevin Ezell falsely telling Bill Warren, during February 2015, that Plaintiff "hired someone without any prior notification to NAMB" and "a few months later did it again." *See* NAMB 6777.

NAMB also claims there is no evidence its conduct impeded Dr. McRaney's ability to find work after his termination by BCMD. Again, the record as a whole demonstrates there are genuinely disputed material facts which preclude the entry of summary judgment, and there is sufficient evidence for a jury to find in favor on Dr. McRaney on Count 4.

While under oath during depositions in this case, NAMB witness described Dr. McRaney as: "intelligent" [13]; "hard working"[14]; "talented"[15]; having "great vision"[16]; having "courage"[17]; "not afraid to tackle hard issues"[18]; "a man of integrity"[19]; "and a man of truth."[20]

Yet, by the time NAMB had Dr. McRaney ousted from BCMD, he was "untouchable." Everyone knew hiring Dr. McRaney would incur the wrath of Kevin Ezell and NAMB. As

---

[13] de Armas Tr. 38:17-19.

[14] Doc. 263-4 (Warren Tr. 352:1-8).

[15] Paul Tr. 93: 19-22.

[16] Doc. 263-4 (Warren Tr. 224:6-9).

[17] Doc. 263-4 (Warren Tr. 224:6-9).

[18] Doc. 263-4 (Warren Tr. 385:13-386:3).

[19] Ferrer Tr. 44:15-17.

[20] Doc. 263-4 (Warren Tr. 385:13-386:3).

described in the affidavits from Scott Thomas and Jimmy Crosby show, that was not a risk they were willing to take. *See* Doc. 263-30, 263-31.

Post-termination, NAMB continued its campaign to smear Dr. McRaney. In addition to repeating its false accusations about his conduct and performance while with BCMD, NAMB employed new methods of interference with Dr. McRaney's ability to find employment, including (as described more fully above):

- Impeding opportunities as a speaker and presenter at conferences

- Deploying other arms of the SBC in its campaign against Plaintiff, such as the SBC's Baptist Press, telling a prominent journalist who had previously worked as a freelancer, that she might get future work if she "would stop writing about Will McRaney."

- Making out-of-court misrepresentations about Plaintiff's positions and purported demands with respect to this litigation, including falsely claiming that Plaintiff "resigned" from BCMD despite knowing that BCMD's Board voted to terminate his employment; portraying him as unreasonable, greedy, and seeking to unfairly *enrich himself*, by disclosing confidential settlement negotiations with Plaintiff and asserting Plaintiff "demand[ed] that NAMB pay him more than $7.7 million"; and falsely suggested that Plaintiff has refused to engage with NAMB in "biblical reconciliation"—a falsehood NAMB knows is injurious to Plaintiff's reputation. NAMB knew this assault on Dr. McRaney's character would impede his ability to earn a living.[21]

As detailed in his Interrogatory responses, Dr. McRaney made considerable efforts to find work in his field, to no avail. *See* Second Supplemental Response to Interrogatory No. 16. As a result, after years of diminished income, he started his own organization. His actual economic harm is estimated in the expert report of Dr. Sharp. *See* Doc. 134; *see also* Barker Dep. Tr. 37:1- (Ezell "has been out to destroy Dr. McRaney"); Barker Dep. Tr. 37:14-20 (Ezell has "blackballed" Dr. McRaney).

---

[21] *See*, *e.g.*, Wood Dep. Tr. Exh. 15; NAMB 009345; NAMB 009362; NAMB 009056; NAMB 009362; NAMB 009348; NAMB 009345; NAMB 008003.

### 2. Defamation

NAMB contends some of its alleged defamatory statements are not actionable because it believes Mississippi's limitations period applies. Doc. 264 at 18. However, NAMB's argument rests on legal errors. As previously explained, Florida law governs Count 5. And Florida law treats limitations periods as substantive. *Fulton Cnty. Adm'r v. Sullivan*, 753 So.2d 549, 553 (Fla. 1999). Thus, Florida's statute of limitations governing defamation applies to Count 5—and that period is two years. Fla. Stat. §95.11(4)(h)(2023). As for Count 2, Maryland law applies to that cause of action. And while Maryland has a one-year limitations period for defamation, "each separate defamatory statement itself constitutes a separate and distinct cause of action." *Long v. Welch & Rushe, Inc.*, 28 F. Supp. 3d 446, 457 (D. Md. 2014). Moreover, if the defamatory statement is repeated by a third party, an author can be liable for the republication of a prior defamatory statement if the republication of the statement by a third-party is "the natural and probable consequence" of his original act of publishing the defamatory statement. *Shepard v. Nabb*, 84 Md. App. 687, 689-701 (Md. Ct. Spec. App. 1990). NAMB has not established it is legally entitled to summary judgment for either Count 2 or Count 5 on the basis of a time bar.

NAMB next contends it is immunized from defamation claims on the basis of a "qualified 'common interest' privilege" under Maryland law. Again, NAMB is wrong about the source of law for Count 5: it is Florida law. As for the application of this purported "qualified privilege" to Count 2, NAMB acknowledges it only applies if made in "good faith." Doc. 264 at 19. Here, Dr. McRaney's contends the facts demonstrate the absence of good faith, but there is at least a genuine factual dispute, and summary judgment may not be granted based on a presumption of good faith.

NAMB next argues there is no evidence that its alleged defamatory statements are false. Again, the facts discussed here and in the accompanying filings show otherwise. And, again, there

is at least a genuine factual dispute about the falsity of NAMB's allegedly defamatory statements. Notably, BCMD conducted "a careful and thorough exploration of [NAMB's claims against [Dr. McRaney] in regards to the [SPA]" and told NAMB "we are confident that our Executive Director and our Network have not breached the agreement." BCMD went on to add that NAMB's "false accusations" against Dr. McRaney were "unfounded and highly inflammatory." NAMB 010664. Moreover, in February 2015, BCMD's outside law firm (which represents both it and Mr. Warren in connection with this litigation) conducted a review of NAMB's allegation that Dr. McRaney had breached the SPA, and concluded there had been no breach, "either technically or of the spirit of the agreement." Doc. 263-4 (Warren Tr. 274:13-277:18). The same month, BCMD's General Mission Board unanimously voted a resolution of support of Dr. McRaney. Doc. 263-12. And, to state the obvious, the false accusation that Dr. McRaney breached the SPA is a serious and damaging accusation. Steve Davis, formerly a NAMB Vice President responsible for relationships with BCMD and other State Conventions, agreed at his deposition that breaking agreements with business partners is an "undesirable characteristic for a candidate to work in an organization." Davis Tr. 281:3-11.

NAMB's then argues that a series of disparaging statements it does not deny making are immunized as "opinions" or "hyperbole." But NAMB has disparaged Dr. McRaney's with damaging, false, *assertions of fact*.

For example, NAMB tries to pass off as harmless its calling Dr. McRaney a liar. But both common sense and the testimony of NAMB witnesses demonstrates the potential harm of such an accusation. Former NAMB Executive Vice President and Chief Financial Officer, Carlos Ferrer— acknowledged at his deposition that calling someone a liar is a serious accusation, which can harm someone's reputation. *See* Ferrer Tr. 48:6-15. Former NAMB Board of Trustees Chair, Danny de

30

Armas, testified that being told by a trusted source that someone lied or was liar would adversely impact his view of the accused's character. De Armas Tr. 210:22-211:2.[22] NAMB's Steve Davis testified he would not hire a job candidate if told by a colleague that the candidate had lied. Davis Tr. 275:25-276:16; *see also* Tr. 280:3-20. Mr. Davis also testified he would not hire a candidate described as "delusional" or a "nutcase" by a trusted source (Tr. 276:17-277:17)—terms Mr. Davis's boss, Kevin Ezell, used to describe Dr. McRaney.

NAMB personnel also defamed Plaintiff, describing him as a threat to the safety or physical well-being of Kevin Ezell or others at NAMB. *See*, *e.g.*, NAMB 008237-28. Chairman de Armas acknowledged at his deposition that accusing someone of being a risk of physical threat to others is a serious accusation, which could harm the reputation of the person being accused. De Armas Tr. 54:15-19, 55:7-20.

Other defamatory statements by NAMB include:

- Disseminating a document which disparaged Plaintiff, including asserting his "[f]ailure to follow a Partnership Process in Hiring Jointly Funded Missionaries," "[d]isregard for National Agreements," "complete lack of cooperation with NAMB's local initiatives," and "disregard for NAMB staff." *See* NAMB 6744-45; *see*, *e.g.*, NAMB 6756-58; 6772.

- Suggesting Plaintiff is greedy and/or refused to engage in discussions with NAMB to redress the impact of NAMB's conduct through biblical reconciliation. *See*, *e.g.*, Wood Dep. Tr. Exh. 15; NAMB 009345; NAMB 009362; NAMB 009056; NAMB 009362; NAMB 009348; NAMB 009345; NAMB 008003.

- Asserting that all of Plaintiff's assertions were untrue and made up. *See*, *e.g.*, NAMB 009188.

- Asserting that Plaintiff's videos posted online were "90% bull," meaning false. *See*, *e.g.*, NAMB 009181.

---

[22] Other documents show NAMB defaming Dr. McRaney by asserting that he told lies. *See*, *e.g.*, NAMB 008240; NAMB 008242; NAMB 008685; NAMB 009459.

- Telling BCMD's Bill Warren that Plaintiff had "disregard for NAMB staff," "disregarded NAMB processes," and added percentages fees to planters. *See*, *e.g.*, WM00831a.

- Asserting that Plaintiff "is a liar" and "has no integrity." *See*, *e.g.*, NAMB 5381.

- Telling people outside of NAMB that Plaintiff is "delusional." WM04574.

- Kevin Ezell telling another SBC leader that Plaintiff is a "nutcase" in a February 2016 email. *See* ERLC 00015.

There is sufficient evidence for a jury to return a verdict in favor of Plaintiff with respect to his defamation claims.

### 3. Infliction of Emotional Distress

With respect to Plaintiff's claim for infliction of emotional distress, NAMB again mistakenly concludes Maryland law applies to both. Instead, Count 6 is governed by Florida law.

There is sufficient evidence for a jury to return a verdict in favor of Plaintiff with respect to his defamation claims—under both Maryland law (Count 3), and Florida law (Count 6).

NAMB claims Dr. McRaney cannot prove the necessary "intent." Doc. 264 at 23. But there is ample evidence in the record from which a jury could conclude that NAMB's misconduct was willful and deliberate.

NAMB also claims Dr. McRaney cannot show its conduct was "outrageous." Doc. 264 at 24. But NAMB's argument focuses on NAMB's defamatory statements, ignoring the full body of evidence about NAMB's behavior. A properly instructed jury should be permitted to look at all of the evidence, and decide if NAMB's conduct was outrageous.

Next, NAMB disclaims a causal connection between its conduct and Dr. McRaney's emotional distress. But the record contains evidence of such a causal connection: Dr. McRaney submitted a verified interrogatory response, testifying that he "suffered from stress, anxiety, difficulty sleeping, and weight gain as result of Defendant's conduct, and consulted primary care

medical professionals and a cardiologist in connection with those conditions." Doc. 263-40, at 22. NAMB adduced no evidence in discovery contradicting that testimony, and elected not to ask about it during Dr. McRaney's deposition.

Finally, NAMB appears to argue that Dr. McRaney's emotional distress is not severe enough to be actionable. But the only "evidence" NAMB proffers is the observation that Dr. McRaney is "still . . . the lead pastor of a church." NAMB, however, cites no case establishing that an employed person cannot sustain a claim for infliction of emotional distress. Dr. McRaney submitted a verified interrogatory response in which he testified that, he "suffered from stress, anxiety, difficulty sleeping, and weight gain as result of Defendant's conduct, and consulted primary care medical professionals and a cardiologist in connection with those conditions." If asked at his deposition, Dr. McRaney would have elaborated on that response, with more information about his medical history, and counseling sought to deal with the emotional distress caused by NAMB—information that will be presented to the jury at trial. NAMB elected to not ask Dr. McRaney about those issues at his deposition, and to not serve additional or more focused discovery. NAMB is not entitled to summary judgment because it did not seek more information when it had the opportunity.

## C.       There Are Grounds for the Jury to Doubt the Credibility of Key NAMB Witnesses

At summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . [and] [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Moreover, when deciding a summary judgment motion, a court "may not presume" the jury would find the movant's witnesses credible, *Cypress-Fairbanks*, 53 F.4th at 345, and the entry of summary judgment "is

not appropriate" when there are questions about the credibility of key witnesses. *Deville*, 567 F.3d at 165.

There are grounds for the jury to doubt the credibility of key NAMB witnesses. For example, former NAMB employee, Bill Barker, who worked for NAMB for 17 years, and with Kevin Ezell, testified: "It seemed to be a pattern in Kevin's life of saying something, and then if he didn't want it out, to get it deleted because there's deniability when no one has a record of what's been said." Barker Dep. Tr. 47:22-48:1; *see also* Barker Declaration. Barker also testified: "It was also my firsthand experience of interactions with Mr. Ezell that, on occasions, he made statements and accusations that were false and bullying in nature." Doc. 232-2.

The conduct of NAMB itself in this case raises questions about its credibility. As discussed above, NAMB has demonstrated a troubling lack of candor with the courts. The most prominent example of being the submission of the ERLC Amicus Brief to the Fifth Circuit which contained inaccurate and material misstatements—misstatements NAMB let stand until after rehearing was decided. NAMB compounded that misconduct with its failure to disclose to the Fifth Circuit its relationship to the ERLC.

Another example is the admission buried in NAMB's emails that its claim to be a supporting organization of BCMD was a defense conjured up for this case alone. NAMB's Executive Vice President of Public Relations, Mike Ebert, acknowledged about that defense: it is "limited to the facts of ***this specific case*** . . . ." Doc. 265-6 (Ebert Dep. Exhs. 30, 31) (emphasis added).

"[A]t summary judgment, credibility calls go to the plaintiff." *Rushing*, 2022 WL 873835 at *5. This is yet another reason why NAMB's motion for summary judgment should be denied.

34

## **CONCLUSION**

For the foregoing reasons, NAMB's motion for summary judgment should be denied.

June 1, 2023                                          Respectfully Submitted,

*William Harvey Barton*

William Harvey Barton, II
BARTON LAW FIRM, PLLC
3007 Magnolia Street
Pascagoula, MS 39567
Phone: (228) 769-2070
harvey@wbartonlaw.com

*Scott E. Gant*

Scott E. Gant
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Phone: (202) 237-2727
sgant@bsfllp.com